UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK                FOR PUBLICATION

In re:

          MF GLOBAL INC.,          Case No. 11-2790 (MG) SIPA

                            Debtor.

**MEMORANDUM OPINION GRANTING TRUSTEE'S MOTION TO APPROVE
SECTION 363 PURCHASE AGREEMENT IN FURTHERANCE OF COURT-ORDERED
BULK TRANSFERS**

*A P P E A R A N C E S:*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York 10004
By:    James B. Kobak, Esq.
         Jeffrey S. Margolin, Esq.
         Josiah S. Trager, Esq.
         Dina R. Hoffer, Esq.

PAUL HAMANN
*Pro Se*
511 Beverly
Lake Forest, Illinois 60045

FOLEY & LARDNER LLP
*Counsel for Alexander Coxe*
90 Park Avenue
New York, New York 10016
By:    Richard J. Bernard
         Geoffrey S. Goodman
         Alissa M. Nann

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

　　　　Before the Court is the *Trustee's Motion To Approve Section 363 Purchase Agreement in Furtherance of Court-Ordered Bulk Transfers* (the "Motion"). (ECF Doc. #1046.) In support of the Motion, the Trustee submitted the *Declaration of Richard M. Siegel* ("Siegel Decl."). (ECF Doc. #1046, Exhibit 2). Paul Hamann ("Hamann") filed an objection to the Motion (the "Hamann Objection"). (ECF Doc. #1147.) Also, Alexander Coxe ("Coxe") filed a response to the Motion (the "Coxe Response"). (ECF Doc. #1155.) In response, the Trustee filed an *Omnibus Reply to Responses to Motion To Approve Section 363 Purchase Agreement in Furtherance of Court-Ordered Bulk Transfers* (the "Omnibus Reply"). (ECF Doc. #1164.) The Court heard oral argument on the Motion on April 2, 2012. The Coxe Response was resolved by the Trustee's agreement to include additional clarifying language in the proposed order. For the reasons explained below, the Hamann Objection is overruled and the Court grants the Motion.

**BACKGROUND**

　　　　The background of this case has already been discussed in numerous opinions of this Court and will not be repeated here. On November 2, 2011, the Court approved the Trustee's initial request to complete a bulk transfer of customer accounts containing open U.S. commodity contracts and a percentage of the associated margining collateral to futures commissions merchants ("FCMs"), other than MFGI. (ECF Doc. #14.) On November 17, 2011, the Court approved a second partial transfer of certain customers' cash-only accounts. (ECF Doc. #316) ("Second Bulk Transfer Order"). On December 9, 2011, the Court approved a third bulk transfer of certain property of commodities futures customers, (ECF Doc. #717), and also a bulk transfer of certain property of securities customers, (ECF Doc. #718) (together, the "Third Bulk Transfer Order").

As part of the Third Bulk Transfer Order, the Court authorized the Trustee to distribute non-liquid assets, such as warehouse receipts, precious metal certificates, shipping certificates, and other certificates of title for commodities held by MFGI for its customers (the "Physical Customer Property"). Those customers whose Physical Customer Property exceeded the *pro rata* share to which they were entitled either (i) posted deposits so that they could receive the excess value of the Physical Customer Property, or (ii) will receive the remainder of their distribution pursuant to the Third Bulk Transfer Order following the liquidation of their Physical Customer Property.

## DISCUSSION

Through the Motion, the Trustee seeks to complete implementation of the Court's Third Bulk Transfer Order by specifically authorizing the Trustee to liquidate the Physical Customer Property, consisting of precious metal warehouse receipts (the "Certificates"), remaining under his control. The Trustee, working with the Chicago Mercantile Exchange Group ("CME"), asserts that the most cost-effective method of converting the Physical Customer Property to cash is through a bulk sale of the Certificates to Jefferies Bache Financial Services, Inc. ("Jefferies") for 99% of the aggregate closing price for futures contracts on the precious metals underlying the Certificates for the next active trading month (the "Purchase Agreement"). The Trustee notes that there have been no other offers to acquire the Certificates through a bulk sale.

