James B. Kobak, Jr.
Christopher K. Kiplok
Jeffrey R. Coleman
Vilia B. Hayes
Sarah L. Cave
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of MF Global Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re | |
|---|---|
| MF GLOBAL INC., | Case No. 11-2790 (MG) SIPA |
| Debtor. | |

**<u>Report of the Trustee's Investigation and Recommendations</u>**

# TABLE OF CONTENTS

**Page**

I.     Executive Summary ....................................................................................1

    A.     Introduction ..................................................................................1

    B.     Summary Of Events ......................................................................5

II.    MF Global Structure: Governance, Key Departments, And Personnel ..........................15

    A.     Corporate Structure ....................................................................16

    B.     The Boards of Directors And Senior Management...............................17

    C.     Treasury, Finance, Treasury Operations, Operations, And Regulatory.................19

        1.     Treasury and Treasury Operations............................................20

        2.     Finance and Financial Regulatory Group ...................................21

        3.     Operations ........................................................................23

    D.     Risk, Compliance, And Internal Audit ...........................................24

        1.     Risk ................................................................................24

        2.     Compliance .......................................................................25

        3.     Internal Audit ....................................................................26

III.   Regulatory Framework ...........................................................................26

    A.     Securities Regulation ..................................................................26

        1.     Relevant Entities ................................................................26

        2.     SEC Customer Protection Rules ..............................................28

        3.     Foreign Securities Regulators .................................................30

    B.     Commodities Regulation ..............................................................31

        1.     Relevant Entities ................................................................31

        2.     Net Capital Requirement.......................................................32

        3.     FCM Customer Accounts ......................................................33

## TABLE OF CONTENTS
### (Continued)

**Page**

4.　　Segregation Statement ...................................................................34

5.　　Permitted Investments for Segregated Assets............................36

6.　　Secured Statement For 30.7 Funds For Trading Foreign Futures on Non-U.S. Exchanges....................................................................37

7.　　Permitted Investments for Secured Assets................................39

8.　　MFGI Policy ...............................................................................39

9.　　Daily Reporting...........................................................................40

IV.　Key Third Parties ....................................................................................42

A.　　Clearing Houses And Exchanges..................................................42

1.　　Securities....................................................................................42

2.　　FCM .............................................................................................44

B.　　Foreign Exchanges.........................................................................47

C.　　Bank Accounts ...............................................................................48

1.　　Summary ......................................................................................48

2.　　FCM Accounts .............................................................................50

3.　　Non-FCM Accounts and the Securities Lending Program .........50

4.　　Credit Facilities...........................................................................52

D.　　Outside Auditor..............................................................................53

V.　MF Global History Through Early 2011 ...............................................54

A.　　Origins............................................................................................54

B.　　Becoming MF Global .....................................................................55

C.　　The Dooley Trading Incident And Its Aftermath ..........................57

D.　　Jon Corzine Takes The Helm.........................................................58

E.　　Risk Management And MF Global's New Direction ......................60

## TABLE OF CONTENTS
(Continued)

**Page**

F. The Sovereign Debt RTM Portfolio ...................................................................63

    1. The RTM Strategy ...................................................................................64

    2. Risk and Growth of the RTM Portfolio ....................................................68

G. Liquidity Needs And Intraday Transfers From The FCM ....................................71

VI. The Summer And Fall Of 2011 ...................................................................................73

A. Liquidity Risks And Stresses ..........................................................................73

B. A Proposal For Overnight Transfers From The FCM ...........................................75

C. Intraday And Overnight Transfers After The July 28 Memo ...............................78

D. Wires To Securities Customers ........................................................................78

E. Monitoring Of Segregation Reports, FCM Balances, And Liquidity ...................79

F. FINRA And FSA Inquiries ...............................................................................84

VII. The Final Week Of MF Global's Operations ....................................................................90

A. The Downgrades And Earnings Call ....................................................................90

B. "Liquidity Asphyxiation" ..................................................................................93

C. Transfers, Liquidity, And Segregation Of Customer Property ..............................96

    1. October 24, 2011 ...................................................................................97

        (a) Segregation Statement and Secured Statement ..............................97

        (b) Intraday Transfers ..................................................................98

        (c) Securities Client Wires .............................................................98

        (d) 15c3-3 Calculation ...................................................................98

        (e) Liquidity Dashboard .................................................................99

    2. October 25, 2011 ...................................................................................99

        (a) Segregation Statement and Secured Statement ..............................99

# TABLE OF CONTENTS

(Continued)

**Page**

(b)      Intraday Transfer ........................................................100

(c)      Securities Client Wires ...............................................101

(d)      Liquidity Dashboard ...................................................101

3.      October 26, 2011 ............................................................102

(a)      Segregation Statement and Secured Statement ...........102

(b)      Intraday Transfers ......................................................103

(c)      Securities Client Wires ...............................................105

(d)      Liquidity Recap ..........................................................105

4.      October 27, 2011 ............................................................107

(a)      Segregation Statement and Secured Statement ...........107

(b)      Intraday Transfers ......................................................109

(c)      Securities Client Wires ...............................................109

(d)      Liquidity Dashboard ...................................................110

5.      October 28, 2011 ............................................................111

(a)      Wire to MFGUK ........................................................111

(b)      Segregation Statement and Secured Statement ...........111

(c)      Intraday Transfers ......................................................113

(d)      Securities Client Wires ...............................................113

(e)      Liquidity Dashboard ...................................................114

6.      October 29, 2011 ............................................................115

(a)      Work on Segregation and Secured Statements ...........115

(b)      Potential Sale of MF Global .......................................116

(c)      Discussions with Regulators .......................................117

## TABLE OF CONTENTS
(Continued)

**Page**

7.   October 30, 2011 ...................................................................117

    (a)   Preparation for Sale and Possible Bankruptcy Filing .................117

    (b)   Attempts to Reconcile Segregation And Secured Statements ....................................................................118

8.   October 31, 2011 ...................................................................119

9.   Summary of Segregated Funds Shortfall ................................122

10.   Failed Transactions ...............................................................123

11.   Mailing of Checks During the Week of October 24 ................123

D.   The Run On The Bank ...................................................................125

1.   The Clearing Banks..............................................................125

    (a)   JPM ..........................................................................126

        (i)   Actions Taken By JPM ...................................127

        (ii)   Specific Transactions .......................................130

    (b)   BNYM.......................................................................139

        (i)   Actions Taken by BNYM ................................139

        (ii)   $325 Million Tri-Party Shell Account ............139

2.   The Clearing Houses.............................................................142

    (a)   DTCC ........................................................................142

    (b)   FCM Clearing Houses................................................143

3.   The New York Fed's Requests For Additional Collateral For Open TBA Transactions ...................................................................143

4.   MF Global Sells Assets To Generate Liquidity And Reduce Leverage................................................................................145

# TABLE OF CONTENTS

(Continued)

**Page**

VIII.   The Speed And Severity Of The Run On The Bank Far Eclipsed Even
        Management's Eleventh-Hour Predictions ...................................................................148

        A.      The "Break the Glass" Scenario ....................................................................148

        B.      Main Stressed Uses Of Cash ..........................................................................149

        C.      Main Mitigants Of Cash...................................................................................153

IX.     Recipients Of Funds...........................................................................................................155

        A.      Customer Funds .................................................................................................155

        B.      Trading And Sales..............................................................................................155

        C.      Margin And Other Payments To Clearing Houses and Exchanges ....................156

        D.      Affiliates ............................................................................................................156

X.      Disputes With MFGUK .....................................................................................................156

XI.     MF Global Canada .............................................................................................................160

XII.    Other Affiliate Claims........................................................................................................161

XIII.   Investigation And Analysis Of Potential Claims ............................................................162

        A.      MF Global's Officers, Directors, And Other Employees ..................................162

        B.      MF Global's Principal Financial Institutions....................................................163

        C.      Customers And Counterparties ..........................................................................165

        D.      Unwinding Financial Transactions ...................................................................167

        E.      Affiliates ............................................................................................................168

        F.      Clearing Houses And Other Parties ...................................................................169

XIV.    Recommendations...............................................................................................................170

        A.      Abolish The Alternative Calculation Method And Implement A Required
                Excess "Cushion"...............................................................................................171

# TABLE OF CONTENTS
(Continued)

**Page**

B.  Eliminate The Segregated vs. Secured Distinction Currently Made By Regulation 30.7, Ensure Consistency of Customer Protection When Trading Overseas, And Closely Monitor Compliance Abroad.............................172

C.  Create A Protection Fund For Futures And Commodities Customers Under A Certain Threshold, And Implement Suitability Standards For FCM Customers .................................................................................................175

D.  Provide For Civil Liability For Officers And Directors In The Event of Commodities Segregation Shortfall......................................................176

E.  Simplify CFTC Rules For Bulk Transfers And Claims In An FCM Liquidation Proceeding.........................................................................177

    1.   Bulk Transfer Rules ...............................................................177

    2.   Proof of Claim Rules .............................................................178

F.  Enact Legislation Explicitly Authorizing Trustee Standing On Behalf Of Customers ..............................................................................................179

James W. Giddens (the "Trustee"), as Trustee for the liquidation of MF Global

Inc. ("MFGI" or the "Firm"), respectfully submits this Report of the Trustee's Investigation and

Recommendations (the "Report")[1] in accordance with his duties under sections 78fff-1(c) and (d)

of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.* and the

Commodity Exchange Act of 1936 ("CEA").

# I.    Executive Summary

## A.    Introduction

This Report reflects the Trustee's initial findings regarding the failure of MFGI,

whose parent, MF Global Holdings, Ltd. ("Holdings"[2]), filed for reorganization under

Chapter 11 of the Bankruptcy Code on the morning of October 31, 2011 (the "Filing Date"),

following which the Securities Investor Protection Corporation ("SIPC") commenced a

proceeding to liquidate MFGI under SIPA.[3]  Holdings, together with MFGI and other MF Global

subsidiaries and affiliates, is referred to collectively as "MF Global".  The focus of the Report is

on the underlying reasons for and the consequences of the collapse of MF Global, including the

shortfall of segregated customer property that MFGI publicly announced early on the morning of

October 31, 2011.

The Trustee has no law enforcement or regulatory authority.  The Report

therefore draws no conclusions about possible criminal liability or whether sanctionable

---

1.    This Report substantially supplements and expands the Trustee's Preliminary Report on Status of His
      Investigation, submitted on February 6, 2012 (D.E. 896).

2     "MF Global Ltd.", a Bermuda company, changed its name and its state of incorporation to "MF Global
      Holdings Ltd.", a Delaware company, on January 4, 2010.  References to "Holdings" in this Report refer to MF
      Global Ltd. when discussing events prior to January 4, 2010, and to MF Global Holdings Ltd. when referring to
      events after January 4, 2010.

3.    *Securities Investor Protection Corp. v. MF Global Inc.*, Case No. 11-CIV-7750 (PAE) (S.D.N.Y.), *In re MF
      Global Inc.*, Case No. 11-2790 (MG) (SIPA) (Bankr. S.D.N.Y.) (the "SIPA Proceeding").

regulatory violations occurred.  Furthermore, the facts as set forth in the Report are not intended to be viewed as findings of fact binding on any court or jury, who will reach their own conclusions based on the admissible evidence before them.  The Trustee has been cooperating with the various law enforcement and regulatory agencies investigating MF Global's collapse, and does not wish to impede those efforts.  The Trustee's goal has been to deploy his professionals and limited strategic resources to enable him to complete his Investigation and issue this Report on certain key questions in the public interest at the earliest possible date and in an efficient manner.  The Trustee's professionals concentrated their efforts on examining the most relevant information and transactions necessary for the findings, analysis, and recommendations in this Report.  This Report reflects the Trustee's best judgment based on information currently available to the Trustee, which is less than the amount of information available to law enforcement and regulators who are also investigating MF Global, and is subject to change or supplementation in the event of new information.  This Report should be read in conjunction with its accompanying Annexes, which amplify and provide further perspective on points in this Report, as well as the Interim Report that is being filed simultaneously.

As indicated in the accompanying First Interim Report on the Status and Administration of the Liquidation ("Interim Report"), the shortfall in segregated property available to return to customers currently amounts to approximately $900 million in domestic accounts (both commodities and securities), plus an additional approximately $700 million related to trading by customers on foreign exchanges.  Most of the latter part of the shortfall involves property (the "30.7 Funds") that is being withheld by the Joint Special Administrators of MF Global United Kingdom ("MFGUK").

This $1.6 billion shortfall may be reduced slightly through the narrowing of claims in the claims process and completion of marshalling remaining funds from exchanges, affiliates and others.  Most readily-available property, however, has already been marshalled.  These remaining steps will therefore produce only minor reductions.  Elimination of the shortfall, and the possibility of a one hundred percent return of property to all public commodities customers, will require a combination of three things:  (1) successful recovery of funds in the U.K. proceedings; (2) recoveries, if available, through litigation and negotiation with third parties; and (3) allocation of non-segregated property to the pools of customer property pursuant to SIPA and the CEA, and the regulations thereunder.

The Trustee is working diligently and expeditiously on each of these fronts.  First, he has shared information with and pressed the Joint Special Administrators of MFGUK to institute proceedings to resolve the question of return of the 30.7 Funds.  Those proceedings are now underway.

Second, the Trustee is pursuing those claims that he believes to be potentially viable to recover customer property.  As has been publicly announced, the Trustee is engaged in discussions with JPMorgan Chase ("JPM"), with respect to transfers that the Trustee believes may be voidable or otherwise recoverable.  The Trustee is already consulting with commodities' customers' class action counsel about actions against officers and directors and other employees.  The Trustee believes that claims, including claims for breach of fiduciary duty and negligence, may be asserted against Jon Corzine, Henri Steenkamp, and Edith O'Brien, among others.  The Trustee has also communicated with relevant insurers with respect to these claims.

Third, the Trustee has marshaled hundreds of millions of dollars of property — and continues to marshal assets and pursue recoveries — that may be available for distribution to

customers as well as creditors.[4]  The Trustee has undertaken these efforts — and will be

undertaking others as described later in this Report — with the expectation that significant

property may need to be allocated to make up for customer shortfalls.

As detailed below, while the Trustee continues to consider many possibilities, the

Trustee does not believe, based on his investigation and his counsel's analysis, that there are

likely to be sound bases for pursuing claims against non-insider customers for return of their

accounts, or avoidable transfer claims related to repayments in accordance with the terms of

standard contracts involving securities and financial transactions with non-affiliated

counterparties.

To the extent possible at this time, without divulging strategies or compromising

ongoing discussions and investigative efforts, this Report will identify recovery prospects and

the facts and circumstances relevant to them.  The Report will also provide further details about

the factors that led to MFGI's demise, the nature of the liquidity crisis and flow of funds and

transactions in the last week of MFGI's existence, and the circumstances surrounding the

invasion of customer property.

The Trustee's findings in this Report are based on, among other things, his

counsel's interviews of more than one hundred people, along with review of hundreds of

thousands of documents, and an extensive forensic investigation conducted with the assistance of

forensic accountants at Ernst & Young LLP ("EY").[5]  The Report concludes with a discussion of

---

4.  At this time, the Trustee continues to expect that the prospects for substantial dividends to general unsecured
    creditors are low, even apart from the likelihood that significant property that might otherwise be in the general
    estate may have to be allocated to one or more of the customer property pools.

5.  Analyses and demonstratives prepared by EY and the Trustee's counsel ("Annex __") are submitted along with
    this Report.

the possible sources of recovery — and their limitations — and recommendations for legislative, regulatory or other reforms that might help avert similar liquidations in the future, or at least alleviate their consequences.

This Report seeks to summarize and explain key background facts and circumstances based on the information the Trustee has learned to date.  The timing of the issuance of this Report is dictated by the widespread questions raised by this Court, customers, legislators, regulators, and others about what went wrong at MF Global and the current discussions concerning possible changes in the regulation and structure of broker-dealers ("BDs") and futures commission merchants ("FCMs").

The Trustee cannot comment in detail at this time on the strengths and weaknesses of potential causes of action that may be available to him or to others to restore customer property, or otherwise recover for damage to customers or the Firm.  Nor is this the place to set out in detail the legal arguments on matters such as standing, the effect of safe harbor provisions or other possible defenses that may be relevant to some potential causes of action. Discussions such as these are not the primary purpose of this Report.  Rather, its purpose is to present a basic understanding of why shortfalls in segregated customer property occurred and a realistic appraisal of the extent to which they may be remedied.

The Trustee expects, in light of progress in negotiations, further consultation with customer representatives, and continued factual and legal analysis to reach decisions about commencing most major litigation to recover customer property within sixty days.

**B.**    **<u>Summary Of Events</u>**

Jon Corzine became CEO and Chairman of the Board of Holdings in March 2010, at a time when MF Global had reported losses for five straight quarters.  He quickly moved to try to transform what had been a longstanding FCM combined with a BD conducting a relatively

modest customer and proprietary securities business into a full-service global investment bank. With Mr. Corzine at the helm, dramatic changes ensued, including changes in personnel, lines of business, and markets into which MF Global expanded its business.

Historically, MFGI had generated revenue by earning interest on customer margin deposits, commissions on customer securities and future transactions, proprietary trading activities, and interest revenues from its matched repo book.[6]  In the face of declining interest rate revenues,[7] MF Global's proprietary investment strategy shifted from short-term, low-yield investments to longer-term high-yield and highly-leveraged investments.  As part of the shift in its proprietary investment strategy to generate greater streams of apparent or realized income, MF Global also developed and launched a number of new lines of business, all of which increased the daily demands for liquidity.  With these changes, a significant percentage of the MF Global workforce was terminated and replaced with new employees.

Notwithstanding the increased demands on global money management and liquidity, the Firm's Treasury Department, which was involved in implementing the transfers of funds, did not expand or modernize.  Likewise, the technology for recording and tracking transactions and liquidity did not materially change.  These critical functions remained

---

6.  A repurchase agreement (repo) is a financing transaction involving what is in form a sale of securities together with an agreement for the seller to buy back the securities at a later date. http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary.

7.  Although the Federal Funds interest rate had been gradually declining since 2007, the Federal Reserve cut the rate to essentially zero following the financial crisis in the fall of 2008.  MF Global had historically generated a substantial portion of its income from interest generated from repurchase agreements, government securities in inventory or held for commodities customers, and failed transaction fees.  The drop in the Fed Funds rate caused a dramatic decline in MF Global's interest income; Holdings' interest income decreased nearly 90% from 2007 to the Filing Date and MFGI's interest income decreased by more than 80% over the same period. (Annex A.)  As interest rates decreased sharply in recent years, MF Global's net interest income earned on the cash sitting in the Customer Accounts plummeted, from $4.01 billion in 2007, to $517 million in 2011.  (*See* MF Global Form 10-K for the period ended March 31, 2009 ("2009 10-K") at 48; MF Global Form 10-K dated May 20, 2011 ("2011 10-K") at 85.)

essentially as they had been prior to Mr. Corzine's arrival, with the Firm often tracking liquidity and ability to transfer funds by informal means that were derived from a number of different reports, both computerized and oral.

While Mr. Corzine acted as CEO of the entire MF Global enterprise, he also traded actively on its behalf through a specially designated account. Among the lines of business that Mr. Corzine built up to attempt to improve profitability at MF Global was the trading of a portfolio of European sovereign debt securities. These trades provided paper profits booked at the time of the trades, but presented substantial liquidity risks including significant margin demands that put further stress on MF Global's daily cash needs.

The European sovereign debt trades were structured as "repos to maturity" ("RTMs"). In these transactions, sovereign debt securities purchased by MFGI at a discounted price were repoed back to its affiliate, MFGUK. Because the termination of the RTMs between MFGI and MFGUK was the same date as the maturity of the sovereign bond, accounting rules allowed MF Global to account for the RTM as a sale, and therefore record an immediate gain on the sale, while removing the transactions from MF Global's consolidated balance sheet. The corresponding repo transaction between MFGUK and LCH.Clearnet (previously known as the London Clearing House ("LCH")), however, was for a term two days shorter than the maturity date of the underlying bonds. This disparity meant that MFGUK — which turned to MFGI to provide funding — would ultimately have to finance the sovereign bonds for the two-day window, thus increasing the amount of cash MFGI needed to maintain the RTM portfolio. In addition to this liquidity risk as between MFGI and MFGUK, MFGI continued to bear the risk of default of the bonds themselves. By the terms of an agreement between MFGI and MFGUK,

MFGI received only 20% of the profit on the trades while 80% was allocated to MFGUK.  (*See* pp. 63-65, *infra*.)

Because the sovereign debt portfolio consisted of sovereign bonds issued primarily by European nations experiencing severe financial distress (Ireland, Italy, Portugal and Spain), the trades presented arbitrage opportunities arising from fluctuations in the yield curve, interest rate futures, and foreign exchange rates, as well as price discrepancies in the sovereign debt sector.  MF Global's investment in sovereign debt peaked at nearly $7 billion (net) in October 2011, and still stood at nearly $6 billion as of the Filing Date.  As early as May 2010, the Chief Risk Officer at the time, Michael Roseman, began expressing concerns regarding liquidity risk of the RTM portfolio, which reportedly led to his termination in January of 2011.  As the Board and management were aware, the exposure from this portfolio was the equivalent of 14% of MF Global's assets as of September 30, 2011, and was more than four-and-a-half times MF Global's total equity, a level that was orders of magnitude greater than the relative exposure at other, larger financial institutions.

The first fiscal year under Jon Corzine's leadership and new strategy resulted in somewhat improved, though still consistently unprofitable, financial performance for both Holdings and MFGI.  The below chart compares financial results for fiscal 2010 (under Mr. Corzine's predecessor) to the results under Mr. Corzine during 2011:

| | YEAR ENDED MARCH 31 | | | |
|---|---|---|---|---|
| *(dollars in millions)* | | 2010 | | 2011 |
| **MFGH** | | | | |
| Total revenues | $ | 1,944.7 | $ | 2,233.6 |
| Total expenses | | 2,190.1 | | 2,309.9 |
| Income (loss) before taxes | $ | (195.4) | $ | (76.3) |
| **MFGI** | | | | |
| Total revenues | $ | 1,084.0 | $ | 1,283.7 |
| Total expenses | | 1,198.7 | | 1,347.2 |
| Income (loss) before taxes | $ | (114.7) | $ | (63.5) |

Over the same period of time, the balance sheet consistently showed MF Global as a highly leveraged organization. Its ratio of total liabilities to equity went from 43:1 as of March 31, 2010 to 28:1 as of March 31, 2011 - an improved, but still high, ratio. Unfortunately, these improvements did not meet the rating agencies' expectations for the company to generate annual pre-tax revenues of at least $200 million in order to maintain an investment grade rating. Thus, further measures were taken to attempt to generate profitability.

In August of 2011, because of concerns about MF Global's exposure to sovereign debt, the Financial Industry Regulatory Authority ("FINRA") required MFGI to record additional capital charges to reflect risks associated with the European sovereign debt portfolio. The increased capital charges meant that, in FINRA's view, MFGI had a net capital deficiency as of July 31, 2011, and MFGI had to re-state its financial results in its July 2011 Financial and Operational Combined Uniform ("FOCUS") report. As a result, MFGI underwent a $183 million capital infusion to satisfy the increased minimum net capital threshold under SEC uniform net capital Rule 15c3-1.

The underlying liquidity problems at MF Global, however, did not commence in the fall of 2011. Rather, liquidity had been a cause for concern before and throughout Mr. Corzine's tenure at MF Global, yet systems and tools that would enable accurate real time monitoring of liquidity were never implemented. While MFGI's proprietary securities business had previously generated enough liquidity to support its daily cash needs, that had changed by 2011. To make matters worse, relevant employees had fragmented reporting relationships and transaction approval authority, and in some cases these employees were new to their positions in the spring and summer of 2011. Liquidity concerns grew especially acute during the summer of 2011. For example, the Assistant Treasurer wrote in an August 11 email that she had "to spend

hours every day shuffling cash and loans from entity to entity."  Regardless of whether Mr. Corzine's bet on European sovereign debt would ultimately have been profitable, in the short term, MF Global became increasingly vulnerable to the developments that ensued in the fall of 2011.  Risk and perception of risk quickly turned MF Global's longstanding liquidity problems into a crisis for which it had neither the tools nor the emergency resources to withstand.

One of the sources of liquidity that MF Global considered tapping to help satisfy ever-increasing liquidity demands of the proprietary securities business was the perceived "excess" funds in customer accounts at the FCM.  While an FCM must segregate customer funds from proprietary funds, some confusion and differences of opinion existed within MF Global regarding the extent to which excess funds might be available to meet liquidity needs across the MF Global enterprise.  The Commodity Futures Trading Commission ("CFTC") requires that customer funds be kept in "Customer Segregated" or "Foreign Secured" accounts (collectively "Customer Accounts").  CFTC regulations provide for Customer Segregated accounts or "4d accounts" to hold the property of customers trading on domestic exchanges, and for Foreign Secured accounts, or "30.7 accounts," to hold customer property of customers trading on foreign exchanges.  The regulated customer funds in the Customer Accounts were not to be used for other purposes.

As discussed in Section III.B below, the regulations for Customer Segregated accounts require a daily accounting of the net liquidation value of the customer funds in the account (the "Net Liquidating Method").  CFTC regulations, however, did not require that all customer funds necessarily be maintained on a dollar-by-dollar basis in the Foreign Secured accounts.  Instead, unlike Customer Segregated accounts (for trades on domestic exchanges), the CFTC regulations allowed an "Alternative Method" for calculating whether Foreign Secured

accounts were in regulatory compliance even though less than all customer funds deposited for

trading on foreign exchanges might actually be deposited in Foreign Secured accounts.  MFGI

used this "Alternative Method," and during the month of October 2011, the amount of

"Regulatory Excess" — the average amount of customer funds in excess of the regulatory

requirement under the Alternative Method (but not the Net Liquidating Method) — was

approximately $1 billion.  Some at MF Global considered the Regulatory Excess to be a potential

source of funds for intraday, or even overnight, transfers to fund the non-FCM activities of MF

Global, although others were of the view that the Regulatory Excess would still have to be

"locked up" for the benefit of customers.  Finally, since the CFTC required that the calculations

be done "as of the close of business each day," questions existed as to whether funds needed to

be "locked up" for the benefit of customers intraday as well.

CFTC regulations allow an FCM to deposit its own funds in the Customer

Accounts as the FCM deems necessary to prevent Customer Accounts from becoming under-

segregated, and, conversely, to withdraw its own funds for proprietary use.  MFGI referred to

Firm funds kept in Customer Accounts, including funds that were swept in each night, as the

"Firm Invested in Excess."  This excess had the beneficial result of acting as a cushion to prevent

shortfalls in customer funds owing to changing margin requirements resulting from daily market

movements.  The benefit of having such funds as a cushion would be achieved, however, only as

long as funds removed from those accounts for proprietary activity were limited to the Firm

Invested in Excess, the amount above the level that was needed to satisfy obligations to

customers on a net basis.

As MF Global's liquidity needs intensified, senior management looked

increasingly to the FCM as a source of liquidity for the non-FCM business.  For example, in July

2011, senior management proposed that the cash-starved proprietary securities business borrow $250 million on a regular overnight basis from the Regulatory Excess.  (*See* pp. 75-77 *infra*.) After consultation with outside counsel, the North American CFO opposed the proposal on the ground that it would create undue risk to customers' funds.  In early August, this proposal was dropped, and thereafter only Firm Invested in Excess was supposed to be available for overnight transfer from the FCM.

Firm Invested in Excess funds were, however, allowed to be used to fund MF Global's proprietary activities both overnight and during the day, and it appears that part of the Regulatory Excess was, at times, also used for intraday funding of the non-FCM business.  When MF Global's proprietary trading gave rise to a need for additional liquidity, Operations in New York would request what they referred to colloquially as an intraday "loan" — actually, not a true loan but simply a transfer of funds — from the Treasury Department in Chicago.[8]  The Customer Segregated or Foreign Secured accounts at the FCM were at times tapped to fund these transfers.  Because compliance with the CFTC regulations was computed as of the close of business, as long as the transfers were returned before the end of each day, some MFGI employees did not consider the transfers to have any regulatory implications, although the CFTC has stated that FCMs must be in regulatory compliance at all times.  By the summer of 2011, however, what had previously been relatively small, intermittent intraday transfers from the FCM to New York, became nearly a daily event in increasingly greater amounts.  In addition, transfers from the FCM to Operations in New York were kept overnight or longer, presumably with the intention that any overnight transfers would be limited to the Firm Invested in Excess.

---

8.  These intraday "loans" were not loans at all since they were simply temporary transfers within the same consolidated entity.  There were no repayment terms or interest, but simply an expectation that the funds would be returned each day.

The spring and summer of 2011 also saw a change in how MFGI funded securities customers' requests to withdraw their funds.  Historically, MF Global's proprietary securities trading business had generated sufficient funds to send wires to customers as needed.  At some point in the second half of 2011, however, the Treasury Department in Chicago began to process the wires to securities customers, and needed to draw on funds from the FCM accounts, including the Foreign Secured accounts, in order to fund those wires.  The weekly SEC Rule 15c3-3 calculation for securities was performed each Monday as of the close of business the previous Friday.  (*See* Section III.A.2, *infra*.)  It was contemplated that the SEC Rule 15c3-3 requirement would be reduced to reflect the funds that had been withdrawn by securities customers during the week, and that the next calculation would permit the release of funds that had been locked up so they could be returned to the FCM accounts.  Before the end of October, this funding of securities customer wires by the FCM should not have put customer funds at significant risk, because the typical weekly amount of such wires was less than $60 million, an amount that was generally within the Firm Invested in Excess, and the funds were generally returned to the FCM.

Although MF Global disclosed the net capital deficit and the $183 million capital infusion required by FINRA on September 1, this event did not garner much national attention until an October 17 report in *The Wall Street Journal*, after which events rapidly came to a head.  On October 24, Moody's Investors Service downgraded MF Global's credit rating to near-junk status.  Then, on October 25, MF Global held its third quarter earnings call during which it announced the $119 million write-off of deferred tax assets ("DTAs"), signaling increased doubt about near-term prospects for profitability.  The next day, S&P put MF Global on "Credit Watch Negative," and on October 27, Moody's cut MF Global to junk status.  Together with the

downgrades of MF Global's credit rating and growing concerns about the large sovereign debt

portfolio, this news contributed to a major loss of market confidence.[9]

A classic run on the bank ensued as customers sought to withdraw their property

from their MFGI accounts, while counterparties and exchanges demanded increased collateral or

margin.  At the same time, other counterparties declined to do business with MF Global

altogether, leaving it with illiquid securities that it could not finance in the repo market or

elsewhere.  The rush to meet funding needs for collateral, margin and customer liquidations led

to billions of dollars in securities sales, draws on credit facilities, and a web of inter-company

transactions across MF Global affiliates.  MF Global's computer systems and employees had

difficulty keeping up with the unprecedented volume of transactions.  Some transactions were

recorded erroneously or not at all.  So-called "fail" transactions, where either the buyer or seller

failed to deliver the cash or the security, respectively, were more than five times greater than the

normal volume that week.  It was, in the words of one former MF Global executive, a "liquidity

asphyxiation."  The extent to which the crisis exceeded even management's eleventh-hour

attempts to quantify and prepare for the worst is detailed in Section VII.A below.

These events during the final week of MF Global's operations increased the

demands to use FCM funds to meet liquidity needs elsewhere in the enterprise.  Most

significantly, on October 26, there was an unprecedented intraday transfer of $615 million from

the FCM to fund proprietary securities trading, an amount that was not returned to the FCM

before the close of business (although $325 million was put in a BNYM account, as described

---

9.  MF Global's results for the second quarter of fiscal year 2012 showed a decline in financial strength.  Its pre-tax
    losses increased to almost $100 million for the quarter ended September 30, 2011.  (MF Global Form 8-K dated
    Oct. 5, 2011.)  The decline resulted primarily from decreasing revenues from securities in MFGI's inventory.
    (MFGI FOCUS Report dated Oct. 25, 2011 ("Oct. 2011 FOCUS Report").)

below).  Although some of this transfer was ultimately repaid, MFGI was out of regulatory compliance with respect to Customer Segregated funds on October 26, and remained so through October 31.  At the same time, MFGI was advising customers that it was "hold[ing] all customer cash and collateral in CFTC Rule 1.25 and Rule 30.7 - Customer Segregation [accounts]," implying that 30.7 funds were subject to the same segregation requirements as 4d funds.  To make matters worse, on October 28, MF Global personnel made a $175 million transfer from FCM customer funds to MFGUK, to clear an overdraft balance at JPMorgan Chase ("JPM") in London.

Before a transfer was made on the morning of October 31 — when certain funds that had been locked up for securities customers pursuant to SEC Rule 15c3-3 were transferred to the FCM — the shortfall resulting from transfers from the FCM amounted to approximately $900 million.  Contrary to some public reports, the shortfall of customer property at MFGI was not caused by direct investment of customer funds in sovereign debt or even by losses on proprietary investments such as the sovereign debt.  Rather, as detailed below, the actions of management and other employees, along with lack of sufficient monitoring and systems, resulted in FCM customer property being used during the liquidity crisis to fund the extraordinary liquidity drains elsewhere in the business, including margin calls on the European sovereign debt positions.

## II.    MF Global Structure: Governance, Key Departments, And Personnel

This section contains a description of MF Global and its business structure, regulatory environment, and some of the key players, to assist in understanding the events of October 2011, and the conditions that led to them.

A.    **Corporate Structure**

The corporate structure of MF Global consisted of Holdings, a Delaware corporation,[10] as the holding company and parent of nearly fifty separate direct or indirect subsidiaries, including MFGI, with MFGI representing by far the predominant part of the MF Global enterprise.  MF Global's corporate structure is illustrated in Annex B.

Holdings was a public company that traded on the New York Stock Exchange under the ticker symbol "MF."  MF Global Holdings USA Inc., a New York corporation, was a direct subsidiary of Holdings that in turn had nine direct subsidiaries, including MFGI, which operated both as an FCM and a BD and held custodial assets for itself, customers, and other affiliates.  Less than nine months before its collapse, MF Global became one of twenty primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York (the "New York Fed").  (MF Global Form 8-K dated Feb. 3, 2011 at 2.)  The Firm traded through more than seventy exchanges globally, including through affiliates in the United Kingdom, Australia, Singapore, India, Canada, Hong Kong, and Japan.  (2011 10-K at 91.)  A number of affiliates of MFGI in turn traded through accounts with MFGI as their FCM or BD, including MF Global Special Investor LLC.  At least two affiliates executed agreements subordinating certain of their assets to customers and other creditors of MFGI, excluding such assets from the customer reserve formula for regulatory purposes.  (*See*, *e.g.*, Oct. 2011 FOCUS Report, at 18 (designating MF Global Finance USA Inc. as subordinated).)  In the course of its daily operations, MFGI had extensive affiliate trading interactions with MFGUK, through which

---

10.  Prior to January 4, 2010, MF Global was incorporated in Bermuda under the name MF Global Ltd.  (2011 10-K at 91.)

MFGI traded in European sovereign debt.  MFGUK also served as a broker and depository for MFGI and customer monies and assets trading on foreign exchanges.

In addition, from time to time, MFGI and other affiliates were funded by liquidity drawn from the committed lending facility on which Holdings was primary borrower.  (*See* p. 52, *infra*.)  Those funds moved through the account of another Holdings' subsidiary, MF Global Finance USA Inc ("FINCO").

### B.    The Boards of Directors And Senior Management

As a separately incorporated subsidiary of Holdings, MFGI had its own Board of Directors.  For the three years immediately prior to the Filing Date, MFGI's Board consisted of three directors who conducted business by unanimous written consent in lieu of meetings, as allowed under Delaware law and MFGI's by-laws.

As set forth below, each of the MFGI Board members in this time period also held positions at Holdings and its affiliates:

| MFGI Board Member | Term | Other Positions Held |
|---|---|---|
| Jon Corzine | 3/25/2010-10/8/2010 | CEO of MFGI from 9/1/2010 to Filing Date; CEO and Chairman of Holdings from March of 2010 to Filing Date |
| Laurie Ferber | 12/11/2009 - Filing Date | General Counsel of Holdings and of MFGI from 11/19/10 to Filing Date |
| J. Randy MacDonald | 10/9/2010 - Filing Date | Chief Financial Officer of Holdings prior to April of 2011; Global Head of Retail thereafter; President of FINCO |
| Bradley Abelow | 10/9/2010 - Filing Date | President and Chief Operating Officer of Holdings; Chief Operating Officer of FINCO |

The substantive resolutions by the MFGI Board related to appointment of officers and authorization of their authority or signatory status, bank loan and credit arrangements, and approving contractual agreements such as leases or joining exchanges.  The key decisions

regarding sovereign debt investments, the expansion of MFGI's proprietary businesses into new products, and the risk and liquidity policies were all made by the Holdings Board, not the MFGI Board.

The key executive officers of Holdings included:  Jon Corzine (Chairman and Chief Executive Officer); Bradley Abelow (Chief Operating Officer as of September 2010 and also President as of March 2011); Laurie Ferber (General Counsel); J. Randy MacDonald (Chief Financial Officer prior to April 2011 and Head of Retail thereafter); Henri Steenkamp (Chief Financial Officer effective April 2011 and before that Chief Accounting Officer); Michael Stockman (Chief Risk Officer starting in January 2011); and Vinay Mahajan (Global Treasurer as of August 2011.)  (2011 10-K at 13-14; Press Release dated Aug. 17, 2011.)

As of the Filing Date, the following directors were on the Board of Holdings:

| Director | Term | Holdings Position(s) |
| --- | --- | --- |
| Jon S. Corzine | 2010 – Filing Date | Chief Executive Officer, Chair of the Board of Directors and Chair of the Executive Committee |
| David P. Bolger[11] | 2010 – Filing Date | Director, Member of Audit and Risk Committee and Member of Nominating and Corporate Governance Committee |
| Eileen S. Fusco[12] | 2007 – Filing Date | Director, Chair of Audit and Risk Committee, Member of Nominating and Corporate Governance Committee and Member of Executive Committee |
| David Gelber[13] | 2010 – Filing Date | Director, Chair of Compensation Committee, Member of Audit and Risk Committee and Member of Executive Committee |

---

11. Mr. Bolger was a former executive of Aon Corporation and of Bank One Corporation.  (MF Global Schedule 14A Proxy Statement filed July 7, 2011 for the period Aug. 11, 2011 ("July 2011 Proxy"), at 18.)

12. Ms. Fusco formerly was a senior partner at Deloitte & Touche, regional tax counsel of UBS AG, CFO of Twenty-First Securities Corporation, managing director and director of tax of Kidder, Peabody & Co., Inc., and a tax partner at Ernst & Young LLP and Spicer & Oppenheim.  (*Id.*)

| Director | Term | Holdings Position(s) |
|---|---|---|
| Martin J. Glynn[14] | 2008 – Filing Date | Director, Member of Audit and Risk Committee and Member of Compensation Committee |
| Edward L. Goldberg[15] | 2007 – Filing Date | Director, Chair of Nominating and Corporate Governance Committee, Member of Compensation Committee and Member of Executive Committee |
| David I. Schamis[16] | 2008 – Filing Date | Director, Member of Audit and Risk Committee and Member of Compensation Committee |
| Robert S. Sloan[17] | 2007 – Filing Date | Director |

(2011 10-K at 13; July 2011 Proxy at 5.)  In addition to his management duties, Mr. Corzine also acted as head of trading, executing trades for the Firm on his own, while also instructing others to do so.

### C.    Treasury, Finance, Treasury Operations, Operations, And Regulatory

Henri Steenkamp, MF Global's CFO, Chief Accounting Officer and Global Controller, reported to Mr. Corzine.  Mr. Steenkamp was based in New York and had overall responsibility for overseeing the Company's financial operations, including treasury, accounting and all global financial control and reporting functions.  The responsibilities for monitoring

---

(Footnote continued from prior page)

13. Mr. Gelber formerly was a director and Chief Operating Officer of ICAP plc, Chief Operating Officer of HSBC Global Markets, and held a variety of senior trading positions in the foreign exchange and derivatives businesses at Citibank NA, Chemical Bank and HSBC.  (*Id*. at 19.)

14. Mr. Glynn was formerly an executive of HSBC Bank USA, HSBC Bank Canada, and held other positions at HSBC affiliates.  (*Id*.)

15. Mr. Goldberg is a founder of Dix Hills Partners, LLC and its affiliate management company, Dix Hills Associates, LLC and serves as a managing member of both companies.  Mr. Goldberg was previously an executive at Merrill Lynch.  (*Id*.)

16. Mr. Schamis is a managing director and member of the operating committee of J.C. Flowers & Co. LLC.  (*Id*.)

17. Mr. Sloan is the Managing Partner of S3 Partners, LLC and was formerly a managing director at Credit Suisse First Boston.  (*Id*. at 20.)

liquidity, investing funds in the Customer Accounts, monitoring the balances in the Customer

Accounts, and approving and transferring funds among MFGI's accounts were fractured and

divided among Treasury, Treasury Operations, Operations, Finance, and the Financial

Regulatory Group.  A schematic illustrating the various reporting relationships is attached to this

Report as Annex C.

### 1.    Treasury and Treasury Operations

The Global Treasurer Vinay Mahajan, joined MF Global in New York only in

August 2011, and reported to Mr. Steenkamp.  Mr. Mahajan assumed responsibility for

financing, capital structure, balance sheet, liquidity, investments, and banking.  MF Global's risk

policies assigned overall responsibility for monitoring liquidity, which under MF Global's policy

included regulatory compliance, to the Treasurer.  The Treasury Department also was identified

as responsible for ensuring that the investments and use of Customer Segregated and Foreign

Secured accounts complied with CFTC rules.  Mr. Mahajan replaced David Dunne, who had

served as Global Treasurer since September 2008.  Mr. Dunne remained as head of Treasury

Capital Markets to continue to manage the day-to-day global liquidity demands of MF Global.

(Press Release dated Aug. 17, 2011.)  Most of the rest of the Treasury personnel were located in

Chicago.

Chicago-based employee, Edith O'Brien, who had the formal title of Assistant

Treasurer, reported to Vinay Mahajan in New York.  Ms. O'Brien was described by various

employees as the person responsible for approving the transfers between the FCM and

Operations in New York and monitoring the effect of those transfers on the regulated accounts.

Her responsibilities, as set forth on at least one organizational chart depicting "Liquidity

Management," included "cash management" and "meeting regulatory requirements."  Ms.

O'Brien was also involved in preparing liquidity reports for management, which included

tracking the available excess in the FCM accounts.  She was also generally responsible for the

investment of customer funds.  Requests for intraday transfers were directed to Ms. O'Brien or

her staff, which included Joseph Cranston, Robert (Jason) Chenoweth, and Irma Romo.

Following approval, another group in Treasury Operations processed the wires.

Once part of the Treasury function, the Treasury Operations group was moved in or about late

2009 or early 2010 to Operations under the overall supervision of Senior Vice President Tim

Mundt.  The Treasury Operations team consisted of ten individuals based in Chicago who

ultimately reported to MFGI North American Chief Operating Officer, Robert Lyons, in New

York.  Treasury Operations was primarily responsible for performing daily bank reconciliations

and executing wire transfers and other money movements at the request and direction of other

departments, including Treasury.

The Treasury Operations group, including Christy Vavra and individuals who

reported to her, were responsible for sending the wire transfers of funds from the FCM that are

discussed in this Report.  Additionally, Treasury Operations prepared daily recommendations of

reallocation of excess funds between Customer Segregated and Foreign Secured accounts that

were forwarded each afternoon to the Financial Regulatory Group (discussed below) in an effort

keep the targeted cushion of excess funds in the Customer Segregated accounts.  Beginning in

November 2010, Treasury Operations employees in Chicago became exclusively responsible for

sending wires to securities customers as authorized by the Margin Department.  Those wires

transferred funds initially from an existing account used by Operations personnel in New York,

and later from a new account created for that purpose and overseen by personnel in Chicago

### 2. **Finance and Financial Regulatory Group**

Christine Serwinski was the North American CFO of MFGI.  She was based in

Chicago but she reported to Kemper Cagney, a senior financial executive based in London, and to

Mr. Steenkamp in New York.  Ms. Serwinski testified before Congress that she did not have the

authority to transfer the customer funds, which, she said, were managed by Mr. Mahajan and Ms.

O'Brien.  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Financial Services,*

*Subcomm. on Oversight and Investigations*, 112th Cong. 2d Sess. (Mar. 28, 2012) (Testimony of

Christine Serwinski ("Serwinski Testimony") at 23-24).)  The Financial Regulatory Group, which

prepared the regulatory filings, reported to Ms. Serwinski, and she appears to have monitored the

regulatory balances.  Mr. Steenkamp testified before Congress that the responsibility for the

transfer of customer funds would have been divided between Ms. Serwinski's group and Ms.

O'Brien's group.  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Financial Services,*

*Subcomm. on Oversight and Investigations*, 112th Cong. 2d Sess. (Mar. 28, 2012) (Testimony of

Henri Steenkamp ("Steenkamp Testimony") at 23).)

       Just as Mr. Mahajan was joining MF Global only weeks before its liquidity crisis

began, Ms. Serwinski was preparing to exit.  She had tendered her resignation on June 27, 2011,

but had agreed to stay through March 31, 2012 to train her replacement.  (*MF Global Bankruptcy:*

*Hearing Before the H. Comm. on Financial Services, Subcomm. on Oversight and Investigations*,

112th Cong. 2d Sess. (Mar. 28, 2012) (Statement of Christine Serwinski ("Serwinski Statement")

at 1).)  She was on vacation during the week of October 24, although she was in communication

with the office throughout the week, and returned to the office on Sunday, October 30.  (*Id.*)

       Matthew Hughey was in charge of the Financial Regulatory Group.  In May 2011,

Mr. Hughey assumed a position that had been vacant since March 2011.  He oversaw the work of

two employees, Philip Cooley and Stacey Farrero Campbell.  The Financial Regulatory Group

was responsible for:  (i) preparation of regulatory reports, including the daily statement

demonstrating that assets on deposit in Customer Segregated accounts were in compliance with

CFTC Regulation 4d (the "Segregation Statement") and the daily statement demonstrating that assets on deposit in Foreign Secured accounts were in compliance with CFTC Regulation 1.20 (the "Secured Statement"), (ii) computation of daily compliance with net capital requirements pursuant to CFTC Rule 1.17 (the "Net Capital Report"), and (iii) weekly and end-of-month reports regarding compliance with SEC segregation requirements pursuant to SEC Rule 15c3-3 (the "15c3-3 Report")  The group also prepared the monthly FOCUS report required by SEC Rule 17a-5.  12 C.F.R. § 17a-5(a).

The Segregation Statement, Secured Statement, and Net Capital Report were filed daily electronically and went to the CFTC, Chicago Mercantile Exchange, and National Futures Association, among others.  MFGI was required to compute its Rule 15c3-3 requirements weekly and to report any deficiency to the SEC and its examining authority.  *See* 17 C.F.R. § 240.15c3-3(i).  In addition, the monthly FOCUS reports were provided to regulators, including FINRA and the CFTC.  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Agriculture*, 112th Cong. 2d Sess. (Dec. 8, 2011) (Testimony of Jill Sommers, Commissioner, CFTC ("Sommers Testimony") at 21); *MF Global Bankruptcy: Hearing Before the H. Comm. on Financial Services, Subcomm. on Oversight and Investigations*, 112th Cong. 2d Sess. (Dec. 15, 2011) (Testimony of Richard Ketchum, Chairman/CEO, FINRA ("Ketchum Testimony") at 9).)  The Financial Regulatory Group also prepared reports that were distributed internally and reflected, among other things, the Firm Invested in Excess that was maintained in the Customer Accounts. (*See* Section VII.C, *infra*.)

### 3.    Operations

North American COO Robert Lyons served as the head of Operations for the non-FCM business in New York, which initiated requests for funding from Treasury in Chicago.  He in turn reported to the Global Head of Operations, David Simons.  Requests for funding were

made by Operations personnel, including Senior Vice President Richard Gill, and Vice

Presidents Dominick DeLucia, Richard Tramutola, and John Ferrara.  Mr. DeLucia was

primarily responsible for managing Bank of New York Mellon ("BNYM") collateral (and some

liquidity reporting), Mr. Ferrara was responsible for clearance of transactions with JPM, and

Mr. Tramutola was Equities Operations Manager and was responsible, among other things, for

interactions with the Depository Trust & Clearing Corporation ("DTCC").  Requests for funding

in New York for the non-FCM business were made on a daily basis in order to clear and settle

trades and to close out positions.  These intraday transfers were largely recorded only through

email communications and journal entries.  The resulting gaps in record-keeping, combined with

the fragmented chain of reporting and staff turnover within Treasury, Treasury Operations, and

Finance described above, contributed to the chain of events that led to the shortfall of customer

property.

### D.    Risk, Compliance, And Internal Audit

#### 1.    Risk

In August 2008, MF Global hired Michael Roseman as Chief Risk Officer

("CRO") to oversee the development and implementation of risk policies.  (*The Collapse of MF

Global: Part 2: Hearing Before the H. Comm. on Financial Services, Subcomm. on Oversight

and Investigations*, 112th Cong. 2d Sess. (Feb. 2, 2012) (Statement of Michael K. Roseman

("Roseman Statement") at 2).)  With input from outside consultants, risk policies and procedures

were developed and formalized.  (*Id.* at 2-3).

An April 2009 Enterprise Risk Policy approved by the Holdings Board identified

the executives who were responsible for key aspects of capital and liquidity risk as the CRO, the

CFO, the global and regional Treasurers, and the Asset and Liability Committee ("ALCO").[18]

The policy also envisioned a separate Global Head of Capital and Liquidity Risk responsible for

exercising risk control over liquidity management including independent and objective

assessment of liquidity risk, and contemplated liquidity contingency planning. The Policy

included an explicit recognition that segregated client funds were not available for MF Global to

use for liquidity purposes:

> In the major jurisdictions in which it operates, MF Global is forbidden to use segregated funds for any purpose other than as directed by the client. Therefore, as a matter of policy MF Global considers that segregated funds are not available to it for liquidity purposes.

## 2.    Compliance

The Compliance Department was headed by Global Chief Compliance Officer

Tracy Whille, who reported to Ms. Ferber. The Audit and Risk Committee of the Holdings

Board also received regular updates from Compliance. Following a 2008 trading incident (*see* p.

57, *infra*) and other regulatory violations, MF Global's compliance policies were formalized and

updated in Compliance Manuals, with separate manuals for the Securities and Futures

businesses. The Compliance Department also conducted surveillance and training, and prepared

periodic reports on progress in implementing and enforcing compliance standards. For the most

part, MF Global's compliance policies and procedures focused on functions of the Firm that are

not directly relevant to the issues discussed in this Report.

---

18. ALCO was a committee chaired by David Dunne, consisting of MF Global senior personnel from Finance, Treasury and Risk and various product groups that were charged with "overseeing and influencing the management of capital, liquidity and investment related risks throughout the Company in accordance with the Risk Policy, Risk Appetite Statement, and Delegations of Authority . . . . " Among the liquidity responsibilities assigned to this group were: "Overseeing the day-to-day activities related to the management of liquidity throughout the Treasury and related operations within the Company" and "[c]onsidering the results of liquidity adverse scenarios, drawing conclusions and recommending appropriate action."

### 3.     __Internal Audit__

MF Global's Internal Audit department was charged with being "a professional objective provider of risk, internal control and related advisory services." For this purpose, Internal Audit was to conduct independent reviews across the Firm. For the Americas, Internal Audit was led by Matthew Gopin in Chicago. Mr. Gopin reported to the Global Head of Internal Audit, Marcus Adams (based in the UK), who reported to the Audit and Risk Committee of the Holdings Board. Administratively, Internal Audit reported to General Counsel Laurie Ferber, who signed off on all internal audits.

## III.     __Regulatory Framework__

A number of U.S. and foreign regulatory agencies and exchanges regulated MF Global's business. (*See* 2011 10-K at 11.) In the United States, MFGI was principally regulated in the futures markets by the CFTC, the CME Group, and the National Futures Association ("NFA"), and in the securities markets, by the SEC, FINRA, and the Chicago Board Options Exchange ("CBOE"). (*Id.*) The activities of MF Global's foreign affiliates were overseen by their relevant foreign regulatory authorities. (*Id.*)

### A.     __Securities Regulation__

#### 1.     __Relevant Entities__

The SEC is the federal agency that holds primary responsibility for enforcing the federal securities laws and regulating the securities industry, domestic stock and options exchanges, and other electronic securities markets in the United States. *See* 15 U.S.C. § 78a *et seq.*; *see also* http://www.sec.gov/about/whatwedo.shtml. The SEC oversees the key participants in the securities markets, including securities exchanges, securities brokers and dealers, investment advisors, and mutual funds.

Although the SEC is the ultimate regulator of broker-dealers, the "front-line" supervisory function for the securities activities of broker-dealers is performed by self-regulatory organizations ("SROs") such as FINRA, which all broker-dealers are required to join, and the various securities exchanges through which the broker-dealer trades.  When a broker-dealer is a member of multiple SROs, one SRO is the "designated examining authority" responsible for examining the firm's compliance with the Securities and Exchange Act of 1934 (the "Exchange Act") and other relevant SEC rules and regulations, including its compliance with the SEC's capital and customer protection requirements.  15 U.S.C. § 78q(d); 17 CFR § 240.17d-1.  In the case of MFGI, the designated examining authority was the CBOE, although FINRA was also closely involved in the oversight of MFGI's broker-dealer activities.  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Agriculture*, 112th Cong. 2d Sess. (Dec. 8, 2011) (Testimony of William J. Brodsky, Chairman/CEO, CBOE ("Brodsky Testimony") at 7).)

The CBOE itself (or its subsidiaries) is an SRO under the Exchange Act and a designated contract market under the CEA.  As a self-regulatory organization and a designated contract market, CBOE is required to enforce compliance by its trading permit holders and their associated persons with the provisions of the Exchange Act, the provisions of the CEA, the SEC's rules and regulations, the regulations of the CFTC, the CBOE's own internal rules, and certain rules of the Federal Reserve Board and the Options Clearing Corporation.  *See generally* 15 U.S.C. § 78q(d); 7 U.S.C. § 7(d)(11); http://www.cboe.com/aboutCBOE/legal/disciplinary.aspx; http://www.cboe.com/AboutCBOE/Legal/PDFs/RegProcessmem.pdf.  MFGI was a clearing trading permit holder at CBOE and was subject to the CBOE's rules, regulations and oversight.

*See* CBOE Annual Report 2009 and CBOE Annual Report 2010 at 15, *available at*

http://www.cboe.com/aboutcboe/annualreports.aspx.

FINRA is also an SRO that regulates trading in equities, corporate bonds,

securities futures, and options.  *See* http://www.finra.org/AboutFINRA/P125239.  All broker-

dealers dealing in securities are required to be member firms of FINRA, unless they are regulated

by another self-regulatory organization.  *See* 15 U.S.C. § 78o(b)(8); 17 CFR 240.15b9-1;

http://www.sec.gov/divisions/marketreg/bdguide.htm.  FINRA promulgates rules to govern

member behavior, audits members for regulatory compliance, and is authorized by the SEC to

discipline member firms that fail to comply with federal securities laws and FINRA's rules and

regulations.  *See generally* http://www.finra.org/AboutFINRA/P125239.  MFGI was a member

firm of FINRA, which from time to time examined the broker-dealer business of MFGI to ensure

regulatory compliance.  (Brodsky Testimony at 7; *MF Global Bankruptcy: Hearing Before the*

*H. Comm. on Agriculture*, 112th Cong. 2d Sess. (Dec. 8, 2011) (Testimony of Stephen Luparello,

Vice Chairman, FINRA ("Luparello Testimony") at 12-13).)

### 2.    SEC Customer Protection Rules

Customer funds and securities that have been entrusted to a securities broker-

dealer are required to be protected under SEC Rule 15c3-3, the Customer Protection Rule.

17 C.F.R. § 240.15c3-3.  With respect to securities, a firm must maintain physical custody or

control (as defined in the Rule) of all fully-paid and excess margin securities carried for the

accounts of its customers.  17 C.F.R. § 240.15c3-3(b), (c).  In addition, a broker-dealer must

maintain a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (a "Reserve

Account") separate from its other bank accounts.  17 C.F.R. § 240.15c3-3(e).  A U.S. broker-

dealer must have a written agreement with the bank that the Reserve Account funds are not to be

used directly or indirectly as security for a loan and must maintain a "no-lien letter" from the

bank acknowledging this limitation. 17 C.F.R. § 240.15c3-3(f). The Reserve Account must contain an amount not less than the amount computed under the SEC reserve formula, which is calculated weekly as of the close of business on the last business day of the week. 17 C.F.R. § 240.15c3-3(e)(1), (3). The calculation generally computes credits corresponding to cash obligations owed by the BD to customers or in connection with customer transactions less debits corresponding to obligations owed by customers or in connection with customer transactions to the broker-dealer. *See* 17 C.F.R. § 240.15c3-3a.

In addition to the Customer Protection Rule, the Net Capital Rule, SEC Rule 15c3-1, seeks to ensure that a broker-dealer has sufficient liquid assets to enable a firm, should it fall below its minimum requirement, to liquidate in an orderly fashion. 17 C.F.R. § 240.15c3-1. Generally, net capital is measured by the broker-dealer's equity under U.S. Generally Accepted Accounting Principles ("GAAP"), plus subordinated debt, minus illiquid assets (non-current assets such as property, plant and equipment, prepaid assets, and the like) and other charges (regulatory charges and securities haircuts). *Id.*; *see also* General Instructions for Form X-17A-5 Part II. The broker-dealer's net capital is compared to its established net capital requirement (generally the greater of a specific dollar amount dependent on the type of broker-dealer or a risk-based requirement), and the broker-dealer is required to maintain an appropriate level of excess net capital or face significant operational restrictions, sometimes including cessation of operations. *See generally* 17 C.F.R. § 240.15c3-1; 17 C.F.R. § 240.17a-5. FINRA required an early notification if the net capital fell below 120%. FINRA Rule 4120(a)(1)(E), *available at* http://finra.complinet.com/; 17 C.F.R. § 240.17a-11. The net capital calculation is performed and submitted as part of the broker-dealer's monthly FOCUS report filing. *See* 17 C.F.R.

§ 240.15c3-1; Oct. 2011 FOCUS Report, Part II.  Broker-dealers are expected to be in

compliance with the Net Capital Rule at all times.  *See* 17 C.F.R. § 240.15c3-1(a).

### 3.    Foreign Securities Regulators

In the United Kingdom, the Financial Services Authority ("FSA") is an

independent, non-governmental body that regulates the financial services industry, including

financial services markets, exchanges and firms.  *See* http://www.fsa.gov.uk/pages/about/who/

index.shtml.  The FSA has a wide range of rule-making, investigatory and enforcement powers

under the Financial Services and Markets Act 2000.  *See* FSA, "What we do: regulatory

approach," *available at* http://www.fsa.gov.uk/pages/about/what/approach/index.shtml.[19]  This

regulatory authority sets standards for and has rule-making powers over individuals and firms

carrying on regulated activities by way of business in the United Kingdom and is empowered to

take action if such firms or individuals fail to comply with these rules and standards.  The four

main statutory objectives for the FSA are:  (i) maintaining market confidence, (ii) ensuring

customer protection, (iii) reducing and preventing financial crime, and (iv) contributing to the

stability of the U.K. financial system.  *See*

http://www.fsa.gov.uk/pages/about/aims/statutory/index.shtml.  MFGUK was subject to FSA

supervision, which included regular risk assessment and monitoring.  *See*

http://www.fsa.gov.uk/pages/doing/regulated/supervise/index.shtml.  FSA requires firms such as

MFGUK to submit to an Internal Capital Adequacy Assessment Process ("ICAAP") that

includes a regulatory capital component.  *See*

http://www.fsa.gov.uk/about/what/international/basel/info/pil2.

---

19.  The FSA's responsibilities are in the process of being transferred to a number of new agencies, including the
Prudential Regulatory Authority.  FSA, "Prudential Regulatory Authority: the future approach to banking
supervision," *available at* http://www.fsa.gov.uk/library/communication/pr/2011/043.shtml.

MF Global Canada was primarily regulated by the Investment Industry

Regulatory Organization of Canada ("IIROC"), which is a self regulatory organization that

enforces rules regarding the conduct of broker-dealers and conducts reviews of a broker-dealer's

capital compliance.  *See generally* IIROC Website, *available at*

http://www.iiroc.ca/English/Pages/home.aspx.[20]  IIROC sets regulatory and investment industry

standards, protects investors and ensures market integrity while maintaining Canada's capital

markets.  *See* http://www.iiroc.ca/English/About/Pages/default.aspx.  IIROC sets and enforces

rules regarding the proficiency, business and financial conduct of broker-dealers and their

registered employees and sets and enforces market integrity rules regarding trading activity on

Canadian equity marketplaces.  IIROC, "About IIROC," *available at*

http://www.iiroc.ca/English/About/Pages/default.aspx.

> **B.**    **Commodities Regulation**

> **1.**    **Relevant Entities**

The CFTC is an independent agency of the U.S. government that regulates futures

and options markets.  Its mission is to protect participants on the futures and options markets and

the public from fraud, manipulation, abusive practices and systemic risk related to derivatives

that are subject to the CEA.  *See* http://www.cftc.gov/About/MissionResponsibilities/index.htm.

The CFTC oversees derivatives clearing organizations and other market participants in the

clearing process, including futures commission merchants, swap dealers, major swap participants

and large traders.  *See* 7 U.S.C. § 2.  The CFTC also monitors the clearing of futures, options on

futures, and swaps by derivatives clearing organizations, assesses derivatives clearing

---

20.  Other regulatory agencies for MF Global's foreign affiliates include: the Australian Securities & Investments
     Commission for MF Global Australia Limited, the Monetary Authority of Singapore for MF Global Singapore
     Pte. Limited, and the Hong Kong Securities and Futures Commission for MF Global Holdings HK Limited.

organizations' compliance with regulations, and conducts risk assessment and surveillance.  *See*

http://www.cftc.gov/About/MissionResponsibilities/index.htm.  MFGI was a registered FCM

and was subject to the CFTC's oversight and regulation.

The CME Group ("CMEG") is the world's largest derivatives marketplace,

formed from the merger of the Chicago Mercantile Exchange and the Chicago Board of Trade in

2007.  CMEG's Clearing House Division is a subsidiary of the CMEG.  Other exchanges owned

by CMEG are the Board of Trade of the City of Chicago, Inc., the New York Mercantile

Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX").  These entities are

generally referred to in this Report as the "CME."  *See*

http://www.cmegroup.com/company/membership/.

The CME confirms, clears and settles all derivatives contracts traded at the

CMEG exchanges, acts as the central counterparty and provides a performance guaranty for all

futures and options contracts cleared through these exchanges.  (*See MF Global Bankruptcy:*

*Hearing Before the H. Comm. on Financial Services, Subcomm. on Oversight and Investigations*,

112th Cong. 2d Sess. (Dec. 15, 2011) (Testimony of Terry Duffy, Exec. Chairman, CME Group

("Duffy Testimony") at 3).)  CME was also the designated self-regulatory organization

("DSRO") for MFGI.  (*Id.*)  As MFGI's DSRO, CME was responsible for:  (i) conducting audits

of MFGI on a risk-based cycle; (ii) reviewing the monthly and annual reports submitted by

MFGI; and (iii) reporting any concerns or deficiencies in MFGI's compliance with CFTC

regulations.  (*Id.*)

## 2.    Net Capital Requirement

CFTC regulations require FCMs to maintain adjusted net capital equal to or in

excess of the greatest of: (i) $1 million, (ii) the FCM's risk-based capital requirement, computed

as eight percent of the total risk margin requirement for positions carried by the FCM in

customer accounts and noncustomer accounts; (iii) the adjusted net capital requirements imposed

by the registered futures association of which the FCM is a member; or, (iv) the capital

requirements of SEC Rule 15c3-1(a) if the FCM is also registered as a broker-dealer.  17 C.F.R.

§ 1.17.  Each FCM has an "early warning level," which is the greater of either: 1) 150% of

adjusted net capital, or 2) 110% of its minimum risk-based capital.  17 C.F.R. § 1.12.  The CFTC

requires that the FCM have at all times sufficient net capital — *i.e.*, its current assets exceed its

liabilities — in order to continue operations.  *See* 17 C.F.R. § 1.17.

Because MFGI was also registered as a broker-dealer, it needed to comply with

the FINRA 120% notification level, which was higher than the 110% CFTC risk-based level.

*Compare* 17 C.F.R. § 240.17a-11(b)(3), *with* 17 C.F.R. § 1.12(b)(2).  The Financial Regulatory

Group (generally Mr. Cooley) prepared a Daily Estimated Net Capital - U.S. Benchmark

Summary, which summarized the capital levels and provided the CFTC Net Capital requirement,

the CFTC Excess Net Capital, the Global Estimated Total Capital, and the surplus in excess of

the FINRA 120% Notification level.  In the internal version, circulated internally to Jon Corzine,

Henri Steenkamp, David Dunne, Kemper Cagney, Vinay Mahajan, Christine Serwinski, Edith

O'Brien and others, the amount of capital in excess of the FINRA Notification Level was

highlighted in the subject line and the schedules showed information from the Segregation

Statement and the Secured Statement, including the amounts required to be kept in 4d and 30.7

accounts, the amounts in each account, and the amount of the Firm Invested in Excess.

### 3.    **FCM Customer Accounts**

The trading of commodities futures in the United States is governed by the CEA

and the regulations promulgated by the CFTC.  The general governing provision is set forth in

Section 4d(2)(a) of the CEA, which provides that customer property "shall be separately

accounted for and shall not be commingled with the funds of such commission merchant or be

used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held."  Section 4d further provides, however, that funds of different customers can be commingled or deposited in the same account or accounts.  7 U.S.C. § 6d(a)(2).

The CFTC regulations provide more specific guidance.  An FCM must segregate and separately account for customer funds of U.S. and foreign customers trading on U.S. exchanges.  17 C.F.R. §§ 1.20, 30.7.  Similarly, FCMs may engage in the offer and sale of commodities futures and option contracts on foreign exchanges only in accordance with Rule 30.7.  The regulations also require that an FCM maintain in a separate account or accounts money, securities, and property "in an amount at least sufficient to cover or satisfy all of its current obligations" to U.S. customers (and, at the election of the FCM, foreign customers) trading on foreign exchanges.  17 C.F.R. § 30.7(a).  As noted above, however, there is a permissible "Alternative Method" that requires potentially less than the total amount of customer funds to be secured in 30.7 accounts.

### 4.    Segregation Statement

The CFTC regulations require an FCM to compute a daily Segregation Statement "as of the close of each business day," which includes (1) the total amount of customer funds on deposit in segregated accounts; (2) the amount of such customer funds required by the Act and its regulations to be on deposit in segregated accounts; and (3) the amount of the FCM's residual interest in such customers funds.  17 C.F.R. § 1.32.

Regulation 1.23 specifically allows an FCM to have a residual interest in the funds on deposit in customer segregated accounts, and to add its own funds or unencumbered securities as it may deem necessary to keep customer funds from becoming under segregated.

An FCM can withdraw funds for its own use to the extent of its actual interest.  17 C.F.R.

§ 1.23.[21]

The Segregation Statement lists:  (a) the "Segregation Requirements," which are

MFGI's obligations to FCM customers trading on U.S. exchanges; (b) the "Funds on Segregated

Requirements," which are the assets segregated by MFGI to meet its obligations to customers,

and the amount of the FCM's funds in the segregated assets; and (c) the amount of the excess.

*See generally* 17 C.F.R. § 1.32.  The amount required to be segregated is a net liquidating value

— the amount required to liquidate all customer positions.

The question has arisen whether excess funds in segregated accounts could be

used by the FCM intraday for its own purposes.  Since the CFTC regulations specifically allow

an FCM to withdraw funds equivalent to its own residual interest in the account

(17 C.F.R. § 1.23), there is no question that, to the extent an FCM has its own funds in the

segregated accounts, those funds may be withdrawn.  With respect to customer funds, however,

the CFTC has stated that customer funds must remain intact "at all times."  (Sommers

Testimony, at 4.)  The CFTC has also stated that while customer segregated funds may be

invested in specific investments permitted by Regulation 1.25, the regulations do not permit an

FCM to take customer money from a segregated account and return the money at a later time.

(*Id*. at 6-7.)  Because the regulations require the segregated calculations to be computed "as of

---

21.  *See* 17 C.F.R. § 1.23 ("The provision in Section 4d(a)(2) of the Act and the provision in § 1.20(c), which
prohibit the commingling of customer funds with the funds of a futures commission merchant shall not be
construed to prevent a futures commission merchant from having a residual financial interest in the funds,
segregated as required by the Act and the rules in this part and set apart for the benefit of commodity or option
customers; nor shall such provisions be construed to prevent a futures commission merchant from adding to
such segregated customer funds such amount or amounts of money, from its own fund or unencumbered
securities from its own inventory, of the type set forth in § 1.25, as it may deem necessary to insure any and all
commodity or option customers' accounts from being undersegregated at any time.  The books and records of a
futures commission merchant shall at all times accurately reflect its interest in the segregated funds.")

the close of each business day," however, some personnel at MFGI interpreted the regulations as

permitting customer funds to be used intraday.  Generally, until the final week of MFGI's

operations, there was a sufficient excess in the Customer Accounts to cover intraday transfers

(although, as discussed below, much of the excess was attributable to the Regulatory Excess that

resulted from using the Alternative Method for the Secured Statement rather than a true excess

above the Net Liquidating Method).

### 5.      Permitted Investments for Segregated Assets

Regulation 1.25 specifies that segregated customer funds may be invested in U.S.

government and agency securities, municipal bonds, bank certificates of deposit, commercial

paper, corporate notes, sovereign debt securities, and money market mutual funds.  17 C.F.R.

§ 1.25.  In addition, an FCM may utilize reverse repos (whereby the FCM gives cash to a

counterparty in exchange for securities collateral for a contracted period of time to generate

investment income), provided that the securities subject to such agreements are securities

consistent with those outlined in Regulation 1.25.  These reverse repurchase agreements must be

in compliance with the specific parameters outlined in Regulation 1.25.  Generally, these

parameters specify the permitted counterparties (limited to banks or other broker-dealers), terms

of the agreement (limited to overnight agreements or agreements that do not prohibit early

termination), documentation of the agreement (separately identifiable securities with written

contracts and confirmations required for the agreements), and a required location of the securities

collateral (retained in safekeeping accounts that are acknowledged as segregated for customers

by the depository institution).  17 C.F.R. § 1.25(d).

6. **Secured Statement For 30.7 Funds For Trading Foreign Futures on Non-U.S. Exchanges**

Rule 30.7(f) requires each FCM to compute "as of the close of each business day":  (1) the total amount of money, securities and property on deposit in separate account(s); (2) the total amount of money, securities and property required to be on deposit in separate account(s); and (3) the amount of the [FCM's] residual interest in money, securities and property on deposit in separate account(s).  17 C.F.R. § 30.7(f).  The Secured Statement consists of two main sections:  1) "Foreign Futures and Options Secured Amounts" representing MFGI's obligations to FCM customers trading on foreign domiciled exchanges, and 2) "Funds on Deposit in Separate Reg. 30.7 Accounts" representing assets secured by MFGI to meet its obligations.[22]  *Id.*

There are two methods under which a FCM may compute its secured amount requirement.  The common method historically used by FCMs to determine their secured amount requirement is the Net Liquidating Method, which is calculated from the sum of the net liquidating value of customer accounts plus any customer securities held (the "Netliq Requirement").  (*See* Foreign Futures and Options Guide, The Joint Audit Committee, December 2001, at 5-5.)  This method mirrors the computation used to calculate the Segregation Requirement for customer trading on U.S. exchanges.  Alternatively, an FCM may elect to use the Alternative Method in calculating the secured amount requirement.  The Alternative Method is the sum of an account's risk maintenance margin requirement ("MMR"), open trade equity ("OTE"), securities and net options value ("NOV") (the "Alternative Secured Requirement").

---

22.  The CFTC requires that funds be secured for U.S.-domiciled customers trading on foreign exchanges, but allows FCMs to include the accounts of foreign-domiciled customers in its calculation.  MFGI included both.

*See* 17 C.F.R. § 1.3(rr); Foreign Futures and Options Guide, The Joint Audit Committee, December 2001, at 5-6.

The Alternative Secured Requirement is computed on a customer account by customer account basis and results in a significantly lower regulatory requirement as compared to the Netliq Requirement.  Thus, use of the Alternative Method meant that the regulatory requirement for funds to be kept in secured accounts — the Alternative Secured Requirement — was significantly lower than actual customer net liquidating balances.  The Secured Statement filed with the regulators showed the amount required to be secured under the Alternative Method.  The "Regulatory Excess" was the difference between the Netliq Requirement and the Alternative Secured Requirement.  Prior to the acquisition of Refco, MFGI used the Net Liquidating Method, while Refco used the Alternative Method.  Around the time MFGI acquired the assets from Refco in 2005, MFGI decided to use the Alternative Method.

During the month of October 2011, the Regulatory Excess was, on average, $1.04 billion, representing the amount of customer balances that MF Global would not be required to lock up in the secured calculation.  (Annex D.)  The difference between the two methods is attributable primarily to the fact that the Alternative Method does not include in the calculation any customer ledger or cash balance amounts in excess of the maintenance margin requirement.  Thus, an account that has no open foreign futures and options positions, but contains a positive ledger balance, would have a secured amount requirement of $0.  As such, the FCM would not be required to set aside funds in the secured calculation for these customers.[23]

_____

23.  For example, if a customer deposits $100,000 in cash into her "30.7" Foreign Secured account on Day 1, in order to start trading on UK exchanges, but has no open positions, there is no maintenance margin requirement, and therefore, under the Alternate Method, there would be a $0 requirement for MFGI to set aside her deposited funds.  Conversely, under the Net Liquidating Method, there would be a $100,000 requirement.

Additionally, if the customer withdraws its money, the withdrawal may not have a dollar-for-dollar impact on the 30.7 requirement.

### 7.    Permitted Investments for Secured Assets

Until recently, the investment guidelines for secured assets were "general in nature," and did not limit investment to permitted investments under Regulation 1.25.  76 Fed. Reg. 78776-01, 78777 (Dec. 19, 2011) (citing Commission Form 1-FR-FCM Instructions at 12-9 (Mar. 2010) ("In investing funds required to be maintained in separate section 30.7 account(s), FCMs are bound by their fiduciary obligations to customers and the requirement that the secured amount required to be set aside be at all times liquid and sufficient to cover all obligations to such customers. Regulation 1.25 investments would be appropriate, as would investments in any other readily marketable securities.").)  As a result of recent amendments that take effect this summer, Rule 30.7(g) now notes that, "Each futures commission merchant that invests customer funds must invest such funds pursuant to the requirements of § 1.25 of this chapter."  Thus, the permitted investments for secured assets are the same as those allowed for segregated assets as described in Section III.B.5, above.

### 8.    MFGI Policy

Although MFGI employed the Alternative Method for purposes of reporting the secured requirement to regulators, it prepared a daily Secured Statement for internal distribution using both the Net Liquidating Method and the Alternative Method.  MFGI's practice was to continue to use the Alternative Method for regulatory reporting, but to monitor balances in the Customer Segregated and Foreign Secured accounts in total as if they were using the Net Liquidating Method.  All customer funds not required to be kept in 30.7 accounts under the Alternative Method were required to be maintained in regulated accounts.  MFGI calculated the "Firm Invested in Excess" each day — the total amount of the aggregate of any segregated funds

excess and foreign secured excess — using the Net Liquidating Method.  (*See*, *e.g.*, Serwinski Statement at 3.)  The Firm Invested in Excess was monitored and if it was negative when the 15c3-3 calculation was done, the amount of the deficiency was included in the amounts to be locked up per MFGI policy.

### 9.    **Daily Reporting**

The Financial Regulatory Group in Chicago was charged with preparing the daily Segregation Statement, Secured Statement, and Net Capital Report which they would submit each day electronically to the CFTC, CME and others.  (*See* Section II.C.2, *supra*.)

For the Segregation Statement, either Mr. Cooley or Ms. Campbell extracted information from MFGI's records as to the amount required to be segregated and the amounts actually segregated.  This included deposits in Customer Segregated accounts (cash and securities), margins on deposit with clearing organizations, settlements due to or from clearing organizations, and unrealized receivables or obligations for options contracts.  Mr. Cooley or Ms. Campbell would also prepare a version of the Secured Statement for internal distribution only that reflected the Firm's requirements to protect customer funds using both the Alternative and Net Liquidating Methods.

After review by Mr. Hughey, the internal Segregation Statement and Secured Statement reports were circulated internally at MFGI to the Financial Reporting Group, Treasury and Treasury Operation Groups, as well as to several New York executives including Mr. Mahajan.  After internal circulation, the Regulatory Group would finalize the report, which would show only the Alternative Method for the Secured Statement, and send it to the CFTC, the

CME, and the NFA via electronic filing on WinJammer Online Filing System ("WinJammer")[24]

and via email to the CBOE.  As reflected in an August 26 email from Mr. Hughey, the Financial

Regulatory Group did not historically perform "any type of analytics or analysis as to the drivers

of either the Daily Segregated or the Daily Secured Computation."

Treasury Operations tracked the balance of outgoing and incoming customer

wires from the Customer Segregated accounts (indicated in statements by the designation "F1")

and from the Foreign Secured accounts (indicated in statements by the designation "F2") each

day.  Treasury Operations also generated each day after conclusion of such movements a

summary report titled "Daily Excess Seg," which showed the estimated changes to seg balances

throughout the day ("Daily Excess Seg Movement Report").  The excess was allocated between

the Customer Segregated and Foreign Secured accounts.  MFGI had an informal target of

maintaining $400 million in the segregated accounts, although much of this excess was created

only by the use of the Alternative Method, which did not require segregation of all customer

funds.  The Daily Excess Seg Movement Report was sent to the Financial Regulatory Group[25]

with a recommendation from Treasury Operations as to whether a transfer between accounts was

appropriate to maintain target excess balances in the Segregated Accounts.  Upon approval by

the Financial Regulatory Group, a transfer would be made.

---

24. WinJammer is a web application used by futures firms to enter and transmit FOCUS reports, 1FR-FCM and
other financial statements.  Since the time of the Refco acquisition in 2005, MFGI was required to file a daily
Segregation Statement and a daily Secured Statement with the regulators.

25. Other personnel from Finance, Treasury and Treasury Operations were copied on the transmittal.

IV.    **Key Third Parties**

A.    **Clearing Houses And Exchanges**

1.    **Securities**

On the securities side of its business, MFGI was a self-clearing member of the DTCC. MFGI funded and settled its own trades and the trades of its customers directly through the DTCC's subsidiaries without the use of an intermediary. The DTCC subsidiaries that MFGI interacted with include the Depository Trust Company ("DTC"), the National Securities Clearing Corporation ("NSCC"), and the Fixed Income Clearing Corporation ("FICC"), which has both a Government Securities Dealer ("GSD") division and a Mortgage Backed Securities ("MBSD") division. The DTC serves as a custodian of the securities deposited by its participants and provides clearing and settlement services to market participants by making automated "book-entry" changes to reflect changes of ownership of the securities and also assists with settlement for institutional trades (which typically involve money and securities transfers between custodian banks and broker-dealers) as well as money market instruments. http://www.dtcc.com/about/subs/dtc.php. NSCC provides clearing, settlement, risk management, central counterparty services and a guarantee of completion for virtually all U.S. broker-to-broker trades involving equities, corporate and municipal debt, American depositary receipts, exchange traded funds and unit investment trusts. http://www.dtcc.com/about/subs/nscc.php. FICC provides real-time trade matching, clearing, risk management and netting for trades in U.S. Government debt issues, including repos and to the mortgage-backed securities market http://www.dtcc.com/about/subs/ficc.php.[26]

---

26.  MFGI had four accounts with FICC, two in the GSD and two in the MBSD.

DTCC, through its subsidiaries, provides clearing, settlement and information services for virtually all equities, corporate and municipal bonds, U.S. government securities, mortgage-backed securities, commercial paper and other money market instruments traded in the U.S.  At its core, DTCC is a huge data processing and risk management business, involving the safe transfer of securities ownership and the settlement of trillions of dollars in trade obligations every day.  DTCC manages risk through various methods, including: (1) continuous trade netting; (2) setting minimum capital adequacy standards for its members; (3) maintaining a clearing fund; and (4) requiring members to post collateral based on that member's open trading positions every day.

As SEC-registered clearing agencies, the DTC, NSCC and FICC each issue SEC-approved rules and procedures that govern the trading activity and conduct of their participants, including broker-dealers.  As part of these rules and procedures, the DTC, NSCC and FICC set minimum standards for capital adequacy and collateral that a broker-dealer must maintain in order to conduct market transactions.[27]  Participants who conduct transactions though the DTC, NSCC or FICC must also provide the relevant clearing agency with certain required information, including ongoing financial, operational and regulatory reports.  A failure to comply with these reporting requirements or the other rules and procedures of the DTC, NSCC, or FICC can result in disciplinary sanctions and fines.[28]

---

27. *See* http://dtcc.com/products/fi/ficc_financial_reqs.php.

28. *See* http://www.dtcc.com/legal/compliance/reporting.php.

MFGI was also a member of the Options Clearing Corporation (the "OCC"),[29]

which acts as both the issuer and guarantor for option and futures contracts. The OCC also

provides clearing and settlement services for both securities and commodities transactions in

futures products, including options and future contracts.[30]   For securities lending transactions, the

OCC offers central counterparty clearing and settlement services.[31]   MFGI primarily used the

OCC to clear and settle equity option trades.   The OCC also promulgates rules and regulations

which govern the market activities, conduct and capital and collateral requirements of its

participants. And as a SEC registered clearing agency, all of OCC's rules and regulations are

approved by the SEC.  15 U.S.C. § 78f(b); 17 C.F.R. § 240.19b-4.

### 2.    FCM

The majority of MFGI's futures business was conducted on the CME's various

exchanges (Section III.B.1, *supra*), with MFGI also providing access to the following exchanges

for its customers (in descending order of value traded):  Intercontinental Exchange, Inc.

("ICE");[32] the OCC; the Kansas City Board of Trade ("KCBT"); the Minneapolis Grain

Exchange, Inc. ("MGEX"); and New York Portfolio Clearing ("NYPC").  (2011 10-K at 11.)

These exchanges are known as Derivatives Clearing Organizations ("DCOs").

DCOs stand between two member firms or clearing participants and serve to

reduce the risk that one (or more) member firms or clearing participants might default on their

---

29.  The OCC operates under the jurisdiction of the SEC as a registered clearing agency and under the jurisdiction of
      the CFTC as a derivatives clearing organization.  *See* http://www.optionsclearing.com/about/corporate-
      information/what-is-occ.jsp.

30.  *See* http://www.optionsclearing.com/about/corporate-information/what-is-occ.jsp.

31.  *Id.*

32.  The Clearing Corporation (the "TCC") is an ICE subsidiary through which MFGI also conducted business.  *See*
      ICE Annual Report 2011, *available at* http://ir.theice.com/annuals.cfm.

trade settlement obligations.  DCOs also seek to reduce settlement risks by (i) netting offsetting transactions between multiple counterparties; (ii) requiring margin deposits; (iii) providing independent valuation of trades and collateral; (iv) monitoring the credit worthiness of the member firms; and (v) in many cases, providing a guarantee fund that can be used to cover losses that exceed a defaulting member firm's collateral on deposit.  Additionally, DCOs enable member firms to substitute the credit of the DCO for the credit of the parties to the contracts that trade on their exchanges.  Each DCO also issues its own rules and procedures that govern the trading activity, conduct and collateral requirements of their participants.  *See, e.g.*, CME Rules 971 ("Segregation, Secured and Sequestered Requirements"), 583 ("Domestic Cross-Exchange Trading"), 903 ("Responsibility for Qualified Members"), and 80104 ("Clearing Self Referencing CDS Contracts").

In addition to being a DCO, the CME was also MFGI's DSRO.  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Agriculture*, 112th Cong. 2d Sess. (Dec. 8, 2011) (Testimony of Dan Roth, Chairman/CEO, NFA ("Roth Testimony") at 29).)  As MFGI's DSRO, the CME was charged with supervising MFGI's compliance with the financial and reporting requirements of the CEA and relevant CFTC regulations.  (*Id*.)  In order to ensure compliance, the CME conducted periodic audits of the FCM and shared the results of the audit with the other regulatory bodies of which the firm is a member.  (*Id*.)  The CME conducted audits of MFGI every nine to fifteen months pursuant to standards and procedures established by the Joint Audit Committee ("JAC")[33] and reported such results to the CFTC and MFGI's DCOs.  (Duffy

---

33.  The JAC is a representative committee of the U.S. futures exchanges and regulatory organizations that MFGI used to conduct futures transactions.  The JAC created a joint audit and financial surveillance program that was approved and overseen by the CFTC.  CFTC regulations permit self regulatory organizations, such as the DCO listed above, to delegate their financial surveillance responsibilities to a DSRO to avoid the duplication of

(Footnote continued on next page)

Testimony at 7.)  The most recent audit was as of January 31, 2011, which the CME completed

in August 2011 and which did not find any material problems with MFGI's calculations of net

capital, segregated amounts or secured amounts.

MFGI was a member of each exchange, trading futures contracts and options both

on its own behalf, and also providing execution and clearing services for MFGI clients in

customer omnibus accounts.  As an exchange member, MFGI was required to maintain clearing

deposits and other membership assets, such as purchased membership seats on the exchange and,

for certain exchanges, stock in the exchange.  Exchanges require these assets to cover potential

defaults by a clearing member on open transactions, and can (and with respect to MFGI did)

increase the requirements when the member's positions or credit risk pose an  additional risk of

default.  In addition, client positions on the exchanges require margin, typically calculated at

least daily based on the mark-to-market ("MTM") change in the value of the positions.  MFGI

was required to collect margin from its clients for each customer's position and to post margin

for its house positions.  Margin calls from exchanges or return of excess margin when the market

changes were favorable to MFGI positions were ordinarily taken from or deposited directly to

the MFGI bank accounts.

In addition to the exchange requirements for margin, MFGI imposed additional

margin requirements for certain clients to address the credit risk they posed.  To meet the

fluctuating margin requirements imposed by exchanges and, if applicable, the additional credit

risk margin requirements imposed by MFGI, futures and options clients frequently left amounts

---

(Footnote continued from prior page)

monitoring and auditing efforts.  *See* 17 C.F.R. § 1.52(c) (authorizing two or more self-regulating organizations
to file a plan with the Commission delegating to a designated self-regulatory organization the responsibility of
"monitoring and auditing for compliance with the minimum financial and related reporting requirements
adopted by such self-regulatory organizations. . . .")

in their MFGI accounts significantly in excess of the day-to-day margin requirements.  In the event of default, these margin payments would be used to cover the customers' contractual obligations.

### B.    Foreign Exchanges

MFGI also provided its FCM customers with significant access to non-domestic futures markets, primarily through its affiliates MFGUK and MF Global Canada.  (2011 10-K at 11.)  MFGI did not have a direct membership relationship with any of the foreign exchanges, and accordingly traded through MFGUK and other affiliates both for its proprietary positions and on behalf of its customers.  The primary foreign exchange that MFGI accessed through MFGUK was the LCH.  The LCH is a leading European clearing house that clears a broad range of asset classes.  As a clearing house, LCH sits in the middle of a trade, assuming the counterparty risk involved when two members trade.[34]  In this role, LCH collects initial and variation margin from the participants, and should one of the participants fail to deliver, LCH uses this margin to fulfill the failing party's obligations.[35]  MFGI conducted both proprietary transactions and transactions for its 30.7 customers with LCH through MFGUK, which was a member of LCH.  Exchanges that MFGI accessed through MFGUK, and as a result of which transactions were cleared through

---

34.  *See* http://www.lchclearnet.com/about_us/.

35.  (LCH Clearnet Rule Book, as of Sept. 23, 2011, ("LCH Rule Book") at 62-63.)  Under the LCH Clearing Rule Book, initial margin is the amount calculated by LCH "to cover the liquidation risk and resulting from" MFGUK's open positions "as a result of Transactions registered with [LCH] in the name of" MFGUK.  LCH Rule Book at 10.  Variation margin is the amount LCH calculated to cover the negotiation risk and resulting from daily revaluation to the settlement price of MFGUK's open positions.  (*Id.* at 15.)  In the event that MF Global were to be downgraded below the minimum rating of BBB, MFGUK's initial margin requirement would automatically be multiplied by 110% in the event of a downgrade to BBB-, and 200% in the event of a downgrade to BB+.  Further downgrades below BB+ could lead LCH to terminate MFGUK's membership.  (*Id.* Art. 2.3.3.3.)

clearing houses such as LCH, included Eurex, ICE Futures Europe, London Metal Exchange,

and the London Stock Exchange.  (2011 10-K at 11.)

C.    **Bank Accounts**

1.    **Summary**

MFGI cash transactions alone spanned 48 bank accounts at eight financial

institutions, including Customer Segregated, Foreign Secured, and house accounts on the FCM

side, and house/clearing and Rule 15c3-3 accounts on the securities side.  In addition, MFGI had

24 accounts for deposit of securities across six financial institutions, including accounts for

clearance and settlement of securities transactions, segregated accounts for customer property,

and accounts specifically designated for pledge of securities, in some instances as margin, and in

others to secure financing.  The following table summarizes the main accounts within these

groupings and includes the definitions of certain accounts used in this Report:

**Quick Reference Guide to Main MFGI Accounts**

MFGI - Cash Accounts

| | Purpose / Classification | Financial Institution | Account # | |
|---|---|---|---|---|
| CUSTOMER | BD - RESERVE CASH 15C33 | Harris Bank | 245-280-3 | x2803 |
| | | | 267-129-5 | x1295 |
| | | | 328-774-5 | x7745 |
| | | JPMorgan Chase | 323-347312 | x7312 |
| | FCM - CUSTOMER SEG | Harris Bank | 247-859-2 | x8592 |
| | | | 263-937-5 | x9375 |
| | | | 325-013-1 | x0131 |
| | | JPMorgan Chase | 323-960650 | x0650   ("JPM Customer Trust Account") |
| | | | 910-2-591055 | x1055   ("JPM Customer Seg Account") |
| | | Wells Fargo | 412-1453815 | x3815 |
| | | | 412-1453864 | x3864 |
| | FCM - FOREIGN SECURED | Harris Bank | 245-263-9 | x2639 |
| | | JPMorgan Chase | 323-961290 | x1290   ("JPM Foreign Secured Trust Account") |
| | | | 910-2-591063 | x1063   ("JPM Foreign Secured Account") |
| HOUSE | HOUSE - BD | Bank of New York Mellon | 8901-030910 | x0910   ("BNYM Clearing Account") |
| | | | 8901-031208 | x1208   ("BNYM DTC Account") |
| | | Harris Bank | 267-130-3 | x1303 |
| | | JPMorgan Chase | 799831201 | x1201   ("JPM BD Wire Account") |
| | | | 066-650070 | x0070   ("JPM Clearing Account") |
| | | | 066-650089 | x0089   ("DTC settlement account") |
| | HOUSE - FCM | Harris Bank | 245-331-4 | x3314 |
| | | JPMorgan Chase | 910-2-591048 | x1048   ("Treasury House Account") |

From time to time, MFGI and other affiliates received funding via intercompany transfers from Holdings, which moved through an account at JPM belonging to FINCO, an unregulated Holdings subsidiary.  Holdings and a number of MFGI affiliates, including MF Global Special Investor, LLC, MFGUK and MF Global Canada Co. traded through accounts with MFGI as their commodities FCM or securities BD, in addition to maintaining their own depository accounts.

As detailed in Section VII.D below, JPM (along with BNYM) provided clearing services to MF Global's non-FCM business.  JPM was also the primary repository of FCM customer segregated accounts, and was the administrative agent for two MF Global lending facilities.  JPM also entered into securities lending and repurchase agreements with MF Global including in connection with a multi-billion dollar securities lending program.  (*See MF Global*

*Bankruptcy: Hearing Before the H. Comm. on Financial Services, Subcomm. on Oversight and Investigation*, 112th Cong. 2d Sess. (Mar. 28, 2012) (Statement of Diane Genova, Deputy General Counsel, JPMorgan Chase & Co. ("Genova Statement"), at 3).)

### 2.   FCM Accounts

On the FCM side of MFGI's business, JPM was the primary repository of Customer Segregated and Foreign Secured cash required to be segregated in compliance with CFTC regulations.  MFGI's largest Customer Segregated account was JPM account number 323-960650 (the "JPM Customer Trust Account").  The corresponding Foreign Secured account was JPM account number 323-961290 (the "JPM Foreign Secured Trust Account").  Both the JPM Customer Trust Account and the JPM Foreign Secured Trust Account were interest bearing accounts into which any excess proprietary funds of the Firm, including excess funds from the BD, were swept each evening for the purpose of maintaining a cushion in the regulated accounts and to earn interest on the overnight funds in these accounts.[36]

### 3.   Non-FCM Accounts and the Securities Lending Program

MFGI used both JPM and BNYM (collectively, the "Clearing Banks") as clearing banks for its own and customers' securities transactions.  Historically, all of MFGI's clearing relationship was exclusively with JPM.  In 2010, MFGI began to transfer its clearing relationship from JPM to BNYM.  Initially, MFGI engaged BNYM only for the clearance of U.S. Treasury securities transactions, while continuing to clear mortgage-backed securities ("MBS") through JPM. Because of MFGI's desire to preserve its relationship with JPM, which also acted as agent

---

36. While initial deposits of domestic (Segregated) customer margin requirements and Foreign Secured customer funds could also be made into accounts at Harris Bank, any excess funds on deposit in those accounts were swept to the JPM Customer Trust Account or the JPM Foreign Secured Trust Account before close of business on a daily basis.

on two revolving credit facilities available to MF Global, the Firm decided to maintain its

clearing relationship with JPM for MBS.

        MFGI maintained a matched repo book, meaning that MFGI invested in both repo

and reverse repo transactions and sought to capture the spread between the reverse repo and repo

rates. A component of MFGI's matched repo book included the liquidity generated by

acquisition of MBS from Real Estate Investment Trusts ("REITs") through repos with JPM as

agent, followed by the pledge of MBS as collateral under JPM's securities lending program to

obtain U.S. Treasuries.  Because BNYM was MFGI's clearing bank of U.S. Treasuries, MFGI

transferred the Treasuries acquired through JPM's securities lending program to BNYM, and at

the same time entered into offsetting repos with various counterparties, as demonstrated in the

below chart:



Financing Through Securities Lending Program



4.    **Credit Facilities**

Distinct from its role as clearing bank for MFGI's BD, JPM was administrative

agent for syndicates of lenders on two separate revolving credit facilities ("RCF"):  (1) a $1.2

billion unsecured committed revolving credit facility for which Holdings was the borrower (*see*

Annex E); and (2) a $300 million secured committed revolving credit facility for which MFGI

was the borrower.[37]  The secured revolving credit facility typically required DTC-eligible

securities to be pledged as collateral to the JPM DTC pledge account.  JPM exercised a lien on

these pledged assets in its capacity as administrative agent for the syndicate lenders on the credit

---

37.  *See* 2011 10-K, at 40, 67.

facility.  This lien was distinct from any lien JPM asserted in connection with its role as a

clearing bank for MFGI.  In addition to JPM's role as agent on the two credit facilities, both JPM

and BNYM participated as principal lenders on both facilities.

  **D.**  **<u>Outside Auditor</u>**

    PricewaterhouseCoopers LLP ("PwC") served as MFGI's independent auditor.  In

that role, PwC audited MFGI's financial statements, which were filed with various regulatory

agencies including the SEC, CFTC, and FINRA.  As part of PwC's audit of MFGI for the fiscal

year ended March 31, 2011, PwC audit team members performed procedures to understand

internal controls over financial reporting as a basis for designing its audit procedures.  These

procedures included steps to understand and test the practices and procedures followed by MFGI

with respect to MFGI's control activities for safeguarding securities, customer, and firm assets.

The audit procedures included tests of of MFGI's practices and procedures considered relevant

to the objectives of SEC Rule 17a-5(g) and CFTC Regulation 1.16.  The information included in

the supplemental schedules to the MFGI financial statements for the year ended March 31, 2011

was required pursuant to Rule 17a-5 under the Exchange Act and Regulation 1.10 under the

CEA, and was subjected to audit procedures by PwC during the course of its Audit.  These audit

procedures included tests of a sample of segregation calculations during the audit period and at

fiscal year end, confirmation of cash, securities and customer balances, tracing amounts reported

in the supplemental schedules to accounting source documents, and analytical procedures.[38]

---

38.  The Trustee has retained conflicts counsel to investigate and report on the activities of PwC in relation to MF
  Global.

## V.    MF Global History Through Early 2011

### A.    Origins

MF Global originated as a cooperage started by James Man in England in 1783.[39] Several decades later, his grandsons expanded the business into sugar brokerage, and later trading in physical commodities such as sugar and coffee, and eventually, trading in financial instruments.[40]  The company became known as ED & F Man in 1869.[41]  In the twentieth century, ED & F Man diversified from pure cash commodities into commodity futures.[42]  ED & F Man was floated on the London Stock Exchange in 1994 and then in 2000, changed its name to Man Group plc, following the separation of its agricultural commodities business.[43]  The futures brokerage subsidiary, ED & F Man International, was renamed Man Financial in 2001.[44]

Man Financial conducted a series of acquisitions to expand its product capability and geographic reach, including the 2002 purchase of GNI, a leading broker of futures, options, foreign exchange and equity derivatives.[45]  Man Financial's largest and most significant transaction was the $304.9 million acquisition in November 2005 of client assets and accounts from entities of Refco, which collapsed following the discovery of an internal accounting fraud

---

39.  *See* http://www.mangroupplc.com/about-man/heritage/index.jsf; http://www.mangroupplc.com/assets/pdf/media/timeline.pdf.

40.  *See* http://www.edfmanliquidproducts.com/aboutus_h.php?cs=history.

41.  MF Global Prospectus dated July 18, 2007 ("July 2007 Prospectus") at 121.

42.  *See* Mary Ann Burns, *Man Oh Man*, Futures Industry Magazine, May 2003, at 1, *available at* http://www.futuresindustry.org/fi-magazine-home.asp?iss=134&a=843; July 2007 Prospectus at 2.

43.  *See* July 2007 Prospectus at 121-122; Andrew Capon, *The Unlikely Ascent of Man*, Institutional Investor, Dec. 1, 2002, *available at* http://www.institutionalinvestor.com/Popups/PrintArticle.aspx?ArticleID=1027149.

44.  July 2007 Prospectus at 122.

45.  July 2007 Prospectus at 2, 122.

scheme.[46]  The Refco deal transformed Man Financial's retail and institutional business,

allowing it to strengthen its industry position in U.S. institutional futures, retail futures, and cash

securities, establish a presence in Canada and India, and increase its footprint in Singapore and

Taiwan.[47]

> **B.**    **Becoming MF Global**

In July 2007, Man Financial's parent, Man Group plc, separated the brokerage

and commodities business from its asset management business by transferring all the entities and

net assets that comprised its brokerage business to MF Global Holdings Overseas Limited

(formerly known as Man Financial Overseas Ltd.) and MF Global Holdings Europe Limited

(formerly known as ED&F Man Group Ltd.) – two holding companies incorporated in the

United Kingdom.  (*See* MF Global Form 10-K for the period ended Mar. 31, 2010 ("2010 10-K")

at 44.)  Man Group completed the separation of the brokerage business by transferring all the

outstanding capital stock of those two overseas companies plus MF Global Singapore Pte

Limited (formerly known as Man Financial (S) Pte Limited), and MF Global Holdings HK

Limited (formerly known as Man Financial Holdings (HK) Ltd.), to Holdings in exchange for

Holdings common stock.  (*Id.*)  Following these transactions, Man Group also made a capital

contribution of $516.2 million in cash to Holdings in return for additional shares of common

stock.  (*Id.*)

---

46.  *Id.* at 21, 122; Alistair Barr, *Man Group wins Refco LLC auction*, Nov. 10, 2005, *available at* http://articles.marketwatch.com/2005-11-10/news/30789037_1_chief-executive-phillip-bennett-largest-independent-futures-broker-refco-shares; MF Global Form 10-K for the period ended Mar. 31, 2008 ("2008 10-K"), at 29.

47.  2008 10-K at 19; July 2007 Prospectus at 121-22.

To complete the separation and become an independent company, in July 2007 Man Financial changed its name to MF Global and completed an IPO of 97,379,765 shares of its common stock, all of which were sold at a price of $30 per share and listed on the New York Stock Exchange.[48]  As a result of the separation from Man Group plc, MF Global needed to find the means to develop and maintain its own sources of capital, and to establish and maintain credit ratings on a stand-alone basis.[49]  In connection with the IPO, FINCO entered into a 364-day $1.4 billion unsecured revolving credit facility, for use as bridge funding.  (*See* July 2007 Prospectus at 10, 48.)  MF Global paid down the outstanding bridge funding balance in increments during 2008, with the final payment on November 24, 2008.[50]

Following the IPO, MF Global's revenue derived from four main sources: "commissions from agency execution; commissions from clearing services; mark-ups from principal transactions, primarily consisting of client trades executed on a matched-principal basis; and interest income."[51]  Interest was earned on cash balances in clients' accounts, primarily maintained to meet margin requirements, as well as from fixed income and principal transactions activities."[52]  MF Global executed trades for clients in Europe, North America, and the Asia/Pacific region.[53]  As of December 31, 2007, MF Global merged its U.S. FCM subsidiary and its U.S. BD subsidiary into the combined entity, MFGI.

---

48.  2010 10-K at 3, 45.

49.  July 2007 Prospectus at 24.

50.  2009 10-K at 80.

51.  2008 10-K at 3.

52.  *Id.*

53.  2008 10-K  at 19.

C.    **The Dooley Trading Incident And Its Aftermath**

During the late evening of February 26, 2008 and early morning of February 27, 2008, an MFGI trader, Evan Dooley, trading for his own account out of a Memphis, Tennessee branch office, wrongfully put on significant wheat futures positions, which were liquidated at a loss to the Firm of $141 million.  (*See* MF Global Form 10-Q for the period ended June 30, 2011 ("6/30/11 10-Q") at 35.)  This loss wiped out a significant percentage of the Firm's profit for the year.  (*Id.*)[54]  When the loss was announced, the ratings agencies downgraded MF Global, and even though customer funds were not implicated, a number of MFGI customers lost confidence and withdrew their accounts.  *See*, *e.g.*, Vikas Bajaj *et al.*, *Plunge Averted, Markets Look Ahead Nervously*, N.Y. Times, March 18, 2008.

After the Dooley trading incident, the CFTC fined MFGI $10 million for poor risk management practices.  (*See* 2010 10-K at 132.)  Regulatory proceedings and civil litigation ensued, and the Firm continued to struggle to generate revenues.  In July 2008 the private equity firm, J.C. Flowers & Co. invested $150 million in MF Global in exchange for preferred shares and a seat on the Holdings Board.[55]

---

54. MFGI sought to recover the $141 million losses stemming from the Dooley trading incident by making a claim under the Firm's fidelity bond insurance policy.  The insurer denied the claim and initiated litigation against MFGI under the policy.  *See New Hampshire Ins. Co. v. MF Global Inc.*, No. 601621/2009 (1st Dep't).  The litigation is presently pending before a New York appellate court.  The Trustee has stepped into MFGI's shoes to pursue the claim and maximize the recovery under the policy.  Because of the automatic stay, the argument date has been postponed twice, and the Trustee is in discussions with the insurers.

55. (July 2011 Proxy at 14.)  In July 2008, Holdings completed the issuance and sale of $150,000,000 in aggregate liquidation preference of its Cumulative Convertible Preferred Stock, Series A (the "Series A Preferred Stock") to J.C. Flowers II L.P.  The net proceeds from the sale of the Series A Preferred Stock were used to repay a portion of MF Global's then outstanding bridge facility pursuant to its capital plan.  (6/30/11 10-Q at 41.)  J.C. Flowers & Co. had representation on the Board through David Schamis, a managing director and member of the operating committee of J.C. Flowers & Co. LLC and later also through Mr. Corzine, who was an operating partner and advisor at a J.C. Flowers & Co. affiliate.

To resolve the CFTC's charges of violations, MF Global agreed to retain and implement best practices in its "risk management, supervision and compliance programs" as recommended by Promontory Financial Group LLC ("Promontory").[56] As part of its retention, Promontory undertook a comprehensive review of MF Global's risk management and internal controls. Among the high priority recommendations were to enhance risk monitoring by updating and revising written risk policies and procedures.

Promontory also undertook follow up reports on MF Global's progress in implementing these policies, as well as other recommendations. On May 26, 2010, Promontory reported to Holdings' Audit Committee that MF Global had successfully and effectively implemented most of the Promontory recommendations and the CFTC undertakings and established an enhanced enterprise-wide risk management and compliance program and internal controls framework.

### D.    Jon Corzine Takes The Helm

As a publicly-traded company, MF Global continued to struggle to achieve profitability. (*See* 2010 10-K at 42.) General market conditions over the preceding years had put a strain on profitability, particularly volume-based commissions business. (*See id.* at 91, 139.) To maintain its investment-grade credit rating MF Global needed to find a way to generate profits. Moody's, for example, indicated that to maintain its Baa2 rating, MF Global would need to generate $200 million to $300 million in annual before-tax profits and reduce leverage. In early 2010, then-CEO Bernie Dan resigned unexpectedly, and on March 23, 2010, Jon Corzine became Chairman and CEO of Holdings. (MF Global Form 8-K dated Mar. 23, 2010.)

---

56. *See* Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodities Exchange Act and Making Findings and Imposing Remedial Sanctions, CFTC Dkt. No. 10-03, *In re MF Global Inc.* (Dec. 17, 2009).

Soon after Mr. Corzine joined MF Global, he announced his strategic vision to transform the Firm from a commissions-based BD/FCM into a full-service investment bank. (6/30/11 10-Q at 55.)  Under this strategic plan, MF Global sought to transform its business into a commodities and capital markets-focused investment bank within three to five years.  (*Id.*)  The strategic plan was designed to leverage MF Global's strengths, including its heritage and expertise in commodities trading and its broad global footprint.  The business was then reorganized into four categories: Capital Markets, Retail Services, Prime Services, and Asset Management.  (*Id.* at 55-56.)  Significant personnel changes accompanied the new strategic plan. In the first quarter of fiscal 2011, MF Global planned to reduce its workforce by 10% to 15%. (2010 10-K at 23.)  This reduction included nearly all of the personnel in certain departments, such as Compliance, which were then rebuilt from the ground up by Global Chief Compliance Officer Tracy Whille.  At the same time, Mr. Stockman became the CRO in January of 2011, Henri Steenkamp was promoted to CFO in April of 2011, while Mr. Mahajan became Global Treasurer in August of 2011.  (August 17, 2011 Press Release); 2011 10-K at 14.)

The new strategic plan also included bringing in groups of traders and retooling internal practices to focus on specific areas, including institutional capital markets, retail services, transaction services, and asset management.  Unlike the Firm's existing proprietary trading, each of these groups required substantially larger daily liquidity to fund settlements. And it could take as long as six to nine months for even a highly-successful new product group to become self-sustaining, *i.e.*, to generate enough cash on its own to fund its daily liquidity needs.  Even assuming these groups would all become highly successful in the market conditions they would face, in the interim, MF Global would have to come up with the funds to support each of these new groups needed to fund settlements and other operations on a daily basis.

In June 2010, in accordance with Mr. Corzine's vision, a division within MFGI called the Principal Strategies Group ("PSG") commenced trading, participating in principal trading of various products, including fixed income, equities, commodities (energy, agriculture and metals), and foreign exchange. The PSG team included six senior traders, three junior traders and a trading assistant. PSG relied on the existing middle and back office support staff for account setup and management processes, as well as the clearing and settlement processes. Within PSG, Mr. Corzine maintained his own portfolio for the company in an account that bore his initials (JSC) and consisted of proprietary trades that he himself executed or instructed others to execute on his behalf.

### E.    Risk Management And MF Global's New Direction

The Risk Department struggled to keep up with MF Global's strategic changes. By the spring of 2010, the changes in MF Global's business had progressed ahead of the risk policies and practices in place, and gaps became apparent and were identified to the Board. In a presentation to the Holdings Board in April 2010, dozens of gaps in policies, procedures, and technology were identified in the various risk areas. Among the key gaps discussed were the need to have a Global Head of Capital and Liquidity Risk and to establish policies in this area. This report also recognized that gaps in technology made the data needed for forecasting liquidity risks inadequate and unreliable. A follow up report to the Board in October 2010 continued to reflect many critical or high risk gaps in risk policies.

Similar concerns surfaced in internal audit reviews. A Corporate Governance internal audit issued in May 2010 identified MF Global's risk policies as not congruent with the changes to its broker-dealer business. Among the specific gaps identified by Internal Audit was liquidity risk reporting. Similarly, an Internal Audit report on Market and Credit Risk Management in October 2010 identified "High Risk" areas arising from the lack of controls over

risk reporting.  The report also reiterated that market risk policies had not been updated to reflect the current operating environment.  The report attributed the failures to remediate gaps to staffing and budget constraints.  Thereafter, during 2011, Internal Audit expressed concern that the absence of reliable liquidity reporting tools and dependence on Ms. O'Brien's comprehensive knowledge of liquidity issues might represent a "key man risk," because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on Ms. O'Brien's expertise and experience.

Other reports by Internal Audit also highlighted problems in other areas relevant to MFGI's demise.  This included an internal audit of US Financial Regulatory Reporting that was conducted beginning in the Fall of 2010.  Internal Audit had not conducted any prior audits of this function.  This audit did not include review of MF Global's segregation computation or secured account records because the two most recent audit reports by the CME (from December 2008 and January 2010) had not noted any significant issues regarding either computation.  Moreover, at the outset of this audit, CFTC staff were expected to perform a limited scope review encompassing these areas.  The US Financial Regulatory Reporting audit also excluded the Rule 15c3-3 reserve requirements from its scope, based on CBOE annual reviews of this area that did not report any significant issues.  In the absence of any issues identified by the regulators, Internal Audit excluded these areas from the audit.

Even with this limited scope, some of the findings suggested problems in MF Global's regulatory reporting.  The Internal Audit final report dated March 31, 2011 (and issued in May 2011) concluded:

> The Regulatory Reporting group handles numerous daily, weekly and monthly reporting responsibilities.  The vast majority of the calculations underlying these reports are done via spreadsheet. The group performs various checks and balances to ensure the

> information utilized is complete and accurate; however, in a
> variety of instances, the controls are not in place or not all aspects
> of these controls are documented as evidence that they have been
> performed.  Additionally, these spreadsheets are typically not
> secure and are susceptible to human error, although at 9/30/10 no
> material errors were noted.

This report also identified problems with controls to identify proprietary and firm owned

accounts, but nonetheless found that underlying processes and controls were generally designed

effectively to mitigate the risks identified.  Internal Audit designated regulatory reporting inputs

as an area for regular monitoring by management, but this issue was unresolved as of the Filing

Date.

By the late fall of 2010, the Audit and Risk Committee was discussing changes to

MF Global's risk policies and risk limits to take into account the changes in the business since

Mr. Corzine's arrival.  Risk and Treasury personnel worked on proposing changes to the key risk

policy documents for Board consideration.  In January 2011, Mr. Stockman was hired and

Mr. Roseman was subsequently advised that he was being replaced.  (Roseman Statement at 6.)

When he started, Mr. Stockman understood that MF Global was "in the process of transitioning

its business model from a traditional commodities broker to a full-scale investment bank, and

that the company was seeking a new Chief Risk Officer with the experience and skill-set to assist

in that transition."  (*The Collapse of MF Global: Part 2: Hearing Before the H. Comm. on

Financial Services, Subcomm. on Oversight and Investigations*, 112th Cong. 2d Sess. (Feb. 2,

2012) (Statement of Michael G. Stockman ("Stockman Statement") at 1).)

In the midst of these transitions, on February 11, 2011, Holdings completed an

offering of $287.5 million principal amount of its 1.875% Convertible Senior Notes due 2016.

The offering followed on the heels of privately negotiated convertible bond hedge transactions

and warrant transactions with each of J.P. Morgan Securities LLC, as agent for JPMorgan Chase

Bank, National Association, London Branch, Citibank, N.A., Deutsche Bank Securities Inc., as

agent for Deutsche Bank AG, London Branch and Goldman Sachs & Co.  (MF Global Form 8-K

dated Feb. 11, 2011.)

        Also in early February 2011, MF Global achieved the long-sought designation as

a Primary Dealer by the New York Fed.  MF Global had applied for the designation more than

two years earlier, but the NY Fed refrained from approving the application because of concerns

about pending enforcement and compliance issues relating to the Dooley trading incident.  (*MF

Global Bankruptcy: Hearing Before the H. Comm. on Financial Services, Subcomm. on

Oversight and Investigations*, 112th Cong. 2d Sess. (Dec. 15, 2011) (Testimony of Thomas

Baxter Jr., General Counsel, Federal Reserve Bank of New York ("Baxter Testimony") at 11).)

As one of the select group of twenty primary dealers, MF Global served as a counterparty to the

NY Fed in open market operations, participated in Treasury auctions, and provided analysis and

market information to the NY Fed's trading desks.  (MF Global Form 8-K dated Feb. 3, 2011

at 3; Baxter Testimony at 14.)

        F.        **The Sovereign Debt RTM Portfolio**

        In embarking on the mission to transform MF Global into an international

investment bank, Mr. Corzine was faced with the need to satisfy the rating agencies' calls for

revenues, as well as the need to finance the new product groups.  To meet these needs,

Mr. Corzine decided to turn to trading in the sovereign debt issued by economically-distressed

European nations.  These trades were structured in the form of repos-to-maturity ("RTMs").[57]

The sovereign debt trades were expected to produce greater yields than U.S. Treasury Securities,

_____

57.  In an RTM, the resale date is the same as the maturity date of the underlying security.  Under MF Global's
     accounting policy, the underlying sovereign debt securities were therefore "de-recognized" from the balance
     sheet, and the gain on sale was recorded as of the trade date.

and therefore greater profits on an immediate basis because of the RTM accounting treatment,

described in greater detail below.[58]

### 1.        The RTM Strategy

MF Global's sovereign debt strategy involved taking advantage of the difference

in the spread between the coupon payment from a European sovereign bond, and the rate at

which the same bond could be loaned back out as collateral.  The strategy sought profits by

targeting arbitrage opportunities based on fluctuations in the yield curve of the sovereign debt

resulting from differences in market view about the risk of the countries' default, changing

supply and demand of the securities, interest rate futures and foreign exchange rates.  In simplest

terms, the gain derived from the difference between the original price at which MF Global

purchased the sovereign debt securities and the RTM price at which MF Global sold the

securities back to the LCH.

On July 1, 2010, MFGI and MFGUK entered into an investment management

agreement ("IMA") in relation to the European sovereign trades.  Under the IMA, MFGUK,

which had relationships with the LCH and other European clearing entities, agreed to execute the

European sovereign RTM trades, which would then be kept on the books of MFGI because

MFGUK was unwilling to accept the risk of issuer default or restructuring of the sovereign debt.

The IMA provided that MFGUK would receive 80% of the consolidated net revenue of each

transaction, while 20% went to MFGI, which continued to carry the trades on its books and bore

the risk that the sovereigns would default or restructure their debt.

---

58.  Use of the RTM mechanism had historically been a part of MF Global's business, primarily at MFGI through
     US Treasury and Agency bonds.

The RTM structure was as follows.  MFGUK purchased the sovereign bonds from counterparties, the trades for which settled on the LCH.  MFGUK then sold the bonds to MFGI, although the bonds remained in MFGUK's LCH account.  MFGI recorded the bonds on its books, classifying them as securities owned in MFGI's long inventory book.  Subsequently, MFGI entered into an intercompany repo with MFGUK (which showed a reverse repo to MFGI).[59]  Each intercompany repo was governed by the global master repurchase agreement between MFGUK and MFGI dated July 19, 2004, as amended (the "GMRA").  On completion of the RTM with MFGI, MFGUK entered into a further RTM with another counterparty that also settled through the LCH.

On the trade date, MFGI recognized a gain in the amount of the difference between the original purchase price of the underlying security and the RTM sale price of those securities to the LCH, and MFGUK recognized a gain in the amount of the markup for its role as intermediary between MFGI and LCH.  The RTM between MFGUK and the LCH, however, was only until two days short of maturity, the reason being that LCH did not want to bear the risk of sovereign default.  For these "RTM minus two" positions, then, LCH expected MFGUK to fund the positions for the remaining two days until the bonds matured, so that MFGUK — not the LCH — bore the risk of issuer default during that period.  MFGUK, in turn, looked to MFGI to fund the two-day breaks.  The diagram below, from MFGI's records, details the flow of the RTM transactions:

---

59. MFGI consistently priced the securities underlying the repo and reverse repo components of the RTM several dollars higher than industry (*e.g.*, Bloomberg) prices.  (Annex F at 9.)

**INTERCOMPANY RTM PROCESS OVERVIEW**



A.  MF Global UK purchased securities from the Street and subsequently sold them at a mark-up to MF Global Inc..

B.  Inventory purchased by MF Global Inc, recorded long into Book 7 which are classified as securities owned subject to MTM

C.  Upon classification of RTM treatment  securities were transferred long into Book 4.

D.  At the same time the inventory was subject to RTM treatment, MF Global Inc. entered into an Intercompany Repo (RTM) with MF
    Global UK and MF Global UK had an Intercompany RevRepo (RTM) with MF Global Inc .  These are subject to elimination on
    consolidation

E.  Upon receipt of RTM inventory from MF Global Inc via intercompany revrepo, MF Global UK entered into a RTM with LCH.

The RTM transactions qualified for sales accounting treatment under US GAAP,

and accordingly were de-recognized from the MF Global consolidated balance sheet.  (*See*

6/30/11 10-Q at 13.)  The RTMs were described in MF Global's quarterly report as follows:

> The Company also enters into certain resale and repurchase
> transactions that mature on the same date as the underlying
> collateral ("reverse repo-to-maturity" and "repo-to-maturity"
> transactions, respectively). These transactions are accounted for as
> sales and purchases and accordingly the Company de-recognizes
> the related assets and liabilities from the consolidated balance
> sheets, recognizes a gain or loss on the sale/purchase of the
> collateral assets, and records a forward repurchase or forward
> resale commitment at fair value, in accordance with the accounting
> standard for transfers and servicing. For these specific repurchase
> transactions that are accounted for as sales and are de-recognized
> from the consolidated balance sheets, the Company maintains the
> exposure to the risk of default of the issuer of the underlying
> collateral assets, such as U.S. government securities or European
> sovereign debt. The forward repurchase commitment represents the

fair value of this exposure and is accounted for as a derivative. The value of the derivative is subject to mark to market movements which may cause volatility in the Company's financial results until maturity of the underlying collateral at which point these instruments will be redeemed at par.  (6/30/11 10-Q at 13.)

Margin calls on the portfolio from LCH went to MFGUK, which relayed the calls to MFGI.  Under the GMRA, MFGUK, in anticipation of a margin call from LCH, could also demand advance margin funding from MFGI.  MFGI would transfer collateral, usually U.S. Treasury bills, to MFGUK to meet the margin calls; MFGUK, however, did not provide to MFGI any cash or collateral in exchange for the T-bills, so MFGI was "out-of-pocket" for several days until MFGUK returned the T-bills.

When the portfolio was first established starting in June 2010, the initial margin and variation margin were not onerous and thus were not a deterrent to doing the trades.[60]  But that situation changed, for example in November 2010, at which time a 15% haircut was imposed on certain Irish bonds, as a result of which the LCH demanded more collateral from MFGUK, which in turn called for more collateral from MFGI.  Another large margin call came on September 28, 2011, when, in response to a margin call by LCH to MFGUK with respect to certain Irish and Portuguese bonds that were maturing, MFGUK requested $440 million from MFGI to cover the default risk in the two-day period before maturity.  MFGI met the call with a $440 million wire transfer to MFGUK the same day.  In hindsight, it appears that MFGI's senior executives failed to recognize the extent of the margin demands that could arise should certain market events occur.  (Annex F at 1.)

---

60. Initial, or original margin, is the amount of collateral required to be posted based on the credit risk of the counterparty.  Variation margin is the amount of collateral required to be posted based on fluctuations in the prices of the underlying security and foreign exchange rates.  *See* http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary.

As part of its oversight role, the Holdings Board placed limits on the RTM portfolio as a whole and individual limits as to positions in the long-term debt of particular countries. There is evidence, however, that these limits may have been circumvented through the use of short-term positions, which were not subject to the Board's review.

Mr. Corzine was very hands-on with respect to the sovereign debt trades.[61] He communicated with MFGI and MFGUK personnel directly regarding the trades, instructing them when to enter and exit various positions. The MFGUK traders booked the trades on the MFGI proprietary trading desk, although the MFGI traders and operations personnel typically did not learn about the trades until they appeared on MFGI's books the following day.

### 2.    Risk and Growth of the RTM Portfolio

Within a few months, the RTM portfolio quickly grew, and on September 22, 2010, in response to Mr. Corzine's request, the Executive Committee of the Board of Directors approved an increase in the limit to $4.0 billion. Less than two months later, Mr. Corzine requested and the Board approved another increase, to $4.75 billion. The Board also imposed limits on particular countries and restricted additional new purchases of Irish and Portuguese debt to €200 million each. No increases were approved at the December Board meeting, although the Board did consider stress testing, worst-case scenarios in the event of a sovereign failure, risk profiles of certain sovereigns, and accounting treatment of RTMs.

---

61. When Mr. Corzine first indicated that he wanted to place the trades himself, there was concern at MF Global about whether such trading would be in compliance with FINRA rules and other regulations requiring supervision of trades by senior officers. Under the Firm's Securities Compliance and Supervisory Procedures Manual, an officer could only trade if there was an more senior officer who could review and approve the trade. Because Mr. Corzine was the CEO, there was no officer senior to him. A compromise was reached pursuant to which, *inter alia*, a subcommittee of the Board reviewed both the trades by Mr. Corzine himself and those he placed through others.

At the Audit and Risk Committee Meeting in mid-January, just after Mr. Stockman was hired and Mr. Roseman was terminated, the Board confirmed that the European sovereign debt portfolio would run down as planned with no additional positions placed unless Mr. Corzine obtained further approval from the Board of Directors.

The Board's limits were exceeded on February 3, 2011, and although the breach was brought to Mr. Corzine's attention, it does not appear that the Board was informed.  In mid-February, Mr. Corzine had Mr. Stockman prepare a request to the Board to increase the Global Sovereign Limit from $4.75 billion to $5 billion, which was the number that risk personnel had convinced Mr. Corzine, when he pressed for an even larger increase, was "big enough."  The request noted that the liquidity risk associated with the RTM portfolio was both the impact of an increase of 100 to 500 basis points in the spreads and a commensurate increase in funding requirements, as well as the fact that MFGI would have to fund both the variation margin for these transactions and the increased haircuts required by the counterparties.  The total funding risk associated with the increased limit ranged from $347 million to as much as $765 million.  Some Board members expressed concerns at this point about the level of European sovereign debt exposure and the consequences of increased haircuts resulting from restructurings, downgrades, liquidity events, counter party issues, or collateral calls.  Mr. Stockman was warned that he would face "tremendous pressure" to approve higher risk limits to compensate for declining earnings in certain lines of MF Global's business.

In March 2011, Mr. Stockman supported Mr. Corzine's European sovereign debt limit increase request, involving an aggregate increase from $4.75 billion to $5.0 billion, as well as a temporary increase to $5.8 billion until March 31, 2011.  Mr. Stockman identified to the Board the market risks that, under certain scenarios of changes in yields and haircuts could

produce funding needs of as much as $761 million.  The Board again approved the increases.

Settling for the $5 billion limit on sovereign debt RTMs, however, merely resulted in

Mr. Corzine setting his sights elsewhere, such as seeking an increase in the risk appetite for US

agency debt, to $10 billion, which would have its own issues and risks.

By mid-March, the portfolio had grown to $5.219 billion, within the "temporary"

limit increases.  With the temporary increase set to expire at the end of March, Mr. Corzine told

Mr. Stockman to prepare a request to the Board to increase the limit to approximately $6 billion.

The Executive Committee of the Board approved the request to extend until September 2011 the

"temporary" increase to $5.8 billion, at which time the limit was to revert to $5 billion, provided

maturities were no later than December 2012.

Within a month these limits were breached again, as shown in an April 27

sovereign debt portfolio report that Mr. Stockman provided to Mr. Corzine.  After conferring

with Mr. Corzine, Mr. Stockman commented to others in the Risk Department, "Good news is he

is now aware of gross limits, agrees with concept..."  Several weeks later, however, on June 5,

Mr. Stockman prepared, at Mr. Corzine's direction, a request to the Board to increase the limits

from $5.8 billion to as much as $9.75 billion, adding Belgium to the countries that comprised the

global limit.  The next day, in response to a question from Mr. Corzine, Henri Steenkamp

explained to him the impact of a ratings downgrade below investment grade on liquidity:

> There would be no impact on RTM's from a ratings downgrade, as
> the legal analysis of sale is independent of credit rating until
> maturity.  However, there could be an impact on the reverse RTM
> netting trades as these are to different maturities than the original
> RTM's.  The potential issue is whether some counterparties will
> choose not to roll over transactions or the trading counterpart can't
> trade with us due to our rating.  If this were to happen, then MFG
> Inc could lose its netting benefit on these reverses and thus be
> subject to higher margins, thereby increasing liquidity needs for
> the BD.

At a meeting the same day, the Board approved Mr. Corzine's request in part, increasing European sovereign debt limits to $6.6 billion, with increased sub-limits for individual countries other than Portugal, the limit for which was to remain $1.3 billion.

### G.    Liquidity Needs And Intraday Transfers From The FCM

While the liquidity crisis that led to the demise of MF Global occurred during the last week of operations, liquidity risks were evident much earlier.  Mr. Corzine's efforts to make MF Global profitable by seeking to transform it into a full-service investment bank led to dramatically increased needs for liquidity as a result of increased proprietary trading, and a wide array of new or expanded lines of business, including European sovereign debt trading, mortgage-backed securities, derivatives, and high-yield debt.

The Treasury Department in Chicago had limited sources of funds to provide liquidity to the non-FCM operations in New York.  Those sources were:  a) the Holdings unsecured committed RCF in the amount of $1.2 billion with a syndicate bank group with JPM, as agent (Section IV.C.4, *supra*); b) the MFGI secured committed RCF in the amount of $300 million with a syndicate bank group with JPM, as agent (*id*.); c) other sources of proprietary funds available from or generated at the parent level (including the debt offering); and d) funds in the Customer Segregated and Foreign Secured accounts in excess of the Firm's regulatory requirements.  As MF Global experienced increased pressures to generate liquidity while simultaneously experiencing a decrease in counterparty availability for financing and other acute liquidity needs, the Firm increasingly looked to excess funds on deposit with the FCM as a daily source of liquidity for its business.

For example, for at least a year prior to the Filing Date, the FCM had provided intraday transfers to Operations in New York.  One of the uses of intraday transfers was to facilitate settlements at the Clearing Banks.  Prior to the last week in October 2011, the transfers

were usually in the range of $50 million to $100 million, except on "factor day" (when the value

of the mortgages in the securities lending program at JPM adjusted). On "factor day," the

transfers to JPM accounts increased to $150 million, $125 million and once; on October 7, 2011,

to $226 million.[62]  The transfers were typically repaid intraday but some transferred amounts

remained in securities accounts overnight or longer.  Requests for transfers were made by

Operations in New York to Treasury in Chicago.  Ms. O'Brien or someone else in Treasury

would approve the transfer and then advise Treasury Operations from which account to send the

transfer.  Although the policy of MFGI was that overnight loans were limited to the Firm

Invested in Excess, former MFGI employees believed that the Regulatory Excess was available

to use for intraday transfers if the funds were repaid by the close of business the same day.

Ms. O'Brien and personnel reporting to her within Chicago Treasury, including

Jason Chenoweth and Joseph Cranston are among the individuals who approved the transfers.

Despite the fact that MFGI operated in a world of virtually instantaneous electronic transactions,

the tracking of the "loans" and repayments was done manually on spreadsheets and journal

entries input into the back office or Treasury systems, neither of which were done consistently.

The Financial Regulatory Group was responsible for tracking the regulatory balances and

preparing the regulatory reports, but was not involved in approving transfers to Operations in

New York.

Ms. O'Brien was not responsible for performing the computations required to

demonstrate regulatory compliance, and Treasury employees stated that their primary focus was

managing liquidity, and achieving appropriate and optimal investment income from the assets

---

62. On one factor day, August 5, 2011, there was a loan of $226 million sent to a JPM account plus a loan of $148
    million to a BNYM account.  The last factor day before the Filing Date was October 7.

invested in segregated and secured accounts.  Nonetheless, documents reflect that Ms. O'Brien,

like Ms. Serwinski, was acutely aware of regulatory compliance issues concerning segregation of

customer funds.  (*See*, *e.g.*, October 26, 2011 email from Ms. O'Brien  ("We cannot afford a

SEG issue"); October 27 email from Ms. Serwinski ("I am concerned that the fcm lent the bd

200mil.  Is that correct and that the firm deficit in excess is neg 300+ mil?").)

Although MFGI's FCM and securities businesses had merged in 2007, in many

respects MFGI continued to operate as two separate businesses, marked by a tangible disconnect

between employees in Chicago and New York, which was exacerbated by the fragmented chain

of reporting.  While the Treasury Department based in Chicago had the responsibility for funding

liquidity for the various lines of non-FCM business based in New York, there was limited

communication regarding the basis for requests for intraday funding or the intended or actual use

of funds.  Individuals in Chicago were increasingly frustrated that the FCM was being used to

fund the non-FCM business, and were particularly concerned that there was no transparency as

to where the funds were going once they left FCM.  New York Operations employees, for their

part, needed funding to maintain operations, but generally claim that they were not aware of the

source of the funds other than that they came from Chicago Treasury.  Senior executives were

well aware that excess funds from the FCM were being used to fund the non-FCM side of the

business on an on-going basis.

## VI.    The Summer And Fall Of 2011

### A.    Liquidity Risks And Stresses

In August of 2011, shortly after MF Global completed a $325 million debt

offering, Mr. Mahajan assumed his new position as Global Treasurer.  He concluded that the

Treasury Department "needed lots of help," and that its infrastructure "needed a 180."

Mr. Mahajan reported, however, that by the time he was hired it was "too late" to fix the

Treasury Department because the focus had shifted to "maximizing liquidity." Indeed,

throughout that summer, liquidity issues continued to be of pressing concern.

For example, a June 20, 2011 Global Liquidity and Capital Management Internal

Audit Report noted "numerous and significant gaps between the policy and existing practices."

Although the gaps had been escalated to the Board in May 2010, the processes had not been

resolved. For example, Internal Audit noted that: "Existing liquidity monitoring and forecasting

is manual and limited. Reporting capabilities to evaluate liquidity needs for transactions that are

booked but not yet settled have not been fully developed." The report went on to note that the

Firm relied on "ad hoc tools" and the professional expertise of key personnel to manage liquidity

but warned that "[t]he complexity of capital and liquidity demands have increased with the

addition of principal trading" by the Firm and other new businesses. No responsibility was

assigned to remediate this issue on the grounds that "the business accepts this risk."

During this time period, risk policy documents were revised to reflect the changes

in the nature of MF Global's business. By August 2011 as reported to the Holdings Board, the

sovereign debt spreads and margin increases exceeded the initial risk scenarios, and two new risk

scenarios anticipated a need for as much as $930 million in additional funding to meet margin

calls on the RTM portfolio. An update on proposed changes to risk policies was presented to the

Holdings' Board on August 11, 2011. Among other things, the new policies proposed to lower

the internal capital threshold from 120% of regulatory capital to 110%.[63] This new policy

involved a shift "from [the] extremely conservative profile of an FCM to the more risk-accepting

---

63. MFGI treated the FINRA early warning level (120% of net capital) as the regulatory capital requirement, such that its internal capital requirement of 120% of regulatory capital equated with 144% of net capital. Under the proposed "moderate" risk threshold, MFGI's internal capital requirement would be 110% of regulatory capital (*i.e.*, the FINRA early warning threshold), or 132% of net capital.

profile of a broker-dealer." The changes also were premised on "conforming Risk Appetite and Delegation of Authority metrics to our current capabilities and the measurements used in daily business operations." After review by the Audit and Risk Committee, the revisions were to be presented at a November 3, 2011 Board meeting for approval by the full Board, which, of course, never took place in view of the Chapter 11 filing.

During the summer of 2011, some senior executives appear to have been in deliberate denial of the extent of the liquidity stresses. Most strikingly, on August 11, in an email exchange between Ms. O'Brien and a Global Treasury employee at MF Global Hong Kong, Ms. O'Brien wrote that "Henri [Steenkamp] says to me today . . . 'we have plenty of cash.' I was rendered speechless – and wanted to say 'Really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?'", a process that she described as a "shell game."

### B.    A Proposal For Overnight Transfers From The FCM

In July 2011, Mr. Steenkamp asked Ms. Serwinski to review trends in the FCM Customer Accounts to consider whether $250 million in funds could be "loaned" overnight on a regular basis from the FCM to Operations in New York. This proposal would have been a dramatic change from MFGI's then-current practice. Ms. Serwinski was concerned that MFGI was contemplating using more than the amount of Firm Invested in Excess. She wrote in a July 19 email that "[i]t did not sound like they were just looking for the firm invested amount in excess but more such that the customers funds not required from a secured regulatory computation would be tapped into."

In connection with Mr. Steenkamp's request, Ms. Serwinski reviewed the balances in the Customer Segregated and Foreign Secured accounts from July 1, 2010 to July 18,

2011.  The results showed that the Regulatory Excess funds in the Customer Segregated accounts

ranged from a low of approximately $20 million to a high of over $700 million, and that the

Regulatory Excess in the Foreign Secured accounts, under the Alternative Method, ranged from

a high of over $800 million to a low of over $340 million.  When the excess was calculated using

the Net Liquidating Method, however, the resulting Firm Invested in Excess in the combined

accounts was much lower:  it ranged from a low of approximately negative $98 million on

October 11, 2010 to a high of over $600 million on October 13, 2010.  When Mr. Hughey

reviewed the records for the same one-year time period, he concluded there were five days when

the amount of Firm Invested in Excess was apparently negative.

On July 27, Ms. Serwinski forwarded her analysis containing trend data to

Mr. Steenkamp, Mr. Dunne and Matthew Besgen (Senior Vice President in Treasury, with

responsibility for short term funding and investments) in New York, noting her concerns that

"FCM client assets may be put at risk even if for overnight . . . Utilizing the FCM client asset

[base] should not be a BD working capital source strategy to be relied upon."  She also posed the

question whether, "[i]n the event of a financial crisis, are we guaranteed that we could draw

down on the RCF to meet the firm liquidity needs and return the FCM client assets to meet any

requirements in the seg/secured environment?"  After reviewing the initial data, Mr. Steenkamp

commented that they should probably look to the lower end of the range of the Regulatory

Excess – $433 million – as the maximum client excess liquidity available to the non-FCM

business.  This was vastly greater than the low end or even the average range of Firm Invested in

Excess.  In response, Ms. Serwinski prepared a written memorandum to address management's

proposal to tap into the Regulatory Excess to fund the proprietary needs of the non-FCM

business.

In order to prepare the memorandum, Ms. Serwinski, in consultation with Mr. Hughey, reviewed the CFTC regulations, several FINRA interpretations, and consulted with outside counsel.  They concluded that there were no regulatory rules that would support or prohibit a proposal to lend up to $250 million overnight from customer funds that were part of the Regulatory Excess.  They also concluded, however, based on the FINRA interpretations of Rule 15c3-3, that to the extent the customer balances on deposit in the Customer Segregated and Foreign Secured accounts were less than the amount required to be secured under the Net Liquidating Method, the difference would have to be included in the lock-up requirement of the Rule 15c3-3 calculation, performed as of the close of business Friday and at month end.  In her July 28, 2011 memorandum, Ms. Serwinski made the point that overnight "loans" needed to be limited to the amount of Firm Invested in Excess; otherwise if the calculation of Firm Invested in Excess was negative, the amount of customer funds would need to be locked up in MFGI's 15c3-3 calculation the next time it was done.

On August 3, Mr. Steenkamp advised Ms. Serwinski that he had "walked Jon [Corzine] through" the regulatory requirements, and confirmed that they both understood the concept of the lock-up and they agreed that the Firm had to comply with it.  Mr. Corzine still wanted to know how MF Global could use all of the surplus daily (even if it were only $50 million), "maximize it through daily liquidity management" and also use other securities to fund the lock-up.  Nonetheless, on several days during October 2011, MF Global looked beyond the Firm Invested in Excess to the Regulatory Excess to fund the proprietary activities of the non-FCM business (*see* pp. 83-84 *infra*).  And, during its final days of operation, the Firm went well beyond that.

C.    **Intraday And Overnight Transfers After The July 28 Memo**

MFGI employees have reported that during the summer of 2011, the intraday transfers that had commenced the year before became a daily occurrence.  In addition to the intraday transfers, there were other transfers from the FCM that were kept overnight or longer.  On July 26, for example, after Ms. O'Brien approved a $100 million overnight transfer from the FCM to Operations in New York, she reported to Mr. Dunne and Mr. Besgen in New York that "Christine [Serwinski] was not pleased about the late hour borrow or the size.  The borrow is $100mm and the Seg excess is currently $127mm."  Ms. Serwinski proceeded to ask Ms. O'Brien, "What if I say no?  What if they needed $150mm and I only gave them $100mm?"  Ms. O'Brien's response was that, in that event, "Bob Lyons would need to go to Brad [Abelow] saying they were . . . short and . . . Brad would have to address with Finance."  A few days later, on Friday August 5, 2011, $226 million was transferred to a JPM account and only $155 million was returned, leaving a deficit balance of approximately $71 million owed to the FCM.  This deficit remained until October 7, 2011, when it was reduced to $53 million, although it later increased and was never repaid.  During the period August 1 through October 25, transfers were also made to BNYM clearing accounts from the FCM, some of which remained unpaid overnight or for several days.  For example, on October 11, a $50 million transfer from the FCM was not returned with the result that, that day, the Firm Invested in Excess was negative by approximately $21.4 million.  (Annex D.)

D.    **Wires To Securities Customers**

While the majority of the transfers from the FCM went to support proprietary trading activities, the FCM also began to transfer funds on a weekly basis to fund the wires for securities customers withdrawing funds from their accounts.  Throughout the week, securities customer withdrawals were approved by the Margin Department in New York and a list of wires

was generated.  Treasury Operations sent wires to securities customers from the JPM BD Wire

Account, but if there were insufficient funds available, Treasury Operations would first transfer

funds from the JPM Foreign Secured Trust Account to the JPM BD Wire Account.  Treasury

Operations was to "bill" Operations in New York via email for the advance funds.  Each

Tuesday, after the Rule 15c3-3 calculation was performed and excess funds could be released,

funds to repay the FCM were supposed to be transferred back to JPM Foreign Secured Trust

Account.  Prior to the last week of MF Global's operations, the amounts advanced were

generally less than $60 million weekly and were repaid.

### E.        Monitoring Of Segregation Reports, FCM Balances, And Liquidity

As noted above, the Financial Regulatory Group was responsible for preparing the

Segregation Reports and the Secured Reports that MFGI filed with the regulators.  An internal

version of these reports with additional information not included in the filed version were widely

distributed on a daily basis prior to finalization and filing.  This internal version showing the

Firm Invested in Excess described as "Total Seg/Secured", as well as the calculations under both

the Alternative Method and the Net Liquidating Method, was sent to Treasury and Treasury

Operations, as well as to the Financial Regulatory Group, and Mr. Besgen, Steven Hood (a Vice

President in the Risk Department), Mr. Bolan and Mr. Mahajan in New York.  The amounts of

the balances in the Customer Segregated and Foreign Secured accounts and the amount of the

Firm Invested in Excess also were included on the Daily Net Capital Computation that was

circulated daily to more senior management, including Messrs. Corzine, Abelow, Steenkamp,

and Mahajan.

As described above, MFGI's Internal Audit group noted that formal processes,

reporting, forecasting and monitoring capabilities to manage liquidity and capital globally had

not been fully established.  Rather, Finance, Risk and Treasury team members relied on ad hoc

tools and professional experience to guide the Firm's liquidity management.  As a result, liquidity reporting was manual in nature, with limited forecasting.  Many individuals had long been requesting the IT department to automate the analysis of liquidity.  The complexity of liquidity demands increased with the addition of principal trading across the Firm's customer-facing desks, the PSG, and other new business lines.  The IT department, however, never delivered an automated tracking and monitoring solution.

Given the lack of a formal and consistent approach to liquidity management, a high-level liquidity report was developed sometime in 2010 and evolved over time.  This daily snapshot was in response to a request by Jon Corzine and was used to assist Treasury in estimating the daily cash needs of the broker-dealer.  This "report" (referred to as the "Liquidity Dashboard") was a tool created and used by the front office to approximate sources and uses of liquidity for the broker-dealer.  Although the Liquidity Dashboards, in one form or another, were shared with senior management, they were inexact and did not always tie or agree to what purported to be underlying support.  The dashboards were not intended to be used for any regulatory reporting; nor does it appear that they were evaluated by Finance, Product Control or Internal Audit.

Liquidity Dashboards were generally prepared by Mr. Besgen or Ms. O'Brien, with input from New York Operations employees, including Mr. Delucia, who prepared a daily liquidity report that captured end-of-day bank information.  They appear to have been prepared in some form on a daily basis through October 27.  (*See* Annex G.)

The Liquidity Dashboards attempted to estimate the actual and projected sources and uses of cash each day, and calculated "B/D Liquidity," which, during the month of October, and for some time before, was uniformly negative prior to application of funding from other

sources.  The bottom of the dashboard showed the sources of potential funds (Total FINCO balance plus RCF draw) and a line item labeled "Available FCM Cash" which was intended to be consistent with the Firm Invested in Excess.  There were usually several iterations of the dashboard prepared each day, with at least one version transmitted to senior management, usually including Messrs. Corzine, Abelow, Steenkamp, and Mahajan.

On August 26, Mr. Besgen reported to the Financial Regulatory Group that he was "being asked on a daily basis to update Jon Corzine on the Daily Seg and Secured Excess and the drivers of the changes day over day."  On September 1, Mr. Besgen emailed Ms. O'Brien to inquire about a decrease in the Firm Invested in Excess number by $50 million to $69 million, and asking for a "preliminary snapshot" as to what the excess balance may be "so he could project what funds may be available to the BD if they needed to have funds transferred (over and above the funds from FINCO)."  On September 16, Ms. O'Brien advised Mr. Cranston that, the FCM has a "lower than usual 'seg excess' which is the liquidity figure $25 million versus $70 million average."

As the liquidity stress increased in October, senior MF Global executives became more and more engaged in monitoring liquidity, and remained very much aware of reliance on the "FCM Excess" to help fund other operations.  For example, on October 6, Mr. Steenkamp addressed an email to Mr. Corzine which was copied to senior executives including Mr. Abelow and Mr. Mahajan stating:

> Jon . . . we need to address the sustained [liquidity] stress.  In summary, we have three pools of liquidity for Inc.  - (1) finco cash which is real and permanent, (2) FCM excess cash which is temporary and volatile, [and] depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have [from] finco, thereby having us dip into FCM excess every day.  This should be temporary but is becoming

> permanent, and the FCM cash is not reliable. Why is the BD
> unable to fund itself? Part of it is the permanent pool of liquidity
> needed for RTM's, but we also see continued haircut increases in
> fixed income, increased funding needed PSG and box size being
> permanently large.[64]

Mr. Steenkamp's advice to Mr. Corzine regarding the "volatile" and "unreliable"

nature of FCM excess cash, and the dangers of "dip[ping] into the FCM excess every day" was

supported by the liquidity dashboards.

Thereafter, on October 14, Matthew Besgen wrote to Henri Steenkamp and Brad

Abelow that liquidity was so strained that the broker-dealer would be relying upon a "$53mm

FCM balance" plus $16mm of "FCM buffer," noting that this was the "[f]irst time that the B/D

has relied upon the FCM buffer." It appears that this "FCM Buffer" consisted of a portion of the

Regulatory Excess which had been rejected as a source of liquidity during the summer of 2011.

Mr. Mahajan in turn advised Mr. Steenkamp and Mr. Stockman that "the B/D is leaning on

FINCO and FCM's cash pool. We now require $16mm of the FCM's buffer as well. This leaves

us with $24mm of liquidity – and no buffer – for the U.S. going into the weekend."

The internal Segregated Statement and Secured Statement prepared as of Friday,

October 14, 2011 showed a deficit of $68,411,341 in Firm Invested in Excess. Ms. Serwinski

advised Mr. Steenkamp and Mr. Cagney that the Rule 15c3-3 computation being prepared as of

close of business on October 14, 2011 would therefore need to include a lock-up of

approximately $70 million to cover that amount. When the calculation was made, to meet the

deficit, New York Operations used a majority of the buffer in the Rule 15c3-3 account and

---

64. "Box size" referred to the amount of securities held in the clearance box at depositories. Because of
     MF Global's historically weak credit rating as well as the deteriorating quality of certain fixed income securities
     in the Firm's inventory, those securities were harder to finance in the repo market, and so remained in inventory
     overnight.

locked up an additional $28 million.  MFGI then did a special Rule 15c3-3 calculation on

Tuesday, October 18, 2011 (rather than waiting to perform the calculation on the following

Monday as of the close of business the prior Friday), which resulted in a decreased Rule 15c3-3

reserve requirement and allowed funds to be released from the account.

Mr. Mahajan also communicated on October 14 that "Jon [Corzine] wants to

know the details of the cash movements between yesterday and today."  Ms. O'Brien explained

that "[i]t is critical to note that FCM liquidity is driven from the Daily Segregation calculation –

not cash movements."

On October 17, Mr. Mahajan wrote to Global Head of Retail and MFGI Board

member Randy MacDonald with a copy to Mr. Steenkamp stating, "Henri gets it.  He has talked

to both Jon and Brad telling them that we cannot rely on FCM cash to meet our daily operational

needs."  The next day, Ms. O'Brien advised Mr. Mahajan that the BD has an outstanding "inter-

co balance with the FCM in the amount of $66 million."[65]  Mr. Mahajan responded that "to the

extent it is not creating a regulatory or funding issue for the FCM, I would leave the inter-

company in place until we find a more permanent source of liquidity for the B/D."

For the period October 3 through October 21, the line item "Available FCM

Cash" on the liquidity dashboards ranged from a high of $144 million to a low of $5 million.

As part of the Trustee's investigation, the Trustee's professionals reviewed the

internal Segregation Statements and Secured Statements prepared by MFGI for the month of

October 2011.  That review revealed that MFGI's combined assets in Customer Accounts

exceeded the requirements under the Net Liquidating Method (as opposed to the Alternative

Method) on only 13 of the 21 business days in October.  (Annex D.)  Thus, there were only

---

65.  Of course, the FCM and the BD were both part of one legal entity, MFGI.

thirteen days when there was a Firm Invested in Excess, which ranged from only $10.8 million to

$132 million.  In other words, on eight days during the month of October, some customer funds

were used for liquidity purposes, although, on four of those days, the Firm was in regulatory

compliance because the amount of customer funds used did not exceed the Regulatory Excess.

(Annex D.)

### F.    FINRA And FSA Inquiries

Although the Firm had embarked on trading sovereign debt in the summer of

2010, MFGI's regulators reportedly did not become fully aware of the extent to which the

positions were held on MFGI's books until the May 2011 FOCUS report as of March 31, 2011.[66]

Shortly after that filing, FINRA asked MFGI about the RTM positions set forth in the FOCUS

report.  Not long thereafter, on July 5, 2011, Moody's downgraded Portugal's sovereign debt to

"junk" status and although MFGI's Portuguese positions had matured prior to the downgrade, it

was a source of concern for the regulators.

In the midst of the regulatory scrutiny, Mr. Stockman became aware that the Firm

was continuing to add to the portfolio, including €200 million of Italian bonds acquired in mid-

July.  In a July 30, 2011 email, he told Mr. Corzine, "I am not currently supportive of buying

more sovereigns" because of concerns about MF Global's ability "to comfortably post initial and

variation margin in light and heavier stress scenarios."  Mr. Stockman recommended that they

"hold off buying more long RTM's until we get a better picture of ability to proactively manage

IM's down and our capital raising efforts."  At the same time, July RTM revenues plummeted

over $38.5 million, to $1.1 million, from over $39.6 million in June.

---

66.  There are indications that MFGI's discussions with FINRA about the appropriate capital treatment of the RTM transactions had commenced as early as February 2011.

MFGI personnel discussed and prepared responses to FINRA over the next several weeks, and held multiple calls with the SEC and with FINRA in early August. FINRA asked MFGI to provide a "Proposed Default Risk Charge" as to the collateral supporting the RTM positions. FINRA's position was that, although sovereign RTMs were not specifically addressed within the FINRA rules, these positions were more closely analogized to long positions in sovereign debt, which are treated as nonconvertible debt (that have a charge), than they are to RTMs of U.S. Treasuries or Agencies (that do not have a charge). In response to FINRA's request, Mike Bolan and Matt Hughey assembled and circulated for internal consideration five possible computations for the proposed charge, reflecting a range of possible amounts from $7.6 million to $98.2 million.

On August 11, MFGI provided to FINRA a memo setting forth the Firm's objection to a potential default risk charge, but, as requested, proposed a regulatory capital charge with respect to the sovereign debt RTM transactions of $55.8 million. An additional $60 million was injected into MFGI, to increase the Firm's excess capital to $135 million in anticipation that FINRA would assess a charge that would impact the August net capital requirement. Internal discussions then began about transferring MFGI's RTM positions to FINCO, MFGUK, or a third party. None of the transfer options were ideal, because each would involve posting additional capital, recognizing substantial immediate economic losses, or overcoming regulatory opposition.

At the same time, in the United Kingdom, the FSA began to express heightened concern and required MFGUK to provide a contingency plan for liquidity stress arising from the sovereign RTM portfolio. Although in internal communications, MF Global personnel acknowledged that, if MFGUK faced a $900 million margin call on sovereign RTM positions,

"there is no way we could support" it, MFGUK represented to the FSA that it had "sufficient intraday liquidity" to be able to meet a stress liquidity need of $841 million without disrupting its business.[67]

On August 24, FINRA informed MFGI of its decision that, as of the close of business the next day, MFGI was required to take a full haircut, approximately $257 million, on all sovereign RTMs as "securities owned haircuts."  The Firm continued to note its disagreement with what it perceived as FINRA's re-interpretation of the Net Capital Rule, but took immediate steps to further increase its excess net capital by $183 million, to $287 million (in preparation for the impact of the capital charge to its August 2011 FOCUS report), up from $104 million as of July 31, 2011.  The net impact on MFGI was an increased capital requirement of $255 million. A few days later, FINRA notified MFGI that rather than applying the new capital charges only prospectively, the Firm was required to restate the July 2011 FOCUS report to retrospectively reflect the modified capital treatment of the RTM transactions.  This retrospective application of the charge to the July FOCUS report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously-reported excess of $104.3 million).  In an amended Form 10-Q filed on September 1, MF Global disclosed that the net capital infusion had been made.[68]

---

67. By this time, the European sovereign RTM portfolio stood at $5.7 billion net and current margin funding was $550 million (up from $170 million in May).

68. The Form 10-Q/A stated: "As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level.  The Company does not believe that the increase in net capital will have a material adverse

(Footnote continued on next page)

After the FINRA net capital charge, other regulators and exchanges also increased their focus on MF Global's financial condition:

- MFGI's disclosures were evaluated by the exchanges, and in some instances resulted in additional requests for information.

- Excess margin for MFGI's house accounts was no longer automatically returned or margin requirements were otherwise increased.

- DTCC imposed a margin premium of 25% for 90 days.

- FINRA limited MFGI's underwriting activities to "Best Efforts"-based transactions only, and instructed MFGI that it could not conduct any "Firm Commitment" underwritings until the perceived risk of the European sovereign debt securities collateralizing the RTMs was sufficiently reduced in FINRA's view.

- On September 9, an OCC representative asked MFGI to explain why it failed to provide to OCC an Early Warning Notice regarding FINRA's decision to increase its net capital requirement.

- The NY Fed raised questions regarding FINRA's net capital decision, the RTM positions and the Firm's net capital requirement.

On September 19, FINRA wrote to Mr. Corzine, in his capacity as President of MFGI, that "the overall risk undertaken by the Firm in maintaining the inventory levels in [RTM Sovereign Debt] would meet the criteria for subjecting [MFGI] to special surveillance." As a result, FINRA notified the SEC, SIPC and other SROs and clearing organizations, and requested MFGI to provide certain financial information on a weekly basis.

Meanwhile in the United Kingdom, on September 23, MFGUK again met with the FSA, which announced that it was "uncomfortable with [MFGUK's] liquidity position and uncomfortable with [its] intraday liquidity position." A key topic of discussion was the

_____

(Footnote continued from prior page)

impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012." (MF Global Form 10-Q/A dated Sept. 1, 2011.)

possibility of an intraday margin call from the LCH, and what would happen if MFGI failed to fund MFGUK to meet the margin call.

At the end of September, as certain of MFGI's positions in Portuguese and Irish debt were due to mature, LCH issued a margin call to MFGUK of over €400 million to cover the default risk over the weekend.  To cover the margin call, MFGUK looked to MFGI, which wired $440 million to MFGUK.  After the trades settled, LCH credited the additional margin back to MFGUK, which then returned the funds to MFGI the following week.

As of September 30, 2011, MF Global had a net long position had grown over the quarter by $1.23 billion to approximately $6.3 billion in short-term European sovereign debt, including bonds from Belgium, Italy, Spain, Portugal and Ireland, and the amount of margin posted exceeded $400 million.[69]  (Annex F at 4, 12.)  Some of these positions were acquired as late as the end of July — just prior to FINRA announcing the required net capital charge — and Mr. Corzine planned to continue taking on new positions into November 2011.  The cumulative P&L impact of the RTM trades from inception to bankruptcy was over $103 million.  (Annex F at 15.)  On a quarterly basis, the P&L on the RTM trades amounted to as much as 16% of net revenues.

The size of the RTM portfolio, in comparison to MF Global's size, was staggering.  As set forth in an October 2011 memo to the Holdings Board, as of the end of September 2011, this RTM exposure was the equivalent of almost 14% of MF Global's assets, and was more than four and a half times total equity.  As set forth in the following chart, contained in the memo to the Board, MF Global's sovereign debt portfolio, while nominally

---

69.  At the time, the portfolio was divided as follows: Belgium 2%, Italy 47%, Spain 23%, Portugal 21%, Ireland 6%.

smaller than that of larger financial institutions, as a percentage of quarter-end equity or assets,

was orders of magnitude greater than other, even far larger Wall Street banks:

### Stated Sovereign Exposure

| Company | Stated Balance Sheet Exposure* | Exposure as a % of Q End Equity | Exposure as a % of Q End Assets | Quarterly VaR Average | VaR as a % of Q End Equity |
|---|---|---|---|---|---|
| MF Global (MF) | $6.4 B | 460.6% | 13.9% | $3.0 M | 0.2% |
| Citigroup (C) | $13.5 B | 7.7% | 0.7% | $184 M | 0.1% |
| Goldman Sachs (GS) | $1.9 B | 2.6% | 0.2% | $101 M | 0.1% |
| Jefferies (JEF) | N/A | N/A | N/A | $12.7 M | 0.4% |
| JP Morgan (JPM) | $14 B | 7.7% | 0.6% | $94 M | 0.1% |
| Morgan Stanley (MS) | $2.0 B | 3.4% | 0.2% | $145 M | 0.2% |

*as measured under a firm's internal approach

Thus, as the Board and management were aware, MF Global's appetite for sovereign debt had

taken the Firm to a very precarious position.

Risk personnel remained focused on the liquidity risks posed by the RTM

portfolio, and during this period brought several risk scenarios to the attention of Mr. Stockman

and other senior management. One was the possibility that the Firm would be unable to roll

margin-reducing reverse RTMs. If a counterparty refused, the Firm could be faced with an 80%

margin call from the LCH, which could amount to $602 million. In another scenario, if MF

Global were downgraded below investment grade, that event would trigger a margin call as high

as 200% under LCH rules and higher margin at other exchanges like Eurex. As a possible source

of additional liquidity to meet LCH margin calls, the Risk Department identified the "FCM 30.7

Seg. Excess," and Treasury personnel reportedly agreed that part of this could be moved to the

UK, although "from UK Seg rules perspective," they were uncertain whether that would be

permissible. Very simply, however, the fact was that the sovereign RTM portfolio had grown

beyond even MF Global's moderate risk profile.

In June, Accounting, Finance and Treasury began the process to move the PSG

out of MFGI to a non-regulated entity, MF Global Special Investor, LLC ("Special Investor")

because PSG "use[d] too much reg capital and the cost of reg capital is more than the cost of

funding capital."  Special Investor also entered into a subordination agreement with MFGI.

## VII.    The Final Week Of MF Global's Operations

### A.    The Downgrades And Earnings Call

The September 1 announcement that MFGI had increased its net capital at

FINRA's insistence was largely unheralded at the time.  It was not until the October 17 article in

*The Wall Street Journal* that the market reacted significantly to the news of the net capital charge

and what it indicated about MF Global's financial health.[70]  The last audit report issued by CME

was dated August 4, and on October 17, CME issued a warning letter noting that certain of MF

Global's investments of customer funds did not comply with the requirements of Regulation

1.25.

Credit events impacting MF Global throughout the week of October 24 to

October 28 escalated its liquidity drain to crisis proportions.  These events included a one-notch

downgrade by Moody's on October 24, and a disastrous quarterly earnings call on October 25.

In announcing the October 24 downgrade,[71] Moody's reported that MF Global was unable "to

achieve the financial targets that Moody's had previously specified were required for it to

maintain a Baa2 rating."  Moody's announcement expressed concern about MF Global's

increased European sovereign debt exposure, and viewed the fact that it had to "inject capital"

into MFGI as an indication of problems with the company's risk appetite and risk governance.

---

70.  MFGI's CFO had reported to Moody's on October 23 that "[c]apital and liquidity has never been stronger."

71.  On October 24, MFGI employee Michael Bolan spoke to officials at the CME, and advised that a downgrade was expected.

Among the bad news that the rating agencies learned in mid-October and the public learned during the earnings call on October 25 was that MF Global was writing down its deferred tax assets ("DTAs") by $119 million,[72] virtually wiping them all out and effectively signifying that MF Global did not expect to be profitable in the near future. As a result, MF Global reported a record net GAAP quarterly loss of over $191 million. On October 25, MF Global's stock price, which was already low, fell by 48%. (Annex H.)

In an October 25 email, Laurie Ferber advised Christine Serwinski that the SEC had informed her and Mr. Steenkamp that three or four regulators would be going to Chicago the following day, and that the CBOE was already on site. Later that day, Mr. Bolan reported to Ms. Serwinski and Mr. Steenkamp that he had received a call from the CME that morning, and that they wanted to discuss rumored losses, liquidity, and whether MFGI had a plan if it was further downgraded below investment grade. Also, on October 25, personnel from the CME contacted personnel from MFGI's Risk Department to arrange a meeting on Thursday, October 27.

On Wednesday October 26, the SEC advised MFGI that it wanted to meet with management the next day to discuss liquidity, funding, financial statement condition, and

---

72. Through the end of fiscal year 2011, MF Global had carried on its balance sheet certain DTAs, which, net of a valuation adjustment, stood at $149.7 million as of March 31, 2011 (Net of Deferred Tax Liabilities, the (net) Deferred Tax Assets stood at $108.3 million as of year-end.) These DTAs were composed mainly of the Net Operating Loss Carryforwards ($54.1 million), Intangible Assets ($49.8 million), and Stock-Based Compensation ($27.4 million) (issued in connection to the company's July 2007 IPO). These net DTAs represented essentially the money MF Global anticipated it would save on income taxes in the future, assuming it would be profitable. The company disclosed that the "[r]ealization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies," and that the company had three-year cumulative pre-tax loss at year-end in many jurisdictions in which it did business. MF Global's management remained optimistic that there was "sufficient positive evidence" to conclude that there was a greater than 50% probability that the company would be profitable (in accounting terms) in the next fiscal period, so it would be "able to fully realize [its] deferred tax assets." Management cautioned that "the amount of the deferred tax asset considered realizable, however, could be significantly reduced in the near term if our actual results are significantly less than forecast. If this were to occur, it is likely that we would record a material increase in our valuation allowance." (2011 10-K at 23.)

regulatory computations (including trends), and that the CFTC would also participate.  A call was also held with FINRA and CBOE to discuss similar issues.  After the call, it was observed that the SEC was clearly focused on the exposure to sovereign debt firm-wide, even though the exposure at MFGI had been reduced.  On the evening of October 26, several representatives of the CME had a call with Ms. Ferber and Mr. Steenkamp.

The next day, as scheduled, the CFTC and the SEC met with MFGI management. Members of the CME risk department met with Henri Steenkamp, Dennis Klejna, Michael Stockman and others to conduct a risk review.  The CME requested an update of the briefing it had received the previous day from Ms. Ferber and Mr. Steenkamp.  The CME also sent members of its audit department to MFGI's offices in Chicago to review the Segregation and Secured Statements as of close of business of Wednesday, October 26.  In addition, the CFTC was also on site at the company, and the CFTC and the CME requested all documentation supporting the segregated and secured assets included on the Segregated Statement and Secured Statements as of October 26, 2011.  The next day, the CME advised Laurie Ferber, Christine Serwinski and Mike Bolan that any equity withdrawals had to be approved in writing by CME's audit department.

On Thursday October 27 Moody's downgraded MF Global again by two notches into non-investment grade territory, citing "weak core profitability" that had "contributed to it taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries."  Fitch also announced a two-notch downgrade, citing "increased risk taking activities" that left MF Global "vulnerable to potential credit deterioration and/or significant margin calls."  S&P did not downgrade MF Global further, but on October 26 had put the

company on "CreditWatch Negative," noting that "the continued volatile capital markets and low interest rates will hurt the company's ability to generate capital."

On October 28, both the CME and CFTC were on-site in Chicago.  The CME had another call with Ms. Ferber and Mr. Steenkamp, and reportedly received assurances that MF Global had drawn down substantially all of its line of credit but was not yet using the money.

### B.     "Liquidity Asphyxiation"

The primary source of extra liquidity was the $1.2 billion unsecured RCF that Holdings used to finance the operations of MF Global, including MFGI.  On the morning of October 24, the outstanding balance on the unsecured RCF stood at $367 million; an additional draw that day brought the outstanding balance to $597 million.  All in all, from Monday through Thursday there were further draws on that facility totaling $805 million, leaving MF Global's borrowing capacity fully depleted.  The outstanding balance on the unsecured RCF as of October 27 was $1.172 billion and it remained at that level through October 31.[73]  (Annex E.) MFGI's $300 million secured RCF had a balance of $175 million on the Filing Date.[74]

These available sources of liquidity were, however, insufficient to meet MF Global's ever-increasing liquidity needs.  The announcement of poor financial results coupled with the two Moody's rating downgrades began a "run on the bank" scenario. Customers sought to liquidate their positions and withdraw their funds from MFGI.  Adding to the liquidity stress was the ratcheting up of margin requirements, especially for the sovereign RTM trades.

---

73.  Bank of America was the sole member of the syndicate that refused to fund its portion of $27,376,288; had Bank of America funded this amount, MF Global would have reached the maximum borrowing capacity of the $1.2 billion revolver.

74.  Throughout its final week of operations, as MFGI attempted to draw on its secured RCF but experienced difficulty in identifying and pledging eligible collateral for such draws.

On October 24, an internal memo circulated to Mr. Corzine and other MF Global personnel in the UK and the US entitled "Intraday Liquidity Issues," identified "the greatest liquidity concern" to be the possibility that LCH might impose increased initial margin requirements on the Spanish and Italian RTM positions that needed to be met on a same-day basis.  The memo explained that, "[u]nder these circumstances MFGUK would have to honour its obligation to the clearing house before MFGI could fulfill its obligation to MFGUK."  The memo noted uncertainty about whether LCH would be able to use its automatic protected payment system to satisfy the call on a same-day basis, and, assuming that it could do so, recommended that "some form of intercompany pre-margining" be put in place to protect MFGUK from an intraday shortfall.

During the final week, LCH and FICC, among others, increased their margin requirements:

- RTM margin posted at LCH increased by $211 million to $663 million during the Firm's final week of operations.  (Annex F at 1.)

- DTCC reduced its "Debit Cap," a credit DTCC otherwise provided to MFGI in connection with securities transactions.  The reduction in the Debit Cap from $334 million to $100 million on October 26 increased the cash MFGI had to post to DTCC in order for DTCC to continue to settle trades and meet the demands of MFGI's BD customers.  On October 31, DTCC reduced the Debit Cap to $1, effectively denying MFGI any credit to settle transactions.

- After the net capital charge in August, FICC had imposed additional "penalty" premiums on MFGI.  During the week of October 24, these penalties increased MFGI's margin requirement by approximately $20 million.  On October 25, FICC further increased MFGI clearing requirements and began withholding (*i.e.*, not returning) excess margin for MFGI accounts at its affiliated clearing corporations.  During the final days in October, FICC withheld cumulative excess margin of approximately $108.9 million.[75]

---

75.  The daily cumulative excess in the FICC accounts alone was $48.5 million, $42.8 million and $109 million, respectively for the three days from October 26 through October 28.

- MFGI's net capital charge triggered risk review by ICE and put MFGI on its watch list.  ICE insisted on approving any return of excess margin for MFGI's proprietary accounts.  When MF Global was downgraded on October 24, ICE increased restrictions, limiting return of excess margin from MFGI's Customer Accounts as well as its House account.

The loss of counterparties and increased haircut demands further exacerbated liquidity strains.  In addition, throughout the week, securities that could no longer be funded through third-party repos market were left "in the box" at DTCC, BNYM and JPMC.  The excess box collateral, as depicted on the Liquidity Dashboards, increased from $119 million on October 21 to $606 million on October 26.  No funding in the market via repos or stock loans (as normally done) was available for these assets.  Since no liquidity was provided from these securities while they continued to be on deposit, to the extent it could, MFGI began liquidating positions to generate liquidity.

At the same time, during the last weeks of October, the cash created within the repo matched book began to decline because counterparties demanded greater haircuts on the collateral that MFGI posted, as a prerequisite for continuing to lend money to MFGI via repos.  The demands for further haircuts on MFGI's corporate bond positions were particularly intense.  Counterparties also became more aggressive in marking to market any outstanding repo positions, and in recalling any excess exposure.  Counterparties closed out their reverse repo and repo balances with MFGI, eliminating any excess liquidity that had been embedded in those trades.  State Street Bank, for example, which had been a major repo counterparty, advised MF Global on October 17 that it would cease conducting significant business with MFGI, cutting off an integral source of MFGI's daily funding.

Liquidity was also diminished as a result of the wind down of MFGI's participation in the securities lending program with JPM.  MFGI had up to a $7 billion investment in JPM's Securities Lending program.  MFGI entered into reverse repo agreements

with REITs, who provided mortgage collateral to MFGI in exchange for cash, at an average of

5% discount from face value.  MFGI then entered into a repurchase agreement with JPM

Securities Lending whereby MFGI sent the mortgage collateral to JPM in exchange for U.S.

securities with similar value.  The transaction created liquidity for MFGI as a result of the

difference in the spreads of 5% discount on the mortgages compared to 2% paid for the U.S.

Treasuries.  In addition, during the program, MFGI had additional liquidity as a result of market

movements in its favor and the interest on the extra margin that REITs had deposited with

MFGI.  During the week of October 24, both MFGI and JPM decided to unwind transactions to

reduce MFGI's investment in the program.  This had a significant impact on MFGI's liquidity

because it eliminated the liquidity generated by the program and in addition MFGI had to return

the excess margin on deposit from the REITs.  The Trustee's professionals have estimated that

the unwinding of the program after October 25 eliminated a source of liquidity of approximately

$430 million.

### C.    **Transfers, Liquidity, And Segregation Of Customer Property**

Had customer funds been properly protected, the customer property in Customer

Accounts should have been largely if not completely unaffected by the liquidity crisis at

MF Global.  Instead, these funds were used to fund MF Global's liquidity needs in at least the

latter part of the week of October 24.

As was widely reported, in the early hours of October 31, MFGI reported a deficit

of approximately $952 million in the segregated funds as of the close of business on October 28,

and also determined retroactively that it had been under-segregated as of the prior day.  A review

by the Trustee's professionals has determined that MFGI had a segregation deficiency as early as

mid-day Wednesday October 26.  (*See* pp. 122-23, *infra*.)

To present the cash movements that impacted the ultimate shortfall in Customer Segregated funds, this section recounts for each day during the week of October 24 through 31: (a) the internal version of the Segregation and Secured Statements, the filed Segregation and Secured Statements, and Daily Estimated Net Capital Internal Summary; (b) the intraday transfers between the FCM accounts and the BD accounts at JPM and BNYM and repayments of these intraday transfers; (c) money transferred from the FCM accounts to the JPM BD Wire Account; (d) the 15c3-3 calculation and related documents; and (e) discussions of the Liquidity Dashboards for each day that week.  The section concludes with a summary of the segregation shortfall from October 26-31, followed by discussions regarding checks issued to customers that week.

### 1.    October 24, 2011

#### (a)    Segregation Statement and Secured Statement

The internal Segregation Statement and the Secured Statement prepared on October 24 showed the following balances as of the close of business on Friday October 21, 2011:

| | |
|---|---|
| Excess segregated funds | $416,369,197 |
| Excess secured funds under Alternative Method | $847,353,903 |
| Excess secured funds under Net Liquidating Method | ($371,553,722) |
| Firm Invested in Excess | $ 44,815,475 |

This information was circulated internally at MFGI and essentially the same information was included in the Daily Estimated Net Capital summary provided to Messrs. Corzine, Steenkamp, Mahajan, and others.  There was no recommended movement between the segregated and secured funds.  The Segregation Statement and Secured Statement (with the requirements

calculated under the Alternative Method and without any reference to the Firm Invested in

Excess) were filed via Winjammer with the CFTC, the CME and the NFA and also emailed to

the CBOE.  Thus, the filed reports reflected excess segregated and secured funds of over

$1.2 billion, while the Firm Invested in Excess was only $44.8 million.

### (b)    Intraday Transfers

At 11:17 a.m.,[76] Operations in New York requested a $25 million intraday

transfer, which Ms. O'Brien approved.  Irma Romo instructed Treasury Operations to wire the

money from the JPM Foreign Secured Trust Account to the Treasury House Account and from

there to the JPM Clearing Account.  New York Operations repaid the $25 million to the Treasury

House Account by close of business the same day.[77]

### (c)    Securities Client Wires

As of the start of business on October 24, the Treasury Operations tracking sheet

showed that the FCM was owed $19 million relating to the funding of client wires from the JPM

BD Wire Account.  At 7:45 p.m. that day, the FCM approved the transfer of an additional

$15 million from the JPM Foreign Secured Account to the JPM BD Wire Account.  That

increased the outstanding "loan" balance for funding of client wires from the JPM BD Wire

Account to $34 million.

### (d)    15c3-3 Calculation

MFGI calculated the 15c3-3 Customer Reserve Requirement and PAIB Reserve

Requirement as of the close of business on October 21.  It was determined that $28,598,922

could be released from 15c3-3 Account on Tuesday October 25.

---

76.  All times are Eastern Standard Time, unless otherwise noted.

77.  As of October 24, there remained an outstanding balance from the BD to the FCM of $78 million that had
     previously been transferred to JPM and not returned.

(e)     **Liquidity Dashboard**

The Liquidity Dashboard circulated to senior management as of close of business on October 24 including Messrs. Corzine, Abelow, Steenkamp, and Mahajan showed the BD had negative liquidity of $338 million.  In addition to available FINCO and RCF Funds to fund this deficit, the dashboard also showed $30 million in "Available FCM Cash."

The dashboard showed the following information:

- Sources of Liquidity           $470 million
- Uses of Liquidity              ($808 million)
- B/D Liquidity                  ($338 million)

Additional sources of Liquidity outside the BD were:

- Total FINCO balance            $254 million
- RCF Draw                       $355 million

After subtracting the $338 million needed in the B/D, the Total Available Liquidity shown was $301 million:

- Remaining Free Cash (FINCO)   $271 million
- Available FCM Cash             $30 million

The daily Net Capital computation for that day showed the Firm Invested in Excess (as of October 21) to be $44 million.

2.     **October 25, 2011**

(a)     **Segregation Statement and Secured Statement**

The internal Segregation Statement and Secured Statement prepared by MFGI on October 25 showed the following balances as of the close of business on October 24:

| | |
|---|---|
| Excess segregated funds | $396,696,201 |
| Excess secured funds under Alternative Method | $824,868,698 |
| Excess secured funds under Net Liquidating Method | ($341,838,228) |
| Firm Invested in Excess | $  54,857,973 |

This information was circulated internally at MFGI on October 25, and essentially the same

information was included in the Daily Estimated Net Capital summary provided to

Messrs. Corzine, Steenkamp, Mahajan, and others.  The Segregated Statement and Secured

Statement (with the requirements calculated under the alternative method and without any

reference to the Firm Invested in Excess) were filed via Winjammer with the CFTC, the CME

and the NFA and also emailed to the CBOE and to ICE.

A Daily Excess Seg Movement Report circulated on October 25, 2011,

recommended movement of $32 million from JPM Foreign Secured Trust Account to the JPM

Customer Trust Account.  The Regulatory personnel approved the transfer and Treasury

Operations executed a wire of $32 million.

Although the documents filed with the regulators showed Regulatory Excess of

over $1 billion, the Firm Invested In Excess was $54.8 million.

### (b)    **Intraday Transfer**

On the morning of October 25, Operations in New York requested $50 million in

intraday funding, which Ms. O'Brien approved.  Ms. Romo instructed Treasury Operations to

transfer the funds from the JPM Foreign Secured Trust Account to the Treasury House Account

and from there to the JPM Clearing Account.

Operations in New York then requested an intraday transfer of $200 million, to

facilitate the settlement of bonds being returned.  Ms. O'Brien approved the request even though

the Firm Invested in Excess as of October 24 was less than $55 million, thereby transferred

customer funds from the Regulatory Excess for proprietary activities.  Ms. Romo instructed, with

Ms. O'Brien's approval, Treasury Operations to transfer the money from the JPM Customer

Trust Account to the Treasury House Account and then to the BNYM DTC Account.

Operations in New York repaid both transfers the same day:  $200 million from

the BNYM Clearing Account, and $50 million from the JPM Clearing Account.

### (c)    Securities Client Wires

As of the start of business on October 25, the FCM was owed $34 million relating

to the funding of BD client wires.  During the day, an additional $16.6 million was transferred

from the JPM Foreign Secured Account to the JPM BD Wire Account which increased the

balance to $50.6 million.  That day, the excess funds in the 15c3-3 Account were released and

$19 million (reflecting the prior week's balance) was transferred to JPM BD Wire Account.  It

was apparently intended that these funds would be used to repay the FCM balance.  The

Treasury Operations tracking sheet shows a balance of $31.6 million, and a corresponding

payment of $19 million.  However, the repayment did not actually happen and the amount owed

to the FCM on account of securities customer wires was $50.6 million as of close of business on

October 25.

### (d)    Liquidity Dashboard

Even as of October 25, MFGI's senior management seemed in disbelief about the

extent of the liquidity drains that final week.  For example, Mr. Mahajan wrote in an October 25

email that "[w]e took Jon [Corzine] through the [liquidity analysis] because he keeps speculating

where the money has gone and sends Treasury in different directions to investigate."  The

Liquidity Dashboard delivered to senior management (including Messrs. Corzine, Steenkamp,

Abelow, Mahajan, and others) as of the close of business on October 25 reflected that the broker-dealer had negative liquidity of $433 million.  The dashboard showed the following information:

- Sources of  Liquidity        $440 million
- Uses of Liquidity            <u>($873 million)</u>
- B/D Liquidity                ($433 million)

Additional sources of Liquidity outside the B/D were:

- Total FINCO balance          $254 million
- RCF Draw                     $655 million

After subtracting the $433 million needed in the B/D, the Total Available Liquidity shown was $536 million

- Remaining Free Cash (FINCO)  $476 million
- Available FCM Cash           $60 million

The Available FCM Cash of $60 million was close to the Firm Invested in Excess as of the prior day which was approximately $55 million.

### 3.    <u>October 26, 2011</u>

#### (a)    <u>Segregation Statement and Secured Statement</u>

The internal Segregation Statement and Secured Statement prepared by MFGI on October 26 showed the following balances as of close of business on October 25:

| | |
|---|---|
| Excess segregated funds | $298,753,401 |
| Excess secured funds under Alternative Method | $769,545,225 |
| Excess secured funds under Net Liquidating Method | ($277,241,768) |
| Firm Invested in Excess | $ 21,511,633 |

On the morning of October 26, this information was circulated internally at MFGI and essentially the same information was included in the Daily Estimated Net Capital summary

provided to Messrs. Corzine, Steenkamp, Mahajan, and others.  The large change in the amount of cash figures caused some concern, although Ms. O'Brien reviewed the calculations and concluded, "This is precisely as I projected.  No issues."  The Segregation Statement and Secured Statement (with the requirements calculated under the alternative method and without any reference to Firm Invested in Excess) were filed via WinJammer with the CFTC, the CME and the NFA and also emailed to the CBOE, ICE, and FINRA.

The Daily Excess Seg Movement Report was not prepared on October 26 or for any subsequent day.  There was therefore no adjustment of the balances prepared daily by Treasury Operations between the JPM Customer Trust Account and the JPM Foreign Secured Account for the rest of the week, and no transfers between the accounts to reallocate any excess was made.

As of Wednesday, October 25, although the Regulatory Excess was over $1 billion, the Firm Invested in Excess was only $21.5 million.

### (b)    <u>Intraday Transfers</u>

Over the course of the day on October 26, Ms. O'Brien authorized a total of $615 million in intraday transfers from the FCM.  Because the Firm Invested in Excess as of the close of business the day before was less than $22 million, these transfers came from customer funds.  From the FCM accounts, a total of $290 million was transferred to the JPM Clearing Account and $325 million was transferred to BNYM ($125 million to the BNYM Clearing Account, and $200 million to the BNYM DTC Account to address DTCC's Debit Cap reduction).

The $615 million in transfers from the FCM on October 26 consisted of the following:

- At 8:02 a.m., Ms. O'Brien approved a transfer of $125 million from the JPM Foreign Secured Trust Account to the Treasury House Account, and then to the BNYM Clearing Account.

- At 9:41 a.m., Ms. O'Brien approved a transfer of $75 million. Ms. Romo instructed Treasury Operations to wire the funds from the JPM Foreign Secured Trust Account to the Treasury House Account, and then to the JPM Clearing Account.

- At 10:06 a.m., Operations in New York requested an intraday transfer of $200 million to be paid to the BNYM DTC Account, because DTCC had reduced the debit cap from $300 million to $100 million. In an email at 10:08 a.m., Ms. O'Brien approved the request and noted that the intraday "loan" balance owed to the FCM was $400 million. Ms. Romo requested a transfer from the JPM Customer Trust Account to the Treasury House Account to the BNYM DTC Account to facilitate the "loan".

- At 10:32 a.m., the BD requested and Ms. O'Brien approved $50 million intraday transfer. Ms. Romo instructed Treasury Operations to transfer $50 million from the JPM Customer Trust Account to the Treasury House Account and then to JPM Clearing Account.

- At 5:53 p.m., Mr. Chenoweth requested a $165 million wire from FINCO to the JPM Clearing Account and Mr. Cranston approved the request. The funds were transferred instead from the JPM Customer Seg Account to the JPM Clearing Account. JPM's role in connection with this $165 million transfer is discussed in detail below. (*See* pp. 136-38, *infra*).

The funds were applied to non-FCM proprietary settlement and clearance obligations at the respective institutions to which they were transferred.

The failure of New York Operations to return these funds to the FCM by the close of business caused a panic regarding segregation compliance within Treasury. Ms. O'Brien emailed Messrs. Gill, Lyons, and Simons in Operations in New York at 6:24 p.m., stating "I need to know how much is being return[ed] – from where to where", and again at 6:25 p.m., stating, "I NEED TO KNOW NOW – TO PRE-ADVISE FUNDING AND AVOID A SEG ISSUE." Operations, however, failed to return any funds before the Fed Wire closed.

Instead, because there was $325 million in cash available in the BNYM Clearing Account, Mr. DeLucia arranged, at Treasury's request, for the cash to be locked up in a shell

account at BNYM designated for "Customer CFTC 1.25." The amount deposited in the shell account was thus eligible to be included as an asset in the Segregation Statement prepared as of the close of business on October 26. It was treated on the Segregation Statement as if the funds on deposit in the shell account had been invested in a CFTC Regulation 1.25 compliant triparty repurchase transaction. At 7:36 p.m., Mr. Cranston emailed Mr. DeLucia, Mr. Gill, Mr. Cleere with a copy to others in Treasury, stating that the FCM "need[ed] to have the $325 million closed out in Tri-Party and return[ed] to us as soon as possible" the following day. The circumstances surrounding BNYM's role in this transaction are discussed in detail below. (*See* pp. 139-42, *infra*.)

### (c)    Securities Client Wires

As of the start of business on October 26, MFGI's tracking sheet showed that the FCM was owed $31.6 million, an amount that was actually understated by $19 million. On October 26, the FCM transferred an additional $74 million from the JPM Foreign Secured Account to the JPM BD Wire Account in two wires of $5 million and $69 million. MFGI documents show that New York Operations intended to repay $2.7 million, but it appears the funds were never transferred to the FCM. As of October 26, the amount owed to the FCM on account of securities customer wires was $124.6 million, but on MFGI's tracking sheet it was understated as $102.9 million.

### (d)    Liquidity Recap

On October 26, drafts of a liquidity dashboard were prepared, and Edith O'Brien, Matthew Besgen and Michael Wieczorek developed a high-level, end-of-day report on liquidity entitled "MF Global Inc. Recap." This Recap was to be given to the New York Fed daily. The Recap for October 26 circulated that evening showed:

- Excess Cash Margin/Haircuts    $425 million

- Haircut/Margin Paid             ($793 million)

- Box Collateral                  ($606 million)

- Net Cash Excess/(Deficits)      ($974 million)

- MFGI Cash                        $77 million

- Total MF Finance Company Free cash      –

- RCF Committed Draw              $897 million

- Total Unsecured Funding         $974 million

- **Available Committed Lines      $458 million**

Thus, this Recap showed the BD to have both a cash deficit and unsecured funding of $974 million.

At 12:39 a.m. on October 27, a similar Liquidity Recap was provided to Messrs. Corzine, Abelow, Steenkamp, Mahajan, and others that showed that, as of the close of business on October 26, the broker-dealer had net liquidity usage of $879 million with "Liquidity on hand" of "$00 mm FCM entity."  This Liquidity Recap also showed:

- Excess Cash margin/haircuts       $425 million

- Haircut/Margin Paid               ($793 million)

- Box Collateral                    ($606 million)

- Net Cash Excess/(Deficits)        ($974 million)

Total unsecured funding was $897 million:

- MFGI Cash                          –

- Total FINCO Free Cash              –

- RCF Committed Draw                $897 million

Net Liquidity was shown as negative $77 million,[78] and Available Committed lines were $458 million:

- RCF Committed Draw          $303 million

- JPM Chase Secured           $155 million

The summary that accompanied this Liquidity Recap included projections as of the close of business October 27 showed "FCM Liquidity Source $0 mm Increase."  As noted above, the Firm Invested in Excess as of the prior day was approximately $21.5 million.

4.      **October 27, 2011**

    (a)      **Segregation Statement and Secured Statement**

On the morning of October 27, Ms. O'Brien asked the Regulatory Group to provide her with the internal Segregation Statements "after completed - before distributed.  We had significant moving parts."  Ms. Campbell provided a draft to Ms. O'Brien and Mr. Chenoweth that reflected the following information as of the close of business on October 26, 2011:

| | |
|---|---|
| Excess segregated funds | $116,164,132 |
| Excess secured funds under Alternative Method | $517,139,754 |
| Excess secured funds under Net Liquidating Method | $(457,906,411) |
| Firm Invested in Excess | $(341,744,278) |

This information was circulated internally at MFGI, and essentially the same information was included in the Daily Estimated Net Capital summary provided to Messrs. Corzine, Steenkamp, Mahajan and others.  The Segregation Statement and Secured Statement (with the requirements calculated under the alternative method and without reference to Firm Invested In Excess) were

78.  This internal version of the Liquidity Recap appears to show MFGI cash of $0 and a net liquidity deficit of $77 million.

filed via WinJammer with the CFTC, the CME and the NFA and also emailed to CBOE, OCC, ICE and FINRA.

Ms. Serwinski, who was out of town on vacation, received a copy.  She asked for an explanation for the large negative Firm Invested in Excess balance, and expressed concern about the $200 million "loan" from the FCM that had been made on October 27.  Ms. O'Brien responded, "Lent is a strong word-I would state-Fail to return intraday funding compounded by Funding B/D Customer Wires."  Ms. O'Brien provided the following explanation of the changes from October 25th to October 26:

- $80 million in securities customer wires; and

- $290 million in two intra-company transfers that New York Operations did not repay, for a total negative number of $328 million.

Ms. O'Brien also informed Ms. Serwinski that she estimated the Firm Invested in Excess would be negative $167 million as of close of business on October 27, 2011.

For the second day, there was no Daily Excess Seg Movement Report prepared reallocating excess balances (if any) between Customer Segregated and Foreign Secured accounts.  Treasury Operations personnel told the Trustee's counsel that because they were processing customer wires until the Fed Wire closed, they were unable to make any calculation in time to make any adjustment.  Thus, as of Wednesday, October 26, while the documents filed showed a Regulatory Excess of approximately $633 million, there was a deficit in the Firm Invested in Excess of $341 million.

On October 27, the CME and the CFTC requested all documentation supporting the segregated and secured assets as of the day before.  At 4:53 p.m., the CME advised MFGI that no equity withdrawals were permitted without the consent of CME's Audit Department.

**(b)**     **Intraday Transfers**

On October 27, MFGI requested that BNYM release the $325 million from the tri-party shell.  As detailed below, BNYM requested certain assurances from MFGI prior to releasing these funds to the house account at the close of business.  (*See* pp. 140-41, *infra*.) Instead of being returned to a Customer Segregated account, the funds were released to the BNYM XGX Account — a house securities clearing account.

Notwithstanding her reference that morning to "significant moving parts," Ms. O'Brien authorized an additional "loan" from the FCM to fund proprietary activities in the amount of $200 million.  Ms. Romo instructed Treasury Operations to transfer $200 million from the JPM Customer Seg Account to the Treasury House Account and then to BNYM XGX Account to fund the request.  October 27 also saw the return of significant funds to the FCM when a total of $540 million was transferred from the BNYM XGX Account back to the FCM by way of the Treasury House Account.  The transfers were divided into five wires of $100 million and one wire of $40 million.[79]

**(c)**     **Securities Client Wires**

On October 27, the FCM transferred $123.2 million from the JPM Foreign Secured Account to the JPM BD Wire Account, bringing to $247.8 million the amount that was owed by the BD to the FCM for securities customer wires, although the Treasury Operations tracking sheet incorrectly showed $226.1 million.

---

79. Therefore, on a net basis on October 27, $340 million was transferred from the BNYM XGX Account to the Treasury House Account.  During October 27, a total net amount of $375.5 million was returned to Customer Segregated accounts from FCM House Accounts.  (*See* Annex I, Customer Transactions (Net), MFGI Accounts by Type, Oct. 27, 2011.)

(d)    **Liquidity Dashboard**

The dashboard as of the close of business on October 27 reflected a negative liquidity of $789 million.  In addition to FINCO and RCF funds to fund the deficit, the dashboard showed $82 million in "Available FCM Cash."  Even though the Firm Invested in Excess as of the prior day was a deficit of $341 million, as noted above, the FCM transferred another $200 million for non-FCM proprietary purposes that day (although funds were also returned to the FCM that day.)

The dashboard showed:

- Sources of Liquidity        $281 million
- Uses of Liquidity           ($1,070 million)
- B/D Liquidity               ($789 million)

Additional sources of liquidity outside the B/D were:

- Total FINCO balance         $252 million
- RCF Draw                    $888 million

After subtracting the $789 million needed in the B/D, the Total Available Liquidity was shown to be $433 million:

- Remaining Free Cash (FINCO)   $351 million
- Available FCM Cash            $82 million

Later that evening, an MF Global Inc. Recap was sent to the New York Fed and given to JPM.  The Recap for October 27 showed the following:[80]

- Excess Cash Margin/Haircuts     $115 million

_____

80.  There is a question as to whether the entry for "Excess Cash and Fully Paid for Securities" of $602 million properly reflected a source of liquidity or whether it included securities which were actually a drain on Liquidity.

- Haircut/Margin Paid            ($1,020 million)

- Box Collateral                ($215 million)

- Net Cash Excess/Deficits)     ($1,120 million)


- MFGI Cash                     –

- Total MF Finance Company Free cash  $82 million

- RCF Committed Draw            $1,120 million


- Excess Cash and Fully Paid for Securities  $602 million

- Total Unsecured Funding       $1,804 million

- Net Liquidity                 $684 million


- Available Committed Lines     $166 million

### 5.    <u>October 28, 2011</u>

#### (a)    <u>Wire to MFGUK</u>

On October 28, Ms. O'Brien, at the instruction of Mr. Corzine, facilitated the transfer of $175 million from the Treasury House Account to an MFGUK at JPM in London account to pay down an overdraft balance in that account.  This wire to MFGUK was actually funded by a $200 million transfer from the JPM Customer Seg Account to the Treasury House Account.  The circumstances surrounding this transfer are described in further detail below.  (*See* p. 130-35, *infra*.)

#### (b)    <u>Segregation Statement and Secured Statement</u>

On the morning of October 28, when Mr. Cooley prepared the Segregation Statement and Secured Statement as of close of business on October 27, he discovered a deficit

in the Segregation Statement of approximately $300 million.  Mr. Cooley and Mr. Hughey went

to Treasury to meet with Ms. O'Brien to discuss the deficit and potential reconciliation items.

After a preliminary discussion with Ms. O'Brien (who was on the phone with JPM), she asked

Mr. Chenoweth to handle the matter.  After reviewing the wires and bank reconciliations, it

appears that Mr. Chenoweth and Ms. Romo concluded that $540 million in wires that were sent

from BNYM the day before were not properly recorded.  Based on these discussions, an

erroneous $540 million manual adjustment was made to the Segregation Statement by personnel

in the Financial Regulatory Group, although they did not have backup for the adjustment.  The

witnesses' descriptions regarding this matter are confusing and contradictory.  The bank

reconciliation prepared for October 27 shows an entry corresponding to the five wires totaling

$540 million from Operations in New York to the FCM, with the note "Treasury Ops to Post."

Even though the October 26 Segregation Statement showed a negative Firm

Invested in Excess deficit of over $341 million, and Ms. O'Brien had projected a negative Firm

Invested in Excess of $167 million as of October 27, 2011, all concerned seem to have accepted

the $540 million adjustment as accurate.

After the $540 million adjustment (which later turned out to be unsubstantiated)

was made, the Segregation and Secured Statement filed by MFGI showed the following inflated

balances:

- Excess segregated 4d funds                                    $200,178,912

- Excess secured 30.7 funds under Alternative Method            $533,418,865

The Segregation Statement and Secured Statement (with the requirements calculated under the

alternative method) were filed via WinJammer with the CFTC, the CME and the NFA and also

emailed to CBOE, OCC, ICE, DTCC and FINRA.  As a result of the erroneous adjustment, the

Firm Invested in Excess was shown to be $150,379,941.  This information was included in the

Daily Estimated Net Capital 4:28 p.m. summary provided to Messrs. Corzine, Steenkamp,

Mahajan, and others.

### (c)    Intraday Transfers

Following the transfers and repayments described above, at the beginning of the

day on October 28, New York Operations owed the FCM $275 million in intraday transfers from

the FCM.  The FCM made three additional transfers to fund proprietary activities in New York

on October 28 in the amounts of $135 million, $62.5 million and $50 million, bringing the

outstanding amount owed to the FCM since October 26 to $522.5 million.  By the end of the day,

New York Operations returned $178 million, which brought the balance down to $344.5 million,

according to MFGI's books and records.[81]

Treasury also attempted to secure the return of $165 million that had been sent

from the JPM Customer Seg Account on October 26, 2011 but was unsuccessful.  (*See* pp. 136-

138, *infra*.)

### (d)    Securities Client Wires

On October 28, the FCM transferred an additional $163.8 million from the JPM

Foreign Secured Account to the JPM BD Wire Account, bringing the amount funded by the

FCM for customer wires to $411.6 million, even though the Treasury Operations tracking sheet

incorrectly showed $389.9 million.

---

81. When the Trustee's professionals examined the subsequent transfers to determine whether the money was
actually returned to the JPM Customer Trust Account, they determined that $7.5 million of the money returned
by the BD to the FCM was not returned to any Customer Account.

(e)    **Liquidity Dashboard**

No Liquidity Dashboard appears to have been prepared for October 28. Notwithstanding this apparent lack of information about the Firm's liquidity position, and the daily reports of severely limited available cash in the FCM, Mr. Corzine and other members of senior management directed Ms. O'Brien that morning to transfer $175 million to clear the overdraft in the account of MFGUK at JPM.  On the morning of October 29, Mr. Mahajan sent Mr. Steenkamp a Liquidity Recap prepared as of October 28 for the Board which reflected positive MFGI liquidity of $233 million for close of business October 28, but did not reference the FCM specifically or "Available FCM Cash."  It did, however, reflect that "MFGI Cash" was zero.  Mr. Mahajan noted, "It is not meant to reconcile all our cash movements to penny.  Please ensure you appropriately caveat this when distributing this sheet to the Board and other interested parties."

The Recap showed:

- Excess Cash margin/haircuts                –
- Haircut/Margin Paid                ($945 million)
- Box Collateral                ($177 million)
- Net Cash Excess/(Deficits)        ($1,122 million)

Total unsecured funding was $1,355 million:[82]

- MFGI Cash                –
- Total FINCO Free Cash                $25 million
- RCF Committed Draw                $1,120 million

---

82.  Again, there is a question as to whether the "Excess Cash and Fully Paid for Securities" figure was an accurate source of liquidity.

- Excess Cash and Fully Paid for
  Securities                                    $210 million

- Total Unsecured Funding              $1,355 million

Net Liquidity was shown as $233 million, and Available Committed lines were

shown as $203 million:

- RCF Committed Draw                    $80 million

- JPM Chase Secured                         $123 million

## 6.    October 29, 2011

### (a)    Work on Segregation and Secured Statements

At Ms. Serwinski's request, the Financial Regulatory Group reported to the office

on Saturday October 29 to prepare the Segregation Statement and the Secured Statement as of

close of business Friday, October 28.  The SEC had also asked MFGI to prepare the Rule 15c3-3

calculation for the regulator's review by Sunday, October 30.  Treasury and Treasury Operations

personnel were also in the office preparing the necessary bank reconciliations and responding to

inquiries from New York in connection with a potential sale of the business, as well as inquiries

from the CME and CFTC personnel who continued to be on-site throughout the weekend.

When Mr. Cooley first prepared the Segregation Statement and the Secured

Statement on the morning of Saturday October 29, he discovered a deficit of almost $1 billion.

The immediate reaction was that the amount was simply too large to be accurate and the

speculation was that the manual adjustment of $540 million that was to have been posted on

October 28, 2011 must have been incorrectly booked backwards (*i.e.*, $540 million had been

debited from Segregation instead of credited).  To reconcile the deficiency, Mr. Cooley consulted

with Mr. Chenoweth in Treasury.  Because the bank reconciliations were not complete,[83]

Mr. Cooley and Mr. Chenoweth were unable to confirm that the discrepancy was simply a bank

reconciliation error, and the Financial Regulatory Group left the office at midday on Saturday.

Before leaving the office at around 2:00 pm, Mr. Hughey reported to Ms. Serwinski in an email:

"Seg and Secured apparently OK - Treasury assures us we have excess seg.  Waiting for

Treasury to provide support and back-up for adjustments."

On Saturday, Ms. Campbell prepared a preliminary Rule 15c3-3 calculation,

which reflected an excess of approximately $200 million.  This calculation was considered

preliminary because not all necessary information was available.

### (b)    Potential Sale of MF Global

By Saturday, October 29, Evercore Partners, which had been retained by MF

Global two days earlier to explore strategic options, including sale of the Firm, was making

progress.  Among the firms Evercore actively pursued as a potential purchaser of some or all of

MF Global's business was Interactive Brokers Group, Inc. ("Interactive").[84]  On Saturday,

October 28, CME personnel emailed the CFTC to advise that MFGI had a "very motivated

buyer" and needed to get approvals from the SEC, FINRA and CFTC.  (CME MF Global

Chronology, Week of October 24-31, 2011 ("CME Timeline").)  The CME personnel then

---

83. Even after responsibility for cash management was consolidated in Chicago, Operations personnel in New York
provided Treasury Operations with banking reconciliations for the clearing banks, which Treasury Operations
would review and include in their reconciliation report.  Typically, the reconciliations for Friday would be
prepared and sent on the following Monday.  Accordingly, when Treasury Operations personnel sought to
review the Friday banking reconciliations on Saturday October 29, they did not have the New York Operations
reconciliations.

84. Potential purchasers participating in discussions with Evercore were granted access to a data room that
identified the contents and mark to market pricing of MFGI's RTM sovereign debt portfolio, asset holdings and
matched repo book.  In addition the data room contained MFGI's September 30 FOCUS Report.

forwarded to the CFTC a Bloomberg news report stating that the Holdings Board would be meeting regarding options to sell the Company.  (CME Timeline.)

### (c)    Discussions with Regulators

At 4:30 p.m. on October 29, CME personnel communicated with representatives of the CFTC who recounted hearing from the SEC that the FSA "might be starting to panic." (CME Timeline.)  The CME advised that if FSA put MFGUK into administration, the U.S. regulators would have little choice but to follow.  Ms. Ferber reported that she briefed the CME, and that she and Mr. Abelow briefed the CFTC about their plans for an orderly transfer or liquidation of the RTMs.

### 7.    October 30, 2011

### (a)    Preparation for Sale and Possible Bankruptcy Filing

On Sunday, October 30, MFGI had a conference call with the CFTC regarding bankruptcy contingency plans.  By Sunday, Interactive had emerged as the likely buyer.  The CME had several calls with Interactive throughout the day to discuss the prospective sale.  (CME Timeline.)  A draft term sheet provided that:  (1) Holdings would file under Chapter 11 of the Bankruptcy Code and obtain $800 million in debtor-in-possession financing from Interactive secured by proprietary assets; (2) MFGI customer accounts would be transferred to Interactive, subject to regulatory approvals; and (3) Interactive would agree to purchase substantially all of Holdings' remaining assets for $1 billion.  MF Global personnel continued to have telephone calls with Interactive, and to circulate drafts of the agreements and press releases well into the night on Sunday.  At 7:43 p.m., MF Global circulated to the SEC, the CME and the FSA an outline of a proposed agreement with Interactive.

**(b)**       **Attempts to Reconcile Segregation And Secured Statements**

The CFTC had again requested the segregated and secured numbers, with a deadline of noon (Central).  Mr. Hughey received a call to come in and complete the computation, so he, Mr. Cooley and Ms. Campbell each reported to the office in Chicago.

At 12:35 p.m., Mr. Hughey and his colleagues reported that the segregated and secured computations would be delayed while they were "awaiting notification by Treasury as they rebalance the books for the last couple of days."  The preliminary computation continued to reflect a deficit of over $952 million in the Customer Segregated accounts.  The CME has said that at approximately 2 p.m., a CME representative learned that the CFTC had seen a draft of the segregation statement as of October 28 that showed a deficit.  (CME Timeline.)  At 2:59 p.m., Mr. Chenoweth advised Mr. Hughey that Treasury had reconciled all the bank statements and had not identified a problem with the segregated assets.  As a result, the Financial Regulatory Group concluded that any explanation for the deficit had to be on the "liability side," and they continued to consult with Treasury to attempt to identify the source of the deficit in segregated property.

Later in the day, after continued review and audit of the bank reconciliations, Treasury identified an item that they believed might offset the deficit.  Treasury enlisted an Assistant Controller to review their findings.  At 6:06 p.m., Ms. O'Brien reported to Laurie Ferber and others that, "there has been an item(s) identified that may offset the Seg debit.  The

figure appears to be @ 900 million.  Matt and I shared this with both the CME and

CFTC…Jason is proving this out …."[85]

Upon completing their review, however, Ms. Dean and Mr. Chenoweth

determined there was in fact no offsetting item.  Instead, they concluded with some degree of

certainty that the Segregation Statement was accurate and there was in fact a deficit of

$952,047,822.  They also concluded that the $540 million adjustment that had been made on

October 28 was wrong and thus there had been a deficit on Thursday, October 27 in the amount

of $339,821,088.  Ms. Serwinski returned to the office Sunday night and reviewed all of these

findings.  (Serwinski Statement at 3.)

### 8.    October 31, 2011

In the early morning hours of Monday, October 31, the deficit in the segregated

funds was confirmed to the CFTC, the CME, and Interactive, the only remaining prospective

purchaser of MF Global's business.  When it became clear that the segregated money shortfall

had not been resolved, the deal with Interactive fell apart.  (*See* CME Timeline.)

To attempt to remedy the deficit, Ms. Serwinski, who had returned to the office

the prior evening, in consultation with Treasury personnel, sought to identify potential sources of

funds to move into the Customer Segregated accounts.  (Serwinski Statement at 4.)  These

sources included house funds, 15c3-3 funds, and funds or collateral on deposit at clearing

organizations.  At 6:46 a.m., Mr. Bolan informed Ms. Serwinski and Ms. O'Brien that "[i]n

conjunction with the SEC, CFTC and other US regulator[s], MF Global will [r]equest Firm

excess to be moved to Seg funds only at this time."  At approximately 7:30 a.m. (Eastern) on

---

85. The CME reported that Ms. O'Brien held a meeting with the CFTC and CME at approximately 6:00 p.m., and
    advised that MFGI had a potentially huge deficiency in the segregated account due to an unidentified
    accounting mistake.  (CME Timeline.)

October 31, MFGI moved approximately $220 million in what was perceived to be excess funds

in the 15c3-3 account at JPM to the JPM Customer Seg Account at JPM; this transfer was

completed by 10 a.m. (Eastern).  This represented what MFGI perceived to be all of the excess in

the account, without leaving even the 10% cushion that MGFI customarily kept above the

regulatory requirement.  The Rule 15c3-3 reserve calculation prepared on November 1 (as of

October 31) reflects this withdrawal of $220,338,722.

At 8:05 a.m., Ms. O'Brien instructed Mr. Tramutola in an email:  "Please move

ALL DTCC AND BOX COLLATERAL to MFGI Seg.  Delivery should be free of payment."

At 8:40 a.m., Mr. Tramutola forwarded Ms. O'Brien's instructions to Mr. DeLucia, stating that

"[w]e will also need to be able to release ALL collateral held at BNYM and RCF."

MFGI personnel input wire transfer instructions in an attempt to move

approximately $500 million from Harris, JPM and BNYM into the Customer Segregated

accounts.  Only three wires totaling approximately $15 million from JPM and a small amount

from Harris were permitted to move, owing to the Clearing Banks' pre-petition restriction of

movement from accounts they claim were subject to their liens securing unpaid obligations of

MFGI.  Around 10:30 a.m., Holdings filed a petition for reorganization under Chapter 11 of the

Bankruptcy Code.  At 10:51 a.m., MFGI in-house counsel Joe Pucci informed Ms. Ferber, "I'm

here in Edith O'Brien's office with Serwinski, CFTC and the CME.  No wires out of any sort

from MF firms.  We are ordered to move as much from the BD to the FCM immediately, without

regard to CFTC 1.25."

At 3:07 p.m., the CME advised MFGI that it had ordered that all trading of MFGI

and its customers be for liquidation only.  At 3:48 p.m., the CME advised MFGI not to add any

further exposure to its house account.  At 6:30 p.m., the CME ordered MFGI to liquidate all of its house positions.

At 3:58 p.m., SIPC initiated a liquidation proceeding against MFGI, which then ceased operating as a broker-dealer.  At 8:03 p.m., Ms. Campbell circulated the Segregation and Secured Statements, as of the close of business on October 28, to MF Global personnel as well as ICE, CBOE, OCC, DTCC, and FINRA.  The Segregation Statement showed a deficit of $891,465,649 and the Secured Statement showed an excess of $615,092,609 (using the Alternative Method).  The Segregation and Secured Statements were also filed via WinJammer.

In addition, the Financial Regulatory Group prepared amended internal Segregation and Secured Statements, for the close of business on October 27, 2011, which eliminated the mistaken $540 million adjustment and then showed the following balances:

| | |
|---|---|
| Excess segregated funds | ($213,062,967) |
| Excess secured funds under Alternative Method | $533,418,865 |
| Excess secured funds under Net Liquidating Method | ($49,798,971) |
| Firm Invested in Excess | ($262,861,938) |

When the calculations were redone on November 1 to reflect the transfers on October 31, they showed a deficit of $589,344,008 in the Segregation Statement and an excess of $4,220,335 in the Secured Statement under the Net Liquidating Method.  Mr. Cooley filed the Segregation and Secured Statements, prepared as of the close of business on October 31, 2011, via WinJammer with CFTC, the CME, and NFA and sent it by email to MF Global employees, as well as ICE, CBOE, OCC, DTCC, and FINRA.  The final Segregation and Secured Statement

showed a deficiency of $589,344,008,[86] and the Secured Statement showed an excess of

$531,400,668 (again using the Alternative Method).

### 9.    Summary of Segregated Funds Shortfall

The Trustee's investigation has revealed that, while some personnel may have

believed they were still in regulatory compliance, MFGI experienced a shortfall in 4d customer

funds beginning during the day on Wednesday October 26.  When the Segregation Statement

was prepared on October 27 as of the close of business on October 26, it showed an excess of

$116,164,133.  A review by the Trustee's professionals, however, revealed that MFGI had failed

to deduct $415 million of outgoing wires from the segregated assets, which overstated the cash

balances that day by $415 million.  (*See* Annex D.)  When that error is taken into account, there

is a deficiency of Customer Segregated funds in the amount of $298,835,867 on October 26.[87]

This deficiency continued and increased throughout the week.

As described above, the Segregation Statement initially filed on October 28 as of

close of business on October 27 showed an excess balance of $200,178,912, after MFGI made an

incorrect manual adjustment of $540 million.  When that Segregation Statement was revised on

October 31 to correct the $540 million error, it showed a deficiency in Segregated funds of

$213,062,967 and a Firm Invested in Excess deficit of $262,861,930.  Review by the Trustee's

professionals reflects that even this deficiency was understated.  Because $200 million of

outgoing wires from the Segregated accounts were excluded from the computation and other

adjustments were required, the actual deficiency as of the close of business on October 27 was

---

86.  This figure does not include MFGI's above-referenced transfer of $220 million from the 15c3-3 Account to the FCM on October 31.

87.  As discussed on page 103-104 *supra*, on October 26, there were intraday loans of $615 million that were not returned by the close of business.

$413,062,969.  As of October 28, the deficit in the segregated account was $891,465,650.  On October 31 after the $220 million transfer was made from the 15c3-3 account, the figure was shown to be $589,349,008.  (*See generally* Annex D.)

## 10.    **Failed Transactions**

The number of transactions executed by MF Global during the last week prior to the bankruptcy escalated to unprecedented levels.  MF Global's computer systems and employees had difficulty keeping up with the unprecedented volume of transactions.  In its final days of operations, MFGI was often unable to secure the release of collateral from securities transactions that was needed to meet delivery obligations for pending settlement instructions.  In addition, as market participants perceived increased credit risk of MFGI, they declined to meet their contractual obligations to sell or buy securities with MFGI.  These failed transactions – where either the buyer or seller fails to deliver the cash or the security, respectively – were five to ten times the normal volume during the Firm's final week.

## 11.    **Mailing of Checks During the Week of October 24**

The Trustee's professionals have investigated allegations that during the last week of operations, MFGI personnel deliberately mailed checks to customers, instead of transmitting funds by wire transfer, in an effort to reduce its segregation requirements.  Some of those checks were returned for insufficient funds, but the Trustee has made distributions to those customers to the same extent as other customers to whom funds have been transferred during the course of the liquidation.  While the Trustee takes the allegations regarding this matter very seriously, to date he has not seen evidence that there was any connection between the sending of checks and segregation considerations, or that there was a deliberate effort to use checks rather than wires to delay actual outlay of funds.

The Trustee's investigation has revealed that MFGI policy normally provided for auto-signature of checks by an employee who was named on the bank accounts.  This responsibility was delegated to Ms. O'Brien and Ms. Vavra a few years before the Filing Date. The auto-signatures were kept in the Troy check writing system, which printed the checks with the signatures on them.  While on the BD side of MFGI, transfers to customers were made by wire only, the FCM transmitted funds to customers both by check and by wire.

Employees report that, in the normal course of business, a client who wanted to withdraw cash from an account would contact his or her introducing broker who would then submit the request to the Margin Department.  David Earley in New York was the manager of the Margin Department.  He handled the accounts margined out of New York, which tended to be bigger institutional clients.  Donna Stroder, who was based in Chicago, reported to Mr. Earley, and was in charge of a team that handled margin for smaller retail clients.  Smaller retail clients received the majority of the checks, and the standard policy was to send checks back to customers who made deposits by check.  The Margin Department would enter the instruction into MF Global's GMI system as a wire or a check.  Treasury Operations did not have the ability to make GMI entries; nor did they have the authority to decide whether to cut a check or wire funds.  Rather, Treasury Operations "pulled" the instructions off GMI and would debit the client and credit the bank, then issue the wire instruction or cut the check according to the instructions in GMI.

Employees have reported that these procedures remained in place the final week of operations, although the volume of requests for transfers of customer funds had dramatically increased.  In fact, on October 28, a total of 168 customer checks were issued totaling over

$5 million, while 721 customer wires were sent totaling over $671 million.  The Trustee is

continuing to look into these allegations.[88]

### D.    The Run On The Bank

#### 1.    The Clearing Banks

The securities transactions cleared through BNYM and JPM substantially

contributed to the severe liquidity drain that precipitated MF Global's failure.  The fact that

MFGI utilized the services of both BNYM and JPM as clearing banks was an unusual practice

within the industry.  Because the clearance of securities transactions through a clearing bank is

often dependent on the credit the bank is willing to advance and is secured by assets on deposit

in the broker-dealer's clearance box, the use of two clearing banks appears to have hindered

MFGI's ability to obtain such advances of credit because unencumbered assets were split

between institutions.  Excess collateral securities held at one bank could not immediately be

applied to collateralize advances of credit at the other as might have been the case when clearing

through a single bank.

As discussed above (*see* p. 51, *supra*), MFGI maintained a matched repo book.

MFGI acquired securities by reverse repo and then pledged them as collateral in repos with third

parties.[89]  MFGI earned a profit on the difference between the interest it earned by "reversing in"

securities and the amount it paid third parties to finance the same securities via repo.  As a

whole, the organization, including MFGI and Holdings, utilized repurchase agreements to

---

88. The Trustee's professionals looked into a complaint from a specific customer that he had requested a wire, but
    received a check.  It appears, however, that this customer's introducing broker asked for the account to be
    closed without specifying a request for a wire.

89. Portions of MFGI's matched repo book may be considered "mismatched" from an industry perspective because
    the securities were reversed in on a term basis and repoed on a daily basis, but still had offsetting positions on a
    cusip and par basis.  (Annex J.)

finance their own proprietary trading positions.  MFGI's matched book repo contributed to its highly leveraged balance sheet.  As market participants perceived MFGI's increased credit risk, they increased margin requirements to finance securities for MFGI through repo, and as a result, MFGI earned decreased profits on the spread from its matchbook.

As MFGI's credit crisis escalated and to attract potential purchasers, it took steps to reduce its leveraged balance sheet by reducing its investment in matched book repo. However, MFGI needed significant liquidity to unwind repo transactions that were not being reinvested.  Its increased liquidity demands were exacerbated by steps taken by the Clearing Banks throughout MFGI's final week of operations to reduce their own exposure to MFGI. These steps included decreasing available sources of credit and imposing limitations on MFGI's ability to settle securities transactions, as described in detail below.  In addition, counterparties became more aggressive in pushing to market outstanding repo positions and in seeking the return of any excess margin.

### (a)    JPM

In response to the October 24 downgrade, JPM took immediate steps to assess and quantify its risk and exposure to MF Global including in its capacity as agent for approximately $5.7 billion in securities lending transactions for which MFGI was the borrower, and with respect to which JPM was obligated to indemnify the counterparty lenders in the event that MFGI defaulted.

To minimize its overall exposure, JPM:  (1) increased the margin requirements on the securities lending program from 101.5% to 103% by October 25; (2) facilitated a reduction of MFGI's participation in the securities lending program throughout the week; and (3) reduced available intraday and overnight uncommitted secured lending to MFGI.  By October 27, JPM had converted MFGI to a "prefunding" basis (essentially refusing to lend even when

overcollateralized) by requiring MFGI to have exact cash or assets in its accounts to permit

settlement of any transactions and reducing JPM's intraday lending to zero.

### (i)    Actions Taken By JPM

### Securities Lending Unwind

The securities lending program (*see* p. 50-52, *supra*), which MF Global

sometimes referred to as the "Bonds Borrowed" program, was unwound during the last week

because MF Global wanted to release collateral from the secured transactions to reduce its

leveraged position on its balance sheet, and JPM wanted to eliminate its indemnity exposure on

the securities lending transactions.

MF Global had to secure release of the treasuries to return them to JPM either by

(1) paying cash to unwind the triparty transactions at BNYM in which the treasuries were

invested, or (2) producing eligible collateral to substitute in those repurchase transactions to free

up the treasuries.  While the unwind of the securities lending program helped MF Global reduce

its overall leveraged position, the Firm sustained a significant liquidity drain of approximately

$430 million on the unwind of the transactions at a critical time.

One issue that impacted MFGI's access to the securities it needed to unwind the

securities lending contracts was MFGI's transition to late day settlement in August of 2011.  Late

day settlement was a change in how the street unwound repos that was aimed at reducing risk to

clearing banks by moving the unwind of tri-party repo from approximately 7:00 a.m. in the

morning to 3:30 p.m. in the afternoon.[90]  As a result, MFGI would not be able to unwind a repo

to free up eligible collateral (*i.e.*, U.S. Treasuries) to deliver to close out its investment in the

securities lending program until 3:30 p.m., and would only have from 3:30 p.m. until

---

90   *See* SEC Release No. 34-65213 at 1 (Aug. 29, 2001) (approving FICC's Rule change).

approximately 5:30 when the Fed Wire closed to deliver the securities from BNYM to JPM to facilitate the unwind.[91]  Alternatively, MFGI could substitute eligible collateral in the tri-party to free up the collateral in order to perform the unwind, but would need to have sufficient cash or eligible replacement securities to perform the substitution.

### Reduction of Secured Uncommitted Credit Lines

During the week of October 24, JPM first reduced intraday overdraft lines of credit to zero and then put MFGI on a "prefunding" basis.  This meant that MFGI needed positive cash balances in its accounts to clear transactions, as opposed to JPM lending cash against securities in MFGI's clearance box.[92]  JPM's refusal to provide credit to MF Global caused MFGI's securities transactions to settle more slowly, as they remained in a pending queue until MFGI acquired sufficient cash to permit settlement, even if MFGI otherwise had sufficient unencumbered securities value in its accounts to support the transactions.

Late on October 27, JPM put a number of MFGI's accounts, including all of the Customer Accounts, on "debit alert," meaning that instructions by MFGI to transfer funds from any JPM account were subject to review by the Bank and would settle only if JPM determined there were "good funds" present in the account sufficient to support the requested transfer.  The implementation of "debit alert" on these accounts caused significant delay in the settlement of transactions, even when JPM ultimately determined that MFGI had "good funds" on deposit to permit the transaction to settle.

---

91  *See* Task Force on Tri-Party Repo Infrastructure: Payment Risk Committee Final Report, Feb 15, 2012.

92.  The Clearing Banks performed real-time computations of MFGI's net free equity ("NFE"), which is the calculation of the value of unencumbered lienable assets on deposit in any MFGI account at the bank less any obligations owed by MFGI to the bank.  Based on the computation of NFE, the Clearing Banks could extend secured loans to MFGI, which would permit MFGI to settle transactions even if they only had securities and not cash in their accounts.

## Role in Settlement of Transactions

In view of these constraints, by close of business on October 26, MFGI had made little progress in unwinding the securities lending program.  Therefore, on October 27, JPM decided to apply a $150 million credit to MFGI's NFE intraday, but only for purposes of unwinding the securities lending program (which would reduce JPM's exposure on its indemnification obligations).  JPM personnel were on MF Global premises throughout the day, reviewing and approving each instruction for settlement of a securities transaction to determine whether to permit it to settle.  JPM thus ensured that transactions necessary to facilitate the securities lending unwind were prioritized in MFGI's queue and permitted to settle.

The U.S. Treasuries required to unwind MFGI's investment in JPM's securities lending program were pledged in a repo at BNYM.  As a result, the credit to MFGI's NFE at JPM and the steps taken by JPM to prioritize settlement of transactions at JPM had no effect on securing the release of the securities at BNYM needed to facilitate the securities lending unwind.

Restrictions on extensions of credit by the respective Clearing Banks ensured that no funds extended by one bank would be available to facilitate unwinds at the other financial institution.  In order to facilitate unwind of transactions at JPM even when it was unable to secure release of necessary securities from transactions at BNYM, MFGI attempted to substitute eligible collateral, including "cash cusips" created by isolating cash and pledging it in substitution to secure release of a specific cusip.  The creation of cash cusips compounded the drain on MFGI's liquidity.

By the close of business on Thursday October 27, MFGI's investment in JPM's securities lending program had been reduced to $4.1 billion.  On Friday October 28, JPM provided an additional $50 million credit to MFGI's NFE after the unwind of the triparty repos to facilitate further the unwind of the securities lending program, and converted MFGI to a

completely "manual clearance" process by which JPM personnel manually reordered the transactions. By the close of business on Friday October 28, 2011, MFGI's investment in the securities lending program was reduced to $1.3 billion.

When the market opened on Monday October 31, JPM extended a fully-secured clearing advance of approximately $1.3 billion to MFGI and used those funds to unwind the balance of the securities lending transactions. After the Filing Date, JPM liquidated the collateral in MFGI's clearance account to apply to the overdraft balance generated by the clearance advance and the fail financing loan.

### Monitoring Seg Balances

JPM also monitored the balances in Customer Segregated accounts. On October 27, JPM prepared a synopsis of balances in certain MFGI Customer Segregated and Foreign Secured accounts at JPM on each business day that month. The synopsis showed a steep decline in Customer Segregated and secured balances. In interviews with the Trustee's counsel, JPM employees stated that these efforts to monitor balances in Customer Segregated accounts were to assess whether clients were leaving MF Global in order to help the Bank evaluate MF Global's financial condition and that they were unable to monitor MF Global's compliance with segregation rules.

### (ii)    Specific Transactions

### $175 million transfer to MFGUK

On October 28, MFGI transferred $175 million from MFGI's Treasury House Account to a MFGUK account in satisfaction of an MFGUK overdraft balance in that account at JPM in London. The transfer occurred as a result of an early morning call between JPM representatives and MFGI's executives. At approximately 8:00 a.m., Donna Dellosso, a Chief Risk Officer Managing Director at JPM, along with Barry Zubrow, JPM's Chief Risk Officer

Executive Vice President, and Fernando Rivas, a Client Executive Managing Director, placed a

call to Jon Corzine and Vinay Mahajan regarding overdraft balances in certain MFGUK accounts

at JPM in London.  Ms. Rivas and Ms. Zubrow advised MFGI that JPM would not participate in

any auction or sale of MF Global assets unless the overdraft balances in London were covered.[93]

Senior management, including Mr. Corzine and Mr. Mahajan, instructed Ms. O'Brien to wire

$175 million to MFGUK's account at JPM and Mr. Mahajan advised MFGI and MFGUK

personnel in an email, "Inc. can fund UKL to cover the overdraft today at JPM....  Edith, if we

don't hear from London in the next 5 minutes, please provide them funds today to cover this

overdraft position."  At approximately 9:30 a.m. Ms. O'Brien instructed Treasury Operations to

arrange two wire transfers:  (i) a wire of $200 million from the JPM Customer Trust Account to

the Treasury House Account, and (ii) a wire of $175 million from the Treasury House Account

to a MFGUK account at JPM London.[94]  In an email sent at 1:34 p.m., Ms. O'Brien advised a

MFGUK employee that the transfer of $175 million was "per JC's direct instructions."

      Ms. Dellosso and Mr. Zubrow called Mr. Corzine a second time about the status

of the overdraft.  Mr. Corzine is said by a JPM representative to have told them that it was his

understanding that the funds to cover the overdraft had been transferred, and he suggested that

Ms. Dellosso call Ms. O'Brien to confirm.  Ms. Dellosso called Ms. O'Brien, who provided

detailed information regarding the two wire transfers including the account numbers.

Ms. O'Brien reportedly told Ms. Dellosso that the funds had originally come from a "Chase

---

93.  MF Global had previously provided JPM with information regarding portfolios of assets it wished to sell, including *inter alia* approximately $4.5 billion in agencies and had engaged in substantive discussions with JPM regarding the potential process to facilitate the sales of this property.

94.  Ms. Serwinski testified that, if she had been in the office that day, before authorizing this loan she would have checked the Firm Invested in Excess balance as well as the potential impact of the loan on the excess net capital of the Firm.  She also testified that she would not have approved the transfer.  (*See* Serwinski Testimony at 19.)

Trust Account," and that she knew that JPM "ha[d] issues with that."  Mr. Corzine, for his part,

testified before Congress that Ms. O'Brien "explicitly confirmed to [him] that the funds were

properly transferred."  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Financial

Services, Subcomm. on Oversight and Investigations*, 112th Cong. 2d Sess. (Dec. 15, 2011)

(Testimony of Jon Corzine ("Corzine Testimony") at 16, 39).)

      After her initial conversations with Ms. O'Brien, Ms. Dellosso reached out to

Frederick Vagnini (JPM's Risk Executive/Managing Director) and Sushil Patel (JPM's Risk

Manager/Vice President) to confirm that JPM had received the wires.  Mr. Patel and Mr. Vagnini

provided Ms. Dellosso with confirmations of the initial wire movement and the legal names for

the accounts involved in the transfer, indicating that the initial $200 million was transferred from

the JPM Customer Trust Account.  A JPM employee reportedly told Ms. Dellosso that

movement of monies from a customer segregated account to a house account was not an

uncommon practice for MFGI.[95]  Ms. Dellosso informed Mr. Zubrow that MFGI had in fact

made the transfers to cover the overdraft, but that the funding for the transfer came from a

Customer Segregated account.  Mr. Zubrow and Ms. Dellosso then consulted with JPM in-house

counsel including Kevin Kelley and David Sturm.

      After consultation with counsel, Ms. Dellosso and Mr. Zubrow proceeded to call

Mr. Corzine (for at least the third time) to inform him that:  (i) they had researched the transfer

and wanted to ensure it was in compliance with regulatory requirements, and (ii) they would be

sending a letter for MFGI to sign to confirm that the transfers complied with the relevant

regulations.  According to JPM, Mr. Corzine agreed to review the letter and discuss it with

---

95.  Mr. Vagnini was a recipient of emails summarizing JPM's efforts to monitor balances in MFGI Customer
    Segregated and Foreign Secured Accounts.  In addition, all accounts relevant to the transfers of $200 million
    and $175 million respectively were on "debit alert" by JPM.

MFGI in-house counsel.  Ms. Dellosso then sent an email to Mr. Corzine at 2:28 p.m. with the requested written confirmation.[96]

Later in the afternoon of October 28, Mr. Zubrow and Ms. Dellosso called Laurie Ferber, the General Counsel of Holdings and MFGI, about the requested letter.  Ms. Ferber said that the language of the letter was too broad.  Ms. Ferber, in her testimony before Congress, described the first letter as "asking one individual to confirm that everything that had ever been done in the history of these accounts, and everything that ever would be done in the future, was in compliance with all CFTC rules."  (*MF Global Bankruptcy: Hearing Before the H. Comm. on Financial Services, Subcomm. Oversight and Investigations*, 112th Cong. 2d Sess. (Mar. 28, 2012) (Testimony of Laurie Ferber ("Ferber Testimony") at 29).) Ms. Ferber said that if JPM narrowed the language then MFGI could respond to the more reasonable request.  Ms. Ferber advises that she had spoken with Ms. O'Brien that evening and had gotten the impression that she would sign the letter if it were limited to the $175 million and $200 million transfers.  During or shortly after this call, Ms. O'Brien provided to Ms. Ferber screen shots of the $175 million and $200 million transfers.  That same day, she also provided to Mr. Corzine the screen shot of the $175 million transfer.

Later that day, according to JPM representatives, three JPM lawyers, *i.e.*, Kevin Kelley, Diane Genova and David Sturm, called Laurie Ferber to discuss the situation but have stated that they were only able to reach Dennis Klejna, an MFGI in-house attorney, regarding the still-unsigned letter.  According to a JPM representative, Mr. Klejna said that he would need to talk to Ms. Ferber and others about the letter, and that he did not believe that he would have a

---

96.  At 3:21 p.m. Ms. Dellosso sent a subsequent email attaching a PDF and word version of the draft letter for MFGI to sign with slightly revised language referencing the specific provision of "CFTC Regulation 1.23."

chance to talk to Ms. Ferber before the following morning.  Ms. Genova later testified before

Congress that she received assurances from Ms. Ferber and Mr. Klejna that MFGI "understood

the customer segregation rules and had complied with them."  (*MF Global Bankruptcy: Hearing

Before the H. Comm. on Financial Services, Subcomm. on Oversight and Investigations*, 112th

Cong. 2d Sess. (Mar. 28, 2012) (Testimony of Diane Genova, Deputy General Counsel,

JPMorgan Chase & Co.) ("Genova Testimony") at 67).)

    In an email at 8:06 p.m. on Friday evening to Ms. Ferber, reporting on a

conversation with Mr. Kelley, Mr. Klejna advised that "I didn't promise [Kevin Kelley] anything

other than I'd get back to him.  He asked for an assurance and I didn't give it."  Mr. Klejna has

also advised that he made no assurances of any kind to JPM.  Mr. Kelley sent Mr. Klejna an

email at 6:32 p.m. attaching a revised draft of the letter limiting the request for assurances solely

to transfers made on or after October 28.  At 9:17 p.m. that evening Mr. Klejna reported to

Ms. Ferber in an email that JPM was "[q]uite disappointed" after being advised that "we would

not sign, certainly not tonight."

    At approximately 2:30 p.m. on Saturday October 29, Messrs. Kelly, Sturm and

Ms. Genova had a call with Ms. Ferber and Mr. Klejna regarding the letter.  JPM's employees

describe this call as heated, with Ms. Ferber stating that the letter was too broad, and that if JPM

was entitled to anything at all, then it would only be related to the two transactions on

October 28.[97]  Ms. Genova asked Ms. Ferber whether MFGI would sign and return the letter if

JPM limited it to the two transfers.  Ms. Ferber is said by JPM to have told Ms. Genova to revise

---

97.  According to JPM in-house counsel, Ms. Ferber was the first person to raise the two transactions on the calls
     between counsel.

the draft letter to limit it to the two transactions and send it to MFGI, and that she would get it

signed.  Ms. Ferber testified before Congress in this regard:

> I spoke to Edith O'Brien actually about the transfers that -- that JP
> Morgan was focused on. She provided me with copies of the --
> actually the transaction reports on those two transfers.  They
> matched what JP Morgan has described to me.  And again, my
> very clear understanding was that if the compliance certificate was
> limited to those two transactions, those two transfers, she would be
> able to sign it.

(Ferber Testimony at 49.)  Ms. Ferber advised the Trustee's counsel that she informed JPM that

if the letter were limited to two referenced transfers, she thought that MFGI should be able to

provide the letter.

At 5:23 p.m., Mr. Kelley sent a revised draft of the letter to Mr. Klejna with a note

stating "[h]ere is a revised draft of the letter limiting the transactions referenced as requested."

Thereafter, at 9:42 p.m. Mr. Kelley emailed Mr. Klejna asking if there had been "[a]ny response

to the letter."  Mr. Klejna responded at 9:42 p.m. "Not yet," and again at 11:10 p.m., "[n]ot yet

but we will respond."  JPM did not at any time receive a signed version of the letter, and there

appear to have been no further discussions regarding the letter.  Mr. Klejna advises that on

Saturday evening Ms. O'Brien refused to sign the letter, even as narrowed, but indicated that she

felt the transfers were appropriate based on an excess in the Customer Segregated accounts.  The

Trustee's professionals have been unable to discern any basis for this alleged statement.

Mr. Klejna also advised that he had a meeting later that evening with Messrs. Mahajan and Bolan

(with Ms. O'Brien on the phone) during which there were discussions about Mr. Mahajan

potentially signing a revised version of the letter.

The Trustee's professionals have been informed that Ms. O'Brien was subjected

to extreme pressure to sign the letter, but steadfastly refused to sign it.  Ms. O'Brien reportedly

believed that it was inappropriate for her to sign the letter because she was not an officer of the

company, and did not authorize the transfers.  Ms. O'Brien expressed to several other individuals

her concerns about signing the letter.

### $135 million transfer

      While JPM was in the process of requesting the certification letters from MFGI, at

12:33 p.m., $135 million was transferred from the JPM Treasury House Account to the

JPM Clearing Account.  This transfer caused a $105.4 million overdraft in the JPM Treasury

House Account.  A transfer of $135 million from the JPM Customer Segregated Account to the

JPM Treasury House Account had the effect of satisfying the overdraft caused by the original

$135 million transfer from the JPM Treasury House Account to the JPM Clearing Account.  In

view of the debit alert that had previously been implemented by JPM, funds could not be

transferred from MFGI's accounts unless a JPM employee had received and approved the

transfer.

### $165 million transfer

      The Trustee has also investigated whether funds intended for transfer to the

JPM Customer Segregated account were used to pay down MFGI's proprietary obligations to

JPM, and if so whether grounds exist for the recovery of these funds.  At 5:53 p.m. on

October 26, Jason Chenoweth, a Treasury employee, sent an email authorizing Treasury

Operations to transfer $165 million from a FINCO account at JPM to the JPM Clearing Account

to satisfy MFGI's daily net settlement obligation to JPM.[98]  Notwithstanding this email, the

$165 million transfer was actually sent from the JPM Customer Seg Account to the

---

98.  Similarly, on the morning of October 26, MFGI transferred $125 million of customer funds to repay a clearance
    advance from JPM made the prior evening.

JPM Clearing Account, and was subsequently used to satisfy MFGI's net settlement obligations to JPM.[99]

Almost immediately after the $165 million transfer was processed, MFGI instructed JPM to transfer $165 million from the FINCO Account to the JPM Customer Seg Account (presumably to correct the improper transfer earlier in the evening from the JPM Customer Seg Account). Because the instruction was for a transfer between two accounts at JPM, the transfer could have been processed even after the close of the Fed Wire. There was an insufficient balance in the FINCO account to fund the transfer, however, and the transfer did not settle. The following morning, at 9:23 a.m. on October 27, Christy Vavra, MFGI's Manager of Treasury Bank Operations, emailed a JPM Client Service Representative to request that JPM cancel the request to wire the $165 million from the FINCO Account to the JPM Customer Seg Account.[100] MFGI personnel appear to have determined that there were insufficient funds on deposit in the FINCO account to support the requested transfer, and that the $165 million would have to be returned from another source.

Documents indicate that MFGI attempted to fund the repayment of the $165 million through a draw on its secured Revolving Credit Facility. At 8:03 p.m. on October 27, Dan Rouse, a JPM Executive Director and Client Manager for Origination, emailed Joe Lesar to inform him that JPM had attempted to credit "$165mm proceeds of secured loan" to

99. At the time the wire was sent from the JPM Customer Seg Account, the FINCO account had a balance of only $7.3 million — insufficient funds for the $165 million transfer. The JPM Customer Seg Account balance was $139.8 million. As a result of the $165 million, the JPM Customer Seg Account went into a negative overdraft balance of $25.2 million. Approximately one hour later, $25.5 million was transferred from the JPM Foreign Secured account to the JPM Customer Seg Account. This remedied the overdraft by increasing the JPM Customer Seg Account balance from a negative balance of $25.2 million to a positive balance of approximately $390,000.

100. In her email, Ms. Vavra also requested the bank cancel a wire of $303 million from a Holdings account to the FINCO account.

MFGI.[101]   MFGI's bank records indicate that JPM credited $165 million from the committed

lending facility to the JPM Clearing Account as of the open of business on October 28 but

backdated the credit to October 27.   At 9:33 a.m. on October 28, Treasury Operations employee

Irma Romo authorized a wire of $165 million from the JPM Clearance Account to the

JPM Customer Seg Account.   At 6:52 p.m. on October 28, another employee in Treasury

Operations input a service message through e-Serve, JPM's web-based service application, to

request that the $165 million wire authorized by Ms. Romo be back-valued to October 27.   JPM

did not honor these requests.   At 3:08 p.m. Richard Gill (in Operations in New York) requested

that Treasury authorize payment of $165 million from the JPM Clearing Account to the secured

committed revolving credit facility.   At 2:55 p.m., JPM sent to Mr. Gill wire instructions for a

transfer from the JPM Clearing Account to pay down the committed lending facility.

At 7:46 p.m., Ms. Vitale notified Ms. Vavra that the wire of $165 million was

"released" and the second wire of $165 million was being "cancelled," but did not specify

whether JPM was releasing the $165 million wire to the JPM Customer Seg Account or the

$165 million wire paying down the committed lending facility.   It later became apparent that

JPM cancelled Ms. Romo's request for a $165 million transfer from the JPM Clearance Account

to the JPM Customer Seg account, and instead processed Mr. Gill's wire requesting the

application of the $165 million to the committed revolving credit facility.[102]

---

101. Because the draw on the secured credit facility was processed after the close of the Fed Wire, an email at 8:03
p.m. on October 27 reflects that the payment was done as a "book transfer," as opposed to a Fed Wire transfer.
Due to JPM's systems, they were unable to tell whether the funds hit the account that evening.   Mr. Rouse
advised Mr. Lesar that if the funds "do not hit your account there will be back value credit in the morning."

102. The Trustee's professionals have also identified other transfers of customer money to JPM, consisting of (i) a
$200 million transfer on October 27 that went through a JPM account to BNYM; and (ii) a $62.5 million
transfer on October 28 that went through a JPM account to DTCC.

### (b)    BNYM

#### (i)    Actions Taken by BNYM

Throughout the week of October 24 to October 28, BNYM personnel had daily phone calls with MFGI to ascertain MFGI's daily projected liquidity needs and end of day positions.  On October 26, BNYM drastically increased its collateral requirement for overnight financing of an $85 million loan by MFGI.[103]  At the same time, BNYM placed miscellaneous debits on its calculation of NFE for MFGI's accounts, which caused MFGI transactions entered in BNYM's clearing system to wait in a queue pending BNYM review and approval.  Examples of these miscellaneous debits included a $500 million debit to NFE on October 26 and a $1 billion debit to NFE on October 27.  There was no transaction or credit event specifically tied to the debits on MFGI's accounts at BNYM.  The amounts of the debits appear to have been arbitrary and were entered to artificially create negative NFE (*see* n.92, *supra*) in MFGI's accounts at BNYM, which caused all transactions to remain pending delaying settlement until credit review and approval.  The combination of these actions by BNYM further constrained MFGI's liquidity position and diminished MFGI's ability to clear transactions on a timely basis.

#### (ii)    $325 Million Tri-Party Shell Account

On October 26, MFGI employees input instructions for seven wires totaling $325 million in cash to be sent from an account at BNYM to the Treasury House Account at JPM, intending to return a portion of the outstanding intraday transfers from the FCM and ultimately credit the Customer Segregated accounts.  MFGI intended to fund the wire in part by drawing on MFGI's $300 million secured lending facility, but was unable to coordinate pledge

---

103. MFGI had previously booked overnight loans secured by collateral with BNYM on October 24 and October 25, but at a far more favorable collateral to cash ratio.

of sufficient eligible collateral to obtain timely funding from the syndicate banks on the secured

facility.  As a result the wire failed and remained unsent as of the time the Fed Wire closed.[104]

Because MFGI did not maintain Customer Segregated accounts at BNYM; in order to secure the

funds as Customer Segregated funds after the Fed Wire closed, $325 million in cash on deposit

in the BNYM clearing account was placed in a pre-existing segregated customer tri-party shell

account at BNYM designated "Customer CFTC 1.25."[105]  The shell treated the funds as if they

had been pledged in a repo by the BD in exchange for a CFTC Rule 1.25-compliant investment

by the FCM.  The tri-party repo, however, never occurred, and the cash simply sat in this tri-

party shell account overnight.

            Mr. Delucia called BNYM on the morning of October 27 to request that the funds

locked up in the Customer CFTC 1.25 shell be released early (prior to the 3:30 p.m. time for a

triparty unwind) into a house account.[106]  John Vinci (a BNYM Managing Director in Broker

Dealer Services) reviewed a list of triparty repo collateral shells and noticed that this particular

shell bore the designation "CFTC 1.25."  In view of the account title, at 11:53 a.m., Mr. Vinci

sent Mr. DeLucia an email requesting that MFGI "confirm to me in writing that the cash

collateral you are requesting to be moved to your firm account is unencumbered and not required

---

104. Even though MFGI had sufficient cash on deposit before close of the Fed Wire to permit some or all of the
     wires to settle, the artificial debit on NFE delayed settlement until after the Fed Wire closed.

105. The tri-party shell at BNYM had previously been used for CFTC 1.25-compliant investments by the FCM in
     repo transactions.

106. BNYM asserts that it did not have the capability to transfer the funds in any manner other than to release them
     to a house account.

to be segregated under CFTC requirements."[107]  At 12:44 p.m., Ms. O'Brien responded with a qualified answer to Mr. Vinci's question:  "[p]lease consider this e-mail and authorization and instruction for an early unwind of the MFGI tri-party funds in the amount of $325 million. These proceeds are unencumbered and not required to be segregated *intraday* under CFTC or SEC rules."  (emphasis added.)

BNYM decided not to release the $325 million from the segregated shell until it received payment in full for an overnight secured loan of $85 million that had been booked by MFGI on October 26.  BNYM wanted to insure that repayment for any indebtedness by MFGI to the bank would not come from the $325 million in funds contained in the repo shell with the overnight designation "CFTC 1.25."  MFGI sent a wire from FINCO to repay the overnight loan and BNYM again asked MFGI to provide confirmation in writing that the funds from that wire could be applied to pay the balance of the overnight loan.  In response, Ms. O'Brien sent another email at 4:07 p.m. to BNYM stating, "please consider this e-mail authorization and instruction to post these funds."

Even after receiving the wire payment and email authorization from MFGI, BNYM continued to wait until after the Fed Securities Wire closed before releasing the $325 million in funds from segregation into the BNYM XGX Account.  Six wires totaling $540 million were transferred that day from the BNYM XGX Account to the Treasury House Account and ultimately, a substantial portion of these funds were credited to the JPM Customer Trust Account.  MFGI also sent another $200 million to BNYM the same day consisting of a transfer of $200 million from the JPM Customer Seg Account to the Treasury House Account,

---

107. The decision to request authorization in writing may have been based on a policy recently adopted by BNYM that instructions to release funds or assets from segregation must be made by the client (as opposed to by the bank) to avoid any basis for the statement that the bank improperly released funds from segregation.

which was then transferred to a securities clearance account at BNYM, and applied to securities

clearance obligations owed to BNYM.  The net return from BNYM to the Treasury House

Account on October 27 was therefore $340 million.

### 2.    The Clearing Houses

#### (a)    DTCC

DTCC also took actions throughout the final week of MFGI's operations to

reduce its potential risk and exposure to the BD, which the Trustee continues to investigate.

During the evening of October 25, DTCC implemented a policy that restricted the return of any

excess collateral on deposit in any account maintained by MFGI at DTCC or any of the DTCC

affiliate clearing corporations to MFGI.  Before opening of business on October 26, DTCC took

the further step of reducing MFGI's "debit cap" from $334 million to $100 million.[108]

In response to the reduction of its debit cap, MFGI needed to deposit an additional

$200 million at DTCC to facilitate settlement on October 26, 2011.  The BD requested a transfer

from Treasury for the required funds, which was provided and sourced from the JPM Customer

Trust Account.  Also on October 26, DTCC lowered its internal credit rating for MFGI, which

increased the amount of margin MFGI was required to post at NSCC and doubled the amount of

funds MFGI had to post to clear its MBSD account.  Due to activity settling through MFGI's

account at DTCC on October 26, MFGI required an additional $100 million to facilitate

settlements at DTCC on October 27, which was funded by a transfer from FINCO to MFGI's

BNYM DTC account, and from this account to DTCC.  DTCC ultimately reduced its debit cap to

---

108. The debit cap is a control implemented by DTCC to prevent the completion of transactions that would cause a
    participant's net debit to exceed the total available collateral in its account.  DTCC's net debit cap controls limit
    the net settlement debit that each participant can incur to a specific amount relative to its activity and the
    collateral on deposit in its accounts.  This assures that a participant that fails to pay for its settlement obligation
    will have sufficient collateral in its account for DTCC to liquidate in the event it was insolvent.

$1 as of the close of business on Friday October 28, 2011.[109]  (*See also* p. 94, *supra*, for

discussion of DTCC subsidiary, FICC.)

### (b)    FCM Clearing Houses

FCM clearing houses also monitored MF Global's deteriorating financial

condition, participated in calls with MF Global and its regulators, and took actions to protect

themselves following the downgrade.  ICE no longer automatically returned excess margin on

MFGI's customer accounts or its house accounts.[110]  MGX also took steps to increase MFGI's

margin requirements, although these were not implemented until October 31.

### 3.    The New York Fed's Requests For Additional Collateral For Open TBA Transactions

As of the week of October 24, MFGI had seven open transactions for the future

delivery of "to be announced" or TBA agency mortgage-backed securities (the "TBA

Transactions"), in the aggregate amount of $950 million, directly with the New York Fed.  These

transactions were entered into pursuant to a standard Master Securities Forward Transaction

Agreement (the "MSFTA") dated February 2, 2011 (when MFGI became a primary dealer).  The

MSFTA initially did not include a provision for collateral from either party.

After MF Global's downgrade, the New York Fed met with senior MFGI

executives regarding MFGI's financial condition.  Thereafter, MFGI responded to several

requests for transactional information and liquidity, and included the New York Fed in its calls

with other regulators.  On October 27, representatives from the New York Fed contacted MFGI's

repo desk to express concern about the possibility that MFGI would default on the open TBA

---

109. The Trustee's professionals are also continuing to investigate the actions of the Options Clearing Corporation ("OCC"), which provided clearing services on both the FCM and BD sides of the business.

110. The Trustee's professionals are continuing to investigate the actions of CME, whose document production to the Trustee is ongoing.

Transactions.  To address these concerns, the New York Fed offered MFGI two options:

(1) assign the trade to another broker-dealer so that the New York Fed would no longer have any

exposure to MFGI from the TBA Transactions, or (ii) execute an amendment to the MSFTA (the

"Annex") to provide the New York Fed with collateral to cover the perceived risk of the TBA

Transactions.  The New York Fed explained that if MFGI failed to exercise one of these options,

the New York Fed would revoke MFGI's primary dealer certificate, which would place MFGI in

default on all of their TBA trades.

MFGI management decided to sign the proposed Annex to the MSFTA and to

provide the requested collateral.  This decision was partly influenced by MFGI's concern that

attempting to assign the contract to another broker-dealer would indicate that the New York Fed

no longer supported MFGI, which could have caused further negative reactions by MFGI's other

counterparties.

The Annex, executed October 28, required collateral for either party's net forward

exposure (the difference between the market replacement value for open transactions and the

contract price).  The Annex provided generally that on notice before 5:00 p.m., collateral would

be required by 10:00 a.m. the next business day, but specified that MFGI would provide

$4,335,686 in collateral by 2:00 p.m. on October 28, *i.e.*, the same day the Annex was signed.

MFGI provided the collateral by wire transfer.  Shortly before the 5:00 p.m. deadline, the New

York Fed issued an additional margin call for $5,260,798, due Monday October 31 before

10:00 a.m.

By early Monday, MFGI had determined that the reputational risk from assigning

the TBA Transactions was minor compared to the larger problems facing the Firm.  MF Global

notified the New York Fed that it would seek to assign the TBA Transactions rather than make

the additional margin payment.  The New York Fed refused to allow the assignment and

informed MFGI that if it failed to make the payment MFGI would be in default under the

MSFTA.

MFGI ultimately did not send the collateral payment, and on October 31, the New

York Fed declared MFGI in default under the MSFTA.  The New York Fed entered into

replacement transactions for MFGI's positions (at aggregate higher prices), which resulted in

additional net loss claims of $3,089,843.75.  The New York Fed deducted these costs plus a

small amount of legal fees of $45,000 from MFGI's collateral.[111]

### 4.    MF Global Sells Assets To Generate Liquidity And Reduce Leverage

After the ratings downgrade, MFGI and Holdings began liquidating investments

and assets.  Although these efforts resulted in billions of dollars of sales on a very short

settlement cycle, the impact was insufficient to relieve MF Global's dire liquidity situation.

Within MFGI, proceeds of sales of investments of Customer Segregated funds

were also required to be segregated.  These sales enabled MFGI to meet customer's demands for

cash but did not generate any additional Firm liquidity, and losses in the sale of some

investments actually increased the drain on liquidity.  For example, within the FCM, substantial

Customer Segregated funds were invested in commercial paper that complied with Rule 1.25

requirements.  To generate cash to meet customers' demands, on October 27 MFGI sold a

portfolio of commercial paper in the face amount of $1.35 billion to Goldman Sachs & Co. for

$1,334,562,751, a net $15.4 million loss.  The sale was settled on a same day basis.  The

Trustee's professionals have confirmed that the full proceeds from this transaction went to a

---

111. The New York Fed promptly informed MFGI of the close out costs, and has returned the excess collateral of
$1,200,842.25 to the Trustee.  The Trustee has requested and expects to receive a final accounting from the
New York Fed.

Customer Segregated account at Harris Bank.  MFGI also sold approximately $1.7 billion in U.S.

Government securities from a Customer Segregated account at Harris Bank during the last week

of October.  The Trustee's professionals have traced these sale proceeds and confirmed that they

were appropriately deposited to Customer Segregated accounts at Harris Bank.

Both MFGI and Holdings' proprietary investments were typically fully financed

through repurchase agreements facilitated by MFGI's repo desk.  As a result, sale of these

investments reduced leverage (and potentially in the long term could have reduced the drain on

liquidity) but did not generate significant liquidity in the short term as the cash received from the

sale of the proprietary position was used to repay (or unwind) the repurchase agreement used to

finance the purchase.

At Holdings, another substantial portfolio of "hold to maturity" ("HTM")

corporate bonds was sold to Goldman Sachs for same day settlement on October 27.  The

$418 million par value portfolio was sold for approximately $384 million.  This portfolio was

fully financed through a repurchase agreement with MFGI, which in turn were financed through

outside counterparties.  Accordingly, the proceeds were used to repay financing.  Additional

piecemeal sales of approximately $400 million corporate bonds to Goldman Sachs and others

also were made on October 27, only some of which settled.

Mr. Corzine reportedly resisted until after the downgrade the idea of selling off

any of the European sovereign debt portfolio.  As of October 24, MFGI had a net sovereign debt

RTM portfolio of $6.4 billion.  MFGI sold a portion of the portfolio during the week of October

24, resulting in cumulative losses of nearly $7.3 million in the final two months of the Firm's

existence.  (Annex F at 11.)  As of October 31, 2011, the net sovereign debt RTM position

remained very large, at $5.8 billion.  Of this $5.8 billion, the largest position related to Italian

sovereign debt of approximately $3.3 billion. Given the decreasing value of European sovereign debt, which was the underlying collateral for the RTMs and reverse RTMs, margin exposure increased to approximately $178 million as of October 31. (Annex F at 6.)[112]

Holdings also liquidated $4.5 billion in agency debentures on Friday October 28. These debentures had also been financed through a repurchase agreement with MFGI, which had in turn entered into repurchase agreements with external counterparties. MFGI's records reflect that JPM was the purchaser of these assets. JPM claims that it purchased only $650 million as principal for its own proprietary portfolio and that it facilitated the remaining $3.85 billion in sales at no profit to itself, and that it acted essentially as agent for the sales – soliciting bids from counterparties which were then reviewed and approved by MFGI and settled on a same day basis. These assets were mostly part of a matched repo book; the sales would increase liquidity only to the extent of the difference between the proceeds and the amount then repaid to external counterparties. The Trustee's professionals tested substantial samples of these sales and estimate that the aggregate liquidity generated from these sales was approximately $10.2 million.

The efforts to generate liquidity and reduce leverage continued through the weekend, as MF Global personnel worked with BlackRock to auction off MF Global's proprietary investments to a small group of bidders, including Goldman Sachs, JPM, and Bank of America. BlackRock compiled multiple portfolios of MFGI Treasuries, agencies, MBS, and corporate bonds to be sold for settlement on October 31. MF Global's records reflect that certain

---

112. After the SIPA proceeding commenced, information came to light that LCH had liquidated the positions in European sovereign debt that MFGUK maintained from MFGI. In a November 29, 2011 press release, LCH reported selling "MF Global's fixed income positions, which had a combined nominal value of [Euro] 14.7 billion . . . with no recourse to the default fund." According to some press reports, LCH sold the RTM positions at a discount from current market value to George Soros and others. Because these transactions took place at the LCH, the Trustee has not had full transparency into the these transactions or the amounts that might be owing to MFGI. The Trustee continues to pursue a full accounting from the MFGUK Joint Special Administrators on this and other issues.

of the portfolios were put out to bid over the weekend and that in some cases bids were made and

accepted.  Not all transactions could be consummated, however, due to the clearance and

settlement obstacles posed by the DTC debit cap and by JPM as discussed above.  Some

portfolios of agency securities, treasury bills, and TIPS were settled through BNYM, including

two portfolio sales to Goldman Sachs.  Sales of MBS and corporate bonds, however, were not

consummated.  The Trustee continues to investigate the portfolio sales and the conduct of the

clearing entities.

## VIII.    The Speed And Severity Of The Run On The Bank Far Eclipsed Even Management's Eleventh-Hour Predictions

### A.    The "Break the Glass" Scenario

Liquidity concerns prompted an Audit and Risk Committee request in early

September 2011 for an analysis of the potential impact on MF Global of a significant financial

disaster such as a downgrade.  After surveying business heads and operational personnel, in mid-

October 2011, MF Global Risk, Finance and Treasury personnel prepared a "Stress Scenario

Analysis – Downgrade:  Potential Impact on MF Global" presentation (the "Break the Glass

Scenario").  The presentation, made to the Board on October 19, evaluated and quantified the

likely cash flow and liquidity impact to the Company (MFGI and MFGUK) from a downgrade to

sub-investment grade by at least two rating agencies.  EY reviewed the Break the Glass Scenario

in consultation with the Trustee's counsel, compared the scenarios to documentation and

financial records located during the course of the investigation, and interviewed certain former

MFGI employees.

This analysis captures in one place most of the liquidity stresses at MF Global in

its final weeks of business.  It shows that management conscientiously (if belatedly) examined

the likely sources of losses and demands for funding, but seriously underestimated both the

speed and extent of demands on liquidity.  It is significant that the total of this underestimate is in the range of $600 million to $1 billion dollars, approximating in magnitude the customer funds released from segregation and not returned in MFGI's final days of operation.

In the Break the Glass Scenario, MF Global attempted to evaluate all the known and expected stressors of liquidity that would impact the business in the event of a potential credit downgrade.  A clear step-by-step walkthrough of the various scenarios was outlined in a thorough manner.  The associated dollar impacts for each scenario, however, underestimated the actual impact on the business.  Most notably, the analysis did not (i) anticipate the full customer withdrawal of account balances (above and beyond the excess funds), (ii) identify or quantify the cost of unwinding the bonds borrowed program, or (iii) properly estimate the increased margin requirements from the clearing houses.  Management estimated a loss of approximately $1 billion over the course of three to four weeks.  Instead, a loss of at least one and one half times that amount occurred in a matter of a few days.

The simultaneous occurrence of a customer "run on the bank" and unwinds of repo counterparty and proprietary positions within a three-day timeframe overwhelmed the Firm. The mitigating factors were also overly optimistic.  The speed at which events transpired was beyond management's predictions – the worst-case scenario played out in the span of only a few days.  Reality unfolded vastly more quickly than the assumptions and timing laid out in the presentation, which anticipated that MF Global had sufficient liquidity to survive a "severe stress event" for at least one month.

### B.    Main Stressed Uses Of Cash

Commercial paper –MFGI held $1.35 billion (par value) of commercial paper in an investment portfolio funded with FCM customer cash.  The Break the Glass Presentation set forth the expectation that FCM customer withdrawals would require MFGI to either sell the

portfolio to generate cash or to fund the withdrawals elsewhere, in an amount ranging between

$1.0 billion to $1.5 billion.  As predicted, this portfolio was sold, albeit at a small loss.

| CUSIP | Description | Date | Par Value |
|-------|-------------|------|-----------|
| 0027A0C58 | ABBEY NATL N AMERICA LLC | 3/5/2012 | $150,000,000 |
| 20260ac57 | COMMERZBANK US FINANCE | 3/5/2012 | $75,000,000 |
| 25153JBM1 | DEUTSCHE BANK FINL LLC | 2/21/2012 | $200,000,000 |
| 90262CBT3 | UBS FINANCE DELAWARE LLC | 2/27/2012 | $200,000,000 |
| 6555P0BU2 | NORDEA NORTH AMERICA INC | 2/28/2012 | $200,000,000 |
| 74977kbv0 | RABOBANK USA FIN CORP | 2/29/2012 | $75,000,000 |
| 87019RBV7 | SWEDBANK | 2/29/2012 | $150,000,000 |
| 06737hc64 | BARCLAYS US FUNDING LLC | 3/6/2012 | $100,000,000 |
| 4497W0C71 | ING (US) FUNDING LLC | 3/7/2012 | $200,000,000 |
| | | | $1,350,000,000 |

<u>Financing haircuts</u> – Margin optimization within the repo matched book created

an estimated $450 million to $500 million in gross liquidity on a daily basis throughout the

month of October 2011. During the final week in October, the cash created within the repo

matched book declined significantly as counterparties:

- demanded higher margin/haircut levels from MFGI as a prerequisite for continuing to lend money via repos, particularly against MFGI's corporate bond positions;

- became more aggressive in marking to market any outstanding repo positions and in recalling any excess margin/exposure;

- closed out their reverse repo and repo balances with MFGI, eliminating any excess liquidity that had been embedded in those trades; and

- The Securities Lending Program with JPM began to unwind which eliminated both the liquidity generated and the excess funds that had been deposited with MFGI.

These actions resulted in a major liquidity drain as MFGI lost the benefit of the use of hundreds

of millions that were typically available on a daily basis. This drain was well in excess of the

$100 million to $150 million estimated in the presentation

Margin requirements – A significant stress on MF Global's overall liquidity situation was the ratcheting up of margin requirements. As discussed above, during the final week, LCH, DTCC, NSCC and FICC increased their margin requirements, draining the broker-dealer's liquidity. Further, JPM and BNYM limited the Company's ability to intraday "borrow," effectively requiring "up-front cash" to settle all transactions. The Break the Glass Scenario appears to have forecast only a portion of the increased margin demanded by LCH, within the range of $200 million to $250 million, not the additional $310 million demanded on October 31.

MFGI received margin call requests on the European sovereign RTM trades from MFGUK via daily emails. Margin calls were met by posting collateral, typically U.S. Treasuries. Many of these T-bills were supplied through excess liquidity from MFGI's matched book trading business. The RTM margin paid to MFGUK was seen as the "biggest draw on cash" and ultimately totaled approximately $211 million through October 28, within the range estimated by the Break the Glass Scenario.

| Date | Total Margin Requirement | Aggregate Collateral Posted | Margin Call | Date | CUSIP | Collateral Posted |
|---|---|---|---|---|---|---|
| 10/21 | $ 457,480,290 | $ 452,795,960 | $ 4,684,330 | 10/24/2011 | 9127955C1 | 5,000,000 |
| 10/24 | $ 466,029,079 | $ 457,962,898 | $ 8,066,181 | 10/25/2011 | 9127953G4 | 8,000,000 |
| 10/25 | $ 470,580,345 | $ 464,694,118 | $ 5,886,227 | 10/26/2011 | 9127953G4 | 5,000,000 |
| 10/26 | $ 601,555,949 | $ 492,732,015 | $108,823,934 | 10/26/2011 | 912795Y96 | 23,000,000 |
| 10/27 | $ 665,716,417 | $ 604,003,047 | $ 61,713,370 | 10/27/2011 | 9127955K3 | 109,000,000 |
| 10/28 | $ 723,539,856 | $ 663,925,523 | $ 59,614,333 | 10/28/2011 | Cash | 60,969,500 |
| 10/31 | $ 973,539,856 | $ 663,925,523 | $309,614,333 | Collateral Posted (10/24 - 10/28): | | 210,969,500 |

An additional LCH margin call of nearly $310 million came on Monday October 31, although this call was not met.[113]

---

113. The margin paid was calculated based on the difference in the October 28 and October 31 "Collateral Posted" values. The additional margin ("Margin Call") required from LCH Clearnet SA Paris and LCH London represents the differential between "Total Margin" and "Collateral Posted" on October 31.

In addition, the Break the Glass presentation did not predict the liquidity drains resulting from protections demanded by DTCC.  DTCC decreased the net debit cap from $300 million to $100 million after MF Global's credit downgrade.  This required MFGI to fund the DTCC transactions in cash (by means of an intraday transfer from the Customer Segregated account) to continue clearing operations.  Another $100 million wire to DTCC was prompted by additional funds needed to settle repo trades with counterparties and unwind other transactions.  In addition, during the final business days in October (26 through 28), DTCC's fixed income clearing subsidiary, FICC, no longer returned excess margin to MFGI.  For this three-day period, the total excess margin withheld by the FICC was approximately $108.9 million.[114]

| Date | Total Cumulative Net FICC Excess/(Def) | |
|---|---|---|
| 10/21/2011 | $ | (13,320,984) |
| 10/24/2011 | $ | (16,356,207) |
| 10/25/2011 | $ | (12,353,490) |
| 10/26/2011 | $ | 48,524,283 |
| 10/27/2011 | $ | 42,865,153 |
| 10/28/2011 | $ | 108,976,107 |

Box Collateral – Securities that were unable to be funded in the collateralized markets via repos or stock loans were left "in the box" at JPM, BNYM or DTCC.  Anything left in the box could not generate liquidity.  The excess box collateral steadily increased from $119 million at the beginning of October 24 to $606 million on October 26.  MFGI could not obtain funding in the market via repos or stock loans (as was normally done); therefore, no liquidity was provided from these securities.  The Break the Glass Scenario significantly underestimated the box collateral's drain on liquidity by approximately $400 million.

---

114. The daily cumulative excess in the FICC accounts was $48.5 million, $42.8 million and $109 million, for October 26, 27 and 28, respectively.

Excess client balances – Excess client balances relate to both securities and FCM customers.  Over the course of the final week of operations, the top 20 MFGI customers alone generated over $1.1 billion in net withdrawals through liquidation and transfer of full or partial account balances.  The Break the Glass Scenario underestimated the speed and extent of this drain of funds, which it estimated at $1 billion over the course of two months.  The Break the Glass Scenario contemplated that some customers would withdraw excess margin in their accounts but did not envision many customers seeking to withdraw large portions of their accounts or to liquidate accounts in their entirety.  Management alluded to the adverse operational impact of a "vast increase in redemptions," but fell short of accurately predicting the timing and intensity of the run.

C.    **Main Mitigants Of Cash**

RCF draw – The cumulative draw on the $1.2 billion unsecured facility between JPM and Holdings totaled $930.6 million for the final two weeks of operations, which was in line with the $0.9 billion reference in the "Break-the-Glass" Scenario.  By October 27, the $1.2 billion facility was almost fully drawn, with the exception of $27 million that Bank of America refused to fund.

| Date | Principal Balance | Transaction | Description |
|------|------------------|-------------|-------------|
| 10/18/2011 | $367,000,000 | $125,000,000 | Draw |
| 10/24/2011 | $597,000,000 | $230,000,000 | Draw |
| 10/25/2011 | $897,000,000 | $300,000,000 | Draw |
| 10/26/2011 | $1,120,583,533 | $223,583,533 | Draw |
| 10/27/2011 | $1,172,623,712 | $52,040,179 | Draw |
|  |  | $930,623,712 |  |

Drawing on the RCF in such dramatic fashion in itself had negative effects on liquidity, however.  One such negative ramification was the loss of counterparty funding for transactions.  Many of the syndicate banks in the unsecured revolver were also repo

counterparties.  Traders for those institutions generally had exposure limits on their activity

related to MF Global.  When MF Global drew on the revolver, the portion of the draw funded by

a particular bank would be added to its current exposure.  By drawing close to $1 billion in three

days, many banks reached their limits for exposure to MF Global and began shutting down

trading lines for repo, securities lending and foreign exchange trading.[115]

        Liquidation of corporate paper - MFGI sold $1.35 billion of commercial paper to

Goldman Sachs for $1,334,562,000 on October 27.  Because this portfolio was segregated for

FCM customers, and cash proceeds were kept segregated for customers, this sale generated

liquidity only for FCM segregated customer distributions.  This distressed sale resulted in a loss

of approximately $15.4 million.  The proceeds from this sale were settled on the same day

through the Harris Bank account.

        Liquidation of hard-to-finance inventory – Because MFGI's repo investment was

primarily a matched book, the unwind of the repo transactions did not secure the return of

substantial proprietary inventory to MFGI.  To the extent securities started flowing back to

MFGI, the already hard-to-finance assets, including, but not limited to, high-yield junk bonds,

asset-backed securities (ABS), private-label mortgage backed securities (MBS) and corporate

bonds, were even more difficult to refinance as counterparties no longer wanted to participate in

overnight financing.  MFGI was unable to sell these positions quickly enough and incurred

significant losses.  These assets neither generated the liquidity nor the minimal P&L impact

envisioned in the Break the Glass Scenario.  As funding options began to dry up, the broker-

---

115. Bank of America, Wells Fargo and BNP Paribas were three syndicate banks that steadily reduced their exposure
    by mid-week.  Bank of America provided financing of approximately $2.5 billion in the form of repurchase
    agreements, which were unwound on October 26.  Similarly, Wells Fargo provided $0.5 billion of financing,
    which was fully unwound by October 28.  BNP Paribas provided approximately $0.15 billion of overnight
    financing, which was also unwound by October 28.

dealer heavily relied on unsecured financing from Treasury.  Any cash or liquidity shortfall in

the broker-dealer during that final week required an end-of-day borrow from Treasury.

## IX.    Recipients Of Funds

### A.    Customer Funds

In the aggregate, tens of billions of dollars in assets flowed through MFGI during

the last week of October.  The flow of these funds involved different counterparties, including

clearing and settlement banks, affiliates, exchanges and clearinghouses, lending banks, and

customers.  As outlined above, from Wednesday, October 26 through Monday, October 31, a

shortfall existed in FCM customer property.

The Trustee's professionals, based on currently available information, have

analyzed net payments or receipts involving MFGI's accounts and each of these categories of

counterparties.  Annex I provides this information in three forms as follows:  (i) aggregate net

payments or receipts for the period October 26-31; (ii) daily net payments or receipts for each of

the days before the Filing Date when there was a shortfall in Customer Segregated property

(October 26, 27, 28 and 31); and (iii) daily gross payments or receipts for each of the days when

there was a shortfall in customer property (October 26, 27, and 28 and 31).

The Annex I also reflects interactions between MFGI's accounts, which have

been categorized by regulatory purpose, and the various groups of counterparties involved in

trading and sales activities, liquidations of customer accounts, transfers to clearing houses and

exchanges, transactions with MF Global affiliates, and transfers to financial institutions.

### B.    Trading And Sales

A significant part of the movement of funds during the last weeks of October can

be attributed to MFGI's trading and sales activities, including the unwinding of positions funded

with customer funds pursuant to Rule 1.25.  The Trustee's professionals, based upon currently

available information, have detected no transfers of securities, settlement of repurchase

arrangements and reverse repurchase arrangements, that did not also involve a corresponding

transfer of cash or value, other than the items noted above where securities were posted as

margin.

### C.      Margin And Other Payments To Clearing Houses and Exchanges

Because of increased margin requirements and increased trading volumes,

transactions with clearing houses (DTCC, FICC, MBSD) and commodities exchanges (CME,

OCC, KCBT, ICE, MGEX) amounted to approximately $2.04 billion on a gross basis for the

period October 26 to 31.  The Trustee continues to investigate whether any of these entities had

reason to know of the shortfall in customer property at the time of receiving or requesting

transfers.  The Trustee has obtained or is obtaining significant return of proprietary assets from

DTCC and the CME, among others.  Significant amounts of collateral margin posted by MFGI

have been returned since the Filing Date.  (*See* Interim Report at 9-11.)

### D.      Affiliates

As Annex I reflects, many payments to and from MF Global affiliates occurred

during the final week of the Firm's operations.  The Trustee is continuing to investigate and

analyze these transfers and will assert intercompany claims where appropriate.

### X.      Disputes With MFGUK

MFGI's U.S. futures and options customers who wished to trade on non-U.S.

exchanges (the "30.7 Customers") deposited cash for margin requirements for these trades into

MFGI's segregated 30.7 accounts held with Harris Bank.[116]  MFGI conducted its trading on

---

116. The CFTC's Regulation 30.7 provides that an FCM "must maintain in a separate account or accounts money,
     securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to foreign

(Footnote continued on next page)

foreign exchanges (with the exception of Canadian exchanges) through its UK affiliate, MFGUK. Where MFGUK was to act as carrying broker for such trades, MFGI transferred the margin to segregated 30.7 accounts at MFGUK. MFGUK treated MFGI as its client, although it was aware that MFGI was acting on behalf of its underlying 30.7 Customers as regards margin posted to segregated 30.7 accounts. As of October 31, MFGI's records show that the value of the margin posted to the relevant segregated 30.7 account ("Account 6178T") was $639,918,174 (the "30.7 Funds"). The value of the 30.7 Funds represents a significant portion of the shortfall reported by the Trustee.

On January 6, 2012 the Trustee filed preliminary claim forms (for voting purposes only) with the Joint Special Administrators,[117] asserting his position that the 30.7 Funds rightfully belong to MFGI for the benefit of MFGI's 30.7 Customers. On March 30, 2012, the Trustee submitted his formal client money and client asset claim forms to the Joint Special Administrators. These client claims total approximately $910.4 million, which includes a client money claim regarding MFGI's October 28, 2011 transfer of $175 million to MFGUK, originating from segregated customer funds in the U.S. The Trustee has also filed a general creditor claim for, among other things, margin posted by MFGI to support the RTM trades. These general creditor claims total approximately $462.8 million.

---

(Footnote continued from prior page)

futures or foreign options customers denominated as the foreign futures or foreign options secured amount. Such money, securities and property may not be commingled with the money, securities or property of such futures commission merchant, with any proprietary account of such futures commission merchant, or used to secure or guarantee the obligations of, or extend credit to, such futures commission merchant or any proprietary account of such futures commission merchant."

117. Following the Chapter 11 filing by Holdings on October 31, 2011, the directors of MFGUK petitioned the High Court to place the the UK company in administration. The High Court appointed Richard Fleming, Richard Heis and Mike Pink of KPMG LLP as Joint Special Administrators.

The Trustee's contention is that he should recover all 30.7 Funds, whether on the grounds that the 30.7 Funds constitute client money or client assets, or on other grounds available under applicable regulatory rules and legal principles.

Upon their initial review of the Trustee's voting client claim form, the Joint Special Administrators noted their objection to the Trustee's position that the 30.7 Funds should be classified as either client money or client assets under English law. In a report filed with the High Court of Justice of England and Wales on February 3, 2012, the Joint Special Administrators asserted that the 30.7 Funds were not, on the Filing Date, segregated as either client assets or client monies. The Joint Special Administrators' position appears to be that the Trustee's claim for the 30.7 Funds should be admitted only as a general creditor claim.

Although there does not appear to be any dispute that margin in the form of cash transferred by MFGI to its segregated 30.7 account held by MFGUK prior to March 2009 was required to be treated as client money and protected under the FSA's Client Money Rules ("CASS 7"), the Joint Special Administrators appear to contend that margin deposited in the form of securities was not subject (or need not have been subject to) analogous provisions relevant to client assets other than cash, *e.g.*, those under the FSA's Custody Rules ("CASS 6"). In March 2009, MFGI, which had historically transferred cash in respect of its customers' margin obligations on foreign exchanges, began transferring securities (mostly U.S. Treasuries ("T-Bills")) to a segregated 30.7 account (Account 6178T) for margin requirements. The Joint Special Administrators appear to contend that this change in form, from cash to T-Bills, ended (or facilitated an end to) FSA regulatory protection for the 30.7 Funds.

The Joint Special Administrators' apparent position rests on an important distinction between U.S. and English law concerning the protection of customer property. Under

U.S. law, all customer property held by a U.S. FCM is protected by statute and cannot be used to

satisfy general creditor claims in the event of the FCM's insolvency.  Under English law, while

money and other assets belonging to a client but held by an FSA-authorized investment firm

must generally be segregated by the FSA-authorized investment firm under CASS 7 and CASS 6

and protected from distribution to general creditors in the event of the firm's insolvency, certain

types of clients can agree to alternative arrangements which potentially afford lesser protection

in the event of insolvency.  Specifically, certain customers may consent to absolute title transfer

of that customer's assets to the FSA-authorized investment firm under a "title transfer collateral

arrangement", pursuant to recital 27 of the European Markets in Financial Instruments Directive

("MiFID") as implemented by the FSA's CASS 6.1.6 R and CASS 7.2.3 R.  Such arrangements

apply where an appropriate client of a firm transfers full ownership of an asset (including

money) to a firm for the purpose of securing or otherwise covering present or future, actual,

contingent, or prospective obligations.  In the event of such absolute title transfer, the relevant

assets cease to be client assets upon such transfer and, accordingly, do not receive protections

required under either CASS 7 or CASS 6.  In general, in the event of the firm's insolvency, the

customer would generally rank only as a general unsecured creditor in relation to those assets.

The Joint Special Administrators appear to contend that the 30.7 Funds

transferred by MFGI after March 2009 were transferred on an absolute title transfer basis.  The

Trustee disputes both the factual basis and the legal justification for this position.

In furtherance of his duty to secure all segregated customer property for the

benefit of MFGI's former commodity customers, the Trustee has been engaged since November

2011 in active discussions with the Joint Special Administrators concerning the return of the 30.7

Funds.  Following the filing of the voting claim forms described above, the Trustee engaged in

an exchange of information with the Joint Special Administrators concerning his client and general creditor claims.  On May 3, 2012, at the suggestion of the Trustee, the Joint Special Administrators made an application to the High Court seeking directions concerning whether 30.7 Funds were or should have been segregated under English law.  The Trustee notes that the adjudication of the Trustee's claims will involve evidentiary disclosures and hearings, the completion of which is subject to the procedures of the English court.  The Trustee has pressed the Joint Special Administrators to agree to a litigation timeline that will have this litigation concluded expeditiously.  The preliminary directions hearing, at which time the High Court addressed the calendar for the litigation, took place on June 1, 2012.  The High Court directed that the case be tried on April 9, 2013.

On June 1, 2012, the Joint Special Administrators wrote to the Trustee regarding his creditor claims.  Specifically, the Joint Special Administrators indicated that they dispute the Trustee's valuation of his claim for the RTM margin and suggested that they may apply to the High Court for direction concerning this dispute.  At this time, no such application has been made.

The Joint Special Administrators have also filed customer claims against MFGI.  Net of duplicate claims, these claims amount to approximately $258 million (commodities) and $149 million (securities).  The Trustee is in the process of issuing letters of determination to the Joint Special Administrators concerning these claims.

## XI.    MF Global Canada

MF Global Canada Co. ("MFG Canada") was the only other foreign affiliate to hold funds of MFGI's 30.7 Customers.  Specifically, MFG Canada holds T-bills with an aggregate market value of approximately $101 million in a 30.7 customer account (the "Canadian 30.7 Account").  The Canadian Trustee has never disputed that these funds were held

as segregated customer funds or that MFGI has a right to the prompt return of those funds as a

customer of MFG Canada.  Rather, the Canadian Trustee moved the Canadian Court to authorize

a net equity calculation that would offset monies owed to MFG Canada related to customer

omnibus accounts held by MFGI for customers of MFG Canada (a total of approximately

$42 million in both 4d and 30.7 funds) against the balance owed to MFGI, including those funds

related to the Canadian 30.7 Account.  Canadian law permits offset of amounts owed to a firm in

an insolvency proceeding against monies owed to that customer.  Under the Canadian Trustee's

interpretation of Canadian law, set-off would be permitted after calculating distributions to be

made on accounts held.

After taking into account projected distributions on the claims that the Canadian

Trustee has moved to set off, the net amount in dispute between these positions is not of a

magnitude sufficient to warrant the cost, expense, and delay of litigation.  Therefore, the two

Trustees have agreed in principle to a settlement of the dispute that would allow prompt return of

the funds held in Canada after netting along with withdrawal of MFG Canada's U.S. claims,

which amounts to approximately $62 million, subject to final reconciliation and court approval.

This settlement will be presented to the Court when it is finalized.

## XII.    Other Affiliate Claims

Several other former affiliated companies of MFGI have submitted customer

claims.  The Liquidator of MF Global Australia Limited filed claims of approximately $15

million (commodities) and $3 million (securities).  The Liquidator of MF Global Holdings HK

Limited filed claims of approximately $9 million (commodities) and $0.003 million (securities).

The Liquidators of MF Global Singapore Pte. Limited filed claims, net of duplicates, of

approximately $13 million (commodities) and $0.4 million (securities).  Letters of determination

concerning each of these claims have been sent to the respective administrators.  There appear to be no material disputes concerning these claims.

## XIII.   Investigation And Analysis Of Potential Claims

The Trustee is analyzing potential methods of recovering MFGI proprietary assets, including recovery actions and other causes of action against a number of potential parties.  These include the consensual return of remaining MFGI property at clearing houses or clearing banks to the extent not already recovered, unwinds of transactions with counterparties, as well as pursuit of certain pre-Filing Date actions that may benefit the MFGI Estate, and bankruptcy avoidance actions. The Trustee is also analyzing potential causes of action against third parties that may have received customer property prior to the Filing Date.  The Trustee is already in discussions or negotiations with many parties regarding these possible causes of action as well as with relevant insurers.

As noted above, this Report is not the place to detail the Trustee's negotiations or litigation strategy, and is not the place to speculate about potential adversaries' responses to them.  The most significant steps that the Trustee is considering with respect to the return of or recoveries for damages to customer property are those set forth below.

### A.    MF Global's Officers, Directors, And Other Employees

Possible claims against directors, officers, and potentially other employees, sound, among other things, in breach of fiduciary duty and negligence.[118]  Certain members of MFGI's senior management and others have been named in existing class action lawsuits,

---

118. The Trustee believes that a correct reading of *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd on other grounds*, 442 U.S. 560 (1979), its subsequent history (which resulted in a significant recovery for customers in the state courts after the Supreme Court ruled that no implied cause of action existed under the Exchange Act), and progeny, as well as the Second Circuit's decision in *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989), all establish that the Trustee will likely have standing to pursue claims for losses from segregated customer funds in the current case.

brought by and on behalf of former FCM customers of MF Global. The Multidistrict Litigation

Panel has now consolidated these suits in the Southern District of New York before the

Honorable Victor Marrero. The Trustee believes that he is well suited to pursue certain claims

against appropriate individuals to ensure that the proceeds of any recovery are equitably

distributed among customers of MFGI pursuant to the relevant statutory framework.

As he has publicly announced, the Trustee is engaged in discussions with

representatives of customers who have brought actions regarding the most efficacious way of

seeking recoveries as well as appropriate mechanisms for distributions of recoveries to

customers. The Trustee expects to reach decisions and take appropriate steps with regard to

claims against individuals, and related steps involving customers' counsel and insurers, within

sixty (60) days. As noted above, the Trustee believes that there are claims, including claims for

breach of fiduciary duty and negligence, that may be asserted against Mr. Corzine,

Mr. Steenkamp, and Ms. O'Brien, among others.

### B.    MF Global's Principal Financial Institutions

The Trustee is also analyzing whether there is a basis to assert claims against MF

Global's principal banks. MFGI used the services of these institutions, among others, to clear

securities transactions for the BD, with JPM clearing U.S. Agency securities, and BNYM

clearing U.S. Treasury securities, JPM was also the primary domestic repository of segregated

and secured customer funds.

JPM may have liability in connection with some or all of the above-referenced

transfers (*see* pp. 130-38, *supra*). JPM can be expected to rely on the Bankruptcy Code's safe

harbor provisions and contractual provisions to justify and defend its actions, and may otherwise

contend that it simply acted as a custodial bank for some intercompany transfers that were not transfers to third parties.[119]

To date, JPM has returned $89.2 million[120] in customer property and $518.4 million in non-segregated unallocated MFGI assets, subject to certain reservations of JPM's security interest in such funds.  This sum includes, as widely reported in the press, $168.1 million in funds returned on May 16 and 17, 2012, which will be subject to an appropriate allocation.

JPM has cooperated with the Trustee's investigation, and the Trustee has announced publicly that he is engaged in active discussions with JPM with respect to transfers that the Trustee believes may be voidable or otherwise recoverable.[121]  In the event these discussions do not result in an agreement within the next 60 days, the Trustee, if appropriate, will commence litigation.  While the Trustee may not accept many of JPM's contentions, they must be analyzed and cannot be dismissed out of hand.

---

119. *See* 11 U.S.C. § 546(e)-(j).

120. The U.S. dollar value of returned assets is determined by securities value as of the Filing Date and current conversion rates for foreign currency.

121. In *Lehman Brothers Holding Inc. v. JPMorgan Chase Bank N.A. (In re Lehman Brothers Holding Inc.)*, Adv. No. 10-03266, 2012 WL 1355659 (Bankr. S.D.N.Y. Apr. 19, 2012), Bankruptcy Judge Peck conducted a detailed review of the safe harbors contained in section 546 of the Bankruptcy Code and found that: (i) section 546's safe harbors prevent the avoidance of any transfers that relate to or support a securities contract, and (ii) while guarantee obligations are not protected from avoidance by section 546's safe harbors, transfers made on account of those obligations are protected from avoidance by the safe harbors.  Judge Peck also found, however, that section 546's protections were limited to sections 544, 545, 547, 548(a)(1)(B), and 548(b) of the Bankruptcy Code, and that the safe harbors do not bar a debtor from maintaining other claims, including state and common law claims, based on the same conduct and circumstances.  The court ruled in this connection that "[t]he safe harbors provide incentives and protections to market participants, but they are not a license for major institutions to act in a commercially unreasonable manner.  If JPMC crossed the line of permissible conduct and did anything wrongful that damaged Lehman, Plaintiffs have recourse by means of those counts that involve intentional misconduct or that are based on other claims that are not expressly subject to the protections of the safe harbors.  The safe harbors specifically address certain stated bankruptcy-related risks and remedies but do not offer protection against exposure that exists under these alternative theories of recovery." *Id.* at 5.

The Trustee also continues to investigate BNYM's actions during the week of October 24.  BNYM has cooperated with the Trustee's investigation.

## C.    Customers And Counterparties

The Trustee has considered whether there is a basis to commence actions against former customers of MFGI.  In order to bring such an action in the circumstances of MF Global, the Trustee believes that he would be expected to demonstrate that: (i) MFGI transferred funds to the customer in question with actual fraudulent intent, and (ii) the customer either failed to provide value for the transfers or was willfully blind to the fact that MFGI's transfer was improper.  This standard has been applied in previous SIPA proceedings, including recently in a pair of opinions authored by U.S. Districe Judge Rakoff.[122]  Under the reasoning of these cases, the "safe harbors" set forth in section 546(e) of the Bankruptcy Code insulate former MFGI customers from all avoidance actions unless the customer had knowledge of the fraud or was willfully blind to it.[123]

Based on the information currently available to him, the Trustee believes it is unlikely that there is a sound basis to pursue claims against customers.  As SIPC explained in a 2011 letter to Congress, "[d]isbursements made by a broker to a customer in the ordinary course of business would not be subject to avoidance by a trustee."  At this point in the Trustee's

---

122. *See Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011); *see also SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12-00115, 2012 WL 1505349, at *12 (S.D.N.Y. Apr. 30, 2012) (incorporating and reiterating reasoning of *Picard v. Katz*); *see also Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334–35 (2d Cir. 2011) (discussing purpose and scope of § 546(e) safe harbors).

123. Unlike the operations of Bernard L. Madoff Investment Securities Inc. ("Madoff"), MFGI was operating as a legitimate business and was not an overall fraudulent enterprise or a Ponzi scheme.  In SIPA liquidations involving fraudulent enterprises or Ponzi schemes, section 546(e) may not prevent a SIPA Trustee from avoiding transfers to customers representing fictitious profits or transfers made to customers when such transfers had the ancillary effect of benefitting the fraudulent enterprise.  *See, e.g.*, *In re Bernard L. Madoff Inv. Secs. Inc*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011); *In re Adler Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001).

investigation, the Trustee has found no indication that MFGI ever transferred funds to a customer

with the intention of defrauding its creditors.  Similarly, the Trustee has not discerned any

instances of a former customer receiving a transfer of funds in excess of the value of its MFGI

account.  Nor is the Trustee aware of any evidence of a former customer having had any reason

to suspect that MFGI was improperly using customer funds.[124]  There is thus no basis for a *prima*

*facie* case against any customer.

A portion of customer funds in the final days may have gone to MF Global

counterparties, in connection with, for example, unwinds of securities transactions.  The Trustee

has reviewed the identity of these counterparties and the transactions and documentation related

to them.  These transactions will likely qualify for safe harbor protection.[125]  As with customers,

the Trustee would then need to demonstrate both that MFGI transferred funds to the counterparty

with actual fraudulent intent and that the counterparty failed to provide value for the transfer or

lacked good faith in accepting the transfer.[126]  Additionally, the Order Commencing Liquidation

specifically excludes the exercises of contractual rights by certain financial counterparties,

including a counterparty's rights under a securities contract, commodity contract, financial

---

124.The Trustee is also analyzing the post-petition expedited transfer of customer funds to ensure that no
overpayments were made to individual customers as part of this process and will take appropriate steps to
remedy any such occurrence.

125.*See* 11 U.S.C. § 546(e)-(j); *see also Enron Creditors Recovery Corp.*, 651 F.3d at 334–35 (construing scope of
section 546(e) broadly and concluding that the safe harbor protected payments made by Enron to redeem its
commercial paper prior to maturity).

126.In the case of a sophisticated counterparty, courts are likely to apply the "inquiry notice" standard for
determining whether there was a lack of good faith, as opposed to the "willful blindness" standard that courts
often apply to former customers.  *Compare Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
397 B.R. 1, 22–26 (S.D.N.Y. 2007), *with Picard v. Katz*, 462 B.R. 447, 454–55 (S.D.N.Y. 2011).

contract, repurchase agreement, swap agreement and master netting agreement, from the automatic stay.[127]

### D.    Unwinding Financial Transactions

As a separate and distinct matter, there are monies owed by certain counterparties in connection with the unwind of financial transactions at MFGI.  In this regard, the Trustee and his professionals have been working diligently on the recovery of value from the unwind of the financial products that were transacted at MFGI with broker-dealers, financial institutions, and other parties.  These transactions include, but are not limited to, repurchase transactions, securities lending transactions, derivatives transactions, and to be announced ("TBA") transactions.  On the Filing Date, amounts related to the close-out of financial products transactions were due from approximately 85 counterparties.  Approximately 10% of the counterparties owe the MFGI Estate receivables in amounts of $3 million or more.  The receivables due from this smaller group account for approximately 85% of the total receivables outstanding.  Many of these transactions were supported by collateral, largely cash and government securities, which are included in the calculation of the amount of receivables owed to the MFGI Estate.[128]

---

127. *See* Order Commencing Liquidation, No. 11-07750, (S.D.N.Y. Oct. 31, 2011) (J. Engelmayer), at ¶ VIII A-1 (D.E. 3).

128. On November 15, 2011, the Trustee released protocols, which were developed in consultation with SIPC, to set forth a uniform process for terminating and closing out certain of these transactions that may be subject to the safe harbor provisions of the Bankruptcy Code (*see* 11 U.S.C. §§ 362(b)(6), (7), (17), (27), 546, 555, 556, 559–562).  The protocols set forth procedures for a counterparty (i) to terminate the transactions; (ii) to notify the Trustee of the manner and details of such termination; and (iii) if the counterparty owes MFGI a payment as a result of such termination, the instructions by which the counterparty should make payment.

To date, the Trustee's efforts have resulted in the recovery of approximately $78.66 million, which represents the partial or full resolution of financial products transactions with approximately ten counterparties that owed amounts to MFGI.

In addition to the amounts already recovered, the Trustee expects to recover an additional $50 million to $55 million from the unwind of these financial products from the 85 counterparties that owed close out amounts to MFGI as of the Filing Date.  Of that, approximately $30 million relates to securities lending transactions, $20 million relates to repurchase transactions, with the remaining amounts owed relating to TBA and other miscellaneous transactions.  The Trustee continues to investigate MFGI's books and records, and to reconcile these transactions directly with the trading counterparties in order to marshal amounts owing.

E.    **Affiliates**

In addition to issues with MFGUK and MFG Canada discussed above, the Trustee is also investigating the pre- and post-Filing Date actions of MFGI's affiliates, including Holdings and Special Investor,[129] and will assert any claims or defenses in appropriate fora at appropriate times including as a counterclaim or in an adversary proceeding.

For its part, from time to time Holdings has expressed the view that it has claims against MFGI.  There appears to be no basis for Holdings to recover any funds from MFGI or its customers other than through claims filed in this proceeding that may be subject to offset, subordination, and other defenses.  Such claims would not in, any event, appear to have any

---

129. The PSG was transferred from MFGI to a subsidiary of Holdings, Special Investor, as part of the effort to address the increased regulatory capital requirements imposed by FINRA in August 2011.  Special Investor, which had a subordinated customer account, received transfers from MFGI during the final days before bankruptcy and has also asserted a substantial customer securities claim.  The Trustee will continue to analyze the restructuring and transfers with Special Investor and other MF Global affiliates, to ensure that fair value was provided in connection with any transfer of funds.

priority over customer claims or with respect to customer segregated funds, except to the extent

Holdings maintained bona fide securities accounts that would receive treatment in accordance

with the priorities established by SIPA.[130]  The Trustee will likely oppose any other claim by

Holdings, the Chapter 11 debtors, or other affiliates, and assert available setoffs and pursue

claims in the Chapter 11 proceedings.

### F.    Clearing Houses And Other Parties

The Trustee is also considering the actions of other major actors such as clearing

houses and exchanges in both their regulatory and commercial capacities.  In general, such actors

have rights to close out transactions and protect markets under their rules, relevant safe harbor

provisions of applicable laws, and the Order Commencing Liquidation.  The Trustee will

continue to review these parties' actions for any failures to act in accordance with applicable

rules and regulations that may have caused actionable harm to the creditors and customers of

MFGI or MFGI itself.

The Trustee is continuing to investigate DTCC's conduct with respect to MFGI

during the week of October 24, including its demands for additional cash before clearing trades.

The Trustee is also assessing the actions of DTCC's subsidiary, FICC, in withholding property as

discussed above and whether DTCC or any of its affiliates was or should have been aware that it

---

130. Holdings, on behalf of itself and its affiliated Chapter 11 debtors, has filed various customer claims against MFGI.  The Trustee's professionals are evaluating these claims and have engaged in preliminary discussions with counsel for the Chapter 11 debtors to resolve any disputes relating to these claims.  Current analysis has been conducted exclusively of alleged customer claims, as the Chapter 11 debtors have not yet filed intercompany claims against the MFGI estate.  The Chapter 11 debtors have claimed an aggregate of approximately $110 million in commodities claims and approximately $556 million in securities claims against MFGI.  In addition to problems with the valuation of these claims, they claims are subject to various offsets, including but not limited to set off for claims by MFGI against each of the Chapter 11 debtors, post-petition reconciliations and reclassification of claims.  In addition, some or all of the claims asserted by the Chapter 11 debtors are subject to valid binding subordination agreements or are otherwise subordinated to claims of non-affiliated customers or creditors of MFGI.

received customer funds from MFGI.  DTCC has now returned $160 million in cash margin and is engaged in a reconciliation with the Trustee's professionals about remaining amounts.

As explained in the accompanying Interim Report, other U.S. clearing houses have returned substantially all MFGI customer and proprietary funds with remaining steps largely limited to reconciliations and accountings.   Clearing houses or DCOs have also transferred approximately $4 billion to customers as part of the account transfers, and returned approximately $1.9 billion in customer property to the Trustee for his administration.  Another $63 million in proprietary margin held for the FCM has been returned to the estate from clearing houses and banks, some of which may ultimately be allocated to customer property.

As a separate matter CME still holds or controls approximately $175 million in property posted by MFGI against which some customers and other parties have asserted claims in accordance with CME rules.  The Trustee is engaged in discussions with CME seeking the return of this property with appropriate disposition of claims, as well as with other clearing houses.  (*See* Interim Report at 10.)

The Trustee wishes to make it clear that the fact that he is continuing to analyze a party's conduct does not mean necessarily that liability is believed to exist.  Nor does the fact that some actions may be pursued before others mean that others will not be pursued.

## XIV.   Recommendations

Based upon his investigations, analysis, and longstanding experience as a trustee, the Trustee made certain recommendations to Congress when he testified before the Senate Committee on Banking, Housing and Urban Affairs on April 24, 2012.  The Trustee's recommendations were aimed at avoiding a repeat of the MF Global catastrophe, and allowing for more effective means for future trustees to act effectively and promptly to restore customer property in the event of an FCM liquidation.  These recommendations are amplified below, along

with additional recommendations the Trustee also believes merit consideration based on

continued analysis.

A.    **Abolish The Alternative Calculation Method And Implement A Required Excess "Cushion"**

As described above,  the CFTC currently permits an FCM to use the Alternative

Method to calculate the amounts that need to be included in the Foreign Secured accounts.  In the

case of MFGI, this resulted in a requirement that was significantly less than the amount of

customer funds.  This amount, described in this Report as the Regulatory Excess, averaged

approximately $1 billion during the month of October and once the liquidity asphyxiation began,

painted a misleading picture of MFGI's compliance with segregation requirements that

contributed significantly to the shortfall in customer funds.  The Trustee recommends that the

CFTC amend its regulations so that the regulations require that the monies and assets of

customers trading on foreign exchanges are subject to the same protections as U.S. customers

trading on U.S. exchanges.  This recommendation would involve eliminating the use of the

Alternative Method and requiring instead that all customer monies and assets be maintained in

secured accounts so that there would be no distinction in the rules regarding calculation and

withdrawal of customer funds.

To guard against errors, the Trustee also recommends that consideration be given

to requiring an FCM to segregate an amount in excess of 100% of customer funds.  Requiring

FCMs to post proprietary funds beyond the margin provided by customers could help ensure that

there is a sufficient cushion at all times for commodities customers.  Consideration should also

be given to implementing specific review and sign-off requirements by the CFO or other senior

officers whenever an FCM seeks to withdraw even what are believed to be residual or excess

segregated funds from a segregated (or secured) account when the withdrawal exceeds a certain

dollar amount or percentage of either the account or the calculated excess.

> **B.**    **Eliminate The Segregated vs. Secured Distinction Currently Made By Regulation 30.7, Ensure Consistency of Customer Protection When Trading Overseas, And Closely Monitor Compliance Abroad**

By comparison with Section 4d of the CEA, which requires the complete

segregation of customer accounts designated for trading futures and options on U.S. exchanges,

Regulation 30.7 provides that a FCM: "must maintain in a separate account or accounts money,

securities and property in an amount at least sufficient to cover or satisfy all of its current

obligations to foreign futures or foreign options customers denominated as the foreign futures or

foreign options secured amount. Such money, securities and property may not be commingled

with the money, securities or property of such futures commission merchant, with any

proprietary account of such futures commission merchant, or used to secure or guarantee the

obligations of, or extend credit to, such futures commission merchant or any proprietary account

of such futures commission merchant."

Despite the distinction between the language of 4d and 30.7, both provisions are

generally accepted as requiring segregation of customer money. At MF Global, for example,

although both the legal department and the Treasury department were well aware of the different

terminology used to describe the separate accounts maintained on behalf of customers pursuant

to CFTC Regulations 1.20 and 30.7, the members of these departments engaged in lengthy

discussions concerning the segregated status of 30.7 monies and assets. Regulation 30.7's

secured amount requirement has caused considerable confusion in the marketplace since the

collapse of MF Global, both at FCMs and with their customers. Part of the confusion stemmed

from the lack of equivalent regulations overseas, where monies and assets can be only segregated

or non-segregated. But, importantly, the same principle, namely customer protection, underpins

segregating an asset *qua* asset and securing an amount equivalent to the value of that asset in a separate account.

MF Global investors, for their part, thought that there was no doubt regarding the security of their overseas investments: instead, as highlighted above, there is a significant litigation now pending in the English High Court concerning these investments. Although MF Global cautioned its investors in some documents to consider foreign insolvency rules before making overseas investments, it often suggested that the treatment of 4d and 30.7 property was essentially the same. In any event, the task of interpreting areas of potential conflicts between U.S. and foreign regulations can be a difficult task for regulatory counsel, let alone individual investors. It is simply not reasonable to place such a complex burden on the shoulders of investors, particularly when these investors may lack critical information concerning how the FCM intends to manage its customer omnibus accounts (or actually does so in practice).

The Trustee recommends that the relevant U.S. regulations be amended to clarify that all customer monies and assets must be segregated, regardless of whether they are invested domestically or overseas. For overseas investments, U.S. regulations should expressly require that customer monies and assets be segregated to the maximum extent provided for under the stricter of U.S. law and applicable foreign laws and regulations as a condition to allowing funds to be held abroad. Close coordination between regulators will be required as well as monitoring of how funds or securities are in fact being held, with sign off — and ideally potential personal liability — by responsible officers.

Customer funds and other property, whether kept in individual accounts or in omnibus accounts, should always be treated as segregated funds. Currently, few regulatory regimes globally provide specific rules to govern the treatment of customer omnibus accounts

and those that do so, do so sparingly at best.  It is critical that global exchanges recognize both the concept of a customer omnibus account and create coding on their operational systems to identify such accounts, as well as to distinguish customer omnibus accounts from firm proprietary accounts.  So identified, customer omnibus accounts should either be (i) allowed to be easily transferred to another firm upon insolvency of the FCM or (ii) promptly liquidated and the proceeds returned to the FCM.

U.S. and foreign insolvency rules should be amended to clarify that customer omnibus accounts should not be subject to offsets, other than for debts directly related to those accounts.  In this case, the Canadian Trustee has interpreted the applicable Canadian law to require offset of amounts owing to MFG Canada on its customer omnibus accounts held by MFGI against the larger amount owed to MFGI on its customer omnibus accounts held by MFG Canada.  Although the amounts are not material in MFGI's case, this type of offset approach could result in preferential treatment for customers in one jurisdiction as opposed to another in contradiction to the expectations of customers and regulators.  Regardless of the legal status of a customer omnibus account, the funds held in that account ultimately belong to the many underlying customers of the financial services firm.

Differences between U.S. rules and insolvency rules and financial services regulations in other jurisdictions that give rise to arguments as to the proper status of customer protection, leading to the disputes such as the pending litigation  with the Joint Special Administrators of MFGUK, should be eliminated.  All property held in a customer omnibus account should be required to be segregated in a manner similar to U.S. law and receive the maximum protection afforded under local law.  A country should not be considered a good secured location for customer funds pursuant to applicable regulations where that country's

regulations fail to provide for specific rules requiring segregation of all customer property,

including such property held in customer omnibus accounts.

C.    **Create A Protection Fund For Futures And Commodities Customers Under
A Certain Threshold, And Implement Suitability Standards For FCM
Customers**

The MF Global liquidation would have played out differently had there been even

a modest protection fund from which commodities customers could have received advances.

The statistics the Trustee has gathered through the Claims Process demonstrate that about 78% of

the FCM customers' claims were in fact below a threshold of $100,000, and that the accounts of

more than two-thirds of the customers who filed claims represent only 3% of the total amount

that MFGI was required to segregate for commodities customers, or no more than $200 million

in total.  Thus, a fund capped at a relatively low dollar amount per customer would suffice to

make these customers whole very quickly even in a case with a shortfall the size of MFGI's.

With such a fund in existence, three-quarters of MFGI's commodities customers would not have

been subject to any loss and could have been made whole within days of the bankruptcy filing.

A protective fund of this nature could be modestly funded and maintained at a

minimal cost until such time as necessary to advance funds to customers, thereby allowing them

to resume trading with little or no delay.  The fund could be replenished by industry assessments

when needed to satisfy claims in FCM failures.

In addition, while commodities trading is an important part of the economy that,

among other things, assists the agricultural industry in hedging risk and funding itself, it does

appear that many of MFGI's commodities customers appear to have invested their retirement

accounts and life savings in products that they may not have fully understood.  Indeed, many

former customers have said that they did not understand the account statements that they

received from MFGI even when it was in business.  Under current regulations, commodities

customers are not subject to CFTC-imposed suitability requirements, such as those that the SEC

has approved and are applicable to securities customers.[131]  Suitability requirements for

commodities customers could help ensure that there is reasonable basis to believe that a

transaction or investment strategy is suitable for a commodities customer, based on information

about that customer obtained through reasonable diligence by the FCM.

### D.    Provide For Civil Liability For Officers And Directors In The Event of Commodities Segregation Shortfall

The failure of MFGI was in part due to a failure to maintain integrated systems

for tracking liquidity and the movement of funds, a lack of supervision of key treasury functions,

fragmentation of responsibility, and inattention to the details of maintaining the segregation of

customer funds at senior levels of the company.  If the CFTC regulations are to continue to

require 100% compliance at all times with its segregation rules, an appropriate penalty, in the

event of a regulatory shortfall, would be the imposition of civil liability for the officers and

directors responsible for signing the firm's financial statements or authorizing specific transfers.

Designated officers could be required to certify segregation statements and all transfers of a

specific percentage of funds in segregated accounts above specified percentages for non-

customer purposes and customer liquidation or returns respectively.

Facilitating such certification would be internal systems, analogous to SOX

compliance regimes, to monitor intraday customer segregated and foreign secured balances,

transfers out of the FCM, and other daily cash balances and movements.  Consideration should

be given to requiring the chief executive officer, the chief financial officer, the chief compliance

---

131. Although NFA Compliance Rule 2-30 imposes "know-your-customer" requirements on a customer-by-
customer basis (not a trade-by-trade basis), a failure to comply with this rule will not expose an FCM, or its
directors and officers, to liability under the CEA.  In addition, the CFTC has recently adopted suitability
requirements for swaps dealers, but these requirements do not currently apply to FCMs.

officer, and the general counsel of an FCM to certify not only their company's financial statements but also its and their compliance with customer segregation requirements on a frequent and continuing basis.  Where there is a shortfall in customer funds, Congress should consider making the officers and directors of the company accountable and personally and civilly liable for their certifications without any requirement of proving intent and without permitting them to defend on the basis that they delegated these essential duties and responsibilities to others.

### E.    Simplify CFTC Rules For Bulk Transfers And Claims In An FCM Liquidation Proceeding

#### 1.    Bulk Transfer Rules

The CFTC's Part 190 Rules anticipate that a liquidating Trustee will be able to effect a bulk transfer of open positions and associated margin on the date of the Order for Relief or in the days immediately following the Order for Relief (*see*, *e.g.*, 17 C.F.R. § 190.06 and Appendix A).  While the Trustee agrees that the futures customers — and the markets generally — require customers to have access to their open positions and funds as quickly as possible, in the case of MFGI's liquidation, the Trustee found that the Rules governing these transfers are overly specific and complicated.  The Trustee believes that it would be preferable to have a simple and more flexible rule conveying the intent of transferring open positions and related margin as quickly as possible pursuant to defined criteria to assure fairness and protection of exchanges, facility transfers and FCMs accepting the transferred accounts.  The specific schedule for implementation of the transfers in the Part 190 Rules proved unrealistic given the size and complexity of MFGI's liquidation and, while guideposts may be helpful, the Trustee questions the need for rigid deadlines.  SIPA provides for bulk transfers of customer securities accounts by

giving the Trustee substantial discretion, but SIPC and the SEC monitor the process, which can

be tailored for specific circumstances by Court order. *See* 15 U.S.C. § 78fff(b)(2)(f).

### 2.    Proof of Claim Rules

The CFTC's Part 190 Rules also anticipate that a liquidating trustee will send a

proof of claim to customers within the first two weeks of the liquidation. The Part 190 Rules

provide a sample claim form, but the Trustee received a large number of objections to the

original proposed commodity claims form even though it largely tracked the sample form in the

Rules. Even the modified version, which incorporated changes from dozens of claimants or their

counsel, was generally described by former customers as being too complicated. The Trustee

dedicated extensive resources to helping claimants understand and fill out the form.

Some of the complications arose from the extensive rules governing the

calculations of a claimant's former account's value in order to determine a pro rata share for

ultimate distribution. The basis of these rules is no doubt an effort to calculate the precise value

of a former customer's account even as markets change, and partial transfers and liquidations

occur over time, but the rules produce arbitrary distinctions between customers because of

liquidation procedures beyond their control. In addition, the Trustee found that information

about liquidation values may not be readily available, particularly in the case of liquidation

abroad. Some simple guidelines for establishing the account classes and determining the basis

for the pro rata shares of each class would aid customers in completing forms and simplify the

claims process. Consideration should also be given to allowing use of a set date for valuation

purposes rather than the date of actual liquidation of positions, which may vary for claimants in

unpredictable ways.

F.        **Enact Legislation Explicitly Authorizing Trustee Standing On Behalf Of Customers**

Many years ago the Second Circuit in *Redington v. Touche Ross & Co.*[132] held that a SIPA trustee could sue as bailee to recover for losses to the fund of securities customer property in a SIPA liquidation.  This decision was in line with decisions allowing a trustee to sue on behalf of creditors of a debtor for generalized harms to the creditors and until recently,[133] was followed by other decisions in the Second Circuit and decisions in other Circuits.[134]

On appeal in *Redington*, the U.S. Supreme Court held that there was no implied federal right of action  under the Securities Exchange Act, but the trustee thereafter pursued an action as a bailee in the New York State Courts under other theories of recovery; after discovery, the actions resulted in a settlement that allowed substantially all customers to be made whole.  The Trustee's suit was based on information gained through the investigation he conducted under the investigatory powers conferred by SIPA (the nature and importance of which this Court has confirmed[135]) and the funds were distributed on the basis of the SIPA claims process.

It makes sense that a Trustee responsible to the Court, given broad investigative authority by statute and administering a process for determining customer claims and distributing funds, should be the party with primary responsibility for bringing a range of actions to restore losses to segregated funds of customer property.  This standing should apply to claims to restore

---

132. *Redington v. Touche Ross & Co ("Redington I")*, 592 F.2d 617, 625 (2d Cir. 1978) ("To the extent that customers have claims that have not been satisfied…[w]e hold that the Trustee, as bailee, is an appropriate real party in interest to maintain this action on their behalf."), *rev'd on other grounds*, 442 U.S. 560 (1979).

133. *See St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989).

134. *See, e.g., Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 800 n.7 (6th Cir. 1995); *Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794, 805 (Bankr. S.D.N.Y. 2002); *SIPC v. Cheshier & Fuller, L.L.P. (In re Sunpoint Sec., Inc.)*, 377 B.R. 513, 550 (Bankr. E.D. Tex. 2007), *aff'd sub. nom. Richardson v. Cheshier & Fuller, L.L.P.*, No. 6:07-CV-256, 2008 WL 5122122 (E.D. Tex. 2008).

135. *See In re MF Global Inc.,* No. 11-2790, 2011 WL 5357959 (Bankr. S.D.N.Y. Nov 4, 2011).

property missing from the segregated fund of commodities customer property, the secured fund

of commodities customer property, and the fund of securities' customers property.  Indeed, this

standing would be a desirable complement to the provisions establishing a private right of action

under the Commodities Exchange Act.

Unfortunately, in recent years some court decisions, in dissimilar factual

situations, have rendered decisions questioning *Redington*'s validity and denied standing or

otherwise placed limitation on a SIPA trustee's rights to bring suit in a custodial or bailee

status.[136]  Partly as a result, in cases such as MFGI a multitude of private class actions are filed in

different jurisdictions on a variety of theories, leading to confusion and duplication of effort

without the advantage of the investigative activities, or claims or distribution mechanisms

already in place for a SIPA trustee.  In addition to running the risk of inconsistent determinations

based on similar if not identical factual patterns, a risk that recoveries could go directly to

plaintiffs instead of being distributed equitably to all injured customers in conjunction with the

claims process.

While the Trustee intends to coordinate and combine his efforts with those of

other plaintiffs in *MFGI*, and while there may be a role for other plaintiffs to supplement that of

a SIPA trustee, the Trustee recommends that Congress act to clarify a trustee's ability to assert

customers' rights to recover customer property through appropriate actions.

---

136. *See Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011); *Picard v. Kohn*, No. 11-1181, 2012 WL 566298
(S.D.N.Y. Feb. 22, 2012).

\*        \*        \*

Dated: New York, New York
June 4, 2012

HUGHES HUBBARD & REED LLP

By:   /s/ James B. Kobak, Jr.
        James B. Kobak, Jr.
        Christopher K. Kiplok
        Jeffrey R. Coleman
        Vilia B. Hayes
        Sarah L. Cave
        One Battery Park Plaza
        New York, New York 10004
        Telephone:  (212) 837-6000
        Facsimile:  (212) 422-4726

Attorneys for James W. Giddens, Trustee for
the SIPA Liquidation of MF Global Inc.

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex A

# Historical changes of the federal funds rate
## 2006 through present



# Interest income and federal funds rate
## MF Global Holdings Ltd. and MF Global Inc.

*9/30/2007 - 6/30/2011*



| Date | Federal Funds Rate | Total Interest Income for MFGH | Total Interest Income for MFGI |
|---|---|---|---|
| 9/30/2007 | 4.75% | 1,258 | 468 |
| 12/31/2007 | 4.25% | 787 | 287 |
| 3/31/2008 | 2.25% | 632 | 72 |
| 6/30/2008 | 2.00% | 346 | 108 |
| 9/30/2008 | 2.00% | 272 | 96 |
| 12/31/2008 | 0 - .25% | 154 | 89 |
| 3/31/2009 | 0 - .25% | 100 | 70 |
| 6/30/2009 | 0 - .25% | 112 | 70 |
| 9/30/2009 | 0 - .25% | 101 | 53 |
| 12/31/2009 | 0 - .25% | 122 | 45 |
| 3/31/2010 | 0 - .25% | 156 | 43 |
| 6/30/2010 | 0 - .25% | 114 | 51 |
| 9/30/2010 | 0 - .25% | 128 | 64 |
| 12/31/2010 | 0 - .25% | 142 | 71 |
| 3/31/2011 | 0 - .25% | 133 | 67 |
| 6/30/2011 | 0 - .25% | 122 | 107 |

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex B

23023536



Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex C



Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex C

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex D

| | Monday 10/3 | Tuesday 10/4 | Wednesday 10/5 | Thursday 10/6 | Friday 10/7 | Monday 10/10 | Tuesday 10/11 | Wednesday 10/12 | Thursday 10/13 | Friday 10/14 | Monday 10/17 | Tuesday 10/18 | Wednesday 10/19 | Thursday 10/20 | Friday 10/21 | Monday 10/24 | Tuesday 10/25 | Wednesday 10/26 | Thursday 10/27 | Friday 10/28 | Monday 10/31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SEGREGATED COMPUTATION (1.25)** | | | | | | | | | | | | | | | | | | | | | |
| Seg-ASSETS "A" | 7,612,767,535 | 7,566,576,322 | 7,221,881,370 | 7,453,716,100 | 7,577,223,526 | 7,373,402,813 | 7,174,295,214 | 7,551,283,448 | 7,552,843,854 | 7,131,714,204 | 7,508,138,837 | 7,273,659,279 | 7,645,644,026 | 7,334,188,025 | 7,405,722,497 | 7,128,129,465 | 6,944,217,285 | 6,271,713,473 | 5,255,834,401 | 4,553,861,240 | 5,039,983,638 |
| Seg-LIABILITIES "B" | 7,203,032,143 | 7,167,767,885 | 6,881,001,649 | 7,025,850,221 | 7,128,482,040 | 6,936,822,446 | 6,815,283,306 | 7,072,719,039 | 7,152,634,572 | 6,909,743,872 | 7,101,707,393 | 6,888,339,174 | 7,214,663,433 | 7,003,881,132 | 6,989,353,299 | 6,731,433,264 | 6,645,463,884 | 6,570,549,340 | 5,668,897,369 | 5,445,326,890 | 5,629,327,646 |
| Excess (Deficit) "A-B" | 409,735,392 | 398,808,437 | 340,879,721 | 427,865,879 | 448,741,486 | 436,580,367 | 359,011,908 | 478,564,409 | 490,009,282 | 221,970,332 | 406,431,444 | 385,320,105 | 430,980,593 | 330,306,893 | 416,369,198 | 396,696,201 | 298,753,401 | (298,835,867) | (413,062,968) | (991,465,650) | (589,344,008) |
| **SECURED COMPUTATION (30.7)** | | | | | | | | | | | | | | | | | | | | | |
| 30.7 ASSETS "C" | 1,451,162,403 | 1,432,466,387 | 1,437,755,590 | 1,329,468,931 | 1,309,498,127 | 1,275,592,716 | 1,313,631,664 | 1,304,850,947 | 1,324,318,692 | 1,247,104,708 | 968,836,243 | 1,279,098,421 | 1,362,509,434 | 1,368,989,775 | 1,362,457,660 | 1,319,323,086 | 1,250,325,879 | 1,042,717,975 | 996,411,959 | 996,820,046 | 891,619,955 |
| 30.7 - LIABILITIES per Alternative Method "D" | 571,564,464 | 586,493,519 | 560,234,532 | 507,437,637 | 474,971,324 | 454,345,596 | 459,793,618 | 469,282,028 | 474,264,809 | 424,608,337 | 484,303,445 | 496,265,999 | 525,316,768 | 520,599,855 | 515,103,759 | 494,454,388 | 480,780,754 | 525,578,220 | 462,993,094 | 381,727,437 | 360,219,187 |
| Excess (Deficit) "C-D" | 879,597,939 | 845,972,868 | 877,521,058 | 822,031,294 | 834,526,803 | 821,247,120 | 853,838,046 | 835,568,919 | 850,053,883 | 822,496,371 | 484,532,798 | 782,832,422 | 837,192,666 | 848,389,920 | 847,353,901 | 824,868,698 | 769,545,225 | 517,139,755 | 533,418,865 | 615,092,609 | 531,400,668 |
| 30.7 - LIABILITIES per Net Liq Method "E" | 1,747,153,951 | 1,748,605,192 | 1,752,193,087 | 1,719,271,411 | 1,705,786,962 | 1,099,646,841 | 1,694,039,958 | 1,714,490,791 | 1,723,271,587 | 1,537,486,384 | 1,393,766,943 | 1,719,193,979 | 1,749,375,521 | 1,686,258,796 | 1,734,011,382 | 1,661,161,314 | 1,527,567,748 | 1,500,626,385 | 1,046,210,929 | 926,517,292 | 887,399,520 |
| 30.7 Net Liq Method Excess (Deficit) "C-E" | (295,991,548) | (316,138,805) | (314,437,497) | (389,802,480) | (396,288,835) | 175,945,875 | (380,408,294) | (409,639,844) | (398,952,895) | (290,381,676) | (424,930,700) | (440,095,558) | (386,866,087) | (317,269,021) | (371,553,722) | (341,838,228) | (277,241,769) | (457,908,410) | (49,798,970) | 70,302,754 | 4,220,335 |
| **COMBINED SEGREGATION AND SECURED** | | | | | | | | | | | | | | | | | | | | | |
| Assets - Seg and 30.7 "A+C"=F | 9,063,929,938 | 8,999,042,709 | 8,659,636,960 | 8,783,185,031 | 8,886,721,653 | 8,648,995,529 | 8,487,926,878 | 8,856,134,395 | 8,877,162,546 | 8,378,818,912 | 8,476,975,080 | 8,552,757,700 | 9,008,153,460 | 8,703,177,800 | 8,768,180,157 | 8,447,452,551 | 8,194,543,264 | 7,314,431,448 | 6,252,246,360 | 5,550,681,286 | 5,931,603,493 |
| COMBINED LIABILITIES per Alternative Method "B+D"=G | 7,774,596,607 | 7,754,261,404 | 7,441,236,181 | 7,533,287,858 | 7,603,453,364 | 7,391,168,042 | 7,275,076,924 | 7,542,001,067 | 7,627,099,381 | 7,334,352,209 | 7,586,010,838 | 7,384,605,173 | 7,739,980,201 | 7,524,480,987 | 7,504,457,058 | 7,225,887,652 | 7,126,244,638 | 7,096,127,560 | 6,131,890,463 | 5,827,054,327 | 5,989,546,833 |
| Excess (Deficit) per Alternative Method "F-G" | 1,289,333,331 | 1,244,781,305 | 1,218,400,779 | 1,249,897,173 | 1,283,268,289 | 1,257,827,487 | 1,212,849,954 | 1,314,133,328 | 1,250,063,165 | 1,044,466,703 | 890,964,242 | 1,168,152,527 | 1,268,173,259 | 1,178,696,813 | 1,263,723,099 | 1,221,564,899 | 1,068,298,626 | 218,303,888 | 120,355,897 | (276,373,041) | (57,943,340) |
| COMBINED LIABILITIES per Net Liq Method "B+E"=H | 8,950,186,094 | 8,916,373,077 | 8,633,194,736 | 8,745,121,632 | 8,834,269,002 | 8,036,469,287 | 8,509,323,264 | 8,787,209,830 | 8,876,106,159 | 8,447,230,256 | 8,495,474,336 | 8,607,533,153 | 8,964,038,954 | 8,690,139,928 | 8,723,364,681 | 8,392,594,578 | 8,173,031,632 | 8,071,175,725 | 6,715,108,298 | 6,371,844,182 | 6,516,727,166 |
| Firm Invested in Excess (Deficit) "F-H" | 113,743,844 | 82,669,632 | 26,442,224 | 38,063,399 | 52,452,651 | 612,526,242 | (21,396,386) | 68,924,565 | 1,056,387 | (68,411,344) | (18,499,256) | (54,775,453) | 44,114,506 | 13,037,872 | 44,815,476 | 54,857,973 | 21,511,632 | (756,744,277) | (462,861,938) | (821,162,896) | (585,123,673) |
| **REGULATORY EXCESS** | 1,175,589,487 | 1,162,111,673 | 1,191,958,555 | 1,211,833,774 | 1,230,815,638 | 645,301,245 | 1,234,246,340 | 1,245,208,763 | 1,249,006,778 | 1,112,878,047 | 909,463,498 | 1,222,927,980 | 1,224,058,753 | 1,165,656,341 | 1,218,907,623 | 1,166,706,926 | 1,046,786,994 | 975,048,165 | 583,217,835 | 544,789,855 | 527,180,333 |
| | | | | | | | | | | | | | | | | | | AS Adjusted for $415 M WIRES | AS Adjusted for $200M WIRES | | |

**NOTES:**

October 26, 2011 cash balance as adjusted for $415 M of outgoing cash wire.
October 27, 2011 as adjusted from filed version for $200 M of outgoing cash wires.
October 31, 2011 - The $589 M segregated computation deficit does not include MFGI's transfer of $220 million from the 15c3-3 account to the FCM.

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex D

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex E

**$1.2 billion unsecured RCF summary**[1]

| Date | Principal balance | Transaction | Description | Overview of drawdown/repayment /use of funds |
|---|---|---|---|---|
| 1/1/2011 | $517,500,000 | | Beginning of the year balance | |
| 1/20/2011 | $442,500,000 | ($75,000,000) | Repayment of RCF funds (orig 12/17/2010) | |
| 2/11/2011 | $317,500,000 | ($125,000,000) | Repayment of RCF funds | |
| 2/22/2011 | $292,000,000 | ($25,500,000) | Repayment of RCF funds | Transaction analysis performed on $1.2 billion RCF activity for the final month of business operations (9/27/2011 – 10/31/2011). |
| 3/30/2011 | $367,000,000 | $75,000,000 | Drawdown of RCF funds (overnight basis) | |
| 4/5/2011 | $292,000,000 | ($75,000,000) | Repayment of RCF funds | |
| 5/13/2011 | $342,000,000 | $50,000,000 | Drawdown of RCF funds (overnight basis) | |
| 8/11/2011 | $242,000,000 | ($100,000,000) | Paydown of $100m of RCF | |
| 9/27/2011 | $317,000,000 | $75,000,000 | Drawdown of RCF funds (overnight basis) | Per Vinay Mahajan's instructions, drawdown for additional liquidity/working capital for the day. |
| 9 /28/2011 | $242,000,000 | ($75,000,000) | Repayment of overnight draw | Repayment of prior day's working capital. |
| 9/29/2011 | $742,000,000 | $500,000,000 | Drawdown of RCF funds (overnight basis) | Repo related counterparties significantly increased the amount of required collateral. $400m was sent from MF Global Finance USA Inc. to MF Global Holdings Ltd. and then to JPM. |
| 9/30/2011 | $642,000,000 | ($100,000,000) | Partial repayment of overnight draw | |
| 10/3/2011 | $242,000,000 | ($400,000,000) | Partial repayment of overnight draw | |
| 10/18/2011 | $367,000,000 | $125,000,000 | Drawdown of RCF funds | Used to cover margin call on sovereign debt. Positions in Ireland, Italy, Spain and Portugal went against the company. Funds sent by JPM as two separate wires in the amount of $71.8m and $53.2m. |
| 10/24/2011 | $597,000,000 | $230,000,000 | Drawdown of RCF funds | Per Edith O'Brien's directive to fund several MF Global Inc. cash needs. The $230m draw appears to have been used to roll with Société Générale €225m Irish repo. |
| 10/25/2011 | $897,000,000 | $300,000,000 | Drawdown of RCF funds | |
| 10/26/2011 | $1,120,583,533 | $223,583,533 | Drawdown of RCF funds | The draw request on 10/26/2011 totaled $303m, which would have maximized MF Global's borrowing capacity under the facility. Edith O'Brien told senior management (Mahajan, Corzine, Abelow, Steenkamp and others) that the unsecured RCF had been fully drawn. The next day, notification was received that five banks did not initially fund on 10/26/2011. Four out of the five banks eventually funded on 10/27/2011. $223m posted as a credit memo and $52m was sent by JPM as two separate wires in the amount of $31.9m and $20.2m. Bank of America was the sole bank in the syndicate that did not fund its portion. |
| 10/27/2011 | $1,172,623,712 | $52,040,179 | Drawdown of RCF funds | |

---

[1] Based on available bank statements, wire analyses, and other forms of supporting documentation, the outstanding principal balance of $1,172,623,712 does not agree directly to the $1,172.9m amount for the lending syndicate.

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex F

# Sovereign RTM margin paid from 10/24 – 10/28

? MF Global Inc. received margin call requests for the European sovereign RTM trades from MF Global UK via daily e-mails. Margin calls were met by posting collateral, typically U.S. treasury bills. Many of these t -bills were funded through excess liquidity from the matched book trading business.

| Date | Total Margin Requirement | Aggregate Collateral Posted | Margin Call |
|------|--------------------------|-----------------------------|-------------|
| 10/21 | $ 457,480,290 | $ 452,795,960 | $ 4,684,330 |
| 10/24 | $ 466,029,079 | $ 457,962,898 | $ 8,066,181 |
| 10/25 | $ 470,580,345 | $ 464,694,118 | $ 5,886,227 |
| 10/26 | $ 601,555,949 | $ 492,732,015 | $108,823,934 |
| 10/27 | $ 665,716,417 | $ 604,003,047 | $ 61,713,370 |
| 10/28 | $ 723,539,856 | $ 663,925,523 | $ 59,614,333 |
| 10/31 | $ 973,539,856 | $ 663,925,523 | $309,614,333 |

? RTM margin paid to MF Global UK was approximately $211m during the final week of operations:
  ? $150m margin call (consisting of t -bills)
  ? $61m cash margin call on 10/28
    ? MF Global Inc. sent $61m in free treasuries (CUSIP 9127955K3) to MF Global UK, which failed delivery.
    ? In response to the failed delivery of treasuries, MF Global Inc. sent a cash wire for $60,969,500 to MF Global UK.

| Date | CUSIP | Collateral Posted |
|------|-------|-------------------|
| 10/24/2011 | 9127955C1 | $ 5,000,000 |
| 10/25/2011 | 9127953G4 | $ 8,000,000 |
| 10/26/2011 | 9127953G4 | $ 5,000,000 |
| 10/26/2011 | 912795Y96 | $ 23,000,000 |
| 10/27/2011 | 9127955K3 | $ 109,000,000 |
| 10/28/2011 | Cash | $ 60,969,500 |
| Collateral Posted (10/24 - 10/28): | | $ 210,969,500 |

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex F

## Timeline of European Sovereign Ratings Downgrades

*(Source: Based on Bloomberg News)*



### Principal Balance of Repo and Reverse Repo Transactions

| Date | Reverse Repo | Repo |
|---|---|---|
| 3 Oct | 3,323,834,930 | 8,941,650,212 |
| 4 Oct | 3,317,591,369 | 8,900,872,651 |
| 5 Oct | 3,245,908,966 | 8,967,508,029 |
| 6 Oct | 3,392,306,345 | 9,036,034,798 |
| 7 Oct | 3,410,255,850 | 9,063,852,596 |
| 10 Oct | 3,413,929,007 | 9,071,315,907 |
| 11 Oct | 3,456,170,572 | 9,185,979,511 |
| 12 Oct | 3,473,925,499 | 9,329,484,918 |
| 13 Oct | 3,503,724,491 | 9,593,169,827 |
| 14 Oct | 3,516,586,581 | 9,489,827,726 |
| 17 Oct | 3,544,657,138 | 9,843,835,010 |
| 18 Oct | 3,515,968,103 | 9,805,523,868 |
| 19 Oct | 3,562,170,293 | 9,776,711,431 |
| 20 Oct | 3,743,639,586 | 9,815,869,538 |
| 21 Oct | 3,619,214,842 | 9,635,986,563 |
| 24 Oct | 3,656,032,254 | 10,080,498,356 |
| 25 Oct | 3,655,876,088 | 10,079,772,304 |
| 26 Oct | 3,926,319,009 | 10,103,005,951 |
| 27 Oct | 4,280,597,067 | 9,817,669,072 |
| 28 Oct | 4,400,820,954 | 9,912,280,194 |
| 31 Oct | 3,872,571,810 | 9,549,126,020 |



This chart indicates the daily principal balances of the repo and reverse repo portfolio between MFGI and MFG UK as reflected in MFGI's records.

### Net Par Balances Snapshot by Country



| Country | 10/3/2011 | 10/31/2011 |
|---------|-----------|------------|
| Belgium | 601,920,000 | 424,260,000 |
| England | -17,990,280 | -18,620,910 |
| France | -1,337,600,000 | -777,810,000 |
| Germany | 0 | 0 |
| Ireland | 300,960,000 | 318,195,000 |
| Italy | 3,808,816,000 | 3,285,610,860 |
| Portugal | 601,920,000 | 636,390,000 |
| Spain | 1,779,008,000 | 2,008,164,000 |
| Total | 5,737,033,720 | 5,876,188,950 |

The chart above summarizes the net par balances by country based on the debt pledged on each repo or reverse repo transaction. Net par balances as of 3 October 2011 and 31 October 2011 were obtained from MFGI's records.

*Germany reflected a EUR -2,500,000 position on a repo transaction and a EUR 2,500,000 position a reverse repo transaction, therefore the net par balance was zero.

**Total Net Exposure**



This chart summarizes the total net exposure of the repo and reverse repo transactions. Daily exposure from 3 October 2011 through 31 October 2011 was obtained from MFGI's records.

If the market value of the security declines, the repo counterparty may be required to post additional collateral (known as a margin call). The chart above depicts this as positive exposure. Conversely, a decline in market value for the reverse repo counterparty is depicted as negative exposure.

Given the declining market value of the sovereign debt portfolio relating to MFGI's net repo position, net exposure increased over the course of the month.

**MF Global vs. Bloomberg Underlying Pricing Data**



The chart above compares MF Global Inc.'s prices of the securities underlying their repo and reverse repo transactions against market prices. MF Global Inc.'s daily prices from 30 September 2011 through 31 October 2011 were obtained from the Exposure Reports. Daily market prices from 30 September 2011 through 31 October 2011 were obtained from Bloomberg Data.

MF Global consistently priced above industry price for both repo and reverse repo transactions.

## Margin Requirements vs. Collateral Posted

| Date | Margin Requirement | Collateral Posted |
|------|-------------------|-------------------|
| 9/30 | 417,681,701 | 528,503,372 |
| 10/3 | 445,992,555 | 470,385,849 |
| 10/4 | 443,837,694 | 447,744,965 |
| 10/5 | 448,782,721 | 444,995,749 |
| 10/6 | 440,374,291 | 448,402,444 |
| 10/7 | 433,649,122 | 448,537,360 |
| 10/10 | 438,233,735 | 450,802,651 |
| 10/11 | 426,191,314 | 437,743,094 |
| 10/12 | 432,478,592 | 427,963,253 |
| 10/13 | 425,978,743 | 431,374,556 |
| 10/14 | 432,319,623 | 427,337,643 |
| 10/17 | 431,902,715 | 430,892,493 |
| 10/18 | 447,952,120 | 430,943,455 |
| 10/19 | 447,123,983 | 446,187,007 |
| 10/20 | 452,582,722 | 451,731,735 |
| 10/21 | 458,480,290 | 452,795,960 |
| 10/24 | 466,029,079 | 457,962,898 |
| 10/25 | 470,580,345 | 464,694,118 |
| 10/26 | 601,555,949 | 492,732,015 |
| 10/27 | 665,716,417 | 604,003,047 |
| 10/28 | 723,539,856 | 663,925,523 |
| 10/31 | 973,539,856 | 663,925,523 |



The chart above shows the daily total margin requirements vs. the daily total collateral posted using the Margin Call Statements for 30 September 2011 through 28 October 2011. The differences in these values represent the daily margin calls or collateral excesses.

For the final week in October 2011, there was a consistent increase in Margin Requirements which culminated, on 31 October 2011, with a $310,000,000 Margin Call, which was not posted.

Of the $310,000,000 Margin Call, $250,000,000 was requested as part of an email dated 31 October 2011 in addition to the $60,000,000 that was part of the Margin Call Statement.

## Consolidated Margin Call Information from 10/3/11 through 10/31/11



| Date | Initial Margin | Variation Margin | Buffer Margin | Increase Coverage | Total Margin Requirement | Aggregate Collateral Posted | Margin Call |
|---|---|---|---|---|---|---|---|
| 10/3 | 292,764,542 | 148,228,013 | 5,000,000 | | 445,992,555 | 470,385,849 | -24,393,294 |
| 10/4 | 289,371,060 | 149,466,634 | 5,000,000 | | 443,837,694 | 447,744,965 | -3,907,271 |
| 10/5 | 298,165,000 | 145,617,721 | 5,000,000 | | 448,782,721 | 444,995,749 | 3,786,972 |
| 10/6 | 300,273,203 | 135,101,088 | 5,000,000 | | 440,374,291 | 448,402,444 | -8,028,153 |
| 10/7 | 299,838,948 | 128,810,174 | 5,000,000 | | 433,649,121 | 448,537,360 | -14,888,239 |
| 10/10 | 306,975,526 | 126,258,209 | 5,000,000 | | 438,233,735 | 450,802,651 | -12,568,916 |
| 10/11 | 288,911,693 | 132,279,621 | 5,000,000 | | 426,191,314 | 437,743,094 | -11,551,780 |
| 10/12 | 292,890,650 | 134,587,942 | 5,000,000 | | 432,478,592 | 427,963,253 | 4,515,339 |
| 10/13 | 275,396,318 | 145,582,425 | 5,000,000 | | 425,978,744 | 431,374,556 | -5,395,812 |
| 10/14 | 275,998,850 | 151,320,773 | 5,000,000 | | 432,319,623 | 427,337,643 | 4,981,980 |
| 10/17 | 275,899,318 | 151,003,397 | 5,000,000 | | 431,902,715 | 430,892,493 | 1,010,222 |
| 10/18 | 273,939,212 | 167,180,609 | 5,000,000 | | 446,119,821 | 430,943,455 | 15,176,366 |
| 10/19 | 274,943,374 | 169,012,908 | 5,000,000 | | 448,956,282 | 446,187,007 | 2,769,275 |
| 10/20 | 273,604,300 | 173,978,422 | 5,000,000 | | 452,582,722 | 451,731,735 | 850,987 |
| 10/21 | 277,679,686 | 174,800,604 | 5,000,000 | | 457,480,290 | 452,795,960 | 4,684,330 |
| 10/24 | 278,049,205 | 182,979,874 | 5,000,000 | | 466,029,079 | 457,962,898 | 8,066,181 |
| 10/25 | 277,302,875 | 188,277,470 | 5,000,000 | | 470,580,345 | 464,694,118 | 5,886,227 |
| 10/26 | 410,963,534 | 185,592,415 | 5,000,000 | | 601,555,949 | 492,732,015 | 108,823,934 |
| 10/27 | 454,624,390 | 182,811,558 | 5,000,000 | 23,280,469 | 665,716,417 | 604,003,047 | 61,713,370 |
| 10/28 | 495,975,763 | 199,344,353 | 5,000,000 | 23,219,740 | 723,539,856 | 663,925,523 | 59,614,333 |
| 10/31 | 745,975,763 | 199,344,353 | 5,000,000 | 23,219,740 | 973,539,856 | 663,925,523 | 309,614,333 |

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex F

**MFGI Realized and Unrealized Profit and Loss on RTM Transactions as of 10/31/11**



Net P&L in MFGI

$2,745,765    $914,415

$20,127,245

■ Matured and Settled    ■ Matured and Unsettled    ■ Open Positions



| P&L Category | Gross P&L in MFGI | Mgmt Fee to MFG UK | Net P&L in MFGI |
|---|---|---|---|
| Matured and Settled | 10,983,062 | 8,237,296 | 2,745,765 |
| Matured and Unsettled | 3,657,662 | 2,743,246 | 914,415 |
| Open Positions | 80,508,981 | 60,381,736 | 20,127,245 |
| **Total** | **95,149,704** | **71,362,278** | **23,787,426** |

The chart above, based on the P&L Data, shows the breakdown of profit and loss between MFGI and MFGUK as of 31 October 2011.

P&L Category

➢ Matured and Settled positions represent realized profit and loss in which cash has settled
➢ Matured and Unsettled positions represent realized profit and loss in which cash has not settled
➢ Open Positions have not matured and will likely have P&L adjustments as they are liquidated post-bankruptcy

*Under the IMA, MFGUK was to receive 80% of P&L represented as a management fee (75% of the gross P&L when settled and 5% is taken up front.)

### MFGI Realized and Unrealized Profit and Loss on RTM Transactions as of 10/31/11



| Month End | Cumulative P&L |
| --- | --- |
| 9/30/2010 | 12,826,855 |
| 10/31/2010 | 12,826,855 |
| 11/30/2010 | 19,418,210 |
| 12/31/2010 | 34,974,524 |
| 1/31/2011 | 34,974,524 |
| 2/28/2011 | 40,659,062 |
| 3/31/2011 | 75,710,240 |
| 4/30/2011 | 75,710,240 |
| 5/31/2011 | 75,680,584 |
| 6/30/2011 | 108,771,996 |
| 7/31/2011 | 110,900,044 |
| 8/31/2011 | 110,763,508 |
| 9/30/2011 | 110,318,363 |
| 10/31/2011 | 95,149,704 |

The chart above shows the cumulative profit and loss beginning on 16 September 2010 through 31 October 2011, based on the P&L Data, a substantial portion of which was still unrealized as of 31 October 2011.

Profit and loss was booked as of the trade date. The portfolio had an upward trend in profit from 16 September 2010 through 29 July 2011, at which point losses began to increase.

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex F

**MFGI Realized and Unrealized Profit and Loss on RTM Transactions from August 2011 through October 2011**



| Date Booked | P&L | Cumulative P&L |
|---|---|---|
| 8/17/2011 | 4,518 | 4,518 |
| 8/23/2011 | (8,834) | (4,317) |
| 8/24/2011 | (22,657) | (26,973) |
| 8/25/2011 | (111,797) | (138,770) |
| 8/26/2011 | 3,909 | (134,861) |
| 8/31/2011 | (1,675) | (136,536) |
| 9/1/2011 | (122,232) | (258,768) |
| 9/12/2011 | (5,809) | (264,577) |
| 9/14/2011 | (36,888) | (301,464) |
| 9/20/2011 | (82,593) | (384,057) |
| 9/21/2011 | (44,521) | (428,578) |
| 9/23/2011 | (153,103) | (581,681) |
| 10/5/2011 | (6,478) | (588,159) |
| 10/12/2011 | (965) | (589,124) |
| 10/13/2011 | 27,405 | (561,719) |
| 10/14/2011 | (125,736) | (687,455) |
| 10/17/2011 | (2,746) | (690,201) |
| 10/19/2011 | (64,459) | (754,661) |
| 10/24/2011 | (26,072) | (780,733) |
| 10/26/2011 | (401,149) | (1,181,882) |
| 10/27/2011 | (14,568,458) | (15,750,340) |

The chart above shows the dates when profit and loss was booked, the profit and loss amount and the cumulative profit and loss beginning in August 2011 through October 2011, based on the P&L Data.

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex F

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex G

## Liquidity Dashboard

($ millions)

| | 10/24/2011 | 10/25/2011 | 10/26/2011 | 10/27/2011 | 10/28/2011 |
|---|---|---|---|---|---|
| SOURCES | 470.0 | 440.0 | 425.0 | 281.0 | |
| USES | (808.0) | (873.0) | (1,304.0) | (1,070.0) | |
| **B/D liquidity** | **(338.0)** | **(433.0)** | **(879.0)** | **(789.0)** | |
| Total FINCO Balance | 254.0 | 254.0 | 224.0 | 252.0 | |
| RCF Draw | 355.0 | 655.0 | 655.0 | 888.0 | |
| Remaining FREE CASH (FINCO) | 271.0 | 476.0 | - | 351.0 | |
| Available FCM CASH | 30.0 | 60.0 | (59.0) | 82.0 | |
| **Total Available Liquidity** | **301.0** | **536.0** | **(59.0)** | **433.0** | |

## Liquidity Recap

($ millions)

| | 10/26/2011 | | 10/27/2011 | 10/28/2011 |
|---|---|---|---|---|
| | (A) | (B) | | |
| Excess Cash Margin/Haircuts | 425.0 | 425.0 | 115.0 | - |
| Haircut/Margin Paid | (793.0) | (793.0) | (1,020.0) | (945.0) |
| Box Collateral | (606.0) | (606.0) | (215.0) | (177.0) |
| **Net Cash Excess / (Deficits)** | (974.0) | (974.0) | (1,120.0) | (1,122.0) |
| MFGI Cash | 77.0 | - | - | - |
| Total MF Finance Company Free Cash | - | - | 82.0 | 25.0 |
| RCF Committed Draw | 897.0 | 897.0 | 1,120.0 | 1,120.0 |
| Excess Cash and Fully Paid for Securities | - | - | 602.0 | 210.0 |
| **Total Unsecured Funding** | 974.0 | 897.0 | 1,804.0 | 1,355.0 |
| **Net Liquidity** | - | (77.0) | 684.0 | 233.0 |
| **Available Committed Lines** | 458.0 | 458.0 | 166.0 | 203.0 |

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex G

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex H



MF Global Holdings Ltd. (MFGLQ.PK)
Historical Stock Price
July 26, 2007 - October 31, 2011

Close price adjusted for dividends and splits

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex H

1



### MF Global Holdings Ltd. (MFGLQ.PK)
#### Historical Stock Prices
#### October 17 - 31, 2011

Close price adjusted for dividends and splits

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex H

2

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex I





**Cash Transactions (Net)**
*MFGI Accounts by Type*
October 26 - October 31, 2011



**Cash Transactions (Net)**
*Affiliates*
October 26 - October 31, 2011



**Cash Transactions (Net)**
*Exchanges*
October 26 - October 31, 2011



\* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown flowing to BD – House represents the net amount
of daily settlements (normal course). Amounts shown flowing to DTC from BD –
House represents margin call payments to DTC.

5



**Cash Transactions (Net)**
*Lending / Settlement Banks*
October 26 - October 31, 2011

MFGI Cash Account Group by Regulatory Purpose

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$1,526,094,972

$2,996,860

$10,127,561

$176,407

$165,000,000

**Lending**

$165,000,000

| JPMC Loan Credit* (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan ** | JPMC Loan & Agency Houston Branch |

\* Represents credits (clearance advances) to MFGI's account posted by JPMC as they claimed custody of collateral

\*\*Net loan from JPMC represents a miscellaneous deposit of $130,000,000 less repayment of principal and interest of $127,000,000 and 3,140, respectively.

**Settlement**

$19,712,000     $2,721,125     $15,961,425

| BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

6



**Cash Transactions (Gross)**
*MFGI Accounts by Type*
October 26, 2011





**Cash Transactions (Gross)**
*MFGI Accounts – BD vs. FCM*
October 26, 2011

3



**Cash Transactions (Gross)**
*Affiliates*
October 26, 2011

4

**Cash Transactions (Gross)**
*Exchanges*
October 26, 2011



\* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.

5



**Cash Transactions (Gross)**
*Lending / Settlement Banks*
October 26, 2011

MFGI Cash Account Group by Regulatory Purpose

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$25,078

$10,127,561

$20,000

$112,002,769

$436,000

$4,006,621

| JPMC Loan Credit (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan * | JPMC Loan & Agency Houston Branch | | BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

*Net loan from JPMC represents a repayment of principal and interest of $112,000,000 and $2,769, respectively. Principal repayment was made in 2 separate wires for $84,416,053 and $27,583,947. The repayment appears to be related to a clearance advance of $112,000,000 posted on 10/25.

Lending

Settlement

6



**Cash Transactions (Net)**
*Overview of Transaction Flow*
October 26, 2011



**Cash Transactions (Net)**
*MFGI Accounts by Type*
October 26, 2011

MFGI - Cash Bank Accounts (BD)

BD – House

$449,704,687

$87,000,000

$148,391,247

BD – Reserve Cash 15C33

MFGI - Cash Bank Accounts (FCM)

FCM – House

$280,000,000    $200,000,000

FCM – Customer Seg

$64,600,000

FCM – Foreign Secured

$300,002,850

MFGI – Securities / Clearing Accounts

$183,654,880    $382,896,216

BD – House MN (JPM)

BD – House XGX (BONY)

BD – House* XZF (BONY)

* XZF is linked to XGX and therefore considered a BD – House account ; however, it is used solely for funding of tri-party repo's with FCM Customer assets.

MFGI – Custody / Safekeep Accounts

$4,997,500    $145,228

BD – House Safekeep (Harris x86427)

FCM – House Safekeep (Harris x78564)

$181,990,001    $22,988,500

FCM – Customer Safekeep (Harris x79544)

FCM – Foreign Safekeep (Harris x85981)

2



**Cash Transactions (Net)**
*MFGI Accounts – BD vs. FCM*
October 26, 2011

**Cash Transactions (Net)**
*Affiliates*
October 26, 2011



**Cash Transactions (Net)**
*Exchanges*
October 26, 2011



* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.



**Cash Transactions (Net)**
*Lending / Settlement Banks*
October 26, 2011

**MFGI Cash Account Group by Regulatory Purpose**

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$25,078

$10,127,561

**Lending**

$112,002,769

| JPMC Loan Credit (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan * | JPMC Loan & Agency Houston Branch |

*Net loan from JPMC represents a repayment of principal and interest of $112,000,000 and $2,769, respectively. Principal repayment was made in 2 separate wires for $84,416,053 and $27,583,947. The repayment appears to be related to a clearance advance of $112,000,000 posted on 10/25.

**Settlement**

$436,000        $3,986,621

| BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

6





**Cash Transactions (Gross)**
*MFGI Accounts by Type*
October 27, 2011

**MFGI - Cash Bank Accounts (BD)**

BD – House

$192,188

$123,200,000

$22,870,194    $230,000

$7,733,484,609

BD – Reserve
Cash 15C33

**MFGI - Cash Bank Accounts (FCM)**

FCM – House

$20,438,726

$540,000,000

$227,000,000

$73,591,270

$602,500,000

$2,469,774    FCM – Customer
Seg                    $17,000,000    FCM – Foreign
Secured

$23,000,000    $148,000,000

$440,001,400    $1,846,689,521                    $22,988,526

**MFGI – Securities / Clearing Accounts**

$7,863,714,568    $292,000,000

$200,000,000

BD – House
MN
(JPM)

BD – House
XGX
(BONY)

BD – House*
XZF
(BONY)

* XZF is linked to XGX and therefore considered a BD – House account ; however,
it is used solely for funding of tri-party repo's with FCM Customer assets.

**MFGI – Custody / Safekeep Accounts**

$74,962,500

BD – House
Safekeep
(Harris x86427)

FCM – House
Safekeep
(Harris x78564)

$94,061,916    $77,961,000

FCM – Customer
Safekeep
(Harris x79544)

FCM – Foreign
Safekeep
(Harris x85981)

2



**Cash Transactions (Gross)**
*MFGI Accounts – BD vs. FCM*
October 27, 2011

3

**Cash Transactions (Gross)**
*Affiliates*
October 27, 2011



**Cash Transactions (Gross)**
*Exchanges*
October 27, 2011



* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.

5

**Cash Transactions (Gross)**
*Lending / Settlement Banks*
October 27, 2011





**Cash Transactions (Net)**
*Overview of Transaction Flow*
October 27, 2011

**Cash Transactions (Net)**
*MFGI Accounts by Type*
October 27, 2011



2



**Cash Transactions (Net)**
*MFGI Accounts – BD vs. FCM*
October 27, 2011

3

**Cash Transactions (Net)**
*Affiliates*
October 27, 2011



4

**Cash Transactions (Net)**
*Exchanges*
October 27, 2011



* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.

**Cash Transactions (Net)**
*Lending / Settlement Banks*
October 27, 2011

MFGI Cash Account Group by Regulatory Purpose

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$15,000,000    $151,329

$165,000,000

$19,276,000    $2,849,335

| JPMC Loan Credit (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan | JPMC Loan & Agency Houston Branch | | BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

Lending

Settlement

6



**Cash Transactions (Gross)**
*MFGI Accounts by Type*
October 28, 2011





**Cash Transactions (Gross)**
*MFGI Accounts – BD vs. FCM*
October 28, 2011

3

**Cash Transactions (Gross)**
*Affiliates*
October 28, 2011



**Cash Transactions (Gross)**
*Exchanges*
October 28, 2011



Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.



**Cash Transactions (Gross)**
*Lending / Settlement Banks*
October 28, 2011

**MFGI Cash Account Group by Regulatory Purpose**

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$219,000,000

$1,875

$187,472

$130,000,000

$15,000,371

$165,000,000

$2,273,000    $9,312,940

**Lending**

| JPMC Loan Credit* (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan ** | JPMC Loan & Agency Houston Branch |

* Represents credits (clearance advances) to MFGI's account posted by JPMC as they claimed custody of collateral

**Net loan from JPMC represents a repayment of principal and interest of $15,000,000 and $371, respectively.

**Settlement**

| BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

6



**Cash Transactions (Net)**
*Overview of Transaction Flow*
October 28, 2011



**Cash Transactions (Net)**
*MFGI Accounts by Type*
October 28, 2011

**MFGI - Cash Bank Accounts (BD)**

BD – House

$200,006,250

$163,800,000

BD – Reserve
Cash 15C33

**MFGI - Cash Bank Accounts (FCM)**

FCM – House

$128,000,000

$249,500,000

$29,945,381

FCM – Customer
Seg

$149,100,000

FCM – Foreign
Secured

$400,000,667

**MFGI – Securities / Clearing Accounts**

$333,681,943

$189,000,000

BD – House
MN
(JPM)

BD – House
XGX
(BONY)

BD – House*
XZF
(BONY)

* XZF is linked to XGX and therefore considered a BD – House account ; however,
it is used solely for funding of tri-party repo's with FCM Customer assets.

**MFGI – Custody / Safekeep Accounts**

BD – House
Safekeep
(Harris x86427)

FCM – House
Safekeep
(Harris x78564)

$150,239,541

FCM – Customer
Safekeep
(Harris x79544)

FCM – Foreign
Safekeep
(Harris x85981)

2



**Cash Transactions (Net)**
*Affiliates*
October 28, 2011

MFGI – Securities / Clearing

MFGI: Cash Account Group by Regulatory Purpose

XGX (BONY)

BD – Reserve Cash 15C33

BD – House

FCM – Foreign Secured

FCM – House

FCM – Customer Seg

$55,000,000

3,236,990

$18,464,000

$1,184,018

$4,108,260

MFG Finance NA (FinCo)

$1,759,744

$1,855,610

$175,874,000

$48,163,386

$60,969,500

MFGH Ltd (HoldCo)

$586,589

MFG Holdings USA

MFG UK LTD

MF Global FX LLC

MF GLOBAL CANADA CO

$18,056,000

$2,000,000

MFG Special Investor

MFG Mkt Svcs LLC

MFG Capital LLC

Affiliates – Cash: FinCo & HoldCo

Affiliates – Cash: Other Entities

4

**Cash Transactions (Net)**
*Exchanges*
October 28, 2011



Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.



**Cash Transactions (Net)**
*Lending / Settlement Banks*
October 28, 2011

MFGI Cash Account Group by Regulatory Purpose

| BD – Reserve Cash 15C33 | BD – House | | FCM – Foreign Secured | FCM – House | FCM – Customer Seg |

$219,000,000

$130,000,000

$15,000,371

$165,000,000

$2,271,125    $9,125,468

**Lending**

| JPMC Loan Credit* (Clearance Advance) | JPMC Loan Credit (Misc Deposit) | JPMC Net Loan ** | JPMC Loan & Agency Houston Branch |

\* Represents credits (clearance advances) to MFGI's account posted by JPMC as they claimed custody of collateral

\*\*Net loan from JPMC represents a repayment of principal and interest of $15,000,000 and $371, respectively.

**Settlement**

| BONY Global Custody NY | COBANK ("Man Financial Inc Settlement Account") | JP MORGAN CLEARING CORP / SECURITIES LLC |

6



**Cash Transactions (Gross)**
*Overview of Transaction Flow*
October 31, 2011



**Cash Transactions (Gross)**
*MFGI Accounts by Type*
October 31, 2011



**Cash Transactions (Gross)**
*MFGI Accounts – BD vs. FCM*
October 31, 2011

**Cash Transactions (Gross)**
*Affiliates*
October 31, 2011





No Activity with Affiliates on
10/31/11



4

**Cash Transactions (Gross)**
*Exchanges*
October 31, 2011



* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.



**Cash Transactions (Gross)**
*Lending / Settlement Banks*
October 31, 2011





**Cash Transactions (Net)**
*MFGI Accounts by Type*
October 31, 2011

2



**Cash Transactions (Net)**
*MFGI Accounts – BD vs. FCM*
October 31, 2011

3

**Cash Transactions (Net)**
*Affiliates*
October 31, 2011







No Activity with Affiliates on
10/31/11



4

**Cash Transactions (Net)**
*Exchanges*
October 31, 2011



\* Payments to DTC from BD – House are presented based on the nature of the
transaction. The amount shown on the green line represents daily settlements
(normal course). Amounts shown on the blue line represents margin call payments
to DTC.

5



**Cash Transactions (Net)**
*Lending / Settlement Banks*
October 31, 2011

Report of Trustee's Investigation and Recommendations - June 4, 2012 - Annex J

**Matched Book Trading**



Matched book trading involves anticipating which securities will be in demand, and taking positions accordingly. Profits come from accurately predicting the direction of interest rates and the supply of, and demand for, specific securities.

Matched book trading can also provide additional liquidity to a firm's trading divisions. Securities borrowed to finance in-house trading activities may be passed to the relevant trading divisions at cost.

Financial institutions with the highest credit rating, and the most capital, are in the best position to develop large and sophisticated repo operations. Banks and other financial institutions are most likely to extend credit to them at the lowest rates, and investors are more likely to lend securities to them.

## Matched Book Trading Example



In the example above, MFG US engaged in matched book trades between REITs and JPMorgan. Hypothetically, they took advantage of arbitrage opportunities in these types of trades to generate excess liquidity.

Some of the excess liquidity generated from matched book trading was used to fund margin call requirements for the RTM business.