UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK                NOT FOR PUBLICATION

In re:

MF GLOBAL INC.,                              Case No. 11-2790 (MG) SIPA

Debtor.

# MEMORANDUM OPINION AND ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF AN AGREEMENT PROVIDING FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION OF THE MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE

*A P P E A R A N C E S:*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York  10004
By:    James B. Kobak, Esq.
       Jeffrey S. Margolin, Esq.

MORRISON & FOERSTER LLP
*Counsel for Louis J. Freeh, Chapter 11 Trustee*
1290 Avenue of the Americas
New York, New York 10104
By:    Brett H. Miller, Esq.
       William M. Hildbold, Esq.

JENNER & BLOCK LLP
*Counsel for CME Group Inc., Chicago Mercantile Exchange Inc., Board of Trade of the City of Chicago, Inc., New York Mercantile Exchange, Inc., Commodity Exchange, Inc. and GFX Corp.*
919 Third Avenue, 38th Floor
New York, New York 10022
By:    Heather D. McArn, Esq.
       Carl N. Wedoff, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800

Washington, D.C. 20005
By:    Josephine Wang, Esq.
         Christopher H. Larosa, Esq.

U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Plaza
1155 21st Street N.W.
Washington, D.C. 20581
By:    Robert B. Wasserman, Esq.

JAMES L. KOUTOULAS
*Counsel for the Commodity Customer Coalition*
190 S. LaSalle St., #3000
Chicago, IL 60603
By:    James L. Koutoulas, Esq.

PAUL HAMANN
*Pro Se*
511 Beverly
Lake Forest, Illinois 60045

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is a motion (the "CME Agreement Motion," ECF Doc. # 2029) seeking the Court's approval of a Limited Agreement and Reservation of Rights (the "Agreement") between the James W. Giddens (the "SIPA Trustee"), as Trustee for the liquidation of the business of MF Global Inc. ("MFGI" or the "Debtor") and CME Group Inc. ("CMEG"), on its own behalf and on behalf of each and all of its exchange subsidiaries, and GFX Corporation ("GFX") (collectively, "CME Group"). The Agreement will effectuate the return of at least $130 million toward the payment of allowed customer claims in the SIPA liquidation of MFGI. Paul Hamann, a commodities customer of MF Global, Inc., filed an objection to the CME Agreement Motion and another motion seeking entry of an order authorizing the SIPA Trustee to file under seal Exhibit A to the Agreement (the "Sealing Motion," ECF Doc. # 2146). The Court heard argument on both the CME Agreement Motion

and the Sealing Motion on August 8, 2012. The Court issued an opinion and order granting the Sealing Motion (ECF Doc. # 2798); the CME Agreement Motion was taken under submission. For the reasons discussed below, the Court **OVERRULES** Mr. Hamann's objection to the CME Agreement Motion and **GRANTS** the CME Agreement Motion.

## I. BACKGROUND

### A. The History of the CME/MFGI Relationship

Prior to November 1, 2011 (the "Petition Date"), MFGI was a futures commission merchant ("FCM") and a significant clearing member on the Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX") (together, the "Exchanges"). On the Petition Date, the CME suspended MFGI as a clearing member under its rules. Four classes of property have been identified as existing in the liquidation of MFGI's FCM: (i) property related to commodity futures and options trading by former MFGI customers on domestic exchanges ("Section 4d Property"); (ii) property related to commodity futures and options trading by former MFGI customers on non-domestic exchanges ("Rule 30.7 Property" and together with Section 4d Property, "Segregated Property"); (iii) property related to warehouse receipts, precious metal certificates, shipping certificates, and other certificates of title for commodities held by MFGI for its customers ("Delivery Property"); and (iv) all other property of the MFGI estate, including property that is or was proprietary to MFGI's FCM business ("Non-Segregated Property").

