UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK　　　　　FOR PUBLICATION
In re:

　　　　MF GLOBAL INC.,　　　　　　　　　Case No. 11-2790 (MG) SIPA

　　　　　　　　　　　　　Debtor.

**MEMORANDUM OPINION GRANTING SIPA TRUSTEE'S MOTION TO APPROVE
CONTINUING COOPERATION AND ASSIGNMENT AGREEMENT FOR CLAIMS
AGAINST PRICEWATERHOUSECOOPERS LLP**

*A P P E A R A N C E S:*

HAYNES AND BOONE, LLP
*Special Counsel for James W. Giddens,*
*Trustee for the SIPA Liquidation of MF Global Inc.*
30 Rockefeller Plaza
New York, New York 10112
By:　Marty L. Brimmage, Esq.
　　　Jonathan D. Pressment, Esq.
　　　Trevor Hoffman, Esq.

KING & SPALDING LLP
*Attorneys for PricewaterhouseCoopers LLP*
1185 Avenue of the Americas
New York, New York 10036
By:　James J. Capra, Jr., Esq.
　　　James P. Cusick, Esq.
　　　David M. Fine, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

　　　　On September 5, 2012, the Court heard argument on the motion of the trustee of the SIPA liquidation ("SIPA Trustee") of MF Global Inc. ("MFGI") for approval of a Continuing Cooperation and Assignment Agreement ("Agreement") between the SIPA Trustee and Kay P. Tee, LLC, Paradigm Global Fund I and certain additional parties, including such Class Representatives as are appointed or as will be appointed by the District Court (the "Customer Representatives"). ("Motion," ECF Doc. # 2906.) The Customer Representatives, who were

commodity customers of MFGI prior to its collapse in October 2011, have filed class actions seeking to recover damages against former officers and directors of MFGI and MF Global Holdings Ltd. ("MFGH"), pending in the United States District Court for the Southern District of New York ("District Court Actions").  The Agreement will permit the Customer Representatives to pursue in the District Court Actions the assigned claims belonging to the SIPA Trustee as well as all class action claims belonging to MFGI customers.  Objections to the Motion were filed by the Ad Hoc Group of Lenders (ECF Doc. # 3078), by certain former directors and officers of MF Global (ECF Doc. # 3079), and by the Chapter 11 Trustee of MFGH ("Chapter 11 Trustee Objection," ECF Doc. # 3082).  The Statutory Creditors' Committee of MFGH filed a joinder in support of the Chapter 11 Trustee Objection (ECF Doc. # 3083).  A "limited objection" to the Motion was also filed by PricewaterhouseCoopers LLP ("PwC") ("PwC Limited Objection," ECF Doc. # 3084).

During the September 5, 2012 hearing, the parties to the Agreement agreed to make further changes to the Agreement to address arguments raised in the objections or in questions raised by the Court during the hearing.  Other than with respect to the objection to the assignment of claims against PwC, as to which the Court requested supplemental briefing and took the PwC Limited Objection under advisement, the Court ruled from the bench, overruling all other objections and approving the Agreement subject to review of the final language changes in the Agreement.  *See* Transcript, Sept. 5, 2012, at 89-92 (ECF Doc. # 3266).  The Court concluded under section 363(b)(1) of the Bankruptcy Code that the assignment of claims to the Customer Representatives reflects an appropriate exercise of business judgment by the SIPA Trustee.  *Id.* at 90.

Following the hearing, the SIPA Trustee and PwC submitted supplemental briefs.  ("PwC Supplemental Memorandum," ECF Doc. # 3282; "Trustee's Post-Hearing Supplemental Memorandum," ECF Doc. # 3283; "PwC's Further Supplemental Memorandum," ECF Doc. # 3348.)

For the reasons explained below, the Court now overrules the PwC objection and grants the SIPA Trustee's Motion to approve the assignment of the claims against PwC to the Customer Representatives on the same terms applicable to the assignment of claims approved at the September 5, 2012 hearing.

## I. BACKGROUND

The background of the collapse of MF Global has been described in many opinions of this Court and has been a staple of news for nearly a year.  It is unnecessary to recount that history here.  The Court will limit its discussion to the Agreement assigning claims.

