**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

MF GLOBAL INC.,                                          Case No. 11-2790 (MG) SIPA

                                            Debtor.

**MEMORANDUM OPINION GRANTING MOTION TO APPROVE SETTLEMENT
BETWEEN MF GLOBAL INC. AND THE TRUSTEE, ON THE ONE HAND, AND MF
GLOBAL UK LIMITED (IN SPECIAL ADMINISTRATION) AND THE JOINT
SPECIAL ADMINISTRATORS, ON THE OTHER HAND, PURSUANT TO FED. R.
BANKR. P. 9019**

*A P P E A R A N C E S :*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York  10004
By:    James B. Kobak, Jr., Esq.
       Christopher K. Kiplok, Esq.
       Sarah L. Cave, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

         Pending before the Court is the motion (the "Motion," ECF Doc. # 5168) of James W.

Giddens (the "Trustee"), as Trustee for the liquidation of MF Global Inc. ("MFGI" or the

"Debtor") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, et seq. ("SIPA"),

pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

for approval of a settlement and compromise (the "Settlement Agreement") between MFGI and

the Trustee, on the one hand, and MF Global UK Limited (in special administration)

("MFGUK") and the MFGUK Joint Special Administrators Richard Heis, Richard Fleming and

Michael Pink (the "JSAs"), on the other (collectively with MFGI, the Trustee and MFGUK, the

"Parties").  In support of the Motion, the Trustee submits the declaration of Christopher K.

Kiplok (the "Kiplock Decl.," ECF Doc. # 5365). No objections were filed to the Motion. The

Settlement Agreement brings to an end an expensive dispute between the insolvency

administrators that has held up making substantial distributions to U.S. commodities customers

of MFGI. The insolvency administrators have worked constructively to reach an agreement that

is in the best interests of the insolvency estates and their creditors. For the following reasons, the

Court grants the Motion approving the Settlement Agreement.

## I.    BACKGROUND

MFGI and MFGUK were subsidiaries of MF Global Holdings Ltd. ("MFGH"), which

was the parent of nearly fifty direct or indirect subsidiaries (collectively, "MF Global"). MFGH

filed for protection under Chapter 11 of the Bankruptcy Code on the morning of October 31,

2011. Soon after,the directors of MFGUK petitioned the High Court of England and Wales (the

"High Court") to place MFGUK in special administration, and the Securities Investor Protection

Corporation ("SIPC") commenced a proceeding to liquidate MFGI under SIPA. The High Court

appointed Richard Heis, Richard Fleming, and Michael Pink of KPMG LLP as the JSAs. The

United States District Court for the Southern District of New York appointed the Trustee for the

SIPA liquidation of MFGI.

MFGI was MF Global's principal U.S. broker-dealer and futures commission merchant

("FCM"). MFGI traded through more than seventy exchanges globally, including through

affiliates in the United Kingdom, Australia, Singapore, India, Canada, Hong Kong and Japan,

both on its own behalf and on behalf of customers. A number of affiliates of MFGI in turn

traded through accounts with MFGI as their FCM or broker-dealer in the United States.

MFGUK, based in London, was MF Global's principal European broker-dealer and dealt

in commodities, fixed income, equities, foreign exchange, futures and options. MFGUK is

authorized and regulated by the Financial Services Authority ("FSA") in the U.K., and traded and settled securities on European and other foreign exchanges for its customers, affiliates (including MFGI), and on its own behalf.

Prior to October 31, 2011, there were extensive dealings between MFGI and MFGUK. The Parties have expended significant effort in investigating these dealings. As a result, the Trustee and the JSAs have identified and brought claims against each other's respective estates. The Trustee and the JSAs have exchanged tens of thousands of pages of documents, and the Trustee's professionals regularly corresponded with the JSAs' professionals to efficiently and expeditiously resolve of the Parties' claims. Despite these efforts to work cooperatively, the Parties identified significant disputes, some of which have led to litigation.

