UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK          FOR PUBLICATION
In re:

        MF GLOBAL INC.,          Case No. 11-2790 (MG) SIPA

                      Debtor.

**MEMORANDUM OPINION AND ORDER CONFIRMING THE TRUSTEE'S
DETERMINATION OF CLAIM NUMBER 600000009**

*A P P E A R A N C E S:*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York  10004
By:    James B. Kobak, Jr., Esq.
         Christopher K. Kiplok, Esq.
         Eleni D. Theodosiou-Pisannelli, Esq.

KELLER ROHRBACK L.L.P.
*Counsel for Cobalt Mortgage, Inc.*
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
By:    Amy Williams-Derry, Esq.
         Deirdre Glynn Levin, Esq.
         Ian Mensher, Esq.


**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

       Before the Court is the *Trustee's Motion for an Order Confirming the Trustee's Determination of Claim Number 600000009* ("Motion," ECF Doc. # 6350).  The SIPA Trustee of MF Global, Inc. ("MFGI") seeks confirmation of his determination that the claim filed by Cobalt Mortgage, Inc. ("Cobalt") does not constitute a securities customer claim under SIPA and should be reclassified as a general creditor claim against the MFGI estate.  Cobalt's claim arises out of TBA Contracts (as defined below) for the purchase of Agency MBS that were all "open" and "paired off" on the Filing Date, meaning Cobalt had not yet transferred any cash or securities

1

to MFGI to hold on its behalf. Because MFGI did not hold any cash or securities in a customer account for Cobalt on the Filing Date, the Court confirms the Trustee's determination that Cobalt is not a securities customer under SIPA and **GRANTS** the Motion.

In support of the Motion, the SIPA Trustee filed the Declaration of Marlena Frantzides ("Frantzides Declaration," ECF Doc. # 6351). The Securities Investor Protection Corporation ("SIPC") filed a memorandum of law in support of the Motion ("SIPC Brief," ECF Doc. # 6355). Cobalt filed a response ("Cobalt Objection," ECF Doc. # 6422). The SIPA Trustee filed a Reply (ECF Doc. # 6466) supported by the Affidavit of Edward Eggert ("Eggert Aff.," ECF Doc. # 6467). SIPC also filed a Reply (ECF Doc. # 6468). The Court held oral argument on the Motion on May 24, 2013. Following the hearing, at the Court's direction, counsel for the parties conferred in an effort to agree upon stipulated facts providing the record for decision. On June 11, 2013, the parties submitted a Joint Stipulation of Undisputed Facts ("Stipulation of Facts," ECF Doc. # 6590).

## I. BACKGROUND

On October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, United States District Court Judge for the Southern District of New York, entered an order commencing the liquidation of MFGI pursuant to the provisions of the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa et. seq. On November 23, 2011, the Court entered the *Order Granting Trustee's Expedited Application Establishing Parallel Customer Claims Processes and Related Relief* (the "Claims Process Order," ECF Doc. # 423), which *inter alia*, (i) approved the procedures for filing, determining, and adjudicating claims, and (ii) established January 31, 2012 as the bar date for filing securities customer claims in the SIPA

2

Proceeding (the "Securities Claim Bar Date") and June 2, 2012 as the date by which all claims must be received by the Trustee (the "Final Bar Date").

On January 18, 2012, Cobalt filed securities customer claim number 600000009 (the "Claim," ECF Doc. # 3717-1), in the amount of $407,421.88, arising out of to-be-announced contracts ("TBA Contracts"). These TBA Contracts arose under a Master Securities Forward Transaction Agreement ("MSFTA") entered into on May 14, 2010 between MFGI and Cobalt ("Cobalt MSFTA," ECF Doc. # 3717-3). On September 11, 2012, the Trustee sent a Notice of Trustee's Determination of Claim to Cobalt which stated the Trustee's determination that the Claim was not a customer claim under SIPA and reclassified it as a general creditor claim against the MFGI estate ("Notice of Determination," ECF Doc. # 3717-2). On October 10, 2012, Cobalt objected to the Notice of Determination (ECF Doc. # 3716) and filed the Declaration of Mark Fairbanks in support of the Objection ("Fairbanks Decl.," ECF Doc. # 3717). The Objection disputed the Trustee's determination that the Claim was not a customer claim under SIPA.

