UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MF GLOBAL INC.,<br><br>Debtor. | FOR PUBLICATION<br><br>Case No. 11-2790 (MG) SIPA |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE TRUSTEE'S SEVENTY-SECOND AND SEVENTY-THIRD OMNIBUS OBJECTIONS TO CERTAIN CLAIMS**

Pending before the Court are the SIPA Trustee's Seventy-Second and Seventy-Third Omnibus Objections to General Creditor Claims (Post-Petition Loss Claims) (the "Objections").[1] The Court previously entered an order sustaining the Objections to claims as to which the Objections were uncontested. (ECF Doc. ## 8224, 8232.) This Opinion and Order addresses responses filed by the following claimants: (1) Frank Buckley;[2] (2) Douglas Bry;[3] and (3) a group of claimants referred to as the Calatrava Claimants.[4] The Trustee filed an omnibus reply

---

[1]  The Seventy-Second Omnibus Objection is at ECF Doc. # 7944, and the Seventy-Third Omnibus Objection is at ECF Doc. # 7992.

[2]  Buckley filed a letter response (the "Buckley Response"), identical copies of which were filed at ECF Doc. ## 8019, 8023.

[3]  Bry filed a letter response (the "Bry Response," ECF Doc. # 8025) on behalf of Northfield Capital Fund, LP ("Northfield Capital") and other claimants, along with a supplement (ECF Doc. # 8048). Bry is the president of Northfield Trading LP, which is the general partner of Northfield Capital. Bry is not authorized to practice law in this Court and is not a named claimant affected by the Objections. On June 25, 2014, Sara E. Echenique, an attorney at the law firm of Hughes Hubbard & Reed LLP called Bry as a professional courtesy to inform him that his letter to the Court on behalf of certain claimants likely qualified as unauthorized practice of law under Federal Rule of Bankruptcy Procedure 9010. (*See* Aulet Decl. ¶ 4; FED. R. BANKR. P. 9010(a) (requiring that an attorney be "authorized to practice in the court").) Bry subsequently filed the supplement, stating that, while he is an attorney currently on inactive status in Colorado, he is not seeking to enter an appearance as an attorney in this proceeding. Rather, as a commodity trading advisor with a limited power of attorney, he felt it was his fiduciary duty to include his clients' claims with the response filed on behalf of Northfield Capital. Neither Bry nor any of his clients retained counsel or appeared at the scheduled hearing on the Objections.

[4]  The Calatrava Claimants are: Calatrava Grain Fund LLC, Elustria Capital Partners Master Fund LP, Inbay Ltd., James River Navigator Hub Fund LLC, RSJ A.S., RSJ II Powerfunds PCC Cell Turboequities, RSJ II Powerfunds PCC Cell FITS, RSJ Prop PCC Cell STS, Shawver, John, Stelbar Oil Corporation, Inc., and TradeLink

(the "Reply," ECF Doc. # 8175), supported by the Declaration of Kenneth Aulet (the "Aulet Decl.," Reply Ex. A). The Court heard oral argument on the Objection on August 21, 2014.

While each of the responses raises a different theory of recovery, each argument fails for substantially the same reason: Customers of a failed brokerage firm cannot recover in a SIPA proceeding for market losses that occur between the date the SIPA proceeding is commenced and the date on which their securities or commodities are returned to them. For that reason, as explained in greater detail below, the Court **SUSTAINS** the Objections.

## I.    BACKGROUND

On October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, Judge for the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation of MFGI (the "MFGI Liquidation Order") pursuant to the provisions of SIPA in the case captioned *Securities Investor Protection Corp. v. MF Global Inc.*, Case No. 11-CIV-7750 (PAE) (ECF Doc. # 1). The MFGI Liquidation Order appointed James W. Giddens as the Trustee for the liquidation of the business of MF Global Inc. ("MFGI") in accordance with SIPA § 78eee(b)(3) and removed the case to this Court as required by SIPA § 78eee(b)(4). As soon as this SIPA proceeding was commenced, all MFGI accounts were "frozen," to allow the Trustee to make an assessment of the securities on hand at the failed broker-dealer and to return securities to customers in a timely, orderly manner.

