**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| MF GLOBAL INC., | Case No. 11-02790 (MG) SIPA |
| Debtor. | |

### MEMORANDUM OPINION AND ORDER SUSTAINING THE TRUSTEE'S OBJECTION TO GENERAL CREDITOR CLAIM NUMBER 50200 FILED BY CHARLES SONSON

*A P P E A R A N C E S:*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the*
*SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York 10004
By:    James B. Kobak, Jr., Esq.
        Christopher K. Kiplok, Esq.
        Jeffrey S. Margolin, Esq.
        Dustin P. Smith, Esq.
        Kenneth J. Aulet, Esq.

COTI & SUGRUE
*Attorneys for Charles V. Sonson*
20 Broad Street
Second Floor
Norwalk, Connecticut 06851
By:    Stephen R. Sugrue, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

James W. Giddens (the "Trustee"), as Trustee for the liquidation of MF Global Inc.

("MFGI")[1] under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA") filed

---

[1]        MFGI is a dually registered futures commission merchant ("FCM") and broker-dealer. *See SIPA Liquidation of MF Global, Inc.*, U.S. SEC. & EXCH. COMM'N, http://www.sec.gov/news/press/2011/secinfo-mfglobal.htm (last modified Nov. 1, 2011).

an objection (the "Objection," ECF Doc. # 8107) to general creditor claim number 50200 (the

"Claim," ECF Doc. # 8108, Ex. 1) filed by Charles Sonson ("Sonson").[2]  The Claim is based on

causes of action that Sonson has previously asserted against MFGI in an action filed in Illinois in

2010.  Specifically, the Claim asserts causes of action for breach of contract, breach of the

fiduciary duty of care, and misrepresentations in violation of the Commodities Exchange Act

(the "CEA") based on MFGI's allegedly improper liquidation of Sonson's customer account with

MFGI.  The Trustee's Objection seeks to disallow Sonson's Claim under section 502(d) of the

Bankruptcy Code on the basis that Sonson's account has a negative balance that is subject to

turnover, and until Sonson pays MFGI the amount of his account deficit, his Claim must be

disallowed.  Sonson filed a response in opposition to the Objection (the "Opposition," ECF Doc.

# 8157),[3] and the Trustee filed a reply (the "Reply," ECF Doc. # 8730).[4]  The Court held a

hearing on the Objection on April 7, 2015 and took the matter under submission.  This Opinion

sustains the Objection to Sonson's Claim.

## I.    BACKGROUND

On October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, United

States District Court Judge for the Southern District of New York, entered an order commencing

the liquidation of MFGI pursuant to the provisions of SIPA (the "MFGI Liquidation Order").

(Obj. ¶ 4.)  On November 23, 2011, the Court entered the *Order Granting Trustee's Expedited*

*Application Establishing Parallel Customer Claims Processes and Related Relief* (the "Claims

Process Order," ECF Doc. # 423), which, among other things, (1) approved the procedures for

---

[2]        The Objection is supported by the declaration of Nancy Morisseau (the "Morisseau Declaration," ECF Doc. # 8108).

[3]        The Opposition is supported by the Declaration of Charles V. Sonson (the "Sonson Declaration," ECF Doc. # 8156).

[4]        The Trustee filed an appendix to the Reply (the "Reply Appendix," ECF Doc. # 8731).

filing, determining, and adjudicating claims, and (2) established January 31, 2012 as the bar date

for filing securities and commodity futures customer claims in the SIPA Proceeding and June 2,

2012 as the date by which all claims must be received by the Trustee.  (*See id.* ¶¶ 6–7.)

A.    **Sonson's Account with MFGI**

Sonson opened an investment trading account with MFGI through Lind-Waldock.  (Obj.

¶ 8.)  On August 20, 2009, Sonson executed a customer agreement with MFGI (the "Customer

Agreement," Morisseau Decl. Ex. 2).  (Obj. ¶ 8.)  The Customer Agreement governed the

relationship between the parties and granted MFGI various rights, including, without limitation,

the right to declare Sonson in default without declaring a margin call and the right to liquidate

his account without affording him prior notice.  (*Id.* citing Morisseau Decl. Ex. 2 ¶ 5).)

According to the Trustee, there was a severe market disruption on May 6, 2010; a rapid

decline in prices for many major exchange-listed stocks caused Sonson's account to become

undermargined and exposed MFGI to risk.  (*Id.* ¶ 9.)  Although not contractually obligated to do

so, MFGI attempted to notify Sonson three times on May 6 to inform him that his account was

below margin and that he needed to deposit $154,000 into his account to maintain his minimum

margin balance.  (*Id.*)  MFGI was unable to speak with Sonson on each attempt to contact him.

(*See id.*)

MFGI's attempts to contact Sonson on May 6, 2010 are summarized as follows.  First,

Tracy Schafroth, an MFGI-registered representative, telephoned Sonson's home number and left

a voice message informing him about the margin demand.  (*Id.* citing Morisseau Decl. Ex. 3 at

14).)  Second, Schafroth subsequently called Sonson's cell phone at approximately 1:25 p.m.

(prevailing Central time) and left another voice message indicating that the margin call had been

issued.  (*See id.* citing Morisseau Decl. Ex. 3 at 14); *see* Sonson Decl. ¶ 12.)  Third, Schafroth

sent Sonson an email stating the following: "Your account . . . is on margin call for $154,000.

Failure to meet this margin call may result in Lind-Waldock liquidating all or part of the

positions in your account. You must notify the order desk in the event that you are going to meet

this call." (*Id.* (citing Morisseau Decl. Ex. 4).) After boarding a flight from Boston to Charlotte

scheduled to depart at 1:45 p.m. (prevailing Central time), Sonson listened to the cell phone

voice message left by Schafroth a few minutes after it was made. (*See* Sonson Decl. ¶¶ 11, 15.)

