**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **NOT FOR PUBLICATION** |
| MF GLOBAL INC., | Case No. 11-02790 (MG) SIPA |
| Debtor. | |

**MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND
OVERRULING IN PART THE TRUSTEE'S OBJECTION TO
GENERAL CREDITOR CLAIM NUMBER 500000143
FILED BY ROBERT CHARLES CLASS A, L.P.**

*A P P E A R A N C E S :*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the*
*SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York 10004
By:    James B. Kobak, Jr., Esq.
       Christopher K. Kiplok, Esq.
       Dustin P. Smith, Esq.
       Gregory C. Farrell, Esq.
       Kenneth J. Aulet, Esq.

LOUIS F. BURKE P.C.
*Attorneys for Robert Charles Class A, L.P.*
460 Park Avenue
21st Floor
New York, New York 10022
By:    Louis F. Burke, Esq.
       Leslie Wybiral, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

James W. Giddens (the "Trustee"), as Trustee for the liquidation of MF Global Inc.

("MFGI")[1] under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA") filed

an objection (the "Objection," ECF Doc. # 8609) to general creditor claim number 500000143

(the "Claim," *id.* Ex. A) filed by Robert Charles Class A, L.P. ("RCA").[2]  The Claim is based on

MFGI's alleged mishandling of a transfer of RCA's futures positions in an account held with

Morgan Stanley Smith Barney ("Morgan Stanley") to an account with MFGI.[3]  The Trustee's

Objection seeks to disallow RCA's Claim under section 502(b) of the Bankruptcy Code on the

basis that RCA fails to allege that MFGI is liable to RCA in connection with the transfer at issue.

RCA filed a response in opposition to the Objection (the "Opposition," ECF Doc. # 8639)[4] and

the Trustee filed a reply (the "Reply," ECF Doc. # 8732).[5]  The Court held a hearing on the

Objection on April 7, 2015 (the "Hearing") and took the matter under submission.

The essence of the dispute is that approximately $23 million in previously *unrealized*

losses in RCA's Morgan Stanley account were booked as *realized* losses in RCA's account when

the account transfer was completed.  According to RCA, this change allegedly resulted from the

method MFGI applied in recording RCA's positions in the MFGI account.  RCA contends that

---

[1]      MFGI is a dually registered futures commission merchant ("FCM") and broker-dealer.  *See SIPA Liquidation of MF Global, Inc.*, U.S. SEC. & EXCH. COMM'N, http://www.sec.gov/news/press/2011/secinfo-mfglobal.htm (last modified Nov. 1, 2011).

[2]      The Objection is supported by the declaration of Edward Eggert (the "Eggert Declaration," ECF Doc. # 8610).

[3]      RCA has asserted similar claims against Morgan Stanley that are currently proceeding in a Financial Industry Regulatory Authority ("FINRA") arbitration.

[4]      The Opposition is supported by the declarations of Robert L. Teel (the "Teel Declaration," ECF Doc. # 8640), Robert E. Conner and Paul C. Carroll (the "Conner/Carroll Declaration," ECF Doc. # 8641), and Leslie Wybiral, Esq. (the "Wybiral Declaration," ECF Doc. # 8642).

[5]      The Reply is supported by the declaration of Kenneth Aulet (the "Aulet Declaration," ECF Doc. # 8734), and an appendix attaching certain decisions cited in the Reply (the "Reply Appendix," ECF Doc. # 8733).

MFGI violated RCA's instructions in entering the positions in its books and records, and that

RCA was damaged as a result.  As explained below, whether the positions in RCA's account

were, in fact, "traded," and whether RCA's instructions on how to book the transferred positions

were disregarded, are disputed issues of fact that cannot be resolved in ruling on the Claim

Objection, and to that extent, the Objection is overruled.  The Objection to RCA's separate cause

of action for fraud based on nondisclosure of the method MFGI would use to record the Transfer

(unless the method MFGI used violated RCA's instructions) is sustained.

## I.        BACKGROUND

On October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, United

States District Court Judge for the Southern District of New York, entered an order commencing

the liquidation of MFGI pursuant to the provisions of SIPA (the "MFGI Liquidation Order").

(Obj. ¶ 8.)  On November 23, 2011, the Court entered the *Order Granting Trustee's Expedited*

*Application Establishing Parallel Customer Claims Processes and Related Relief* (the "Claims

Process Order," ECF Doc. # 423), which, among other things, (1) approved the procedures for

filing, determining, and adjudicating claims, and (2) established January 31, 2012 as the bar date

for filing securities and commodity futures customer claims in the SIPA Proceeding and June 2,

2012 as the date by which all claims must be received by the Trustee.  (*See id.* ¶¶ 10–11.)