Pursuant to 17 C.F.R. §§ 190.02(f)(2) and 190.08(d), specifically identifiable property (including Physical Customer Property and the Certificates) must be liquidated if not returned to or transferred on behalf of the customer to whom it is identified. Under sections 105 and 363 of the Bankruptcy Code, 17 C.F.R. §§ 190.02(f)(2) and 190.08(d), and Rule 6004 of the Federal Rules of Bankruptcy Procedure, the Trustee seeks confirmation that the Third Bulk Transfer

3

Order and all of the Court's rulings pertaining to that Order gives the Trustee the authority to enter into the Purchase Agreement with Jefferies, dated March 12, 2012, attached as Exhibit 1 to the Motion.

### A. The Purchase Agreement

In relevant part, the Purchase Agreement provides as follows:

1. Upon closing, the Trustee will sell the Certificates to Jefferies in exchange for an aggregate amount in cash determined in accordance with the following purchase prices (listed in Exhibit B to the Purchase Agreement):

    a. The Purchase Price shall be calculated by adding the total price of all Certificates.
    b. The price for each Certificate shall be individually determined by multiplying the net weight of the precious metal underlying that Certificate by a per-ounce price which will be set at 99% of the futures market settlement price as of the Closing date for the applicable metal for the forward months listed below:
    (i)     Gold=April price
    (ii)    Silver=May price
    (iii)   Palladium=June price
    (iv)    Platinum=April price
    (v)     Copper=May price

2. Jefferies will reserve 1% of the futures market settlement price for its expenses associated with the bulk purchase of the Certificates. Because the 1% will be taken off the underlying commodities' price for a future month, which is generally higher than the current trading price, the 1% amounts to less than 1% off of the current prices for all Certificates.[1]

3. The sale of the Certificates to Jefferies shall be made free and clear of all liens, claims, charges, security interests, and other encumbrances, except for any created by Jefferies.

---

[1] "At current market prices, the sale of the Certificates to Jefferies will yield approximately $14,500,000 for MFGI's former commodities customers—a value that is over 99% of the aggregate current futures value of the precious metals underlying the Certificates at the time of Closing." Motion, ¶ 21.
[2] *See* 17 C.F.R. § 1.25; COMMODITIES FUTURES TRADING COMMISSION, Registration of Intermediaries, http://www.cftc.gov/IndustryOversight/Intermediaries/registration (last visited Apr. 4, 2012); COMMODITIES

4

The sale of the Certificates is dependent upon the Court's approval of the Transaction; if the Court denies the Motion, the Purchase Agreement will terminate automatically. Further, "the Purchase Agreement provides that if the Trustee, on behalf of MFGI, disposes of any Certificates prior to the Closing, only the remaining Certificates will be subject to the Purchase Agreement." Motion, ¶ 20. This means that if any customer still wishes to receive all or part of his or her *pro rata* distribution in the form of Physical Customer Property, he or she can presumably still do so by posting the 28% deposit prior to the closing date of the proposed Transaction without jeopardizing the Transaction.

### B.    Legal Standard for Section 363 Sales

Section 363 of the Bankruptcy Code provides that "a debtor, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."

Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee. *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Generally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction. *See In re Integrated Res., Inc.*, 147 B.R.

5

650, 656 (S.D.N.Y. 1992). Once a court determines that a sound business justification exists, the court must determine whether (i) the debtor has provided all interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

Additionally, section 363(f) allows a debtor to sell property of the estate "free and clear of any interest in such property of an entity other than the estate," if (1) applicable nonbankruptcy law allows, (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute, or (5) such entity could be compelled to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f)(1)-(5). Satisfaction of any of those requirements suffices to permit the sale of the property free and clear of liens and interests. *See In re Dura Automotive Sys., Inc.*, 2007 LEXIS 2764, at *264 (Bankr. D. Del. Aug. 15, 2007).