CME Group and a number of its affiliates have asserted claims against MFGI as commodity futures customers, arising out of unpaid clearing fees, exchange fees, rent,

indemnification, and other MFGI obligations to CME Group and its affiliates, and pursuant to a number of CME Group rules (collectively, the "Exchange Rules").[1]

### B. The CME Agreement Motion

On June 14, 2012, the SIPA Trustee filed the CME Agreement Motion seeking entry of an order pursuant to section 105(a) of the Bankruptcy Code, made applicable to this proceeding by SIPA sections 78$fff$(b) and 78$fff$-1(a), and Bankruptcy Rule 9019 approving the Agreement, which provides for (i) disposition of the MFGI Property, (ii) subordination of the CME Claim and the GFX Claims to all customer claims; (iii) liquidation and/or sale of the Exchange Memberships and CME Group Shares; (iv) disposition of claims asserted under the Exchange Rules and modification of the automatic stay in the SIPA Proceeding to the extent necessary; and (v) allocation of a portion of the MFGI Property to MFGI's customer estates. In support of the CME Agreement Motion, the Trustee submits the declaration of Anson B. Frelinghuysen (the "Declaration"). (ECF Doc. # 2716.)

In summary, the Motion seeks the Court's approval of an agreement that ultimately allocates at least $130 million toward the payment of allowed customer claims in the SIPA liquidation of MFGI. The Agreement provides for the complete disposition of all MFGI

---

[1] CME Rule 913.B ("Rule 913.B") directs the satisfaction of specified obligations from a withdrawing firm's guaranty fund deposit and other property, and, in pertinent part provides:

> When a clearing member withdraws from clearing membership (whether voluntarily or involuntarily), its guaranty fund deposit, the proceeds from the sale of its memberships assigned for clearing qualification or any other deposits required by the Clearing House, and any remaining assets available to the Exchange including, but not limited to, memberships will be released when Exchange staff determines that the following has occurred: (1) all contracts and obligations with the Exchange have been settled and paid, (2) all sums owing to the Exchange have been paid, (3) all obligations to other members and customers arising out of claims directly related to futures transactions cleared on the Exchange have been paid or otherwise provided for . . . .

CME Rule 110, CBOT Rule 110, and NYMEX Rule 110 (collectively, "Rule 110") direct the satisfaction of certain member and non-member obligations from the proceeds of the sale of exchange memberships and grant the CME Group's claims against a withdrawing firm priority over the claims of public customers.

4

property at the CME Group. Only $16.5 million of the $175 million in property at issue will be directed towards payment of certain Exchange Rule-based claims; the remainder transfers to the Trustee, with the vast majority earmarked for customers. The Agreement also eliminates a duplicate customer-claims process from unfolding under the Exchange Rules and memorializes the voluntary subordination of more than $30 million in claims by the CME Group to the claims of MFGI's customers.

A number of parties filed joinders and memoranda in support of the CME Agreement Motion.[2] Additionally, Louis J. Freeh (the "Chapter 11 Trustee") originally planned on filing an objection to the CME Agreement Motion. The Chapter 11 Trustee initially took issue with the SIPA Trustee's plan to immediately allocate $130 million received from the Agreement to MFGI's commodities customers. However, after extensive negotiations between the two estates, the Chapter 11 Trustee has agreed not to object to the CME Agreement Motion and reserve his rights to contest the motion and the Agreement with respect to the allocation of the MFGI Property to Section 4d Property and Rule 30.7 Property. Pursuant to the resolution, which was reflected in a revised proposed order (ECF Doc. # 2603), the Chapter 11 Trustee may contest the CME Agreement Motion and the Agreement if: (1) the SIPA Trustee allocates more than $65 million of MFGI Property (defined below) to either of the Section 4d Property or Rule 30.7 Property; (2) the SIPA Trustee holds less than $65 million in Section 4d Property or Rule 30.7 Property (or such higher amount should the SIPA Trustee allocate more than $65 million to either or both of the Section 4d Property and Rule 30.7 Property pursuant to the Agreement) in