Generally, the Agreement assigns to the Customer Representatives the SIPA Trustee's potentially viable claims against former directors, officers and/or employees of MFGI and MFGH ("D&O Parties") arising out of MFGI's presently estimated $1.6 billion shortfall of customer funds that was announced on October 31, 2011.  It also assigns potential claims against PwC, MFGI's former independent auditor, including claims on behalf of commodities customers, securities customers, and the Estate and MFGI in its corporate capacity (collectively, the "Assigned Claims").

Upon the commencement of the SIPA liquidation, the SIPA Trustee began an investigation of the causes and consequences of the collapse of MFGI.  On June 4, 2012, the SIPA Trustee released a report of his investigation ("Investigation Report").  (ECF Doc. # 1865.) The SIPA Trustee concluded that there are "certain colorable claims that could be brought on

3

behalf of MFGI's customers and the MFGI Estate against the officers and directors of MFGI and Holdings and other former MF Global employees to recover customer property." Mot. ¶ 12. The SIPA Trustee believes that "he holds colorable claims against certain parties, including but not limited to claims against former directors, officers and/or employees of MFGI and/or its parent corporation . . . ." *Id.*

In addition to the SIPA case of MFGI and the chapter 11 cases of MFGH and its affiliated debtors pending in this Court, numerous civil actions were filed by commodity customers and securities holders in courts around the country. The Customer Representatives commenced putative class actions against the D&O Parties ("Class Action Claims"). These actions have been consolidated and are now pending before the Honorable Victor Marrero in the United States District Court for the Southern District of New York.

The SIPA Trustee asserts that because the SIPA Trustee and the Customer Representatives "share a common interest to maximize recovery for MFGI customers with respect to the Class Action Claims and the Assigned Claims that the Trustee proposes to assign," and because the SIPA Trustee desires to provide an efficient mechanism for maximizing customer recoveries and minimizing the need for duplicative litigation, the Court should approve the Agreement.

**A. The Agreement**

The SIPA Trustee asserts that he holds the Assigned Claims on behalf of the MFGI estate in both a corporate capacity and on behalf of MFGI's customers whose claims he must satisfy as bailee or otherwise. Agreement at 2. The SIPA Trustee further asserts that litigation of the Assigned Claims in connection with the litigation of the Class Action Claims "will most efficiently facilitate the likelihood of recovery for MFGI's commodity customers as well as for

4

MFGI's other customers and creditors with the least duplication of efforts and expense while ensuring that the Class Action plaintiffs will have all appropriate standing." *Id.*

The Agreement provides that the SIPA Trustee will assign to the Customer Representatives "without any representations or warranties, express or implied, all of the Trustee's and/or the MFGI estate's rights, remedies, title and interest in all Assigned Claims." *Id.* ¶ 1. In turn, the Customer Representatives agree to evaluate the Assigned Claims and "where appropriate pursue viable claims subject to the terms of [the] Agreement." *Id.*

The Agreement further provides that "all recoveries in respect of the Assigned Claims and the Class Action Claims . . . will be processed for distribution by the Trustee." *Id.* ¶ 2. To the extent that the commodities customers receive a full recovery on their customer claims, "additional recoveries on the Assigned Claims, if any, will be available for allocation by the Trustee to the general estate . . . and the securities customer estate depending on the nature of the claim for which recovery is obtained . . . ." *Id.*

The Agreement also provides for cooperation between the SIPA Trustee and the Customer Representatives. Each party to the Agreement will work "to preserve and protect each other's interest to the extent consistent with their mutual interest." *Id.* ¶ 3(a). The SIPA Trustee is required to provide the Customer Representatives with "all relevant, material MFGI documents which have been identified as a result of the Trustee's investigation, including all MFGI documents that the Trustee has produced to date to regulatory authorities and other government agencies (the 'Documents')." *Id.* ¶ 3(b). The Customer Representatives must establish and maintain a document depository for the Documents. The district court shall regulate all discovery in the District Court Actions, including the allocation of any costs of discovery.