The necessary process of investigating, conducting litigation, and preparing for further litigation of these claims has already cost substantial sums. If the Parties were to continue to advance the litigation between them, significantly more expense would be incurred. Substantial briefing has already occurred before the High Court for issues related to the MFGI 30.7 Client Asset Claim and the RTM collateral (as defined below), together with substantial discovery in relation to the MFGI 30.7 Client Asset Claim.

One of the key legal issues originally underlying the Trustee's claim in the MFGUK special administration was the determination of the priority under English law for distribution of the funds and assets that the Trustee sought to reclaim on behalf of MFGI's former customers. Given the potentially significant differences in the estimated recovery rates for the categories of property, this determination would have a significant impact on the amount the Trustee could expect to recover from the MFGUK special administration.

A.    **Claims by MFGI against MFGUK**

The MFGI Claims against MFGUK amount to a total of approximately $910 million of
Client Money and Client Assets and nearly $500 million of unsecured creditor claims, as follows
(some of which are described further below):

- o  The MFGI 30.7 Client Asset Claim of approximately $640 million in
  property that the Trustee believed was or should have been secured for
  former MFGI 30.7 Customers.

- o  The MFGI Client Money Claim of approximately $270 million, which was
  comprised of approximately $95 million in respect of MFGI's open positions
  held with MFGUK as of October 31, 2011.  The MFGI Client Money Claim
  also includes the $175 million wire transfer from MFGI to MFGUK on October
  28, 2011.

- o  Unsecured creditor claims of approximately $465 million relating to
  collateral posted with respect to RTM transactions, intercompany
  repurchase transactions, and other miscellaneous items.

1.    _30.7 Client Asset Claim_.  MFGI's U.S. futures and options customers who
wished to trade on non-U.S. exchanges ("30.7 Customers") deposited cash for margin
requirements for these trades into MFGI's segregated 30.7 accounts held with Harris Bank.
MFGI, which was not authorized to trade on non-U.S. exchanges, conducted its trading on
foreign exchanges (with the exception of Canadian exchanges), through MFGUK.  Where
MFGUK was to act as carrying broker for such trades, MFGI transferred the margin to MFGUK
(the "30.7 Funds").  Although MFGUK was aware that MFGI was acting on behalf of its
underlying 30.7 Customers, the JSAs' position is that MFGUK did not consistently hold the 30.7
Funds—transferred primarily in the form of U.S. Treasury Bills ("T-Bills")—on a secured basis.

As of October 31, 2011, MFGI's records show that the value of the margin posted to the
relevant secured 30.7 account was $639,918,174.  The amount of 30.7 Funds represents a
sizeable portion of the total shortfall in the 30.7 estate property available for distribution to 30.7
Customers.  For the purposes of the Settlement Agreement, the JSAs have agreed to accept the

full value of all claims in respect of the 30.7 Funds, $639,918,174, with a portion (approximately $196 million) being returned as a client asset, and the balance being returned as an unsecured creditor claim.

2.    _RTM_.  Starting around 2010, MF Global began a policy of accumulating a portfolio of European sovereign debt securities.  Investment in these securities peaked at nearly $7 billion in October 2011.  Generally, MFGUK purchased the securities on the market and then MFGI and MFGUK entered into repurchase transactions ("repos") with each other, whereby the securities were sold at fixed prices on the terms that equivalent securities would be repurchased at a later date.  These transactions were known as repos to maturity ("RTM"), since the repurchase date under the repos would match the maturity date of the securities, which was generally 12 to 18 months from the beginning of the transaction.  There are a number of grounds for dispute in relation to the valuation of the RTM claim, which could potentially involve litigation both in England and in the United States.