### A.    TBA Contracts

TBA Contracts are bilateral agreements to buy or sell at a future date "to-be-announced" mortgage-backed securities that are issued and/or guaranteed by one of the government-sponsored entities ("GSEs"). The securities to be delivered under a TBA Contract are not specified at the time of the contract. On the date the parties enter into the TBA Contract (the "Trade Date"), the parties agree on six "general parameters" of the contract: the date on which performance is due by the parties (the "Settlement Date"); the agency (Fannie Mae, Freddie Mac, or Ginnie Mae); the coupon or interest rate of the MBS; the maturity date of the MBS; the total face dollar amount of the MBS to be purchased or sold on the Settlement Date; and the price to be paid on the Settlement Date. The interval between the Trade Date and Settlement Date for

3

TBA Contracts is typically several weeks. The seller is not required to specify particular pools of mortgages to the contract until 48 hours before the Settlement Date.

While the contract is "open," during the interval between Trade Date and Settlement Date, a contracting party may enter into one or more off-setting contracts, known in the industry as "pairing-off." The effect of the offsetting trade is to fix a notional gain or loss on the paired contracts without any securities changing hands, resulting in a net payable or receivable between the parties that is not due until the Settlement Date. For example, on Day 1, A agrees to buy on a given Settlement Date 100 units from B at a certain price (the initial contract). On Day 30, A agrees to sell 100 units to B on the same Settlement Date at a different price (the pair-off contract). The amount payable on the Settlement Date is the difference between the price of the initial contract and the pair-off contract. Together, the two offsetting TBA Contracts negate the need for the actual delivery of securities on the Settlement Date.

TBA Contracts are often settled on a "DVP" (delivery versus payment) basis. Under the DVP system, the parties to the TBA Contract retain custody of the property to be exchanged until the Settlement Date, at which point the parties tender to the broker-dealer the property due under the Contract. Thus, prior to the Settlement Date, when a TBA remains "open," the broker-dealer intermediating the transaction will not hold in custody any of the property due from either of the contracting parties.

    **B.**    **The Cobalt Account**

Cobalt's TBA Contracts were recorded in periodic account statements maintained in MFGI's information systems, as shown in Cobalt's account statements for the month of January 2011 ("January Statement," Stipulation of Facts, Ex. C) and October 2011 ("October Statement,"

Stipulation of Facts, Ex. D).[1] Each of the TBA Contracts underlying the Cobalt Claim was paired-off on or before October 28, 2011 with Settlement Dates ranging from November 11, 2011 through December 19, 2011. *See* Trade Blotter (Stipulation of Facts, Ex. F). Therefore, each of the TBA Contracts was "open" on the Filing Date. The parties agree that on the Filing Date, Cobalt did not have any cash in its MFGI Account. *See* Stipulation of Facts ¶ 5. The paired-off TBA Contracts ("Paired TBAs") were the only property in Cobalt's account on the Filing Date. *See id.*

The Cobalt MSFTA provides that TBA Contracts are to be "settled on a delivery-versus-payment basis and payment shall be made to seller in immediately available funds," and "none of the Seller's property interest in the Securities shall pass to Buyer until such delivery and payment are made." *See* Cobalt MSFTA§ 5(a). The Cobalt MSFTA sets forth contractual remedies in the case of default, including any "Act of Insolvency." *See id.* at §§ 7, 8. The contractual default remedies include recovery of damages equal to the cost of "entering into replacement transactions and entering into or terminating hedge transactions," as well as "legal or other expenses" and interest. *See id.* at § 7.

### C. The Parties' Arguments

The SIPA Trustee determined that Cobalt was not entitled to securities customer status under SIPA because MFGI held neither cash nor securities for Cobalt on the Filing Date. The Trustee relied heavily on Judge Peck's decision in *In re Lehman Brothers Inc.*, 462 B.R. 53 (Bankr. S.D.N.Y. 2011), where the court held that claims for damages arising under open TBA Contracts are not customer claims under SIPA and that TBA Contracts themselves are not securities under SIPA.

---

[1] MFGI's SIPA proceeding commenced on October 31, 2011, before the October Statement was prepared. The Trustee provided Cobalt with a copy of the October Statement in connection with the Motion; the parties have stipulated to the accuracy of the information contained in the October Statement.

In response, Cobalt argues that under the amended version of SIPA, which went into effect only after the transactions in *Lehman*, it is entitled to customer status and that TBA Contracts constitute securities. SIPA was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), effective July 22, 2010.

## II.   DISCUSSION

The Court concludes, as did the court in *Lehman*, that TBA Contracts are not securities within the meaning of SIPA. The Court also concludes that under SIPA, as amended by the Dodd-Frank Act, Cobalt is not a customer entitled to protection. Judge Peck's decision is the appropriate starting point for analysis.