## II.    DISCUSSION

In SIPA proceedings, customer claims are determined by the trustee based on the "net equity" of the claimant's account with the liquidating broker. *See In re MF Global Inc.*, No. 11-2790 (MG) SIPA, 2013 WL 5232578, at *3 (Bankr. S.D.N.Y. Sept. 17, 2013). "Net equity" is

---

LLC. Together, they filed the *Claimants' Response to Trustee's Seventy-Second and Seventy-Third Omnibus Objection to General Creditor Claims* (the "Calatrava Response," ECF Doc. # 8049).

determined under SIPA by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase *on the filing date*" all of the customer's securities positions, less "any indebtedness of such customer to the debtor on the filing date . . . ."  SIPA § 78lll(11) (emphasis added).  "As is clear from the definition, net equity is calculated as of the filing date."  *In re Lehman Bros. Inc.*, 433 B.R. 127, 133 (Bankr. S.D.N.Y. 2010); *see also In re Adler, Coleman Clearing Corp.*, 195 B.R., 266, 270 (Bankr. S.D.N.Y. 1996) ("A customer's account is valued as of the date the SIPA liquidation is commenced."); 1 COLLIER ON BANKRUPTCY ¶ 12.14[1][a] ("SIPA requires, and courts have consistently held, that net equity is calculated as of the filing date.").

Under SIPA, the trustee endeavors to deliver securities to customers holding claims for such securities, rather than the cash equivalent.  SIPA § 78fff–2(b).  "For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date."  *Id.*  A customer's net equity claim is fully satisfied upon receipt of the securities held on the filing date, regardless of any drop in value of such securities between the filing date and the date of the distribution.  SIPA does not protect customers against the diminution in value of the securities.  *See Adler*, 195 B.R. at 273 ("Congress did not include compensation for market losses suffered by a customer during the pendency of a SIPA liquidation proceeding within the definition of net equity."); *Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 892 (D.N.J. 1988) ("By use of a uniform filing date, SIPA is designed to insulate the calculation of net equity claims and distributions made on the basis thereof from market fluctuation."); 1 COLLIER ON BANKRUPTCY ¶ 12.14[1][a] (stating that "courts have consistently held that SIPA does not protect customers against market loss accruing during the

period between the filing date and the date on which a claim is determined or paid, regardless of which way the market has moved").

### A. Frank Buckley

Buckley filed claim number 5325 (the "Buckley Claim") against MFGI in the amount of $143,993.13—the amount he alleges was in his MFGI account on the Filing Date. (*See* Buckley Resp. at 1.) MFGI objects to the Buckley Claim as an impermissible claim for postpetition interest. (*See* Seventy-Second Omnibus Obj. Ex. 1.) Buckley received a full distribution on his allowed net equity, as calculated by the Trustee. (*See* Reply ¶ 7; Buckley Declaration and Release, Reply Ex. A.) This amount was approximately $30,000 less than what was in his MFGI account on the Filing Date. (*See* Buckley Resp. at 1–2.) Buckley asserts that he should be entitled to the full amount in his MF Global account as of the Filing Date because MFGI took away his ability to access the account and liquidate his position. (*See id.*) Buckley compares MFGI to an insurance company, which is required to pay out the value of goods at the time they were destroyed, not the value of the goods *after* they were destroyed. (*See id.*).