Despite landing in Charlotte before the close of market on May 6, 2010, Sonson waited until

after the market closed to contact MFGI. (*See id.* ¶ 20.)

The Trustee asserts that Sonson's account was overdrawn within 30 minutes from the

time Schafroth left Sonson the initial voice message. (Obj. ¶ 10.) Sonson failed to contact

MFGI, and MFGI was forced to cover Sonson's debit to protect itself. (*Id.*) Accordingly, MFGI

began liquidating Sonson's account. (*Id.*) By the following day, Sonson's customer account was

fully liquidated and had a debit balance in the amount of $51,093.46. (*Id.*) According to the

Trustee, the Customer Agreement provided that Sonson was "unconditionally obligated" to pay

MFGI the amount of any debit balance in his account regardless of how it was incurred. (*Id.*

(citing Morisseau Decl. Ex. 2 ¶ 5).)

MFGI demanded that Sonson pay the debit balance, but Sonson refused to pay. (*Id.*

¶ 11.) Sonson contends that MFGI improperly liquidated his account. (*Id.*) Rather than pay

MFGI the debit balance, on June 22, 2010, Sonson commenced a lawsuit (the "Prepetition

Litigation") against MFGI in the United States District Court for the Northern District of Illinois

(the "District Court") seeking $284,543 in damages and asserting causes of action for breach of

contract, breach of the fiduciary duty of care, and misrepresentations in violation of the CEA.

(*Id.*) MFGI counterclaimed for breach of contract alleging that Sonson failed to pay MFGI the

debit balance as well as fees and costs pursuant to the terms of the Customer Agreement.  (*Id.*)

The Prepetition Litigation was stayed by entry of the MFGI Liquidation Order.[5]  (*Id.*)  Sonson

has not sought relief from the automatic stay.  (*Id.*)

### B.      The Claim

On March 30, 2012, Sonson submitted his Claim seeking approximately $545,000.  (*Id.*

¶ 12.)  Sonson asserts that the damage award of $284,543 that he sought in the Prepetition

Litigation was a minimum amount, and the amount he seeks in his Claim is based on a

hypothetical valuation of his MFGI account based on similar positions he held at Tradestation

Securities ("Tradestation").  (*Id.* (citing Morisseau Decl. Ex. 8).)

### C.      The Objection

The Trustee argues that section 502(d) of the Bankruptcy Code requires the disallowance

of any claim from a claimant from which property is recoverable unless the claimant pays the

amount for which it is liable.  (*Id.* ¶ 14 (citing 11 U.S.C. § 502(d)).)  According to the Trustee,

the debit balance of Sonson's account, which has a fair and reasonable value of approximately

$51,093.46, constitutes estate property subject to turnover pursuant to SIPA section 78fff(b) and

section 542 of the Bankruptcy Code.  (*Id.*)  The Trustee asserts that Sonson has refused to turn

over any portion of this property to MFGI or otherwise agree to a consensual resolution of the

debit balance.  (*Id.* ¶ 15.)  Accordingly, the Trustee argues that Sonson's Claim should be

disallowed unless and until he has paid or turned over this property to the Trustee.  (*Id.*)

### D.      The Opposition

Sonson asserts four arguments in his Opposition.  First, Sonson argues that the Customer

Agreement incorporates federal law, regulations, and market practices, and MFGI's conduct did

---

[5]      At the time the Prepetition Litigation was stayed, the parties had litigated the action for approximately 15 months and had briefed cross motions for summary judgment.  (*See* Hr'g Tr. 19:14–20, Apr. 7, 2015, ECF Doc. # 8752.)

not meet what was required under federal law and market custom.  (*See* Opp. at 2–3.)  Second, Sonson argues that he was entitled to address the margin call by the close of trading on May 6, 2010, as was understood by Sonson and Schafroth.  (*See id.* at 7–8.)  Sonson also asserts that the Customer Agreement incorporates a reasonable notice requirement, and MFGI did not provide Sonson with reasonable notice before liquidating the positions in his account.  (*See id.* at 8.)  Third, Sonson disputes that his account was in debit when liquidated by MFGI, arguing that "no reliable intraday valuation of an account holding such positions could be made, and certainly not on the day in question."  (*Id.* at 9.)  Sonson claims he held positions similar to those in his MFGI account in two other accounts with Tradestation, actual margin calls were not received from Tradestation until the morning of May 7, 2010, and those margin calls were quickly met.  (*Id.*)  Sonson contends that the indiscriminate manner in which MFGI liquidated his account led to the disputed deficit, rather than his actions or inactions.  (*See id.* at 10.)  Finally, Sonson argues that he is not obligated to pay the disputed deficit as a condition to maintaining his Claim.  (*Id.*)  According to Sonson, the Trustee must first obtain a determination that Sonson owes money to the estate before the Claim may be disallowed under Bankruptcy Code section 502(d).  (*See id.* at 10–13.)