### A.        The Transfer of RCA's Futures Positions

Before October 12, 2010, RCA had a trading account with Citigroup Global Markets Inc.

through Morgan Stanley.  (*Id.* ¶ 13.)  RCA's futures positions at Morgan Stanley were carried

and recorded at their original trade date and original trade price.  (Opp. ¶ 12.)  On October 12,

2010, Robert L. Teel ("Teel"), RCA's co-general partner, executed a transfer authorization form

(the "Transfer Authorization") in connection with the transfer of its account from Morgan

Stanley to MFGI.  (Obj. ¶ 13.)  The Transfer Authorization provides in relevant part:

> [We] direct the transfer of the above Account(s) to [MFGI] subject
> to its approval and to compliance with applicable law and
> regulation.  The Delivering Broker shall deliver to [MFGI] all open
> positions and securities held for the above Account(s), pay [MFGI]
> any net credit balance and cancel any outstanding open orders.
> [MFGI] shall notify the Delivering Broker promptly if the transfer
> is not approved for any reason.  If the transfer is approved, [MFGI]
> shall pay the Delivering Broker any net debit balance.

(Teel Decl. ¶ 5.)

On November 3, 2010, RCA's futures positions in its Morgan Stanley account were

transferred to MFGI (the "Transfer") based on the November 2, 2010 "settlement price" for such

positions.  (*See* Obj. ¶ 14.)  Specifically, on November 3, 2010, an MFGI employee sent an

email to a Morgan Stanley employee stating "I will accept today.  Original trade date and zero

premium on options and original trade date and settlement (11/02) on futures."  (Opp. ¶ 14

(citing Wybiral Decl. Ex. C).)  All of RCA's open futures positions at Morgan Stanley were

closed out by Morgan Stanley and immediately re-opened at MFGI at that day's settlement price;

all funds remaining in the Morgan Stanley account, after taking account of any gains or losses,

were then wired from Morgan Stanley to MFGI.  (*See* Obj. ¶14; Opp. ¶¶ 20, 23.)  Morgan

Stanley charged RCA approximately $327,000 in commissions for executing the Transfer.  (*See*

Opp. ¶ 20.)

As a result of the Transfer, RCA's unrealized losses that had been incurred while Morgan

Stanley was trading the account, which were previously reflected in RCA's open trade equity,

became reflected in RCA's account balance.  (*Id.*)  According to the Trustee, the value of RCA's

account was unchanged, but $23,030,696.62 in market losses was shifted between different

sections of the account statement as a result of the Transfer.  (*See id.*)  Thus, the dispute hinges

on whether MFGI could have and should have recorded RCA's positions at the original trade prices or the settlement date prices; that difference determined whether RCA's losses were unrealized or realized.

### B.    The Claim

On January 31, 2012, RCA filed the Claim in the amount of $23,358,342.12.  (*Id.* ¶ 12.) The stated basis for the Claim is "Commodities Account – Unauthorized Trade," and part of a monthly commodity statement is attached in support of the Claim; no further information regarding the Claim was provided.[6]  (*Id.*)  In response to the Trustee's request for additional information regarding the Claim, RCA provided an affidavit of Teel (the "Teel Affidavit," Obj. Ex. B).  (Obj. ¶ 12.)  The Teel Affidavit sets forth RCA's position that MFGI is liable for RCA's damages resulting from the Transfer because MFGI violated section 4d of the Commodities Exchange Act (the "CEA") by failing to follow RCA's instructions regarding the Transfer (*see* Teel Aff. ¶¶ 11, 14), and MFGI violated section 4b of the CEA by (i) failing to disclose material facts in connection with the Transfer (*see id.* ¶¶ 13, 16); and (ii) engaging in unauthorized trading by closing out RCA's positions in its Morgan Stanley account in order to complete the Transfer in an unauthorized manner (*see id.* ¶ 12).