    C.    **The Arguments of the Parties**

        1.    **The Trustee's Position**

The Trustee states that he believes that the proposed Transaction reflects his sound business judgment and is in the best interests of the estate, former customers, and creditors. Motion, ¶ 13. The Trustee believes that "[t]he Transaction represents the best available opportunity for the Trustee to liquidate the remaining Physical Customer Property under his control in order to complete pro rata distributions to the Physical Property Customers in accordance with 17 C.F.R. §§ 190.02(f)(2) and 190.08(d), and the mandates of this Court's Third Bulk Transfer Order." *Id*. ¶ 21.

In accordance with the Third Bulk Transfer Order, the Trustee states that his professionals have reached out to every physical property customer individually and made

6

arrangements with that individual for *pro rata* distribution of property. *Id.* ¶ 17. Some customers chose to post a 28% deposit of the value of their property in order to receive their physical property; others chose to receive their *pro rata* distribution of their physical property partially or entirely in the form of cash, once some or all of their physical property has been liquidated by the Trustee. *Id.* In sum,

> [i]n light of the Trustee's mandate to liquidate the remaining Physical Customer Property pursuant to 17 C.F.R. §§ 190.02(f)(2) and 190.08(d) and this Court's Third Bulk Transfer Order, and the fact that all Customers have been given ample opportunity to receive part or all of their Physical Customer Property in satisfaction of their pro rata distribution, the Trustee does not believe that the Certificates are subject to any liens, claims, or encumbrances.

*Id.* ¶ 23.

The Trustee also states that his professionals, working with the CME, solicited opportunities to liquidate the remaining Physical Customer Property, but Jefferies presented the only meaningful offer to do so. *Id.* ¶¶ 17, 21. In light of that fact, the Trustee does not believe any higher or better offers exist. *Id.* ¶ 21; Siegel Decl. ¶¶ 5-6. The cash received in exchange for the transfer of the Physical Customer Property will be used to pay 72% *pro rata* distributions for those customers who opted to wait on liquidation of Physical Customer Property. Motion, ¶ 17. The Trustee reports that both the Commodity Futures Trading Commission ("CFTC") and the Securities Investor Protection Corporation ("SIPC") support the proposed Transaction, *id.* ¶ 18, and asserts that the proposed sale of the Certificates to Jefferies is the product of arm's length, good-faith negotiations between the Trustee and Jefferies, as each party was represented during the negotiations by counsel, *id.* ¶ 26.

7

### 2. The Hamann Objection

In his Objection, Hamann "contest[s] trustee's right to sell an asset titled to Paul Hamann, with no liens." Hamann Objection, The Motion, Point 2. Hamann argues that the Motion should not be applied to his Physical Customer Property, stating that he "does not believe that the Trustee can show that MF Global had clean and clear title to the warehouse receipts on October 20, 2011." *Id.*, Preliminary Statement, Point 17. In support of that assertion, Hamann "believes that the CME Group print screens, will show that the Customers of MF Global had clean titles, to all their warehouse receipts (Securities), with no liens." *Id.* at Point 18. Hamann also states that he "has cashed/cancelled checks showing that he paid, in full, for the Securities that the Trustee is planning on selling, with their motion," *id.*, Factual Background, Point 3, and that he "has securities 'electronic warrants' showing his ownership rights to the Palladium in this motion," *id.* at Point 4.

Hamann implies that his accounts qualify as securities accounts, and not commodities accounts, and believes that the accounts should be insured by SIPC. He states that "SIPC's intentions appear to have deceived commodity account holders at MF Global by placing the 'SIPC member' on all the commodity account statements," and that he "used REASONABLE RELIANCE, that SIPC was protecting his brokerage account with CASH and Securities because SIPC Member was printed on his account statement." *Id.* at Points 13 & 14.