---

[2] Specifically, the CME filed a joinder in support of the CME Agreement Motion (the "CME Joinder," ECF Doc. # 2030); certain commodities customers and proposed class of similarly situated commodities customers in the consolidated MFGI-related actions pending before the Honorable Victor Marrero filed a limited joinder in support of the CME Agreement Motion (ECF Doc. # 2262); SIPC filed a memorandum in support of the CME Agreement Motion (ECF Doc. # 2280); and, the Commodities Futures Trading Commission filed a statement in support of the CME Agreement Motion (ECF Doc. # 2284).

reserves for such property pools; or (3) the SIPA Trustee allocates property of the MFGI general estate to any customer property pool. If the Chapter 11 Trustee contests the CME Agreement Motion and Agreement, the contest shall be deemed as if having been made in response to the motion and the standards set forth therein and shall be deemed as if having been made prior to the entry of the order approving the motion. If the Chapter 11 Trustee succeeds in contesting the CME Agreement Motion, all funds will be returned to the CME Group, but in no event shall any customers or creditors be liable for or required to return any property delivered to them by the SIPA Trustee or the CME Group pursuant to the terms of the Agreement.

### C. The Terms of the Agreement

The Agreement provides for: (i) the liquidation and delivery of over $160 million in MFGI property held or controlled by the CME Group; (ii) the elimination of a duplicate customer claims process under the Exchange Rules, including the bulk determination, disposition, or limited payment of such claims, and the modification of the automatic stay to the extent necessary; (iii) the subordination and disposition of the CME Group's claim and GFX's claims in MFGI's liquidation proceeding; and (iv) the allocation of a portion of the MFGI Property to MFGI's customers.

According to the Agreement, on the Petition Date, CME Group maintained Section 4d Property relating to MFGI's former commodities customers of $2,430,038,750. Additionally, CME Group maintains possession or control over the following property (the "MFGI Property"):

- $161,048,885.71 in cash and cash equivalents (the "Guaranty Fund Deposit") collectively held by the Exchanges and posted to them by MFGI as guaranty fund money pursuant to CME Rule 816 (Agreement § 1.1.2);
- $13,416,113.97 in cash and cash equivalents (the "House Origin Funds") in MFGI's house origin account at the Exchanges, which is the remainder in the account subsequent to the auction (organized and effectuated by CME Group) and transfer of certain open proprietary commodity futures positions and associated margin to a third party on November 1, 2011 (Agreement § 1.1.3);

6

- 12,000 shares of CME Group Inc. common stock (the "CME Group Shares") held through the stock registrar/transfer agent (Agreement § 1.1.4); and
- 35 memberships of various classes on various Exchanges (the "Exchange Memberships") (Agreement § 1.1.5).

Under the terms of the Agreement, the following will occur to effect the disposition of the MFGI Property:

- CME Group will deliver the full amount of the Guaranty Fund Deposit and House Origin Funds to the Trustee, less sixteen and a half million dollars ($16,500,000) (the "Set-Aside Funds") (Agreement § 3.1.1);
- The Trustee will request that the stock registrar/transfer agent transfer the CME Group Shares and transfer any post-Filing Date dividend payments, to the Trustee, and CME Group shall provide the stock registrar/transfer agent with appropriate approvals, confirmations, and/or other documentation as may be required to complete such transfer. The Trustee will thereafter liquidate all CME Group Shares (Agreement § 3.1.2); and
- The Trustee will sell the Exchange Memberships in an orderly process pursuant to the Exchange Rules and without the need of further Court approval, and upon the sale of each Exchange Membership, CME Group will transfer the full proceeds of such sale to the Trustee. (Agreement § 3.1.3)

1. *Customer and Non-Customer Claims*

With the exception of customer claims relating to exchange fee rebates that have not been credited to MFGI customer accounts ("Fee Rebate Claims"), under the Agreement, all customer claims asserted under the Exchange Rules will be deemed determined and provided for in accordance with the provisions of the Agreement. The Agreement also provides that, within thirty days of the effective date, the SIPA Trustee will provide to the CME Group a list of the customer accounts entitled to CME Group fee rebates. Each such customer whose rebate has not been credited to their MFGI customer account may be deemed to have filed a claim under Rule 913 and/or Rule 110 without the need to submit a formal claim with the CME Group, and the CME Group may rely upon the list provided by the SIPA Trustee in making distributions on account of the Fee Rebate Claims.