5

The SIPA Trustee is permitted to participate in the prosecution of the Class Action Claims and Assigned Claims. *See id.* ¶ 3(e)-(f). The Customer Representatives must consult with the SIPA Trustee regarding the Assigned Claims, but the Customer Representatives have the right "to determine all aspects of the prosecution of any Assigned Claim." *Id.* ¶ 3(e). The Customer Representatives must provide reasonable prior notice to the SIPA Trustee before they "settle or enter into any other agreement, stipulation or other arrangement with respect to the disposition of any Assigned Claims, including but not limited to a determination not to pursue any Assigned Claims." *Id* ¶ 3(f). Any settlements require the approval of the bankruptcy court and the district court and any net recoveries in the District Court Actions will be distributed by the SIPA Trustee in accordance with the distribution rules approved by both courts. In the event that the MFGI commodity customers recover the full amount of their claims, through distributions in the SIPA proceeding and from any settlements or judgments in the District Court Actions, the SIPA Trustee has the right to associate his counsel in the District Court Actions in the continued prosecution of any remaining claims. This is intended to assure general unsecured creditors of MFGI that the MFGI estate will continue to prosecute any meritorious claims that may lead to additional recoveries that can be used to satisfy claims of the general unsecured creditors.

### B. The PwC Limited Objection

Numerous parties objected to the SIPA Trustee's Motion. As already mentioned, all of the objections other than the PwC Limited Objection were overruled at the conclusion of the September 5, 2012 hearing. PwC denominated its objection as a "limited objection," but there is really nothing limited about it. PwC argues that the SIPA Trustee may not assign any claims against PwC because PwC's engagement letter with the Debtors includes an anti-assignment

6

provision. PwC Obj. at 1 ("PwC opposes the Motion insofar as it seeks an order assigning to the Customer Representatives (as defined in the Motion) claims (if any) that the Trustee may have against PwC, which audited the financial statements of [MFGI]."). PwC argues that because the estate takes property "subject to all restrictions and obligations burdening that property," it cannot assign the claims it may have against PwC. PwC Obj. at 3.

The relevant portion of the engagement letter provides as follows:

> The Companies agree that they will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP arising under this engagement letter to anyone, except to an entity with which the Companies merge or an entity which acquires all or substantially all of the assets of the Companies and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the Companies in violation of this paragraph shall be void and invalid.

Engagement Letter, dated June 24, 2010 (ECF Doc. # 3084, Ex. 1, at 5).

## II.    DISCUSSION

The legal and practical benefits of the Agreement include the following: provides the claims to one set of plaintiffs in one proceeding hopefully eliminating the whipsaw argument otherwise likely to be made in separate proceedings that the claims belong exclusively to the customers and cannot be asserted by the SIPA Trustee, or that the claims belong exclusively to the SIPA Trustee and cannot be asserted by the customers;[1] narrows the risk of inconsistent results; avoids the risk of a "double recovery," with different plaintiffs in multiple cases

---

[1] By permitting the Customer Representatives to pursue the Class Action Claims and Assigned Claims together, the parties to the Agreement hope to reduce or eliminate the risk of potential costly challenges to the SIPA Trustee's standing to assert certain claims based on several recent decisions in U.S. District Court for the Southern District of New York that are currently on appeal to the Court of Appeals for the Second Circuit. *See Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011), *appeal docketed*, No. 11-5207 (2d Cir. Dec. 15, 2011); *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011), *appeal docketed*, No. 11-5044 (2d Cir. Dec. 7, 2011).

recovering damages for the same injury; promotes a complete resolution of all claims at one time through settlement or judgment; and is more efficient and cost effective for plaintiffs and defendants. The Agreement provides that the MFGI estate will not have to bear any of the costs of prosecuting the Assigned Claims, thereby reducing expenses of the estate, redounding to the benefit of all creditors (including commodities customers).

PwC's challenge to the Agreement is an obvious attempt to nip-in-the-bud any effort to permit the Customer Representatives to pursue the Assigned Claims as part of the pending class actions, effectively increasing the burden and expense on the SIPA Trustee if he decides to pursue the claims against PwC. Of course, the burden and expense to the estate would not justify approving the assignment of claims if the assignment is otherwise prohibited by applicable law, but the reasons for PwC's objection is obvious.