3.    _Hindsight Proceeding_.  On May 3, 2012, the JSAs filed an application with the High Court seeking directions on the appropriate valuation methodology for client money claims in which the clients held open positions as of the date MFGUK entered special administration.  The Trustee was not a party to the Hindsight Proceeding but, because the relevant part of the MFGI Client Money Claim was prepared on the basis of values as of October 31, 2011, the outcome could impact the MFGI Client Money Claim.

**B.    Claims by MFGUK against MFGI**

The JSAs have also filed claims against MFGI, which, net of duplicate claims, asserts approximately $410 million in claims: $258 million in commodities claims (the MFGUK 4(d) Commodities Claim and the MFGUK 30.7 Commodities Claim) and $147 million in securities

claims (the MFGUK Securities Claim and MFGUK DTC Box 7423 Claim). The JSAs have also filed the MFGUK Unsecured General Creditor Claims in the amount of approximately $5 million.

### C.    Duplicative Claims

Certain of the 30.7 Customers of MFGI have submitted or may submit claims against MFGUK in respect of the MFGUK/MFGI Futures and Options Business ("Duplicative Claims" and "Duplicative Claimants").

Duplicative Claims compete with the claims submitted by the SIPA Trustee against MFGUK.  At present, there are approximately 116 known Duplicative Claims.  The Parties take the position that the Trustee is the proper and exclusive claimant against MFGUK for the 30.7 Funds, and that the right to recover the 30.7 Funds rests properly and exclusively in the Trustee. The Settlement Agreement therefore provides that existing Duplicative Claims will not be continued against MFGUK, and that further Duplicative Claims will be barred by order of this Court.  This is a condition of the JSAs giving effect to the Settlement Agreement.

### D.    Terms of the Settlement Agreement

The Settlement Agreement is comprised of a number of different agreed claim amounts, which include various provisions for setoffs and shortfalls.  Although subject to subsequent adjustments in certain cases, the agreed amounts under the Settlement Agreement are as follows:

- MFGI Client Asset Claim: $192 million (net of expenses);

- MFGI Client Money Claim: $54 million (a conservative estimate pending resolution of Hindsight Proceeding), to be paid at an estimated initial dividend rate of 60 cents;

- MFGI Unsecured Creditor Claim: approximately $323 million (subject to further adjustment due to a variety of factors following the Settlement Agreement becoming effective), to be paid at an estimated initial dividend rate of 20 cents; and

- The total approximate initial distribution from MFGUK (in special administration) to the MFGI estate following the Effective Date: $291 million.

Therefore, the total combined recovery will be approximately $500 million to $600 million, net of offsets of MFGUK's claims into the MFGI estate.

There are several conditions to the effectiveness of the Settlement Agreement, specifically:

- Entry by this Court, in a form and substance reasonably acceptable to the Parties, of an order:

  o authorizing the Trustee to implement the Settlement Agreement, perform fully his obligations in respect to the Settlement Agreement, and take all actions reasonably necessary to consummate the Settlement Agreement;

  o prohibiting the customers and creditors of MFGI from making or continuing any claim directly against MFGUK which is a Duplicative Claim; and

  o providing that prior to making any further distribution from the MFGI 30.7 commodities estate to a customer (with an allowed claim with a value greater than $12,000 (US)) in MFGI's SIPA proceeding, the Trustee will obtain an appropriate release of all Duplicative Claims in favor of MFGUK and the JSAs.

- JPMorgan Chase withdraws certain claims filed against MFGUK, signs appropriate release documents and returns certain account balances and amounts to MFGUK.

- Claims in any proceedings by MFGH and MF Global Finance USA Inc. ("FinCo.") (collectively, the "Holdings/FinCo. Proceedings") have been withdrawn and MFGH and FinCo. have signed releases in favor of MFGUK, save with respect to certain agreed claims.

## II.    DISCUSSION

Settlements and compromises are favored in bankruptcy as they minimize costly

litigation and further parties' interests in expediting the administration of the bankruptcy estate.

*In re Dewey & LeBoef LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012).  Under Rule 9019 of the

Bankruptcy Rules, the court has the authority to "approve a compromise or settlement."  FED. R.