### A.   The *Lehman* Decision

In *Lehman*, the court considered whether claims relating to TBA Contracts for agency MBS qualify for treatment as customer claims under SIPA during the "open" period (*i.e.,* before any cash or securities actually change hands). 462 B.R. 53. The court held that they do not qualify as customer claims; rather, they are breach of contract claims entitling the claimant to general creditor status. *Id.* In a footnote, the court noted that the pre-Dodd-Frank definition of "customer" applied because the *Lehman* bankruptcy proceeding was commenced before the definition was amended. *Id.* at 61 n.9. But, as explained below, the amendment does not lead to a different result in this case.

The *Lehman* court rejected the claimants' reliance on *In re Adler, Coleman Clearing Corp.*, 211 B.R. 486 (Bankr. S.D.N.Y. 1997). *Adler Coleman* involved an account statement that actually confirmed holdings of Abbott Labs shares; in *Lehman*, "the account statements with [the debtor] establish conclusively that the claims at issue here are not claims for the recovery of

6

property held for the customer, but rather claims for breach of the TBAs." *Lehman,* 462 B.R. at 62. In particular, the claimants were seeking damages calculated on the basis of the sum of (i) the pair-off amount of the TBA contracts, and (ii) the difference between the price agreed upon in the TBA contract with Lehman on the Trade Date and the price of replacement transactions; the claimants in the case had zero balances for both cash and securities in their Lehman account on the filing date. *Id.* at 63. The same is true here.

In addition, the *Lehman* court held that TBA Contracts are not securities under SIPA. To qualify as a security under SIPA, a TBA Contract would need to match one of the terms listed in the definition, including a "security future," "investment contracts," a "warrant or right to subscribe to or purchase or sell any of the foregoing," or "any other instrument commonly known as a security." *Id.* at 63-64. Because TBA Contracts do not fit "neatly" into any of these categories, the court held that they are not entitled to security status under SIPA. *Lehman,* 462 B.R. at 64. *Lehman* described the issue whether TBA Contracts are securities as a question of first impression. In a carefully reasoned opinion, Judge Peck concluded that TBA Contracts are not securities. As Judge Peck explained,

> SIPA's reference to "security future" in the definition of "security" specifically provides "security future as that term is defined in section 78c(a)(55)(A)" of SIPA. SIPA § 78 lll (14). In turn, SIPA § 78c(a)(55)(A) provides that "[t]he term 'security future' does not include any agreement, contract, or transaction excluded from the Commodity Exchange Act [pursuant to certain sections]." SIPA § 78c(a)(55)(A). The referenced sections of the Commodity Exchange Act specifically exclude any "agreement, contract, or transaction in . . . (B) government securities . . . or (G) mortgages or mortgage purchase commitments." 7 U.S.C. § 2(c). As such, the Agency MBS securities that underlie the TBA contracts are specifically excluded from SIPA's definition of "security future."

*Id.*

7

The Court agrees with Judge Peck's analysis and conclusion—TBA Contracts for MBS securities are not "securities" within the meaning of SIPA. Nothing in the Dodd-Frank Act alters this conclusion.

Judge Peck recently issued another opinion in the *Lehman* case, *In re Lehman Bros. Inc.*, __ B.R. __, 2013 WL 3203300 (Bankr. S.D.N.Y. June 25, 2013) ("*Lehman II*"), affirming the SIPA trustee's determination that claims asserted by counterparties in relation to repurchase agreements ("repos") do not qualify for customer treatment because their DVP accounts at Lehman did not hold any cash or securities on the filing date. A repo transaction consists of two parts: first, a seller agrees to transfer securities to a buyer against the transfer of cash by the buyer; second, the buyer simultaneously agrees to transfer back the securities to the seller on a specified future date (the "Repurchase Date"), against the transfer of cash by the seller back to the buyer on the Repurchase Date. *See id.* The repos at issue in *Lehman II* provided that the seller would deliver the purchased securities to the buyer or its agent at the outset of the transactions against the transfer of cash.

The claimants in *Lehman II* argued that they were entitled to customer status under SIPA because they delivered the purchased securities to Lehman with the intention that such securities would be returned on a date certain and that they retained all the benefits of ownership of the securities. Judge Peck rejected their argument because Lehman did not actually hold the securities on the filing date. Instead, as was allowed under the contract governing the repos, Lehman was entitled to, and did, engage in "selling, transferring, pledging or hypothecating" the securities at issue, and the claimants' DVP accounts were empty on the filing date. The court explained that the contractual duty of Lehman to return the purchased securities to the claimants on the Repurchase Date is not the same as actual possession by Lehman. Instead, like the TBA

8

contracts at issue in *Lehman*, the claimants were merely asserting a claim for breach of contract and thus were not entitled to customer status.

### B. Customer Status Under SIPA

*1. Pre-Dodd-Frank Act*

SIPA section 78fff–3(a) provides:

> In order to provide for prompt payment and satisfaction of net equity claims of *customers* of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each *customer*, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property . . .

SIPA § 78fff–3(a) (emphasis added). If "assets are insufficient to compensate 'customers' for their investment losses, each recognized 'customer' can seek to have its remaining losses compensated by the Securities Investor Protection Corporation ('SIPC')—subject to a cap of $500,000 per 'customer'—out of a special fund capitalized by the general brokerage community." *In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422, 426 (2d Cir. 2013).

Protection under SIPA extends only to those creditors that meet SIPA's definition of "customer." *See SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974); SIPA § 78 lll (2). Section 78lll(2)(A) defines a customer as:

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

SIPA § 78lll(2)(A). The term "customer" includes "any person who has deposited cash with the debtor for the purpose of purchasing securities," "any person who has a claim against the debtor for cash, securities, futures contracts, or options on futures contracts received, acquired, or held

9

in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission," and "any person who has a claim against the debtor arising out of sales or conversions of such securities." SIPA § 78lll(2)(A)(i)-(iii).

The Second Circuit has identified the "critical aspect" of the customer definition to include "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422, 426 (2d Cir. 2013); *see also Lehman*, 462 B.R. at 60 ("An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund.") (citing *In re Brentwood Secs., Inc.,* 925 F.2d 325, 327 (9th Cir. 1991)).

"Whether a creditor will qualify as a 'customer' is construed narrowly." *In re Lehman Bros. Inc.*, 474 B.R. 139, 145 (Bankr. S.D.N.Y. 2012) (citing *In re MV Secs., Inc.,* 48 B.R. 156, 160 (Bankr.S.D.N.Y.1985). Furthermore, "[i]t is well-established in the Second Circuit that a claimant bears the burden of proving that he or she is a 'customer' under SIPA." *Id.* (quoting *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.),* 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002)). "A claimant must make such a showing on a transaction-by-transaction basis." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 454 B.R. 285, 295 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013).

*2. Post-Dodd-Frank*

SIPA section 78lll(2)(A), which defines "customer" under SIPA, was not amended by the Dodd-Frank Act, but subsection 78lll(2)(B) was amended. Prior to the Dodd-Frank Act, SIPA section 78lll(2)(B) provided that "[t]he term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . ." The Dodd-Frank Act amended this section as follows:

> The term "customer" includes (i) any person who has deposited cash with the debtor for the purpose of purchasing securities; (ii) any person who has a claim against the debtor for cash, securities, futures contracts, or options on futures contracts received, acquired, or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission; and (iii) any person who has a claim against the debtor arising out of sales or conversions of such securities.

SIPA § 78lll(2)(B).

The legislative history discusses this amendment in conjunction with a section titled "Portfolio margining." *See* S. Rep. 111-176 at 155-56. The legislative history explains that "[u]nder current law, the protections of SIPA do not extend to futures contracts other than security futures. As a result, customers currently are effectively precluded from including securities and related futures in a single securities account." *Id.* at 155. The amended section will now "enable customers to benefit from hedging activities by facilitating the inclusion of both securities and related futures products in a single 'portfolio margining account' provided for under rules of self-regulatory organizations approved by the Securities and Exchange Commission (the 'SEC')." *Id.* In conclusion, the legislative history provides:

> Section 983 amends the definitions of "customer," "customer property," and "net equity" in Section 16 of SIPA to provide that

11

> the owner of a portfolio margining account would be given the priority of a customer under SIPA with respect to any futures contracts or options on futures contracts permitted under SEC-approved rules to be carried in the account. Similarly, the customer's "net equity" in the account would include such futures and options on futures, and they would be treated along with cash and securities in the account as securities customer property. The definition of "net equity" is further amended to clarify that a customer's claim for either a commodity futures contract or a security futures contract will be treated as a claim for cash rather than as a claim for a security.

*Id.* at 156. Because most of the large SIPA cases, such as *Lehman* and *Madoff*, were filed prior to the effective date of the amended statute, no court has considered whether the amended statute provides SIPA protection to counterparties to an open TBA Contract.

### C. Cobalt Is Not Entitled to Customer Status

It is clear that, as of the Filing Date, Cobalt had not transferred any cash to MFGI relating to the TBA Contracts underlying its Claim. In addition, as set forth in the Stipulation of Facts, Cobalt's TBA transactions were "paired-off" before the Filing Date but the Settlement Dates were all scheduled to occur after the Filing Date. As such, MFGI only had an obligation to pay Cobalt their net gain on the transactions on the Settlement Date. Cobalt is essentially seeking to recover from MFGI the amount that MFGI would have had to pay Cobalt on the Settlement Dates in November and December 2011 if the SIPA liquidation had not been commenced; Cobalt is *not* seeking the return of cash or securities held by MFGI on Cobalt's behalf because MFGI did not hold any cash or securities for Cobalt on the Filing Date. Therefore, like the claimants in *Lehman*,[2] Cobalt failed to meet the threshold requirement of showing entrustment of cash or securities by MFGI and is not entitled to "customer" status under SIPA.

---

[2] In *Lehman*, many of the claimants had similarly "paired-off" their TBA transactions before the filing date. *See* SIPA Trustee's Reply, Ex. A.

Cobalt does not qualify as a "customer" under the amended SIPA statute. In order for the Dodd-Frank Act to alter Cobalt's status under the statute, Cobalt must have a claim against MFGI for (1) cash, securities, futures contracts, or options on futures contracts that are (2) "received, acquired, or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission." SIPA §§ 78lll(2)(B)(ii).

The parties dispute whether Cobalt's TBA Contracts were held in a portfolio margining account at MFGI. The Eggert Affidavit submitted by MFGI explains that Cobalt's TBA transactions were held in a DVP account, in which transactions were recorded but no cash or property was held. *See* Eggert Aff. ¶ 4; *see also* Cobalt MSFTA § 5(a) (providing that the Cobalt TBA Contracts were to be settled on a DVP basis). Cobalt has not put forth any factual or legal arguments in support of its position that the TBA Contracts were held in a portfolio margining account that was carried as a securities account and regulated by the SEC, as that term is intended under SIPA, and it is doubtful that they would be able so, as MFGI held neither securities nor futures on Cobalt's behalf. *See* S. Rep. 111-176 at 155-56 (explaining that the purpose behind the Dodd-Frank Act amendments to SIPA is to enable customers to include both securities and related futures in a single "portfolio margining" account). However, it is unnecessary for the Court to decide, as a factual matter, whether the TBA Contracts were held in a "portfolio margining" account because the first prong of SIPA section 78lll(2)(B)(ii) has not been met—Cobalt did not hold any cash, securities, futures contracts, or options on futures contracts in its account on the Filing Date.

As discussed above, Cobalt did not transfer any cash to MFGI relating to the TBA Contracts prior to the Filing Date. In addition, the Dodd-Frank Act did not amend the definition

13

of "security," and, for the reasons thoughtfully articulated by Judge Peck in *Lehman,* TBA Contracts are not "securities" under the statute. Therefore, MFGI did not hold any securities on Cobalt's behalf. Last, TBA Contracts are not "futures contracts" or "options on futures contracts" under the statute. TBA Contracts are forward contracts "entered off exchange and not subject to regulation by the CFTC or any other Government entity." *See* SIPC Reply at 5 n.1. Futures contracts, on the other hand, are "standardized, exchange-traded instruments." *See id.*; s*ee also CFTC v. Erskine,* 512 F.3d 309, 323-25 (6th Cir. 2008) (discussing the differences between futures and forward contracts, the primary difference being that futures are traded on a regulated exchange whereas forwards are not).

### III.    CONCLUSION

Cobalt did not transfer any cash or securities to MFGI prior to the Filing Date relating to the TBA Contracts and it is not seeking the return of cash or securities held on its behalf by MFGI. Cobalt is attempting to recover from MFGI the amount that MFGI would have had to pay Cobalt in November and December 2011, after the Filing Date, to settle the TBA Contracts. It is, in essence, asserting a claim for damages against MFGI based on a breach of contract. Cobalt therefore is not entitled to "customer" status under SIPA and its claim should be reclassified as a general creditor claim against the MFGI estate. The Dodd-Frank Act amendments to SIPA do not alter this conclusion.

Therefore, the Court confirms the Trustee's Determination of Claim Number 600000009.

**IT IS SO ORDERED.**

Dated: June 27, 2013
New York, New York.

___*Martin Glenn*___
MARTIN GLENN
United States Bankruptcy Judge