Buckley's assertions run contrary to the CFTC Rules and SIPA. "SIPA was not designed to provide full protection to all victims of a brokerage collapse." *Sec. & Exch. Comm'n v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974); *see also SIPC v. Bernard L. Madoff Inv. Secs, LLC* (*In re Madoff*), 496 B.R. 744, 756 (Bankr. S.D.N.Y. 2013) (stating that "SIPC is not an insurer and does not guarantee that customers will recover their investments which may have diminished as a result of . . . market fluctuations or broker-dealer fraud" (internal quotation marks omitted)). Under the CFTC Rules, "property held by a commodity broker on behalf of commodity customers must be valued as of the date of its return or transfer and not as if it had been liquidated as of the filing date." 46 Fed. Reg. 57535-01, 57546. This Court has previously

4

rejected claims similar to Buckley's. *See, e.g.*, *MF Global Inc.*, 2013 WL 5232578, at *3 ("A customer has no claim for a decline in the value of securities between the filing date and the date on which such securities are returned to him."). Therefore, the Court **SUSTAINS** the Objection to the Buckley Claim.

B.   **Douglas Bry/Northfield Capital**

Douglas Bry is president of Northfield Trading LP, which is the general partner of Northfield Capital. (*See* Bry Resp. at 3.) He submitted the Bry Response on behalf of ten claimants, including Northfield Capital. (*See id.*) Northfield Capital is a commodity trading advisor to the nine other claimants listed in the Bry Responses, and Bry had power of attorney to trade their positions at MFGI. (*See id.* at 2.)

On the Filing Date, MF Global UK Limited ("MF Global UK") was placed into special administration and Joint Special Administrators were appointed. All trade orders placed with MF Global UK after this date had to be authorized by the Joint Special Administrators. (*See* Email to Douglas Bry, Bry Resp. at 19.) On November 9, 2011, Northfield Capital attempted to liquidate certain positions through MF Global UK (the "Northfield Positions"), without receiving the Joint Special Administrators' authorization. On November 11, 2011, Northfield Capital received a daily statement reflecting a reversal of the trades liquidating the Northfield Positions. (Bry Resp. at 2, ¶ 3.) On December 16, 2011, Northfield Capital was informed that the Northfield Positions were liquidated as of November 11, 2011, two days after the attempted liquidation. (*Id.* at 2, ¶ 5.) Bry argues that (1) Northfield Capital and its clients are entitled to the November 9, 2011 prices of their positions; (2) the Trustee arbitrarily set a price for the Northfield Positions; and (3) the delay from November 9, 2011 to December 16, 2011 violated the CFTC and Exchange Rules. (*Id.* at 2–3, ¶¶ 5–6.) Northfield Capital's proof of claim asserts

5

that it is entitled to recover based on liquidation prices as of November 9, 2011, because MFGI failed, "in the ordinary course of its business to properly accept duly authorized orders for the account of the Creditor and . . . improperly cancel[ed] such orders after their execution . . . ." (*See id.* at 5.)

"[T]he Trustee's role is not that of a substitute broker." *In re Adler Coleman Clearing Corp.*, 211 B.R. 486, 497 (Bankr. S.D.N.Y. 1997) (quoting *In re Weis Sec. Inc.*, 3 Bankr. Ct. Dec. (CRR) 88 (Bankr. S.D.N.Y. 1977)). Once the Trustee was appointed, his only authority was to liquidate the business. *See* 15 U.S.C. § 78fff(a) (stating that the SIPA Trustee's purpose is "to liquidate the business"); *see also Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*, 481 B.R. 268, 283 (Bankr. S.D.N.Y. 2012) (stating that after the SIPA proceeding was commenced, "[e]ven if the SIPA Trustee had wanted to continue operating the business as a going concern, he was statutorily prohibited from doing so"). While Bry's initial post-filing request for trade execution was honored by a lower-level MF Global Hong Kong employee, he was informed shortly thereafter that this was a mistake, and that all trades had to be authorized by the Joint Special Administrators of MF Global UK. (*See* Email to Douglas Bry, Bry Resp. at 19.) The SIPA Trustee did not have authority to execute the trades requested by Bry. Additionally, the Trustee asserts that the Northfield Positions were valued in accordance with the CFTC Rules, the Bankruptcy Code, and SIPA. (*See* Aulet Decl. ¶ 5.) Bry has not offered any evidence to the contrary, stating simply that the Northfield Positions "were liquidated with an 'as of' date of November 11, 2011 at what appears to be an arbitrary price on the Trustee's part inasmuch as those markets were not trading at any similar levels on that date." (Bry Resp. at 2, ¶ 5.) But the Trustee valued the positions in accordance with his

responsibilities, and Bry's bald statement otherwise does not support a claim for recovery. For these reasons, the Court **SUSTAINS** the Objection to the claims included in the Bry Response.

### C. The Calatrava Claimants

Before the Filing Date, each of the Calatrava Claimants entered into an agreement with MFGI (a "Customer Agreement"),[5] under which MFGI opened and maintained one or more accounts on behalf each signing Claimant. Section 10 of each Customer Agreement, titled "Limitation of Liability," sets out a broad and detailed exculpation of liability of MFGI. The last sentence of that section contains a specific capstone provision which reads: "[MFGI] shall only be liable for actions or inactions by [MFGI] which amount to gross negligence or willful misconduct." (*See* Customer Agreement § 10.)

Due to the commencement of this SIPA proceeding, the Claimants did not have access to their MFGI accounts from the Filing Date through the date on which those accounts were liquidated or transferred by the SIPA Trustee. (Calatrava Resp. ¶ 15.) According to the Claimants, their inability to affect their MFGI positions during this period resulted in losses from a decline in the value of those positions (the "Position Losses"). Each of the Claimants timely filed a commodity customer claim and a separate general unsecured claim. The general unsecured claims seek recovery of Position Losses, as well as legal fees and expenses in connection with this proceeding.[6]

The Claimants do not dispute that SIPA does not provide for recovery to commodities customers of Position Losses. Nor do they contest the Trustee's calculation of their net equity

---

[5] A redacted example of a Customer Agreement is attached as Exhibit A to the Calavatra Response.

[6] Some of the Calatrava Claimants' general unsecured claims also sought recovery for losses ("30.7 Losses") resulting from MFGI's alleged failure to properly secure assets held for MFGI commodity customers trading on foreign exchanges pursuant to rule 30.7 of the CFTC regulations. (*See* Calatrava Resp. ¶ 17 n.4.) Based on the SIPA Trustee's intended 100% distribution on all allowed 30.7 customer claims, the Calatrava Claimants agreed to withdraw the 30.7 Losses amounts from their general unsecured claims. (*See id.*)

7

claims or the allowed amount of their commodity customer claims. (*Id.* ¶ 26.) But the Claimants assert they are nevertheless entitled to recovery of Position Losses as contractual damages under the Customer Agreements. (*Id.* ¶ 21.) The Calatrava Claimants argue that MFGI and its officers and directors engaged in gross negligence and willful misconduct leading up to the commencement of this SIPA proceeding[7]—behavior for which MFGI expressly assumed liability in the Customer Agreement. (*See id.* ¶¶ 8–13; 24–25; Customer Agreement § 10.) The Claimants contend that they are therefore entitled to contractual damages, separate and apart from their customer claims.

The Court rejects the Claimants' argument. Under Illinois law,[8] "[c]lear and unambiguous contract terms must be given their ordinary and natural meaning . . . ." *Frydman v. Horn Eye Ctr., Ltd.*, 676 N.E.2d 1355, 1359 (Ill. App. Ct. 1997). The Customer Agreement clearly and unambiguously limits MFGI's liability to its customers and does not create a cause of action based on Position Losses like those sought here. Section 10 of the Customer Agreement states that customers have "no claim against [MFGI] for any loss, damage, liability, cost, charge, expense, penalty, fine or tax caused directly or indirectly by," *inter alia*, (1) "any Applicable Law, or any order of any court;" (2) "suspension or termination of trading," and (3) "any other causes beyond [MFGI's] control." (Customer Agreement § 10.) Here, the MFGI Liquidation Order led to the freezing of MFGI's customers' accounts; an automatic result from the commencement of the case and a cause beyond MFGI's control.

The Calatrava Claimants assert that the last sentence of section 10—imposing liability on MFGI for gross negligence or willful misconduct—should be read into the beginning of section

---

[7] In making this allegation, the Claimants rely upon submissions by the SIPA Trustee and the Chapter 11 Trustee to this Court, the District Court, and to MFGI's creditors. (*See* Calatrava Resp. at 4 n.2, ¶ 24–25.)

[8] The Customer Agreements are governed by Illinois law. (*See* Customer Agreement § 13(a).)

8

10, imposing liability on MFGI if any of the occurrences listed in that section result from MFGI's gross negligence or willful misconduct. According to the Claimants, MFGI is liable for the Position Losses because those Losses were caused by operation of the MFGI Liquidation Order, which in turn was caused by MFGI's gross negligence and willful misconduct. The Claimants read liability for gross negligence and willful misconduct into the section of the Customer Agreement that explicitly exculpates MFGI from liability resulting from the required termination or suspension of trading upon the commencement of the SIPA proceeding. The plain language of the contract bars that result.

In support of their argument, the Claimants cite *Contact Lenses Unlimited, Inc. v. Johnson*, 531 N.E.2d 928, 931 (Ill. App. Ct. 1988), which held that a contract action was created by a clause providing for liability for gross negligence and willful misconduct. But the contract in that case is not analogous to the one at issue here. The contract in *Contact Lenses* stated: "The Agent shall also not be liable for any error of judgment or for any mistake of fact of [sic] law, or for anything which it may do or refrain from doing hereinafter, except in cases of willful misconduct or gross negligence." *See id.* The defendant in that case argued that it could be liable under that clause only for its intentional torts, and that it had immunity from all other claims. *Id.* The court disagreed, holding that the clause in question did not preclude contract actions. *Id.* The court explained that it had to construe the contract as a whole to give effect to the intention of the parties, and that other requirements in the contract—such as the requirement that the defendant undertake due diligence—would be meaningless if the defendant "could ignore those provisions with no penalty." *Id.*

The exculpation clause in the Customer Agreement is distinguishable from the one in *Contact Lenses* because the clause here lists specific occurrences for which MFGI cannot be held

9

liable. *See* Customer Agreement § 10; *see also Rayner Covering Sys., Inc. v. Danvers Farmers Elevator Co.*, 589 N.E.2d 1034, 1038 (Ill. App. Ct. 1992) (enforcing a limitation of damages clause and explaining that the exculpatory clause in *Contact Lenses* "attempted to exclude *all* liability on the part of the seller, at times in conflict with other portions of the contract" (emphasis in original)). The contract here excludes liability for all losses or damages for certain specifically identified reasons listed in the beginning of section 10, and limits liability for losses or damages for any other reason to cases involving gross negligence or willful misconduct. This reading of the contract does not bar MFGI customers from bringing contract damage actions. *See, e.g.*, *Sabena Belgian World Airways v. United Airlines, Inc.*, No. 91 C 0789, 1991 WL 78175, at *2 n.1 (N.D. Ill. May 7, 1991) ("Despite defendants' assertion to the contrary, allegations of willful misconduct or conversion in breaching a contract do not convert a breach of contract action into a tort action."); *Contact Lenses*, 531 N.E.2d at 931 (holding that a contract clause imposing liability for gross negligence or willful misconduct gives rise to contract action). The Claimants simply cannot bring *this* contract action—i.e., one for losses that occurred due to one of the enumerated occurrences in the beginning of section 10, for which MFGI is expressly not liable.[9]

The Claimants also assert that they are entitled to attorneys' fees and other legal costs under the Customer Agreement since those fees and costs are losses that were directly caused by

---

[9]    This holding also comports with SIPA, which does not provide relief for the type of losses sought by the Calatrava Claimants. The Customer Agreement was part of a form set of documents created by MFGI (*see* Calatrava Resp. ¶ 5) that was ostensibly signed by many other MFGI customers. The MFGI account freeze—and the market losses that occurred as a result—was the result of the proper, statutory, mechanical operation of bankruptcy procedure, CFTC Rules, and SIPA. Such losses are expressly contemplated by—and non-compensable under—SIPA. *See MF Global Inc.*, 2013 WL 5232578, at *3 (noting SIPA's "underlying assumption that customers desire to retain the securities in which they have invested" and that customers are exposed "to the same risk and rewards that otherwise would exist if the broker-dealer were still in operation, with the exception that, during the period from the filing date to the distribution date, the customer has no power to sell or otherwise dispose of securities to which the customer has a claim") (quoting 1 COLLIER ON BANKRUPTCY ¶ 12.14[1][a] (16th ed. 2013)). Allowing the Calatrava Claimants' claims for their Position Losses would undermine the purpose and rules laid out in SIPA, and could open the floodgates to similar claims.

10

MFGI's gross negligence or willful misconduct. "To have a contractual right to attorneys' fees in Illinois, that right must be specifically mentioned in the contract. General promises to pay 'costs,' 'expenses,' or the like, are not promises to pay attorneys' fees." *Prudential Ins. Co. of Am. v. Curt Bullock Builders, Inc.*, 626 F. Supp. 159, 170 (N.D. Ill. 1985); *see also Hous. Auth. of Champaign Cnty. v. Lyles*, 918 N.E.2d 1276, 1279 (Ill. App. Ct. 2009) (stating that contracts "must allow for attorney fees by specific language, such that one cannot recover if the provision does not specifically state that 'attorney fees' are recoverable"). "When faced with cost or expense-shifting provisions in contracts, Illinois courts have consistently refused to read attorney fees into imprecise language." *Negro Nest, LLC v. Mid-N. Mgmt., Inc.*, 839 N.E.2d 1083, 1091 (Ill. App. Ct. 2005). The Customer Agreement does *not* give customers the right to recover attorneys' fees and legal costs. The Customer Agreement expressly provides that MFGI may recover "attorneys' fees" from customers in certain circumstances. (*See* Customer Agreement § 10 (customers agree to "to indemnify [MFGI] and hold [MFGI] harmless from and against any and all liabilities, penalties, losses and expenses, *including legal expenses and attorneys' fees*") (emphasis added).) But nothing in the Customer Agreement permits customers to recover attorneys' fees. The Court cannot rewrite the contract to expand the remedies available to customers. *See, e.g.*, *Santorini Cab Corp. v. Cross Town Cab Co.*, Nos. 1–11–0428, 1–11–1607 & 1–11–2539, 2012 WL 6955471, at *6 (Ill. App. Ct. 2012) ("The purchasers drafted the contract and clearly knew how to expressly refer to attorney fees, but chose not to do so in paragraph 4(b).").

For all of these reasons, the Court **SUSTAINS** the objection to the claims filed by the Calatrava Claimants.[10]

---

[10]    The Trustee also asserts that the Claimants' request for attorneys' fees should be disallowed since the Claimants did not submit sufficient justification for the fees requested. (*See* Reply ¶ 17 n.11.) Further, even if the

11

### III.    CONCLUSION

For all of the above reasons, the Objections are **SUSTAINED**. The Trustee shall submit a proposed order expunging all of the claims subject to this Order.

**IT IS SO ORDERED.**

Dated:  September 4, 2014
         New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge

---

Court *did* allow attorneys' fees here, the Trustee asserts that the fees requested are unreasonable in amount and should be reduced. (*See id.*)  The Court need not reach this issue, however, since the Claimants do not have a contractual right to the fees and expenses in the first instance.