        **E.    The Reply**

        According to the Trustee, the material facts regarding Sonson's Claim are not in dispute. (Reply ¶ 2.)  On May 6, 2010, many financial markets experienced an extremely rapid decline later referred to as the "flash crash."  (*Id.*)  As a result of the rapid decline in the value of Sonson's positions, MFGI determined that Sonson's account had become undermargined, resulting in Schafroth (1) leaving a voice message on Sonson's home phone;  (2) leaving a voice message on Sonson's cell phone, indicating that Sonson's account was on margin call and that he

had until the end of the day to meet that margin call; and (3) sending Sonson an email regarding

the margin call.  (*See id.*)  According to the Trustee, Sonson admits that he received the voice

message left on his cell phone before the close of market on May 6, 2010.  (*Id.*)  Despite

knowing that his account was on margin call, Sonson did not respond to MFGI's attempts to

contact him or otherwise indicate that he would meet the margin call.  (*Id.*)  Rather, Sonson

boarded an airplane, leaving MFGI unable to reach him.  (*Id.*)  As the markets continued to

decline on May 6, 2010, MFGI determined that Sonson's account was in deficit and exercised its

contractual right to limit potential losses.  (*Id.*)

First, the Trustee argues that MFGI had the right to liquidate Sonson's account without

notice for being undermargined.  (*Id.* ¶ 4.)  The Trustee argues that neither Illinois nor federal

law impose reasonable notice requirements on FCMs, and the Chicago Board of Trade

("CBOT") and Chicago Mercantile Exchange ("CME") "rules cited by . . . Sonson exist to

protect the broker from claims that it should have liquidated an account sooner, not to void an

FCM's contractual right to liquidate undermargined accounts without notice." (*Id.* (citations

omitted).)  On the other hand, Sonson did have a requirement not only to meet the margin call,

but also to notify MFGI that he would meet the margin call.  (*Id.* ¶ 6.)  Despite his awareness of

highly irregular market behavior on May 6, 2010, Sonson did not promptly inform MFGI of his

intention to meet the margin call.  (*See id.*)

Second, the Trustee contends that Sonson's argument that his account was not in debit

when it was liquidated fails "because MFGI had an absolute right to liquidate [] Sonson's

account when it determines, in its sole discretion, that [] Sonson's account was undermargined or

in debit." (*Id.* ¶ 7 (citing Morisseau Decl. Ex. 2 ¶ 5).)  The Trustee argues that Sonson offers no

legal argument to support his contention that the account must be in deficit as opposed to at risk

of a deficit.  (*Id.*)  Additionally, Sonson cannot deny that his account was actually in deficit because it "was actually liquidated and resulted in a $50,000 debit, and that liquidation provided, by definition, the actual price the market was willing to pay for those options at the time of liquidation."  (*Id.* ¶ 8.)  Furthermore, under the Customer Agreement, MFGI had the sole discretion to determine the manner of liquidation, and liquidating Sonson's positions at the going market price was commercially reasonable.  (*Id.*)

Third, the Trustee argues that Sonson's liability for the deficit is unconditional and must be paid to MFGI to maintain his Claim.  (*See id.* ¶ 9.)  According to the Trustee, "[d]espite Sonson's contentions to the contrary, this Court can make a determination of Sonson's debt to the MFGI estate in the context of this claim objection, without the need for a separate proceeding to determine Sonson's liability."  (*Id.* (citations omitted).)  Finally, the Trustee contends that the automatic stay should not be lifted if the Court were to overrule the Objection because Sonson has not met his burden to show cause why the automatic stay should be lifted.  (*Id.* ¶ 10.)

## II.   DISCUSSION

### A.   Section 502(d) of the Bankruptcy Code

Section 502(d) of the Bankruptcy Code provides in relevant part:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542 . . . of this title, unless such entity . . . has . . . turned over any such property, for which such entity . . . is liable . . . .

11 U.S.C. § 502(d).[6]  Under section 502(d), a bankruptcy court is required "to disallow the claim of any claimant who is withholding property of the estate which may be recovered under § 542(b) of the Code."  *Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 861 (S.D.N.Y. 1994).  The purpose of section 502(d) is to prevent entities that

---

[6]      Section 502(d) also applies to claims held by transferees of avoidable transfers.  *See id.*

hold property subject to turnover or avoidance from receiving a distribution of estate assets until

such property is first returned to the estate. *See In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 609

(Bankr. S.D.N.Y. 1986).

A claim should not be disallowed pursuant to section 502(d) without the court initially

determining whether the claimant is required to turn over property of the estate. *See Atl.*

*Computer Sys.*, 173 B.R. at 862 (finding that section 502(d) requires "some sort of determination

of the claimant's liability before its claims are disallowed, and in the event of an adverse

determination, the provision of some opportunity to turn over the property"); *In re S. Air*

*Transp., Inc.*, 294 B.R. 293, 297 (Bankr. S.D. Ohio 2003) ("When raising an objection to a claim

based upon the ground that claimant has failed to surrender the alleged voidable transfer, the

claim can neither be allowed nor disallowed until the preference matter is adjudicated." (citations

and internal quotation marks omitted)); 4 COLLIER ON BANKRUPTCY ¶ 502.05[2][a] (Alan N.

Resnick & Henry J. Sommer eds., 16th ed. 2014) ("[A] claim may be disallowed at least

temporarily and for certain purposes, subject to reconsideration, simply upon the allegation of an

avoidable transfer."). According to Sonson, his Claim cannot be disallowed under section 502(d)

until MFGI first obtains a judicial determination that he indeed is required to turn over estate

property. (*See* Opp. at 11.) Sonson essentially argues disallowance of his Claim is premature

because MFGI has not yet obtained such a determination. (*See id.* at 11–12.) The Trustee agrees

that the Court must determine Sonson's liability to MFGI in resolving the Objection to his

Claim, but argues "the Trustee does not need to obtain a separate determination of [] Sonson's

liability . . . prior to objecting to his [C]laim pursuant to section 502(d)." (Reply ¶ 9.) The

Trustee cites to *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003) for the proposition that

a court may determine a claimant's liability to the estate on the merits in connection with a claim

objection made pursuant to section 502(d).  (*Id.* (citing *Metiom*, 301 B.R. at 641).)

In *Metiom*, the trustee filed an objection to a claim, asserting among other things that the

holder of such claim received an avoidable preference under section 547 of the Bankruptcy

Code, and therefore, the claim must be disallowed pursuant to Bankruptcy Code section 502(d)

until the claimant returned the amount of the preference payment to the estate.  *See Metiom*, 301

B.R. at 636–37.  The claimant opposed the claim objection on several grounds, including that the

claim objection invoked rights involving sections of the Bankruptcy Code that must be resolved

through an adversary proceeding, but the trustee did not file an adversary proceeding.  *See id.* at

639.  The court held that the trustee's failure to commence an adversary proceeding was not

fatal, observing that Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") provides that "[i]f an objection to a claim is joined with a demand for relief of the kind

specified in [Bankruptcy] Rule 7001, it *becomes* an adversary proceeding."  *Id.* (quoting FED. R.

BANKR. P. 3007).

However, Bankruptcy Rule 3007, which governs claims objections, was amended after

the *Metiom* decision was issued.  *See In re Donson*, 434 B.R. 471, 474 (Bankr. S.D. Tex. 2010)

("In 2007, [Bankruptcy Rule] 3007 was substantially amended.").  Bankruptcy Rule 3007

formerly provided that a claim objection may be joined with an adversary proceeding.  *See*

*Metiom*, 301 B.R. at 639 (citing FED. R. BANKR. P. 3007).  However, Bankruptcy Rule 3007(b)

now provides that "a party in interest *shall not* include a demand for relief of a kind specified in

[Bankruptcy] Rule 7001 in an objection to the allowance of a claim, but may include the

objection in an adversary proceeding."  FED. R. BANKR. P. 3007(b) (emphasis added).  The

advisory committee notes to the 2007 amendments to Bankruptcy Rule 3007 explain "the

amendment prohibits a party in interest from including in a claim objection a request for relief

10

that requires an adversary proceeding." *Id.* advisory committee note. Accordingly, Bankruptcy

Rule 3007 no longer permits a claim objection to automatically convert to an adversary

proceeding when the claim objection is joined with a demand for relief that must be brought by

adversary proceeding, as the *Metiom* court recognized under Bankruptcy Rule 3007 before the

2007 amendments went into effect. *See Pu v. Grubin (In re Food Mgmt. Grp., LLC)*, 484 B.R.

574, 583 (S.D.N.Y. 2012) (observing that "[s]ubsequent amendments to [Bankruptcy Rule 3007]

appear to disallow this kind of automatic conversion" (citing FED. R. BANKR. P. 3007(b); *id.*

advisory committee note)).

Therefore, if the Trustee's Objection seeks relief of the type that must be sought in an

adversary proceeding, such relief cannot be sought in a claim objection and must instead be

pursued in an adversary proceeding. *See Donson*, 434 B.R. at 474–75 (overruling claim

objection on the ground that the objection violated Bankruptcy Rule 3007(b) by seeking relief

that must be pursued in an adversary proceeding).

> **B.    The Objection Does Not Seek Affirmative Relief that Must Be Pursued in an Adversary Proceeding**

The Trustee's Objection to Sonson's Claim is based on the Trustee's allegation that

Sonson's account deficit constitutes estate property subject to turnover under section 542(a) of

the Bankruptcy Code. (*See* Obj. ¶ 14.) Section 542(a) provides in relevant part:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

Bankruptcy Rule 7001 identifies matters that constitute adversary proceedings governed

by the rules of Part VII of the Bankruptcy Rules. *See* FED. R. BANKR. P. 7001. Bankruptcy Rule

7001(1) specifically provides that an adversary proceeding includes "a proceeding to recover money or property, *other than* a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002." *Id.* 7001(1) (emphasis added).  Accordingly, an action to compel turnover of estate property pursuant to section 542(a) constitutes an adversary proceeding under Bankruptcy Rule 7001(1). *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) ("A turnover action is an adversary proceeding which must be commenced by a properly filed and served complaint." (citations omitted)); *see also Camall Co. v. Steadfast Ins. Co. (In re Camall Co.)*, 16 F. App'x 403, 407–08 (6th Cir. 2001) (unpublished decision) (affirming bankruptcy court's decision to deny trustee's request for turnover where it was made by motion rather than adversary proceeding).

However, the Trustee is not seeking affirmative relief under section 542(a) of the Bankruptcy Code.  (Hr'g Tr. 15:10–14, 21–25.)  Rather, the Trustee is solely seeking a determination that Sonson's account with MFGI is in deficit for purposes of temporarily disallowing his claim under section 502(d).  (*See id.*)  Sonson agrees that a determination that his account was in deficit "would constitute required judicial determination" for such purpose.  (*See id.* 18:8 ("I agree that the existence of a deficiency can be determined in a claim objection.").)  Therefore, the Court concludes that the Objection need not be overruled on the basis that it improperly seeks relief that must be pursued in an adversary proceeding.

### C.    The Trustee Has Made a Prima Facie Showing that Sonson's Debit Account Balance Is Subject to Turnover

According to the Trustee, Sonson's account has a debit balance in the approximate amount of $51,093.46, which constitutes estate property.[7]  (*See* Obj. ¶¶ 14–15.)  This debit balance "is in the possession and under the control of [] Sonson and is of more than

---

[7]    The Trustee also asserts that Sonson owes MFGI accrued interest in the amount of $3,442.42 and $24,064.06 in fees and costs incurred by MFGI.  (*Id.* ¶ 14 n.4 (citing Morisseau Decl. Ex. 9).)

inconsequential value to the MFGI estate." (*Id.* ¶ 15.) According to the Trustee, while the exact amount of Sonson's debit balance is in dispute, the Court can determine as a matter of law that Sonson's account has a debit balance that is owed to the MFGI estate. (*See* Hr'g Tr. 10:19–22.)

Sonson agrees that there are no disputed issues of fact that need to be resolved by the Court in order to determine whether his account has a debit balance. (*See id.* 24:20–25:14.) However, Sonson argues that MFGI had no right to liquidate his account before the market closed on May 6, 2010 because he was not provided sufficient time to meet MFGI's margin call. (*See id.* 20:18–21:17.) Sonson asserts that he was told that he had until the close of market to meet MFGI's margin call, but MFGI had effectively liquidated his entire account approximately 30 minutes later, with the exception of one position that was liquidated the next day. (*See id.* 21:17–24:19.) Additionally, Sonson contends that "the inconsistent and haphazard way in which [MFGI] liquidated the positions in his account, after barring him from trading in it, created the very deficit about which it now complains." (Opp. at 10.)

Whether the Trustee has made a prima facie showing that the debit balance of Sonson's account is subject to turnover for purposes of ruling on the Objection requires the Court to resolve whether this debit balance constitutes estate property, an issue with binary outcomes. Either (1) Sonson is liable to MFGI for breach of the Customer Agreement by failing to pay the debit balance of his account, or (2) MFGI is liable to Sonson for breach of the Customer Agreement by improperly liquidating the positions in his account. As discussed below, the Court concludes that Sonson is liable to MFGI in the amount of the debit balance of his account. Additionally, the Court holds that the Trustee has met his burden of making a prima facie showing that this debit balance is subject to turnover pursuant to section 542 of the Bankruptcy Code.

       1.     *MFGI Did Not Breach the Customer Agreement by Liquidating Sonson's Account Without Notice*

Paragraph 3 of the Customer Agreement imposed on Sonson the obligation to maintain a certain amount of margin on deposit (the "Margin Provision").  (*See* Morisseau Decl. Ex. 2 ¶ 3.)  The Margin Provision provided in relevant part:

> You agree to maintain, without demand from us, such margin, cash or other acceptable collateral as we in our discretion require from time to time and you agree to pay on demand any debit balances in your account.  You will make deposits of such margin or collateral immediately upon our request.

(*Id.*)  Paragraph 5 of the Customer Agreement sets forth MFGI's ability to declare a default and the remedies available upon an event of default.  (*See id.* ¶ 5.)  Specifically, paragraph 5 of the Customer Agreement provided the following with respect to MFGI declaring a default (the "Default Provision"):

> Should we deem it desirable for our protection, or should we feel insecure, or should you be in breach of or violate any of the terms of this Agreement, we are authorized to declare (*and without the necessity of a call for additional capital*) you in default under this and any other agreement you may then have with us or our affiliates, whether heretofore or hereafter entered into.

(*Id.* (emphasis added).)  Paragraph 5 further afforded MFGI the following remedies upon default (the "Remedy Provision"):

> In the event of default, each of us and our affiliates reserves the right to sell, *without prior notice to you*, any and all property in which you have an interest held by or through us or our affiliates . . . after which you shall be liable to us, for any remaining deficiencies, losses, costs or expenses sustained by us in connection therewith.  Such . . . sales may be effected publicly or privately *without notice or advertisement in such manner as we may in our sole discretion determine*.

(*Id.* (emphasis added).)

While the Default Provision broadly authorized MFGI to declare Sonson in default (*see id.*), the Customer Agreement did not indicate whether MFGI was required to notify Sonson that he was in default before exercising its remedies upon default.  The plain language of the Default Provision provided that MFGI was authorized to declare Sonson in default "[s]hould [MFGI] deem it desirable for [its] protection, . . . should [MFGI] feel insecure, or should [Sonson] be in breach of or violate any of the terms of th[e] [Customer] Agreement . . . ."  (*Id.*)  Additionally, the Default Provision made clear that MFGI may declare Sonson in default without first making a margin call.  (*See id.* (setting forth that default may be declared "without the necessity of a call for additional capital").)  The Customer Agreement required nothing further for MFGI to declare Sonson in default.

It is undisputed that MFGI attempted to contact Sonson three times on May 6, 2010 to advise him that his account was below margin, including by Schafroth sending Sonson an email indicating:

> Your account [redacted] is on margin call for $154,000.  Failure to meet this margin call may result in Lind-Waldock liquidating all or part of the positions in your account.  You must notify the order desk in the event that you are going to meet this call.

(Morisseau Decl. Ex. 4.)  Sonson also admits that he learned of the margin call by listening to a voice message left by MFGI before his account was liquidated.  (*See* Opp. Decl. ¶¶ 13–15, 19.)  To the extent that the Customer Agreement required MFGI to communicate to Sonson that he was in default on May 6, 2010, the Court concludes that MFGI satisfied this requirement.  By notifying Sonson of the margin call, MFGI communicated that his account was undermargined and in violation of the Margin Provision.  (*See id.* Ex. 2 ¶ 3.)  Additionally, MFGI notified Sonson that his failure to meet this margin call may result in the liquidation of the positions in his account.  (*See id.* Ex. 4.)

The Remedy Provision also clearly provided that, upon default, MFGI may liquidate Sonson's account positions without notice.  (*See id.* Ex. 2 ¶ 5.)  Once MFGI declared Sonson in default, it was authorized to liquidate positions in Sonson's account "without prior notice" and in the manner that MFGI determined in its "sole discretion."  (*Id.*)  Under the plain language of the Remedy Provision, MFGI was not required to provide Sonson with notice before liquidating the positions in his account.

Additionally, neither Illinois nor federal law requires an FCM to provide a customer prior demand or notice before liquidating an undermargined account.[8]  *See ADM Investor Servs., Inc. v. Ramsay*, 558 F. Supp. 2d 855, 861 (N.D. Ill. 2008) (applying Illinois law and holding that FCM was authorized to liquidate undermargined account without notice as a matter of law); *First Am. Disc. Corp. v. Jacobs*, 756 N.E.2d 273, 284 (Ill. App. Ct. 2001) (holding that liquidation provision in FCM customer agreement "is enforceable, in that no demand or notice is required on the part of a brokerage house prior to liquidating an under-margined account"); *see also Mohammed*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,229 (Jan. 27, 1992) ("Nothing in the [CEA] or regulations requires a futures commission merchant to obtain the consent of a customer to liquidate positions on an undermargined account."); *but see Nanlawala v. Jack Carl Assocs., Inc.*, 669 F. Supp. 204, 210 (N.D. Ill. 1987) (finding that exchange rules governing FCM customer agreement require customer be afforded reasonable time to comply with margin call before FCM may liquidate account).

Sonson argues that the Customer Agreement incorporates a requirement that he be afforded reasonable time to comply with a margin call and reasonable notice of liquidation,

---

[8]    The Customer Agreement's governing law provision provides that the Customer Agreement "shall be governed by, and the rights and liabilities of the parties shall be determined in accordance with, the laws of the State of Illinois, without regard to any of its conflicts of laws, principles or rules, and by the laws of the United States." (*Id.* ¶ 29.A.)

16

relying on *Nanlawala v. Jack Carl Associates, Inc.*, 669 F. Supp. 204 (N.D. Ill. 1987).  (*See* Opp.

at 6.)  In *Nanlawala*, the plaintiffs asserted a breach of contract claim against an FCM and two of

its employees, arguing that the defendants breached the applicable customer agreement by failing

to afford the plaintiffs reasonable time to meet a margin call before liquidating their

undermargined account.  669 F. Supp. at 209.  The court denied the parties' cross-motions for

summary judgment, holding that whether the defendants provided the plaintiffs a reasonable

amount of time to comply with the margin call was a genuine issue of material fact.  *See id.* at

210.  In reaching its holding, the court found that the applicable customer agreement

incorporated CBOT Rule 430.00 and CME Rule 827(D), both of which "establish a

reasonableness standard for the time accorded a customer to comply with a margin call . . . ."[9]

*Id.*  Specifically, the court held that both CBOT Rule 430.00 and CME Rule 827(D) require an

FCM to provide a customer a reasonable amount of time to meet a margin call before liquidating

the customer's account.  *See id.*

---

[9]        Chicago Board of Trade Rule 430.00 provides:

> Deposits by customers—A member acting as commission merchant for a customer (member or nonmember) may require from such customer a deposit, as indemnity against liability, and subsequent deposits to the extent of any adverse fluctuations in the market price.  Such deposits must be made with the commission merchant within a reasonable time after demand, and in the absence of unusual circumstances, *one hour shall be deemed a reasonable time*.  The failure of the customer to make such deposit within such time, shall entitle, but shall not obligate, the commission merchant to close out the trades of the defaulting customer . . . .

Chicago Mercantile Exchange Rule 827(D) provides:

> The clearing member may call for additional margins at his discretion, but whenever a customer's margins are depleted below the minimum amount required, the clearing member must call for such additional margins as will bring the account up to initial margin requirements, and if within a reasonable time the customer fails to comply with such demand (*the clearing member may deem one hour to be a reasonable time*), the clearing member may close out the customer's trades or sufficient contracts thereof to restore the customer's account to required margin status.

*Id.* (emphasis added).

In *Jacobs*, however, the Appellate Court of Illinois reversed the trial court's finding that the plaintiff's liquidation of the defendants' account constituted unauthorized trading and a breach of fiduciary duty, holding that the customer agreement's provision authorizing liquidation without notice was enforceable. 756 N.E.2d at 284. In reaching this holding, the court relied on *Moss v. J.C. Bradford & Co.*, 446 S.E.2d 799 (N.C. 1994), a decision of the Supreme Court of North Carolina, and *Mohammed*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,229 (1992), an administrative law decision of the Commodity Futures Trading Commission, observing that "both *Moss* and *Mohammed* enunciate the principle that under the federal regulatory scheme, a broker is permitted to liquidate an under-margined account without prior notice." *See Jacobs*, 756 N.E.2d at 281. The court rejected the defendants' argument that CME Rule 827 requires a broker to issue a margin call before liquidating a customer's account,[10] noting that such argument "was explicitly rejected by the court in *Moss*, which emphasized that '[r]ules of this sort governing margin calls and account liquidation are for the protection of the merchant and, ultimately, for the protection of the commodities exchange itself.'" *Id.* (quoting *Moss*, 446 S.E.2d at 806). "[A]s articulated in *Moss*, the broker may issue a margin call, but Rule 827 does not prohibit him from going a step further and liquidating the customer's under-margined account without notice." *Id.* at 282.

While Illinois courts appear divided on whether FCM customer agreements import a "reasonable notice" requirement, the Court finds the reasoning of *Jacobs* persuasive. "As a good business practice, a futures commission merchant should make a diligent effort to notify a customer that additional margin money must be deposited to avoid liquidation." *Mohammed*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,229, at ¶ 25,229. However,

---

[10]    The *Jacobs* court observed that "CME Rule 827 was replaced by portions of Rule 930 (particularly Rule 930.E and 930.K) . . . ." *Id.* at 282 n.2 (noting that the parties did not dispute that there is any "significant difference between Rule 827 and the relevant portions of Rule 930").

"[n]othing in the [CEA] or regulations requires a futures commission merchant to obtain the consent of a customer to liquidate positions on an undermargined account." *Id.* The regulations applicable to margin are designed to protect FCMs, not customers. *See Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 190 (7th Cir. 1992) ("Margins are accorded a special status in the regulatory scheme of the [CEA] so that futures commission agents are able to assure their own financial integrity, which, in turn, contributes to the financial integrity of the entire marketplace." (citing *Baker*, [1980-1982 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 21,167, at ¶24,772 (Jan. 27, 1981))); ; *see also ADM Investor Servs., Inc. v. Collins*, 515 F.3d 753, 756 (7th Cir. 2008) ("[M]argin requirements in futures markets are not designed to protect investors . . . from adverse price movements.  Margin protects counterparties from investors who may be unwilling or unable to keep their promises."); *Friedman*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,307, 1981 CFTC LEXIS 83, at *4–5 (Nov. 13, 1981) ("Margin is a security deposit to insure that futures commission merchants have adequate customer funds to settle open positions and is required by brokerage houses and exchanges to assure their own financial integrity and the financial integrity of the entire market place." (citations omitted)).  Because the regulatory scheme governing margin calls and liquidation of customer accounts is designed to protect FCMs from losses resulting from undermargined accounts, the Court concludes that this regulatory scheme does not require an FCM to provide reasonable notice, or any notice, to a customer before liquidating an undermargined account. *See Moss*, 446 S.E.2d at 807.

Additionally, MFGI did not waive its right to liquidate Sonson's account without notice once Sonson was in default, notwithstanding that Schafroth communicated to Sonson that his

account was on margin call with the understanding that Sonson could meet the call by the market

close on May 6, 2010.  (*See* Opp. at 7–8.)  Paragraph 10 of the Customer Agreement provides:

> Neither our failure to insist at any time upon strict compliance with
> this Agreement or with any of the terms hereof nor any continued
> course of such conduct on our part shall constitute or be considered
> a waiver by us of any of our rights or privileges hereunder.

(Morisseau Decl. Ex. 2 ¶ 10.)  Assuming arguendo that MFGI did communicate to Sonson that

he had until the close of market to meet the margin call, the Customer Agreement explicitly

provided that this statement did not waive or limit MFGI's right to ultimately liquidate Sonson's

account without notice after failing to receive assurance that Sonson would be able to meet such

demand.  *Cf. Prudential-Bache Sec., Inc. v. Stricklin*, 890 F.2d 704, 707 (4th Cir. 1989) (holding

that customer agreement allowing liquidation without notice authorized broker to liquidate

account approximately one hour after issuing margin call, notwithstanding that broker ordinarily

provided customers 24 hours to meet margin calls, where customer agreement stated that no

"prior course of conduct or dealings" would invalidate customer's "waiver of his right to demand

any notice of liquidation").  Accordingly, the Court concludes MFGI had the right to liquidate

Sonson's undermargined account without notice, and such right was not waived or limited by

MFGI's margin call.

> 2.    *MFGI Did Not Breach the Customer Agreement by Liquidating Sonson's
>        Account in the Manner Performed*

Sonson argues that the debit balance in his account resulted from "the inconsistent and

haphazard way" that MFGI liquidated the positions in his account.  (Opp. at 10.)  According to

Sonson, MFGI could not make a reliable valuation of his account on May 6, 2010 because

substantially all of the positions in his account were relatively illiquid.  (*See id.*)  Because no

reliable intraday valuation of his account could be made on the day in question, he disputes that

his account went "into debit."  (*Id.* at 9–10.)  The Trustee asserts that Sonson's positions were

actually liquidated at the price the market was willing to pay for such positions at the time,

resulting in a debit balance of approximately $50,000.  (Reply ¶ 8.)  While the value of Sonson's

positions may have been theoretical before liquidation, the market price for the positions at the

time of liquidation provided the actual value for such positions.  (*Id.*)  According to the Trustee,

the Customer Agreement authorized MFGI to determine the manner of liquidation "in its sole

discretion."  (*Id.* ¶ 8 n.9 (citing Morisseau Decl. Ex. 2 ¶ 5).)  Moreover, it is commercially

reasonable to liquidate an account's positions at the market price.  (*Id.*)

     The plain language of the Customer Agreement imposed no limitations on the manner in

which MFGI liquidated the positions in Sonson's account.  The Remedy Provision of the

Customer Agreement authorized MFGI to liquidate Sonson's account positions "publicly or

privately without notice or advertisement *in such manner as we may in our sole discretion

determine*."  (Morisseau Decl. Ex. 2 ¶ 5.)  Additionally, neither Illinois nor federal law requires

an FCM to liquidate a customer's account in any particular manner.  Indeed courts do not require

FCMs to adopt "less drastic alternatives" than liquidation.  *See Capital Options Invs., Inc. v.

Goldberg Bros. Commodities, Inc.*, No. 88 C 2073 (JFG), 1990 WL 180583, at *6 (N.D. Ill. Nov.

5, 1990) ("We are not equipped to second-guess, especially with the benefit of hindsight, the

business judgments of professional traders and brokers regarding the risks associated with any

given position or the volatility and direction of any future market movements.").  Nor do courts

require FCMs to liquidate a customer's account in the manner most beneficial to the customer.

*See Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 541 (S.D.N.Y.

2013) ("Morgan Stanley is not required . . . to choose the most beneficial trading strategy for

Peak Ridge, as the right to liquidate is for the benefit of Morgan Stanley in protecting itself

against high-risk positions." (citations omitted)).  Additionally, CME Rule 930.K, which governs

the liquidation of accounts, provides:

> If at any time there is a liquidating deficit in an account in which
> security futures are held, the clearing member shall take steps to
> liquidate positions in the account promptly and in an orderly
> manner.

CME Rule 930.K.2, *available at* http://www.cmegroup.com/rulebook/CME/I/9/9.pdf.

Based on MFGI's broad authority under the Customer Agreement to liquidate Sonson's

account in the manner of its choosing, and the absence of any limitation on such authority under

case law and the applicable exchange rules, the Court concludes that MFGI's liquidation of

Sonson's account did not breach the Customer Agreement.  MFGI promptly liquidated

substantially all of Sonson's account positions before the May 6, 2010 close of market.  (*See*

Morisseau Decl. Ex. 6 at 19–20.)  A single remaining position was liquidated the next day

because there was no bid offer for such position in the only available market open on May 6,

2010.  (*See id.* at 20–21.)

       3.     *The Trustee Has Adequately Alleged that Sonson's Debit Account Balance*
              *Is Subject to Turnover*

The Customer Account provides:

> You are unconditionally obligated to pay to us the amount of any
> debit balance in your account, however incurred, at the lesser of
> the highest rate permitted by applicable law or two percent above
> the current prime rate as announced from time to time by the
> banking institutions with which we normally do business.

(Morisseau Decl. Ex. 2 ¶ 5.)  After Sonson's account was liquidated, his account had a debit

balance of $51,093.46.  (*See* Morisseau Decl. Ex. 9 ¶ 7.)  While Sonson argues that the debit

balance is the result of MFGI's allegedly improper manner of liquidating his positions (*see* Opp.

at 10), he does not dispute that the account currently has a debit balance (*see* Hr'g Tr. 24:25–

25:1 ("I don't believe there are any disputed issues of fact . . . .")).  As set forth above, MFGI's

22

liquidation of Sonson's account did not constitute a breach of the Customer Agreement.

Accordingly, the Court concludes that Sonson is liable to MFGI for the debit balance.

Additionally, the Court finds that the Trustee has adequately alleged that the debit

balance of Sonson's account is subject to turnover under section 542 of the Bankruptcy Code.

Section 542(b) provides:

> Except as provided in subsection (c) or (d) of this section, an entity
> that owes a debt that is property of the estate and that is matured,
> payable on demand, or payable on order, shall pay such debt to, or
> on the order of, the trustee, except to the extent that such debt may
> be offset under section 553 of this title against a claim against the
> debtor.

11 U.S.C. § 542(b).  Because the Trustee has established that Sonson is unconditionally liable to

MFGI for the debit balance of his account, this debt constitutes estate property under section

541(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 541(a).  Section 541(a) of the Bankruptcy Code

provides in relevant part:

> The commencement of a case under section 301, 302, or 303 of
> this title creates an estate.  Such estate is comprised of all the
> following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this
> section, all legal or equitable interests of the debtor in property
> as of the commencement of the case.

*Id.* § 541(a)(1).  "This definition of property has been given 'the broadest possible

interpretation' . . . ."  *In re Nemko, Inc.*, 143 B.R. 980, 985 (Bankr. E.D.N.Y. 1992) (quoting

*Brown v. Dellinger (In re Brown)*, 734 F.2d 119, 123 (2d Cir. 1984)).  "Such property includes

'tangible and intangible property' as well as 'causes of action.'"  *Notz v. Tate (In re Chi. Disc.

Commodity Brokers, Inc.)*, 58 B.R. 619, 623 (Bankr. N.D. Ill. 1985) (citation omitted), *aff'd in

part*, *rev'd in part on other grounds*, No. 86 C 4036 (WTH), 1987 WL 5256 (N.D. Ill. Jan. 5,

1987).  The debit balance of Sonson's customer account with MFGI constitutes a debt owed to

MFGI pursuant to a prepetition contract.

Additionally, because the Trustee has established that Sonson is unconditionally obligated to pay MFGI the amount of this debit balance under the Customer Agreement, the debt is "matured" within the meaning of section 542(b) of the Bankruptcy Code. *See Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC)*, 331 B.R. 47, 57 (Bankr. E.D.N.Y. 2005) ("Matured [debt] refers to debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event." (alterations in original) (citation and internal quotation marks omitted)); *see also Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004) ("In order for a claim to be considered a matured debt, it must be specific in its terms as to amount due and date payable." (citing *Shea & Gould v. Red Apple Cos. (In re Shea & Gould)*, 198 B.R. 861, 867 (Bankr. S.D.N.Y. 1996)); *Kenston Mgmt. Co. v. Lisa Realty Co. (In re Kenston Mgmt. Co.)*, 137 B.R. 100, 108 (Bankr. E.D.N.Y. 1992) ("[F]or an action to be a turnover proceeding, it is not relevant that [all] the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's allegations, as long as these allegations state the existence of a mature debt." (alterations in original) (citation and internal quotation marks omitted)).

Based on the foregoing, the Court concludes that the Trustee has made a prima facie showing that the debit balance of Sonson's account is subject to turnover pursuant to section 542 of the Bankruptcy Code.[11]  Accordingly, the Court **SUSTAINS** the Objection to Sonson's Claim under section 502(d) of the Bankruptcy Code.

### III.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Objection is **SUSTAINED** and the Sonson Claim is

---

[11]    Although the Trustee also alleges facts supporting a turnover action under section 542(a) of the Bankruptcy Code (*see* Obj. ¶¶ 14–15), the Trustee generally alleges that Sonson's negative account balance is subject to turnover under section 542 and has adequately alleged facts supporting a turnover action under section 542(b).

hereby **DISALLOWED** pursuant to section 502(d) of the Bankruptcy Code.

       **IT IS SO ORDERED.**

Dated:  June 2, 2015
       New York, New York

*Martin Glenn*

MARTIN GLENN
United States Bankruptcy Judge