### C.    The Objection

The Trustee argues that RCA fails to establish the three necessary elements of a claim for unauthorized trading:  (i) that MFGI placed a trade against RCA's account; (ii) without RCA's authorization; and (iii) with knowledge (or reckless disregard) of the fact that the trade was unauthorized.  (*See id.* ¶ 18.)  First, the Trustee contends that the Transfer at settlement price

---

[6]    On February 1, 2012, RCA also filed claim number 5029 (the "Duplicative Claim"), which consisted of the same documents attached to the Claim and included no additional information.  (*Id.* ¶ 12 n.3.)  The Duplicative Claim was disallowed and expunged as a duplicative claim by prior Court order (ECF Doc. # 7318) entered on December 5, 2013.  (Obj. ¶ 12 n.3.)

does not constitute a "trade" under the CEA and applicable regulations.  (*Id.* ¶ 19.)  Second, the

Trustee asserts that RCA authorized the Transfer pursuant to the Transfer Authorization, which

was signed by RCA.  (*Id.*)  Third, the Trustee argues that RCA has not provided any evidence

that any MFGI employee was aware at the time of making the Transfer that it was unauthorized.

(*Id.*)  Moreover, even if RCA could show that the Transfer was not authorized and was made

with knowledge (or reckless disregard) of the fact that it was unauthorized, RCA suffered no

damages as a result of the Transfer.  (*Id.*)

### D.    The Opposition

RCA asserts that the customary practice in the futures industry is to transfer account

positions using either (i) the original trade date and original execution prices for such positions;

or (ii) the current trade date and most recent settlement prices for such positions.  (*See* Opp.

¶ 15.)  According to RCA, the parties agreed that RCA's open futures positions in its Morgan

Stanley account were to be transferred to MFGI "ex-pit" utilizing "the original trade dates and

original executed prices so that no gains or losses would be realized."  (*Id.* ¶ 61.)  Instead,

however, MFGI completed the Transfer using settlement prices for RCA's positions, resulting in

RCA booking unrealized losses.  (*See id.* ¶ 18.)

According to RCA, the Claim is based on three theories of liability:  (1) MFGI violated

section 4d(2) of the CEA by failing to follow RCA's instructions regarding the Transfer (*see id.*

¶¶ 50–54); (2) MFGI violated section 4b of the CEA by failing to disclose material facts

regarding the manner in which the Transfer would be executed (*see id.* ¶¶ 55–57); and (3) MFGI

violated section 4b of the CEA by causing trades to be made on RCA's account without

authorization (*see id.* ¶¶ 58–64).  RCA asserts that it suffered damages in an amount no less than

$12 million as a result of the Transfer, and MFGI's conduct was the proximate cause of these

damages.  (*See id.* ¶¶ 63–64.)  RCA asserts that the Trustee fails to provide evidence rebutting

the prima facie validity of any of these theories.  (*See id.* ¶ 49.)

First, RCA contends that "Teel fully expected all of RCA's open futures positions to be

transferred from [Morgan Stanley] to MFG[I] using the original trade date and original executed

prices so that no gains or losses would be realized."  (*Id.* ¶ 51.)  Instead, MFGI ordered Morgan

Stanley to transfer RCA's positions using "original trade date and settlement (11/02) on futures"

(*id.* ¶ 52), in contravention of its duty to follow its customer's instructions with respect to an

account (*see id.* ¶ 54).  RCA argues that MFGI should have ensured that it clearly understood the

details of RCA's transfer request.  (*See id.* ¶ 22.)  Second, RCA asserts that MFGI violated

section 4b of the CEA by failing to disclose material facts to Teel.  (*See id.* ¶ 56.)  Specifically,

MFGI's "last-minute modification of the Transfer Authorization, known only to MFG[I], was a

patently material fact to a trader in Teel's position, and MFG[I] had a duty to disclose this fact to

Teel under Section 4b [of the CEA]."  (*Id.*)  Finally, RCA argues that MFGI violated section 4b

of the CEA by causing trades to be made for RCA's account without authorization.  (*See id.*

¶ 58.)  According to RCA, "[w]hat was meant to be an ex-pit transfer of futures positions from

one FCM to another became a series of *de facto* trades which had the effect of draining off nearly

$24M of cash in RCA's account at [Morgan Stanley] and creating realized losses."  (*Id.* ¶ 62.)

## E.    The Reply

According to the Trustee, the Claim should be disallowed because RCA has failed to

state a claim on which relief can be granted.  (Reply ¶ 4.)  First, the Trustee argues that RCA has

failed to adequately allege a violation of section 4d of the CEA.  (*See id.* ¶ 6.)  MFGI complied

with the terms of the Transfer Authorization, the only actual instructions RCA has specifically

alleged conveying to MFGI, and "RCA fails to allege any way in which these specific, written

instructions were disregarded." (*Id.*)  Second, the Trustee argues that RCA has failed to

adequately plead that MFGI failed to disclose material facts regarding the Transfer in violation

of section 4b of the CEA.  (*See id.* ¶ 11.)  According to the Trustee, a fact is material if it is

"substantially likely that a reasonable investor would consider the matter in making an

investment decision." (*Id.* ¶ 12 (quoting *Sudol*, [1984-1986 Transfer Binder], Comm. Fut. L.

Rep. (CCH) ¶ 22748, 1985 WL 55286, at *4 (CFTC Sept. 30, 1985)).)  However, "the

methodology used in the Transfer cannot be a material fact as a matter of law because it is not

necessary in order 'to assess independently the risk inherent in [RCA's] investment and the

likelihood of profit.'" (*Id.* ¶ 12 (quoting *CFTC v. Commodity Inv. Grp., Inc.*, No. 05-CV-5741

(HB), 2007 WL 1519002, at *7 (S.D.N.Y. Feb. 27, 2007)).)  Third, the Trustee argues that RCA

has failed to state a claim for unauthorized trading under section 4b of the CEA.  (*See id.* ¶ 24.)

According to the Trustee, RCA has failed to allege that any trade took place, that the Transfer

was not authorized, or that MFGI satisfied the scienter requirements for an unauthorized trading

claim.  (*See id.* ¶¶ 13–15.)

    Finally, the Trustee argues that RCA suffered no damages as a result of the Transfer.  (*Id.*

¶ 16.)  The Trustee asserts that RCA improperly asserts a new theory of damages in its

Opposition, which bifurcates its claimed damages.  (*See id.* ¶ 2.)  First, RCA claims that "it is

owed approximately $12 million for the decline in its account between the date of the transfer,

November 3, 2010[,] and the following Monday, November 8, 2010, based on allegations that

the timing and the procedure of the Transfer prevented RCA from placing unspecified new trades

. . . (the "No Trading Damages")." (*Id.*)  "Second, a new damages theory is that MFGI is liable

for unliquidated damages that it claims will be the 'subject of further analysis and quantification'

based on an alleged and unspecified disruption of a trading strategy (the "Unliquidated

Damages”).” (*Id.* (citing Opp. ¶ 46).)  The Trustee asserts that MFGI is not liable for the No

Trading Damages under any of RCA's theories of liability.  (*See id.* ¶¶ 17–21.)  Additionally, the

Trustee argues that RCA should not be allowed to maintain a claim for the Unliquidated

Damages at this stage of the proceeding because more than three years have passed since the

Claim was filed, and requiring the Trustee to hold reserves for the Unliquidated Damages would

prejudice legitimate creditors of the MFGI estate, particularly since RCA has not been willing to

calculate or estimate such damages.  (*See id.* ¶ 22.)

## II.    DISCUSSION

### A.    Claims Objections

Correctly filed proofs of claim “constitute prima facie evidence of the validity and

amount of the claim . . . .  To overcome this prima facie evidence, an objecting party must come

forth with evidence which, if believed, would refute at least one of the allegations essential to the

claim.” *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  By

producing “evidence equal in force to the prima facie case,” an objector can negate a claim's

presumptive legal validity, thereby shifting the burden back to the claimant to “prove by a

preponderance of the evidence that under applicable law the claim should be allowed.” *Creamer

v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS),

2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the

objector does not “introduce[] evidence as to the invalidity of the claim or the excessiveness of

its amount, the claimant need offer no further proof of the merits of the claim.”  4 COLLIER ON

BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if

“unenforceable against the debtor and property of the debtor, under any agreement or applicable

law." 11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy

courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674

(Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim.  *See,*

*e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK*

*Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, a claimant must allege "enough facts to state a claim for relief that is plausible on

its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation

marks omitted).  Plausibility "is not akin to a probability requirement," but rather requires "more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal

quotation marks omitted).  The court must accept all factual allegations as true, discounting legal

conclusions clothed in factual garb.  *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum*

*Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).

The court must then determine if these well-pleaded factual allegations state a "plausible claim

for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement.  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  "The pleadings must create the possibility of a right to relief that is more than speculative."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

To support claims grounded in fraud, Federal Rule of Civil Procedure ("FRCP") 9(b) requires the claimant to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).  FRCP 9(b) is grounded in the purpose "to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties."  *Silverman v. Arctrade Capital, Inc. (In re Arctrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (citation and internal quotation marks omitted).

### B.    Unauthorized Trading

RCA asserts claims against MFGI based on alleged unauthorized trading on two separate theories, arising from sections 4d(a) and 4b of the CEA.  Both theories depend on MFGI having (1) traded the positions in RCA's account, and (2) failed to follow RCA's instructions in the method in which the trades were recorded; MFGI disputes both points.

Section 4d(a) of the CEA requires FCMs to "treat and deal" with customer property "as belonging to such customer."  7 U.S.C. § 6d(a).  "In practice, this duty requires an FCM to follow customers' instructions regarding their money and property."  *Lee*, [1999-2000 Transfer

11

Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,550, 2000 CFTC LEXIS 153, at *11 (CFTC June 29,

2000) (citing *Slone*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,283 at 42,433

(CFTC Dec. 16, 1984)); *see Yrag Traders LLC*, [2013-2014 Transfer Binder] Comm. Fut. L.

Rep. (CCH) ¶ 33,363, 2013 CFTC LEXIS 67, at *44 (CFTC Dec. 12, 2013) (holding that

respondents violated section 4d of the CEA by failing to follow customer's "do-not-liquidate

instructions").  Additionally, section 4b of the CEA makes it unlawful for any person to cheat or

defraud, or attempt to cheat or defraud, another person in connection with a futures contract.  *See*

7 U.S.C. § 6b(a)(2)(A).  "Unauthorized trading constitutes a violation of section 4b when an

associated person executes trades without the customer's permission or contrary to the

customer's trading instructions."  *Crothers v. CFTC*, 33 F.3d 405, 409 (4th Cir. 1994) (citing

*Cange v. Stotler & Co.*, 826 F.2d 581, 589 (7th Cir. 1987); *Haltmier v. CFTC*, 554 F.2d 556, 560

(2d Cir. 1977)).  A person violates section 4b's prohibition against unauthorized trading when he

acts "deliberately, knowing that his acts were unauthorized and contrary to instructions."

*Haltmier*, 554 F.2d at 562 (holding that a violation of section 4b does not require acting with "an

evil motive or an affirmative intent to injure"); *accord Cange*, 826 F.2d at 589 ("[T]he knowing

and deliberate execution of unauthorized trades, even if not done out of an evil motive or intent

to injure the customer, violates [section 4b of the CEA]." (citing *Silverman v. CFTC*, 549 F.2d

28, 32–33 (7th Cir. 1977); *Haltmier*, 554 F.2d at 560, 562))).  Additionally, "[t]here is no

requirement that the unauthorized trades be in themselves fundamentally unfair or injurious to

the client's interests."  *Herman v. T & S Commodities, Inc.*, 578 F. Supp. 601, 603 (S.D.N.Y.

1984).

     The Trustee maintains that MFGI complied with the only instruction provided by RCA—

the Transfer Authorization.  (Reply ¶ 10.)  RCA argues that it contemplated that the Transfer

would be an "ex-pit" transfer of RCA's futures positions from Morgan Stanley to MFGI "using

the original trade date and original executed prices so that no gains or losses would be realized."

(Opp. ¶ 51.)  However, the Trustee asserts that an "ex-pit" transaction is defined as "any

transaction that is executed outside of conventional means (conventional means are in a pit via

open outcry, on the CME electronic trading platform, or the like) on a non-competitive basis."

(Obj. ¶ 24 n.7 (citing *Understanding "Ex-Pit" Transactions*, CME GROUP (Oct. 27, 2011),

http://www.cmegroup.com/education/files/Ex-Pit-Transactions.pdf).)  According to the Trustee,

whether MFGI had agreed that the Transfer would be "ex-pit" does not establish that the

Transfer would be made at original trade price, since transfers made at settlement price also

constitute ex-pit transfers.  (*See id.*)

The Transfer Authorization is silent on the manner in which RCA's account was to be

transferred to MFGI; it contains no explicit reference to the applicable trade date or settlement

price to be used in completing the Transfer.  The Transfer Authorization provides in relevant

part:

> [We] direct the transfer of the above Account(s) to [MFGI] subject
> to its approval and to compliance with applicable law and
> regulation.  The Delivering Broker shall deliver to [MFGI] all open
> positions and securities held for the above Account(s), pay [MFGI]
> any net credit balance and cancel any outstanding open orders.
> [MFGI] shall notify the Delivering Broker promptly if the transfer
> is not approved for any reason.  If the transfer is approved, [MFGI]
> shall pay the Delivering Broker any net debit balance.

(Teel Decl. ¶ 5.)  CME Rule 853, which governs the transfers of trades and customer accounts,

also does not provide guidance on the price to be used in completing a transfer of the kind at

issue.  CME Rule 853.A.5 provides in relevant part:

> [T]ransactions in all physically delivered futures contracts except
> for FX futures contracts must be recorded and carried on the books
> of the receiving firm at the original trade dates; all other

13

> transactions may be recorded and carried at either the original trade
> date or the transfer date. *Futures transactions may be transferred
> using either the original trade price or the most recent settlement
> price . . . .*

CME Rule 853.A.5 (emphasis added). Furthermore, the term "ex-pit" transfer does not

necessarily refer to a transfer made at a particular price. Rather, "ex-pit" transfers are generally

"office and transfer trades [that] involve a transfer of futures contracts between two accounts of

the same customer." 23A JERRY W. MARKHAM & THOMAS LEE HAZEN, BROKER-DEALER

OPERATIONS UNDER SECURITIES AND COMMODITIES LAW § 9:17 (West 2014); *see also* JERRY W.

MARKHAM, COMMODITIES REGULATION:  FRAUD, MANIPULATION & OTHER CLAIMS § 13:4 (West

2015) ("In brief, office and transfer trades involve a transfer of futures contracts between two

accounts of the same customer.  These transactions are also sometimes referred to as 'ex-pit'

trades.").  While "purchases and sales of any commodity for future delivery" are generally

required to "be executed openly and competitively by open outcry . . . or by other equally open

and competitive methods," 17 C.F.R. § 1.38(a), non-competitive office trades are permitted to be

conducted "ex-pit," provided they are conducted in accordance with applicable exchange rules,

*see id.*; MARKHAM, COMMODITIES REGULATION:  FRAUD, MANIPULATION & OTHER CLAIMS

§ 13:4 ("Regulation 1.38 and Section 4c of the [CEA] . . . allow noncompetitive transfers and

office trades, provided they are conducted in accordance with exchange rules.").

However, RCA has sufficiently alleged facts supporting the reasonable inference that

MFGI violated section 166.2 of the CFTC's regulations ("Rule 166.2"), which provides that "an

FCM may execute trades for a customer only after the customer or someone designated by the

customer to control the account 'specifically authorize[s]' the trades under § 166.2(a), or

provides the FCM with written authorization for the trades under § 166.2(b)." *Peltz v. SHB

Commodities, Inc.*, 115 F.3d 1082, 1087 (2d Cir. 1997).  Rule 166.2 provides:

No futures commission merchant, retail foreign exchange dealer, introducing broker or any of their associated persons may directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account:

(a) With respect to a commodity interest as defined in any paragraph of the commodity interest definition in § 1.3(yy) of this chapter, specifically authorized the futures commission merchant, retail foreign exchange dealer, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies—

    (1) The precise commodity interest to be purchased or sold; and

    (2) The exact amount of the commodity interest to be purchased or sold); or

(b) With respect to a commodity interest as defined in paragraph (1) or (2) of the commodity interest definition in § 1.3(yy) of this chapter, authorized in writing the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the account without the customer's specific authorization; provided, however, that if any such futures commission merchant, introducing broker or any of their associated persons is also authorized to effect transactions in foreign futures or foreign options without the customer's specific authorization, such authorization must be expressly documented.

17 C.F.R. § 166.2.  Rule 166.2(b) applies to (i) futures contracts, and (ii) "[a]ny contract, agreement or transaction subject to a Commission regulation under section 4c or 19 of the [CEA]."  *Id.* § 1.3(yy)(1)–(2).

    RCA has sufficiently alleged that Morgan Stanley and MFGI completed trades of futures positions in violation of Rule 166.2.  According to RCA, Morgan Stanley and MFGI each executed unauthorized trades of RCA's futures positions rather than simply implementing an office transfer of such positions.  (*See* Hr'g Tr. 61:5–14, Apr. 7, 2015, ECF Doc. # 8752.)  The

Trustee asserts that the Second Circuit's decision in *Haltmier* supports the proposition that "[a]

trade requires exposing a client's assets to market risk or . . . making a 'market gamble' with the

client's money (or conversely, the exiting of a market gamble)."  (Obj. ¶ 20 (quoting *Haltmier*,

554 F.2d at 562).)  In *Haltmier*, the Second Circuit sustained the CFTC's sanctions against the

petition for intentionally engaging in trades not authorized by his customer, finding that the

evidence supported the CFTC's "determination that [the petitioner] knowingly engaged in an

unauthorized market gamble with [the customer]'s money."  *Haltmier*, 554 F.2d at 562.

However, the Court is not convinced that *Haltmier* unequivocally defines what constitutes a

trade under the CEA.  The *Haltmier* court did not indicate what the necessary conditions of a

trade are, but rather held that the transaction at issue met the sufficient conditions of a trade.

While the CEA does not provide a clear definition of a trade, a "trade" is defined by the CME as

"any purchase or sale of any commodity futures or options contract made on the [CME]."

*Definitions*, CME RULEBOOK, ch. iii at 10,

http://www.cmegroup.com/rulebook/files/CME_Definitions.pdf (last visited May 28, 2015).

        The Transfer Authorization did not unambiguously provide that Morgan Stanley was

"specifically authorized" to complete the Transfer of RCA's futures positions by closing out the

positions at settlement price.  Rather, the Transfer Authorization directed Morgan Stanley to

"deliver to [MFGI] all open positions and securities held for the above Account(s), pay [MFGI]

any net credit balance and cancel any outstanding open orders."  (Teel Decl. ¶ 5.)  It is not clear

whether the direction to "cancel any outstanding open orders" contemplated Morgan Stanley

closing out RCA's existing futures positions.  An equally plausible interpretation of this direction

is that Morgan Stanley was to cancel open orders that had not yet been executed.  Nor did the

Transfer Authorization specifically authorize MFGI to purchase the futures positions that were to

be transferred from Morgan Stanley.  Moreover, the Transfer Authorization did not

unambiguously provide either Morgan Stanley or MFGI with authority to execute trades of

RCA's futures positions without specific authorization.  The Trustee has not submitted evidence

sufficient to establish that neither Morgan Stanley nor MFGI executed trades of RCA's futures

positions as a matter of law.  The Trustee argues that the Transfer did not involve trades because

there was "no market exposure."  (Hr'g Tr. 33:14.)  According to the Trustee, "Morgan Stanley

[wa]s not selling positions on the market and MF[GI] [wa]s not buying new positions on the

market, they[] [were] simply closing out the account at Morgan Stanley . . . and then MF[GI]

d[id] the same transactions on its own books and records . . . ."  (*Id.* 33:15–21.)  Whether trades

of RCA's futures positions were actually executed is a disputed issue of fact.

Additionally, RCA sufficiently alleges that MFGI deliberately engaged in unauthorized

trades.  RCA asserts that MFGI executed the Transfer using settlement prices despite the parties'

agreement that original prices would be utilized.  (*See* Opp. ¶¶ 13, 18, 23.)  MFGI's alleged

trading in connection with the Transfer was willful within the meaning of section 4b of the CEA

because it was allegedly done with knowledge that it was not authorized.  *See Haltmier*, 554 F.2d

at 562 ("It is enough that [a person] acted deliberately, knowing that his acts were unauthorized

and contrary to instructions.").  Accordingly, the Court **OVERRULES** the Objection to RCA's

Claim to the extent it is premised on MFGI's violations of sections 4d(a)(2) and 4b of the CEA

by failing to follow RCA's instructions regarding the Transfer.

### C.    Failure to Disclose Material Facts Regarding the Transfer

RCA asserts a separate theory of liability on the part of MFGI for allegedy violating

section 4b of the CEA by failing to disclose to RCA that the Transfer would be made using

settlement trade prices rather than original trade date prices.  (*See* Opp. ¶¶ 55–57.)  In essence,

RCA asserts that MFGI is liable for fraud under the CEA.  (*See* Hr'g Tr. 57:14–17 ("THE

17

COURT:  [T]he 4(b) claims, aren't they essentially fraud claims?  MR. BURKE:  Well they are –

they're the Commodity Exchange Act answer to a fraud claim.").)  The Trustee argues that RCA

cannot state a claim for a fraudulent omission under the CEA because "[t]he Transfer was not an

investment decision and RCA alleges no investment decision it made or did not make based on

the mechanism to be used for the Transfer."  (Reply ¶ 12.)  However, RCA maintains that it is

customary for an ex-pit transfer to be made using "the original details of a position" and MFGI

failed to disclose its intention "to use an unconventional method, *i.e.* original trade date with a

current settlement price, to transfer RCA's futures positions."  (Opp. ¶ 57.)  To the extent RCA

alleges that MFGI violated section 4b of the CEA by engaging in unauthorized trading and

failing to follow RCA's instructions, the Court has already overruled the Objection because of

disputed issues of fact.  But RCA's separate theory of section 4b liability based on fraud for

failure to disclose the method that MFGI would use to record the Transfer fails to state a

plausible claim for relief, and to that extent, MFGI's Objection is sustained.

"Section 4b [of the CEA], like analogous provisions of federal securities law, imposes

liability on brokers for omissions and the making of material misrepresentations."  *Herman v. T*

*& S Commodities, Inc.*, 592 F. Supp. 1406, 1416 (S.D.N.Y. 1984) (citation omitted).  Section

4b(a) of the CEA provides, in relevant part, that it is unlawful for any person

> in or in connection with any order to make, or the making of, any
> contract of sale of any commodity for future delivery . . . that is
> made, or to be made, for or on behalf of, or with, any other person,
> other than on or subject to the rules of a designated contract
> market—
>
>> (A) to cheat or defraud or attempt to cheat or defraud the other
>> person;
>>
>> (B) willfully to make or cause to be made to the other person
>> any false report or statement or willfully to enter or cause to be
>> entered for the other person any false record; [or]

> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or . . . with the other person . . . .

7 U.S.C. § 6b(a)(2)(A)–(C). "To state a claim for fraud under § 4b of the [CEA] a [p]laintiff must allege '(1) the making of a misrepresentation, misleading statement, or a deceptive omissions; (2) scienter; . . . (3) materiality'; (4) and reliance (5) 'in or [in] connection with any order to make . . . any contract of sale of any commodity for future delivery . . . .'" *Walrus Master Fund Ltd. v. Citigroup Global Mkts., Inc.*, No. 08 Civ. 2404 (DAB), 2009 WL 928289, at *3 (S.D.N.Y. Mar. 30, 2009) (quoting *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 499 (S.D.N.Y. 2004)).

The Court concludes that RCA has failed to adequately allege a violation of section 4b of the CEA based on fraud for failing to disclose that it intended to record positions at settlement prices *unless* RCA establishes that it specifically instructed that the positions be recorded at the original trade prices, that such a methodology was permissible in the circumstances, and that MFGI disregarded the instructions. The Court has already held that RCA states a claim for violation of section 4b of the CEA for MFGI's alleged failure to follow RCA's instructions; however, RCA fails to sufficiently plead a claim based on fraudulent omission in the absence of an instruction to MFGI to record the positions at the original trade prices. As already explained, CME Rule 853.A.5 provides that futures transaction "may be transferred using either the original trade price or the most recent settlement price . . . ." CME Rule 853.A.5. RCA provides no basis for imposing an obligation on an FCM to disclose the method it will apply in recording an office transfer absent instructions from the customer. Additionally, RCA has failed to allege scienter on the part of MFGI in its failure to disclose its choice of method for recording the

Transfer unless it was instructed by the customer on the specific method to apply.  It is the

disregarded instruction from the customer that is required to adequately plead the claims.  *See*

*Haltmier*, 554 F.2d at 562 ("It is enough that [the FCM employee] acted deliberately, knowing

that his acts were unauthorized and contrary to instructions.  Such knowing, intentional conduct

made his acts willful . . . in the accepted sense for infractions of [section 4b of the CEA]."

(citations omitted)); *see also Int'l Fin. Servs.*, 323 F. Supp. 2d at 502 ("[S]cienter . . . generally

means intent to deceive, manipulate or defraud though in the context of the CEA, scienter also

may be shown by proof of recklessness." (citations and internal quotation marks omitted)).  An

FCM cannot be faulted for applying a permissible method for recording office transfers on its

books and records absent instructions from the customer to the contrary.  As set forth above, the

Court finds that RCA has adequately alleged a claim under section 4b of the CEA for MFGI's

alleged failure to follow RCA's instructions.  RCA has not provided a basis for finding that

MFGI had an independent duty to disclose that it would complete the Transfer using settlement

prices, rather than original trade prices.

For these reasons, MFGI's Objection to RCA's separate theory of section 4b liability

based on alleged nondisclosure of the method that MFGI would apply in recording the Transfer

in its books and records *unless* the method was contrary to RCA's instructions is **SUSTAINED**.

### III.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Objection is **SUSTAINED in part** and

**OVERRULED in part**.  The Trustee's counsel shall confer with RCA's counsel within fourteen

(14) days from the date of this Opinion regarding the scheduling of any discovery and an

evidentiary hearing, as well as further briefing before trial.  Following such conference, counsel

shall promptly file a status letter advising the Court of the proposed schedule.  The Trustee's

counsel shall also set this matter for a further status conference at an available hearing date.  The

Court will enter a scheduling order following that conference.

**IT IS SO ORDERED.**

Dated:  June 2, 2015
     New York, New York

                                   _____*Martin Glenn*_____
                                        MARTIN GLENN
                        United States Bankruptcy Judge