Pursuant to the Third Bulk Transfer Order, Hamann deposited $28,430.56 with the Trustee in order to receive full distribution of four warehouse receipts for palladium (representing 28% of the value of the physical property Hamann wished to receive). *Id.* at Point 7. He states that the issues that remain are the control of a fifth warehouse receipt, his $28,430.56 deposit, and $6,555.77 in cash from his "SIPC" account. *Id.*

In the Omnibus Reply, the Trustee points out that MFGI was a joint broker-dealer (dealing in both securities and commodities) and a registered commodities futures commission merchant ("FCM"), and it is undisputed that Hamann's property was held in an FCM account at MFGI; therefore, Hamann's property is not entitled to SIPA securities customer protection. Omnibus Reply, ¶ 4. In support of that assertion, the Trustee cites 17 C.F.R. § 190.08(a)(1)(i)(C), which provides that in the event of an FCM liquidation, all commodity customer property, including warehouse receipts, is subject to *pro rata* distribution by account class. *Id*.

### D. The Trustee Has Established A Legal and Factual Basis To Sell the Remaining Physical Customer Property

The Court finds that the Trustee has articulated a valid business justification for the liquidation of Physical Customer Property. The Motion represents the final step in complying with the Court's Third Bulk Transfer Order. The Court finds that the Trustee has provided all interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. The Trustee has worked individually with physical property customers and attempted to make distributions *pro rata* according to the customers' wishes, within the applicable statutory and regulatory requirements. The Trustee made sufficient attempts to secure a buyer for the bulk transfer of remaining physical property and has solicited the highest and best (albeit only) offer; indeed, no party has disputed otherwise.

Regarding the Hamann Objection, it is important to note that futures contracts and options on futures contracts must be executed on or subject to the rules of a commodity exchange. Individuals cannot trade directly on an exchange; rather, only those persons or firms

registered with the CFTC as an FCM or an Introducing Broker may trade on an individual customer's behalf.[2] MFGI was a registered FCM.

Liquidation of an FCM is subject to two separate regulatory regimes: the Securities Investor Protection Act ("SIPA") and the Commodities Exchange Act (the "CEA"). Under both regimes, customers are entitled to a *pro rata* share of the applicable pools of customer property from separate customer account classes. Within the context of a SIPA liquidation, determining the claims of, and allocating customer property to, former MFGI commodity customers incorporates the interplay of subchapter IV of title 11 of the Bankruptcy Code, the CEA, and, as discussed below, 17 C.F.R. Part 190.

The CFTC has enacted regulations to guide trustees and assist courts in implementing the CEA and subchapter IV of title 11 of the Bankruptcy Code. *See* 17 C.F.R. § 190 *et seq*. Those regulations: (1) define what constitutes customer property, *see id.* § 190.08; (2) establish a system of customer classes and account classes, which ensures a fair and orderly process of *pro rata* distribution, *id.* §§ 190.01(a), (m), (bb), & (hh); and (3) provide a formula for calculating allowable "net equity claims," *id.* § 190.07.

Section 190.08 specifies fifteen categories of "customer property." "Specifically identifiable property" ("SIP") is a class of property defined in section 190.01(kk); and sections 190.01(kk)(1) and (3) include those warehouse receipts that can be identified on the books and records of the debtor at the time of the petition for relief, or October 31, 2011, in the case of

---

[2]  *See* 17 C.F.R. § 1.25; COMMODITIES FUTURES TRADING COMMISSION, Registration of Intermediaries, http://www.cftc.gov/IndustryOversight/Intermediaries/registration (last visited Apr. 4, 2012); COMMODITIES FUTURES TRADING COMMISSION, Futures Commission Merchants (FCMS) & Introducing Brokers (IBS), http://www.cftc.gov/IndustryOversight/Intermediaries/FCMs/index.htm (last visited Apr. 4, 2012).

MFGI.[3]  There is no requirement that MFGI have title to or an equitable or beneficial interest in the SIP for them to be considered customer property.

Given the broad definition of "customer property" and the fact that Hamann's warehouse receipts were identified on the books and records of MFGI as of October 31, 2011, Hamann's Physical Customer Property is considered to be property of the MFGI estate, under the Trustee's control, and therefore, eligible for distribution pursuant to the Part 190 regulations.  Any evidence of title that Hamann has presented to the Court, therefore, carries little weight.  In an FCM liquidation, such as in this case, section 190.08 requires the Trustee to distribute all former commodities customer property within the estate of MFGI, including warehouse receipts, to customers *pro rata* by customer and account classes.  *See generally HSBC Bank, USA, N.A. v.*

---

[3] Sections 190.01(kk)(1) and (3) define "specifically identifiable property" as:

> (1) With respect to the following property received, acquired, or held by or for the account of the debtor from or for the account of a customer to margin, guarantee or secure an open commodity contract:
> (i) Any security which as of the filing date is:
> (A) Held for the account of a customer;
> (B) Registered in such customer's name;
> (C) Not transferable by delivery; and
> (D) Not a short term obligation; or
> (ii) Any warehouse receipt, bill of lading or other document of title which as of the filing date:
> (A) Can be identified on the books and records of the debtor as held for the account of a particular customer; and
> (B) Is not in bearer form and is not otherwise transferable by delivery.
> . . . .
>
> (3) With respect to warehouse receipts, bills of lading or other documents of title, or physical commodities received, acquired, or held by or for the account of the debtor for the purpose of making or taking delivery or exercise from or for the account of a customer, any such document of title or commodity which as of the entry of the order for relief can be identified on the books and records of the debtor as received from or for the account of a particular customer as held specifically for the purpose of delivery or exercise.

*Fane (In re MF Global Inc.)*, No. 11-2924, 2012 WL 726640, at * 3-5 (Bankr. S.D.N.Y. Mar. 7, 2012).[4]

Furthermore, Hamann's property is not entitled to protection or insurance under SIPA. Property qualifying for protection or insurance under SIPA is defined differently from property held by an FCM for its commodities customers. Protection under SIPA requires that the property must belong to a "customer," defined as "any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person . . . ." SIPA § 78*lll*(2)(A). Although SIPA also states that the definition of "customer" can include a person who has a claim against the debtor for "futures contracts" and that "customer property" can include a "futures contract," in order to qualify as a securities customer, the contracts in question must be held in a specific type of securities account, that is, a "portfolio margining account." *Id*. §§ 78*lll*(2)(B)(ii), (4)(D). Therefore, to qualify for SIPA protection, a customer's property must meet the definition of "security," and that property must be held in a securities account.

First, Hamann presented no evidence that his property was held in a securities account at MFGI, including a portfolio margining account. Second, SIPA expressly defines "security" to exclude "any commodity or related contract or futures contract, or any warrant or right to subscribe to or purchase or sell any of the foregoing," except as specifically provided for elsewhere within section 78*lll*. SIPA § 78*lll*(14). Hamann's warehouse receipts fall under the definition of a commodity under the CFTC Regulations and not as a security.

---

[4] Hamann's situation differs from that of Jason Fane, discussed in the *HSBC* opinion. Fane's property was not identifiable on MFGI's books and records as of October 31, 2011, as his request for transfer of his warehouse receipts had been received and executed prior to that date; therefore, Fane's property could not be considered property of the MFGI estate and was not eligible for distribution pursuant to the SIPA liquidation. *Id*. at *5.

12

## CONCLUSION

For the reasons explained above, the Court OVERRULES the Hamann Objection and GRANTS the Motion. A separate order will be entered.

Dated: April 6, 2012
New York, New York.

                                        **_/s/Martin Glenn_**
                                        MARTIN GLENN
                                      United States Bankruptcy Judge