7

With respect to non-customers' claims, the Agreement provides that within ninety days of the effective date, the Exchanges will review and make initial determinations of all non-customer claims and Fee Rebate Claims pursuant to the Exchange Rules and will provide the SIPA Trustee with summaries of the determinations made. (Agreement § 3.2.3.) The CME Group may pay allowed Fee Rebate Claims and non-customer claims using the Set-Aside Funds. To the extent the total amount allowed on non-customer claims and Fee Rebate Claims (the Exchange Claim Allowed Amount") exceeds the value of the Set-Aside Funds, the CME Group will distribute the funds on a pro rata basis, as otherwise provided for in the Exchange Rules. Any payments made by the CME Group to claimants for allowed Fee Rebate Claims and non-customer claims will be considered by the SIPA Trustee when making distributions on allowed claims in MFGI's proceeding.

        2. *The CME and GFX Claims*

Under the Agreement, the CME Group waives priority of payment under the Exchange Rules of its claim. In exchange, the SIPA Trustee has agreed (to the extent the CME's claim is allowed) to provide the CME Group with a priority unsecured claim against any MFGI general estate, approved by subsequent order of this Court, entitled to higher priority than all allowed unsecured claims under 11 U.S.C. § 726(a)(2) (as made applicable to the SIPA proceeding under SIPA §§ 78fff(b) and 78fff-1(a)). (Agreement § 3.3.) Additionally, GFX waives priority of payment under the Exchange Rules of its claim or any other claim it may have against MFGI.

The Agreement provides that upon completion of the actions contemplated by the parties and entry of an order approving the Agreement, the requirements for satisfaction of Rule 913.B and Rule 110 will be deemed to have occurred solely for purposes of the Exchange Rules. (Agreement §§ 3.6, 3.7; *see also*, CME Joinder ¶¶ 31-33.)

8

*3. Immediate Allocation of Funds and Resolution with Chapter 11 Trustee*

Through the CME Agreement Motion, the SIPA Trustee discloses that it will immediately allocate $130 million of the MFGI Property, to MFGI's customer account classes under SIPA, the Bankruptcy Code, and the Part 190 Regulations. According to the SIPA Trustee, this property is readily associable with MFGI customer activity because the Exchange Rules direct for its application to customer shortfalls in the event of an FCM's failure. The SIPA Trustee believes that immediately allocating $130 million to customers in exchange for both subordinating claims of at least $30 million and eliminating claims of significantly greater value is in the best interest of the estate.

**D.    Hamann Objection**

Mr. Hamann, the sole objector, asserts three objections to the CME Agreement Motion: (1) Mr. Hamann objects to the SIPA Trustee's request to seal certain information with respect to MFGI's Exchange Memberships; (2) Hamann objects to being barred from making claims relating to the MFGI Property against the CME Group or MFGI Property at the CME Group other than in accordance with the terms of the Agreement; and (3) Hamann questions why only two of the three customer account classes will receive a distribution pursuant to the CME Agreement Motion. At the hearing on August 8, 2012, Mr. Hamann raised concern with the release that the CME Group was receiving through the Agreement, and alleged that the CME Group had facilitated in the alleged fraud that resulted in the shortfall of segregated customer funds.

The Court has considered Mr. Hamann's arguments and the underlying merits of the CME Agreement Motion, and, as discussed further below, the Court finds the Agreement is reasonable in light of the factual and legal issues that would be litigated if the CME Group and the SIPA Trustee had not settled these claims. Additionally, the Agreement is the product of

9

arm's length negotiations between the CME Group and the SIPA Trustee and is in the best interests of MFGI's estate. For these reason, the Court **OVERRULES** Mr. Hamann's objection and **GRANTS** the CME Agreement Motion.

## II.   DISCUSSION

### A.   Settlements are Favored in Bankruptcy

Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Under Bankruptcy Rule 9019, the court has the authority to "approve a compromise or settlement." FED. R. BANKR. P. 9019(a). A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may approve a settlement. *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II)*, Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 WL 134893, at *8–9 (D. Conn. Jan. 14, 2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ. 1190(RJS), 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22, 2010); *In re Chemtura Corp.*, 439 B.R. 561, 593–94 (Bankr. S.D.N.Y. 2010); *In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

A court's responsibility is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Chemtura*, 439 B.R. at 594 (quoting *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal quotations omitted). However, the court is not required to go so far as to conduct a trial on the terms to approve a settlement. *Id.* Before making a determination, however, the court must inform itself of "all facts necessary for

an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) (quoting *TMT Trailer Ferry*, 390 U.S. at 424) (internal quotations omitted). Although courts have discretion to approve settlements, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis. *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009). "At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement." *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citations omitted). In addition, courts may give weight to the opinion of bankruptcy counsel supporting the settlement. *Id.* ("In [approving the settlement agreement], the court is permitted to rely upon 'opinions of the trustee, the parties, and their attorneys.'"); *Chemtura*, 439 B.R. at 594.

To that end, courts have developed standards to evaluate if a settlement is fair and equitable and identified factors for approval of settlements based on the original framework announced in *TMT Trailer Ferry, Inc.*, 390 U.S. 414 (1968). The Second Circuit outlined the test for consideration of settlements under the Bankruptcy Rules in *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). The factors to be considered are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the

11

> bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.* (internal citations omitted). The burden is on the settlement proponent to persuade the court that the settlement is in the best interests of the estate. *See* 8 NORTON BANKRUPTCY LAW AND PRACTICE 3D §167:2 (3d ed. 2011).

### B. The Agreement Falls Well Within the Range of Reasonableness Prescribed by Bankruptcy Rule 9019

The Agreement between the CME Group and the SIPA Trustee clearly falls within the range of reasonableness detailed by *Iridium*. First, the Agreement provides immediate benefit to the MFGI estate whereas litigation into the complexities of resolving disputes between the Part 190 Regulations and the Exchange Rules would be complex, expensive, and provide no clear likelihood of success. The Agreement will effectuate the return of over $160 million and the full proceeds of the Exchange Memberships to the SIPA Trustee for his administration, while allowing a pre-return deduction by the CME Group of $16.5 million for satisfaction of certain claims asserted under the Exchange Rules. If the MFGI Property were distributed pursuant to the Exchange Rules, it would have been subject to various deductions with far less than $160 million returning to the SIPA Trustee. Additionally, the CME Group may have been entitled to withhold the return of MFGI Property until claims asserted against MFGI under the Exchange Rules were addressed.[3] Moreover, litigation between the CME Group and the SIPA Trustee regarding priority of payment under the Exchange Rules versus under the Part 190 Regulations would be time consuming and expensive as these issues present novel issues of law and complex

---

[3] Under CME Rule 913.B, MFGI Property cannot be released unless all claims of MFGI customers directly related to futures transactions cleared on the Exchange (whether or not CME Group members) have been paid or "otherwise provided for."

issues of fact.[4] (Decl. ¶ 5.) Since the Agreement provides that the MFGI Property will not be subject to the uncertainty and priority scheme of the Exchange Rules, MFGI's customers and its estate fair far better under the Agreement than under dueling distribution rules.

Mr. Hamann's objection is couched in unfounded assertions and unsupported by any facts. Further Mr. Hamann fails to understand that the Court's approval of the Agreement is not a decision on the underlying issues that are resolved by the Agreement. As explained above, the Court has canvassed the issues encompassed by the Agreement and has considered each of the *Iridium* factors to the extent applicable. The Court concludes that the Agreement falls within the range of reasonableness prescribed by Bankruptcy Rule 9019. Specifically, the SIPA Trustee has determined that resolving this dispute is beneficial to MFGI's estate because a large amount of customer funds will flow back to MFGI's customers. (Decl. ¶ 9.) In addition, trial of this issue would necessitate significant additional expenditure of time and resources. The Agreement avoids the inherent risk of litigation and "resolves a set of highly esoteric issues." (*Id.*) In addition, the Agreement will inure to the benefit of all creditors of MFGI's estate by permitting the SIPA Trustee to focus on resolving other claims and moving toward further distributions to customers. Furthermore, as described in the Declaration, the Agreement is the product of arm's length negotiations between the SIPA Trustee, the CME Group, the Chapter 11 Trustee, the Official Committee of Unsecured Creditors, and the Ad Hoc Group of MF Global Holdings Ltd. (Decl. ¶¶ 6–8.)

---

[4] The CME Group asserts that the issue whether customer claims arising out of segregated fund losses are "directly related to futures transactions cleared on the Exchange" (Rule 913.B), or have "arisen directly out of transactions on the Exchange" (Rule 110) has not been addressed by any court. (CME Joinder ¶ 19.) In this case for instance, if the Court were to find that customer claims arising out of segregated fund losses were not "directly related" to Exchange transactions, then those segregated account customers would not be entitled to any priority under the Exchange Rules.

### C.   Mr. Hamann's Objections to Specific Provisions of the Agreement Lack Merit

Mr. Hamann's objection to the limitation on customers from asserting claims against the CME Group is likewise not well-taken. The release provided to the CME Group through the Agreement applies only to those claims related to MFGI Property held by the CME Group. According to the SIPA Trustee, this release "only relates to claims to the MFGI Property and its disposition under the terms of the Agreement." (ECF Doc. # 2715 ¶ 10.) Specifically, the Agreement refers to claims already asserted against MFGI Property submitted to the Exchanges pursuant to the Exchange Rules, including "customer claims" arising out of losses related to segregated property. (Agreement § H.) The Agreement further provides that upon the effective date all customer claims shall be deemed provided for by CME Group in accordance with sections 3.5, 3.6, and 3.7 of the Agreement. (Agreement § 3.2.1.) Moreover, the Agreement provides, in relevant part, that all MFGI obligations to customers arising out of claims directly related to futures transactions "shall be deemed to have been 'otherwise provided for' within the meaning of rule 913.B." (Agreement § 3.6.2.) Nothing in the release sections in Article IV of the Agreement provides for any release of tort claims that customers may have against the CME Group. Essentially what this agreement does is channel customer claims for the property that was previously held at the CME to the SIPA Trustee's claims resolution process.

Moreover, Mr. Hamann has not adequately refuted the SIPA Trustee's authority to distribute funds to certain customers of MFGI and not others with the funds recovered from the CME Group. At this time, the SIPA Trustee has stated that he does not anticipate that a significant allocation to the Delivery Property estate will be necessary (*Id.* ¶ 11), and, in this instance, the Court will not disrupt the SIPA Trustee's judgment.

D.  **Mr. Hamann's Request for Certification of a Direct Appeal to the U.S. Court of Appeals for the Second Circuit**

At the August 8 hearing, Mr. Hamann represented that if the Court overruled his objection, he would appeal the Court's decision and seek certification of a direct appeal of this Court's order to the U.S. Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2)(A) and Bankruptcy Rule 8001(f).  This Opinion and Order deals with the approval of a settlement agreement pursuant to Bankruptcy Rule 9019 and does not involve novel issues of law for which certification is appropriate.  Therefore, the Court **DENIES** Mr. Hamann's request for certification of a direct appeal.

### III.  CONCLUSION

For the reasons discussed above, the Court finds that the Agreement falls well within the range of reasonableness and is clearly in the best interests of the MFGI estate.  The Agreement provides for the expedient and cost-efficient administration of the MFGI estate.  The only objection to the CME Agreement Motion, the Hamann Objection, makes assertions that are unrelated to the Agreement and not supported by any facts.  Accordingly, the Court **OVERRULES** Mr. Hamann's objection and **GRANTS** the CME Agreement Motion in all respects.  The SIPA Trustee shall submit an order consistent with this Opinion.

Dated: August 10, 2012
      New York, New York

                                                  *____Martin Glenn_____*
                                                      MARTIN GLENN
                                           United States Bankruptcy Judge