**A. Use, Sale, or Lease of Property of the Estate**

Section 363(b)(1) of the Bankruptcy Code allows the Trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." A trustee may use estate property outside the ordinary course of business as long as the trustee articulates a sound business reason. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (stating that section 363(b) relief "is permissible if the 'judge determining [the] . . . application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (same). *See also In re Lionel Corp.*, 722 F.2d at 1069, 1071 (holding that, in considering a section 363(b) motion,

8

"a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," but must simply find a "good business reason" supporting the proposed transaction).

Courts repeatedly approve trustee requests to assign claims to creditor representatives. *See, e.g., In re Hydrogen L.L.C.*, No. 08-14139 (AJG), 2009 WL 2913448, at *2 (Bankr. S.D.N.Y. May 7, 2009) (approving Rule 9019 motion to settle and assign claims under virtually identical business judgment standard); Order Approving Agreement Among the Trustee and the Class Representatives Pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1) and Rule 9019(a) of the FED. R. BANKR. P., *In re The 1031 Tax Grp., LLC*, No. 07-11448 (MG) (Bankr. S.D.N.Y. May 18, 2009) (ECF Doc. # 1579) (approving cooperation between chapter 11 trustee and class action representatives in maximizing and allocating recoveries).

### B. Assignability of Claims Against a Contract Counter-Party in Bankruptcy

PwC argues that any claims that the SIPA Trustee and MFGI may have against it are not assignable by virtue of the anti-assignment provision in the contracts between PwC and the Debtors. PwC relies on case law relating to the enforceability of anti-assignment provisions outside of bankruptcy. PwC then argues that the SIPA Trustee acquires no greater rights in the property of the estate than the debtor held before bankruptcy and, therefore, any rights against PwC acquired by the SIPA Trustee are subject to the restrictions of the anti-assignment provision in the engagement letter.

The SIPA Trustee responds with four alternative arguments. First, the SIPA Trustee argues that the anti-assignment provision only precludes assignment of *contract* rights and claims, not *tort* claims (e.g., potential malpractice claims) that do *not* arise from the contract but from the duty that an auditor owes to its client. Second, the SIPA Trustee argues that the

9

"potential claims against PwC are being assigned to the Customer Representatives for the purposes of prosecution, but the benefits of such prosecution remain with the estate, since all the proceeds of the claims, net of legal costs, will return to the estate for distribution." Trustee's Post-Hearing Supplemental Brief at 4. This arrangement is said to be an "assignment for collection," permitted in the face of an anti-assignment clause. *Id.* at 4-5 (citing *Metro. Creditors' Trust v. PricewaterhouseCoopers, LLP*, 463 F. Supp. 2d 1193, 1198 (E.D. Wa. 2006) (permitting transfer of malpractice action against PwC to a litigation trust created as part of a confirmed plan despite anti-assignment clause)). Third, the SIPA Trustee argues that section 363(b) impliedly preempts the contractual anti-assignment clause. The SIPA Trustee acknowledges that this third argument has been rejected by *Calvert v. Bongards Creameries (In re Schauer)*, 835 F.2d 1222 (8th Cir. 1987) and *Grochocinski v. Crossman (In re Crossman)*, 259 B.R. 301 (Bankr. N.D. Ill. 2001), both of which the SIPA Trustee argues were wrongly decided. Fourth, the SIPA Trustee argues that the SIPA Trustee has consented to the Customer Representatives prosecuting any potential claims against PwC on behalf of the estate, and that by granting the Customer Representatives derivative standing, the Customer Representatives may pursue the potential claims on behalf of the estate. *See, e.g., Glinka v. Murad (In re Houscraft Indus. USA, Inc.)*, 310 F.3d 64, 70 (2d Cir. 2002); *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d Cir. 2001).

  Because the Court concludes that the SIPA Trustee prevails under the first argument—the anti-assignment clause only precludes assignment of breach of contract claims, not tort (e.g., malpractice) claims—it is unnecessary to reach the remaining three arguments.

*1. The Bankruptcy Code Does Not Expressly Permit Assignment of Claims*

The Bankruptcy Code does not provide a clear mechanism permitting the SIPA Trustee to assign any contract claims against PwC in the face of the engagement letter's anti-assignment clause. The Code is replete with provisions limiting enforceability of anti-assignment provisions. Section 541, governing the creation of the debtor's estate, "effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns [sic] its interests in bankruptcy." *In re Combustion Eng'g, Inc*, 391 F.3d 190, 219 n.27 (3d Cir. 2004). But *Combustion Eng'g* involved whether an anti-assignment clause prohibited the estate from acquiring contract rights belonging to the prepetition debtor, concluding that the estate succeeded to the contract rights, *id.* at 219; the court did not consider whether or how the estate could then assign the contract rights to third parties, the issue presented here.

Section 1123(a)(5) provides a means for the estate to transfer property as part of a confirmed plan, requiring that a plan of reorganization provide adequate means for implementation, including the "transfer of all or any part of the property of the estate to one or more entities . . . ." 11 U.S.C. § 1123(a)(5)(B). Section 1123(b)(3)(B) permits "a representative of the estate appointed for such purpose" to enforce claims retained by the plan. 11 U.S.C. § 1123(b)(3)(B). Indeed, section 1123(b)(3)(B) was the basis for the decision in *Metro. Creditors' Trust* that claims against PwC could be pursued by the post-confirmation litigation trust despite the same anti-assignment clause involved in this case. *Metro. Creditors' Trust*, 463 F. Supp. 2d at 1198-99.

Section 365(f) "invalidates provisions in . . . [a] contract that would permit termination or modification because of the assumption or assignment of the [contract]." 3 COLLIER ON BANKRUPTCY ¶ 365.09[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). "Section

11

365(f) 'works by operation of law to invalidate' lease assignment restrictions." *Shoppers World Cmty. Ctr. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, Nos. 00-16033 (BRL), 00-16035 (BRL), 00-16036 (BRL), 01-CV-3934 (SAS), 2001 WL 1112308, at *11 (S.D.N.Y. Sept. 20, 2001) (quoting *In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996)). *See also In re Office Prod. of Am., Inc.*, 140 B.R. 407, 410 (Bankr. W.D. Tex. 1992) (concluding that lease provisions restricting alienation or assignment of leases have uniformly been struck down).

But there are no provisions in the Bankruptcy Code expressly limiting the effect of anti-assignment provisions when a trustee attempts to assign specific "claims or the proceeds of claims" arising under a contract in the manner the SIPA Trustee proposes to do here. Whether a contract can restrict assignment of *tort* claims against PwC raises important issues of public policy and possible conflict with the purposes of the Bankruptcy Code, but it is unnecessary for the Court to resolve such issues here.[2] As explained below, the SIPA Trustee's tort claims do not arise under the engagement letter and, therefore, the Court concludes that the anti-assignment clause does not apply to prohibit the assignment of tort claims to the Customer Representatives.

*2. The Anti-Assignment Clause Only Restricts Assignment of Contract Claims*

Bankruptcy courts typically deal with questions regarding enforceability of anti-assignment provisions in the context of the assumption and assignment of a lease, or the assignment of causes of action to a litigation trust pursuant to the terms of a confirmed plan of reorganization. It appears that no bankruptcy court has answered the question whether a cause of action that has arisen under a contract containing an anti-assignment clause may be assigned other than as part of a confirmed plan. As PwC has argued, New York law has long recognized

---

[2] The cases PwC relies upon all involve enforcement of anti-assignment clauses to prevent assignment of contract claims, not tort claims based on duties independent of contractual obligations. Particularly in the bankruptcy context, the prohibition on transfer of tort claims raises more difficult issues.

that the assignment of claims arising under a contract may be expressly prohibited by contract. In *Allhusen v. Caristo Constr. Corp.*, 103 N.E.2d 891 (N.Y. 1952), the New York Court of Appeals affirmed the dismissal of a complaint alleging six causes of action brought by an assignee of claims to recover money due under the contract. While the right to receive payments under the contract was assigned, the contract itself was not assigned. The contract contained a clause providing that "[t]he assignment by the second party . . . of this contract or any interest therein, or of any money due or to become due by reason of the terms hereof without the written consent of the first party . . . shall be void." *Id.* The court began by acknowledging that "[w]hether an anti-assignment clause is effective is a question that has troubled the courts not only of this State but in other jurisdictions as well . . . ." *Id.* at 892 (citations omitted). The court concluded that the contract clause prohibiting assignment of breach of contract claims was enforceable:

> In the light of the foregoing, we think it is reasonably clear that, while the courts have striven to uphold freedom of assignability, they have not failed to recognize the concept of freedom to contract. In large measure they agree that, where appropriate language is used, assignments of money due under contracts may be prohibited. When 'clear language' is used, and the 'plainest words . . . have been chosen', parties may 'limit the freedom of alienation of rights and prohibit the assignment.' We have now before us a clause embodying clear, definite and appropriate language, which may be construed in no other way but that any attempted assignment of either the contract or any rights created thereunder shall be 'void' as against the obligor. One would have to do violence to the language here employed to hold that it is merely an agreement by the subcontractor not to assign. The objectivity of the language precludes such a construction. We are therefore compelled to conclude that this prohibitory clause is a valid and effective restriction of the right to assign.

*Id.* at 893 (citations omitted).

The first thing to note about the decision, however, is the very high bar the court set before contractual language can be found to prohibit the assignment of causes of action for breach of contract. No issue was raised in *Allhusen* about any attempted assignment of tort claims. While the engagement letter here includes language making void any assignment of claims "arising under the contract," a result permitted by *Allhusen*, the engagement letter does not include "a clause embodying clear, definite and appropriate language, which may be construed in no other way," *id.*, to restrict transfer of tort claims arising from a duty due to circumstances outside the contract itself.

### 3. The SIPA Trustee's Tort Claims Do Not Arise Under the Engagement Letter and May Be Assigned

The SIPA Trustee argues that any malpractice claim against PwC does not arise under the engagement letter and therefore is not barred by the anti-assignment provision. Professionals such as accountants may owe fiduciary duties to their clients independent of their contractual duties. When such fiduciary duties exist, the professionals may be subject to liability for negligence. In *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365 (N.Y. 1992), the New York Court of Appeals concluded that:

> A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. *Professionals*, common carriers and bailees, for example, *may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.* In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care.

*Id.* at 1369 (citations omitted) (emphasis added). *See also Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 469-70 (S.D.N.Y. 2007) ("Under New York law, claims of fraud and breach of fiduciary duty that merely duplicate contract claims must be dismissed. *Conduct constituting a breach of contract nevertheless is actionable in tort if a legal duty independent of*

14

*the contract itself has been violated. . . .* In other words the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." (internal quotations marks and citations omitted) (emphasis added)); *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (Ill. 1994) (stating that an accountant's "duty to observe reasonable professional competence exists independently of any contract").[3]

Under New York law, an action for professional malpractice or negligence may be maintained by a client against an accounting firm that is in privity of contract with the client. *Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 149 (N.Y. App. Div. 2007) (concluding that professional malpractice or negligence claims against an accountant requires that the underlying relationship be one of contract or the functional equivalent of privity). That requirement is satisfied with respect to the Assigned Claims since PwC performed its audits pursuant to a contract with the Debtors. Additionally, claims for professional malpractice may

---

[3]   Professionals such as lawyers and accountants may be subject to both contract and tort claims:

> The law ordinarily treats a contract between two parties as the sole source of liability for any financial losses caused by negligence in performing it. . . . A prominent exception is the action to recover for professional negligence (also known as malpractice). Suits by clients against attorneys are a common example, and in most respects can serve as a template for others. See generally Restatement Third, The Law Governing Lawyers §§ 48–54. If an attorney's negligence causes a client to lose money, the client can sue for breach of contract; the agreement to hire a lawyer inevitably contains a promise, usually implicit, that the lawyer will use due care to protect the client's interests. But the client also has the option of a tort claim and more often brings the suit in that form. These options coexist. A professional is subject to duties founded in both tort, a public source, and contract, a private source. Usually a professional who breaches one of those duties will also breach the other, allowing the plaintiff to choose which to make the basis of a lawsuit. It sometimes may be possible for the contract to modify the tort duty, as discussed in Comment *e* [relating to contractual disclaimers] . . . .

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 4, cmt. a. (Tentative Draft No. 1, 2012).

15

be assigned under New York law. *See, e.g., Tawil v. Finklestein Bruckman*, 646 N.Y.S.2d 691, 692-93 (N.Y. App. Div. 1996) ("Among the tort claims which may be the subject of assignment are those for professional malpractice.").[4]

The cases on which PwC relies are inapposite. None of the cases involves the issue of limiting the assignment of tort claims. But each case, in any event, involves broader contractual limitations than the language in the engagement letter. For example, *Turtor v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2d Cir. 1994), did not involve the issue whether a tort claim arose independently of a breach of contract claim. Rather the court resolved the issue whether a choice of law and forum selection clause contained in a contract applied to both tort and contract claims. *Id.* at 309. The contract clause provided as follows:

> This note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim *arising out of or relating to* this contract or breach thereof.

*Id.* (emphasis in original).

The court concluded that the language of this clause—most particularly, "arising out of or relating to"—was sufficiently broad to cover both tort and contract claims with respect to choice of law and forum selection. The operative language in the engagement letter here—"arising under this engagement letter"—is narrower and does not sweep tort claims within its ambit, even if the law otherwise permitted it to do so.

---

[4] As already pointed out, professional malpractice claims may often be stated in the alternative as breach of contract claims. The distinction between contract and tort theories of professional liability is usually only important with respect to the selection of the appropriate statute of limitations, an issue that does not appear relevant with respect to potential claims against PwC.

PwC also relies on *Zutty v. Rye Select Broad Market Prime Fund, L.P.*, No. 113209/09, 2011 WL 5962804 (N.Y. Sup. Ct. Apr. 15, 2011), but the issue there was whether the plaintiff was required to arbitrate its claims against KPMG. The arbitration clause included language providing that mediation and arbitration were the "sole methodologies for resolving [a]ny dispute or claim arising out of or relating to the engagement letter between the parties or the services provided thereunder." *Id.* at *17. The language—"arising under or related to the engagement letter . . . or the services provided thereunder"—is much broader than language contained in the PwC engagement letter.

Finally, PwC relies on *Truck World, Inc. v. Fifth Third Bank*, Nos. C-940029 and C-940399, 1995 WL 577521 (Ohio Ct. App. Sept. 29, 1995), a case determining that a jury waiver contained in a contract applied to both contract and tort claims. The jury waiver in the Loan Agreement provided that the parties "waive the right to trial by jury of any matters arising out of this agreement or the transactions contemplated hereby." *Id.* at *3. The jury waiver contract clause differed significantly from the engagement letter—the parties there agreed to waive a jury in any matters arising out of the agreement *and* out of the "transactions contemplated hereby." Therefore, the waiver was not limited to claims arising under the contract.

Because the Court concludes that assignment of any malpractice claims against PwC is not precluded by the anti-assignment clause contained in the engagement letter, it is unnecessary for the Court to address the alternative grounds argued by the SIPA Trustee in support of the assignment.[5]

---

[5] In the PwC Limited Objection, PwC argued that if the Court permitted the assignment of claims against PwC, the assignment should be without prejudice to the right of PwC to assert any defenses "including all rights arising out of the respective anti-assignment clauses." PwC Limited Objection at 3 (ECF Doc. # 3084). While the Court does not address what, if any, defenses PwC may assert to the Assigned Claims if the Customer

(Footnote continued on next page)

## CONCLUSION

For the foregoing reasons, the Court grants the SIPA Trustee's Motion to assign the PwC claims to the Customer Representatives. The SIPA Trustee shall settle an order consistent with this Opinion.

Dated:   October 2, 2012
         New York, New York

                                              ___*Martin Glenn*_____
                                              MARTIN GLENN
                                              United States Bankruptcy Judge

---

(Footnote continued from prior page)
Representatives seek to prosecute them, the Court expressly decides that the anti-assignment clause does not bar assignment of any malpractice claim against PwC. The Court must necessarily decide that issue to resolve PwC's objection; that decision is with prejudice.