BANKR. P. 9019(a).  A court must determine that a settlement under Bankruptcy Rule 9019 is

fair, equitable, and in the best interests of the estate before it may approve a settlement.  *In re*

*Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968)).  *See also Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest*

*II)*, Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 WL 134893, at *8-9 (D. Conn. Jan. 14,

2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ. 1190(RJS), 2010 WL 5298172, at *3

(S.D.N.Y. Dec. 22, 2010); *In re Chemtura Corp.*, 439 B.R. 561, 593–94 (Bankr. S.D.N.Y. 2010);

*In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

A court's responsibility is to "canvass the issues and see whether the settlement falls

below the lowest point in the range of reasonableness."  *Chemtura*, 439 B.R. at 594 (quoting *In*

*re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal quotations omitted).  However,

the court is not required to go so far as to conduct a trial on the terms to approve a settlement.  *Id.*

Before making a determination, however, the court must inform itself of "all facts necessary for

an intelligent and objective opinion of the probabilities of ultimate success should the claim be

litigated."  *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009)

(quoting *TMT Trailer Ferry*, 390 U.S. at 424) (internal quotations omitted).  Although courts

have discretion to approve settlements, the business judgment of the debtor in recommending the

settlement should be factored into the court's analysis. *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009). "At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement." *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citations omitted). In addition, courts may give weight to the opinion of bankruptcy counsel supporting the settlement. *Id.* ("In [approving the settlement agreement], the court is permitted to rely upon opinions of the trustee, the parties, and their attorneys.") (quotations omitted); *Chemtura*, 439 B.R. at 594.

To that end, courts have developed standards to evaluate if a settlement is fair and equitable and identified factors for approval of settlements based on the original framework announced in *TMT Trailer Ferry,* 390 U.S. 414 (1968). The Second Circuit outlined the test for consideration of settlements under the Bankruptcy Rules in *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). The factors to be considered are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.* (internal citations omitted).  The burden is on the settlement proponent to persuade the court

that the settlement is in the best interests of the estate.  *See* 8 NORTON BANKRUPTCY LAW AND

PRACTICE 3D § 167:2 (3d ed. 2011).

As stated in the Motion and in the Kiplock Declaration, the proposed Settlement

Agreement is in the best interests of the MFGI estate.  Litigation based on the parties' claims

would be complex and expensive, and would divert significant estate resources.  The proposed

settlement will likely result in the return of over $500 million in customer property to the SIPA

estate and will thus make substantial funds available for the estate.  The Settlement Agreement

also provides for general releases by the Parties of claims against each other, thereby resolving

any current or potential future issues between the Parties, and it does not provide releases for any

non-settling parties.  It is also reasonable to enjoin the 30.7 Customers from pursuing Duplicative

Claims against MFGUK, as these customers will receive their allowed distributions by virtue of

the Trustee's pursuit of these claims.

Overall, the Court concludes that the Settlement is beneficial for the estate and fully

satisfies the standards for approving settlements under the framework set for by the Supreme

Court in *TMT Trailer Ferry,* 390 U.S. 414, and by the Second Circuit in *Iridium*, 478 F.3d 452.

Since no objections have been filed to the proposed settlement, the Court will not separately

analyze each of the factors identified by the courts for approval of settlements under Rule 9019,

other than to state that the Court has considered each factor to the extent applicable under the

circumstances.

### III.    CONCLUSION

The Settlement reached between the U.S. and U.K. insolvency administrators puts to rest a complex and expensive dispute that has held up the distribution of a substantial amount of funds from MFGI's commodities customers.  Because additional funds are made available to the Trustee from this Settlement, the Court is also entering a separate order authorizing the Trustee to make additional distributions to MFGI's customers.

For all the reasons explained above, an order will be entered approving the Settlement Agreement.

Dated: January 31, 2013
          New York, New York.

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge