**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

MF GLOBAL INC.,

Debtor.

**NOT FOR PUBLICATION**

Case No. 11-2790 (MG) SIPA

---

**MEMORANDUM OPINION AND ORDER SUSTAINING**
**THE SIPA TRUSTEE'S OBJECTION TO THE GENERAL**
**CREDITOR CLAIM OF ROBERT CHARLES CLASS A, L.P.**

*A P P E A R A N C E S:*

LOUIS F. BURKE, P.C.
*Attorneys for Claimant*
*Robert Charles Class A LP*
460 Park Avenue
21st Floor
New York, New York 10022
By:     Louis F. Burke, Esq.

HUGHES HUBBARD & REED LLP
*Attorney for the Trustee*
One Battery Park Plaza
New York, New York 10004-1482
By:     Savvas A. Foukas, Esq.
        Kenneth J. Aulet, Esq.
        Gregory C. Farrell, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the objection of James W. Giddens, Trustee for the SIPA

Liquidation Trust of MF Global Inc. (the "Trustee" and the "Trust")[1] to the general creditor

claim of Robert Charles Class A, L.P. ("RCA" or the "Claimant," and together with the Trustee,

the "Parties") (the "Objection," ECF Doc. # 8609).  RCA filed a response in opposition to the

---

[1]     By an order dated January 8, 2016, the Court approved a substitution of the Trustee's interest in the objection to the general creditor claim of Robert Charles Class A, L.P. with MF Global Assigned Assets LLC ("MFGAA").  Throughout this opinion the Court will refer to the Trust or Trustee, rather than MFGAA.

Objection (the "Opposition," ECF Doc. # 8639).  The Claim, as defined below, arises from alleged unauthorized trading and failure to follow RCA's transfer instructions, in connection with the transfer of RCA's futures commodities account from Morgan Stanley Smith Barney ("MSSB") to MF Global Inc. ("MFGI"), on November 3, 2010 (the "Transfer").  RCA asserts that MFGI's actions with respect to the transfer violated sections 4b and 4d(2) of the Commodities Exchange Act (the "CEA").

The Trustee seeks to disallow and expunge the Claim pursuant to section 502(b) of the Bankruptcy Code, made applicable to this proceeding by sections 78fff(b) and 78fff-1(a) of the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  As explained below, the Court initially concluded that the Claim and the Objection raised a contested matter that could not be resolved completely without an evidentiary hearing.  The Court held the evidentiary hearing on December 3, 2015 and heard closing arguments on December 14, 2015.  Based on the evidence and the arguments, the Objection is **SUSTAINED** and the Claim is **DISALLOWED** and **EXPUNGED**.

## I.    BACKGROUND

On January 23, 2012, RCA filed an unsecured general creditor claim in the amount of $23,358,342.12.  (Claim No. 500000143, the "Claim.")  The Trustee filed the Objection to the Claim on January 30, 2015.  The crux of the dispute is that approximately $23 million in previously *unrealized* losses in RCA's Morgan Stanley account were booked as *realized* losses in RCA's MFGI account when the account transfer was completed.  According to RCA, the realization of the losses allegedly resulted from the method MFGI applied in recording RCA's

positions in the MFGI account.  RCA alleges that MFGI violated RCA's instructions in entering

the positions in its books and records, and that, as a result, RCA was damaged.

In an opinion dated June 2, 2015 (the "June Opinion," ECF Doc. # 8775), the Court

sustained the Objection in part and overruled it in part.  The Court wrote, in relevant part,

"whether the positions in RCA's account were in fact, 'traded,' and whether RCA's instructions

on how to book the transferred positions were disregarded, are disputed issues of fact."  (June

Op. at 3.)  Familiarity with the June Opinion is assumed.

RCA asserts claims against MFGI based on alleged unauthorized trading on two separate

theories, arising from sections 4b and 4d(a) of the CEA.  Both theories depend on MFGI (i)

trading the positions in RCA's account, and (ii) failing to follow RCA's instructions in the

method in which the trades were recorded.  MFGI disputes both points.  As explained below, the

Court expressly finds that (1) in transferring RCA's positions from MSSB to MFGI, MFGI did

*not* trade any of the positions in the account; (2) MFGI did *not* fail to follow RCA's instructions

in choosing the method in which the trades were booked in RCA's MFGI account; (3) RCA

ratified the Transfer from MSSB to MFGI (including the method MFGI utilized in recording the

Transfer in its books and records); and (4) even if MFGI failed to follow RCA's instructions,

RCA suffered no harm as a result.

After pretrial discovery and briefing,[2] the Court entered a joint pretrial order (the "Joint

Pretrial Order," ECF Doc. # 8916).  During the December 3, 2015 evidentiary hearing, the Court

admitted in evidence the testimony of 5 witnesses.  Three witnesses testified in court, through

written direct testimony and in-court cross-examination and redirect examination—Robert L.

---

[2]      On November 23, 2015 the Trustee filed *Pre-Hearing Brief in Support of the Trustee's Objection to the General Creditor Claim of Robert Charles Class A, L.P. (Claim No. 500000143)* (the "Trustee Memorandum of Law," ECF Doc. # 8901).  On the same day, RCA filed its memorandum of law ("RCA Memorandum of Law," ECF Doc. # 8902).

Teel (RCA's co-general partner), Howard Malzberg (RCA's expert witness), and Michael Burke (MFGI's expert witness).  Two witnesses testified by deposition designations and counter-designations—Peter Newcomb (Senior Vice President of Alaris Trading Partners, and RCA's agent in dealing with MFGI, including the Transfer from MSSB to MFGI), and Michael O'Rourke (former MFGI employee who handled account transfers, including the RCA account Transfer from MSSB to MFGI).  The Parties also introduced numerous exhibits.

In making its findings of fact below, the Court has taken into account its opportunity to see and hear the in-court testimony of Teel, Malzberg and Burke, as well as reading the deposition testimony of Newcomb and O'Rourke.  To the extent there are material inconsistencies between the Parties' version of events (mostly between Teel, on the one hand, and Burke, O'Rourke and Newcomb, on the other), understanding of terminology, and explanation of the futures trading process, the Court finds that Teel's testimony lacked credibility on numerous disputed factual issues.  To the extent of such inconsistencies, the Court credits the testimony of Burke, O'Rourke and Newcomb.

The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014.

## II.    FINDINGS OF FACT

### A.    General Background

RCA was formed in 1997 as a California limited partnership for the purpose of holding investments, trading futures and options on futures, and other financial endeavors.  (Joint Pretrial Order at 2.)  RCA was formerly registered with the Commodity Futures Trading Commission ("CFTC") as an exempt commodity pool.  (RCA Mem. of Law at 1, ECF Doc. # 8902.)  Teel was RCA's co-general partner and he was solely responsible for managing RCA's trading in

futures contracts and options on futures contracts.  (Joint Pretrial Order at 2.)  MFGI was

registered with the CFTC as a futures commission merchant ("FCM") and was a member of the

National Futures Association ("NFA").  (*Id.*)

B.    **Account Transfer from MSSB to MFGI**

Before November 3, 2010, RCA maintained a futures trading account with MSSB that

was cleared by Citigroup Global Markets, Inc. ("Citi").[3]  (*Id.* at 3.)  While the RCA account was

at MSSB, Teel pursued a high risk trading strategy that resulted in unrealized losses in excess of

$23 million as of November 2, 2010.  These losses (represented by the account's large negative

trade equity) limited Teel's ability to trade in the account.  While the MSSB account statement

nominally showed a cash balance of $26,738,588.62, as explained below, the account's total net

equity (rather than the listed cash balance) determined the amount that RCA had available to

place new trades.

In the summer of 2010, Teel began exploring options to transfer RCA's account from

MSSB to another FCM.  (Joint Pretrial Order at 3*, see also* RCA Mem. of Law at 3.)  Teel

engaged Alaris Trading Partners ("Alaris"), which was registered with the CFTC as an

introducing broker.  (Joint Pretrial Order at 3.)  Alaris was also a member of the NFA.  (*Id.*)

Alaris was an introducing broker to MFGI.  Todd Brown ("Brown") was a senior vice president

of sales and Newcomb was a senior vice president of futures at Alaris.  Alaris introduced RCA to

MFGI.  (RCA Mem. of Law at 3.)  Newcomb acted as RCA's agent in RCA's dealings with

MFGI.  Teel purportedly believed that by transferring the account from Citi to another FCM, and

recording the positions at their original trade prices, RCA could use the full cash balance shown

in the MSSB account statement in placing new trades, even though the total net equity was

---

[3]      Citi as the clearing firm issued RCA's monthly account statements.  Some documents and testimony refer
to MSSB and some refer to Citi.  The two entities may be considered interchangeable for purposes of this Opinion..

substantially lower.[4]  It is undisputed that the transfer of the positions in RCA's MSSB account

to MFGI was "ex-pit."  (*See* Trustee Mem. of Law at 1, ECF Doc. # 8901; *see also* RCA Mem.

of Law at 1.)  An ex-pit transfer is a transaction that is executed outside of conventional means,

*i.e.*, in a pit via open outcry.  (RCA Mem. of Law. at 1.)

On October 12, 2010, Teel, on behalf of RCA, signed MFGI's account opening

paperwork, which included a customer account transfer authorization form (the "Transfer

Authorization," Trustee Ex. C.).  The Transfer Authorization provides in relevant part:

> [We] direct the transfer of the above Account(s) to [MFGI] subject
> to its approval and to compliance with applicable law and
> regulation. The Delivering Broker shall deliver to [MFGI] all open
> positions and securities held for the above Account(s), pay [MFGI]
> any net credit balance and cancel any outstanding open orders.
> [MFGI] shall notify the Delivering Broker promptly if the transfer
> is not approved for any reason. If the transfer is approved, [MFGI]
> shall pay the Delivering Broker any net debit balance.

(*Id.*)

On October 20, 2010, Alaris employee Newcomb sent the Transfer Authorization to

MFGI.  (Joint Pretrial Order at 3.)  On November 3, 2010, O'Rourke sent an email to Citi

employee Angelito Abrera referencing "ATP 30000"—ATP 30000 was the account number

assigned to RCA's new account at MFGI.  (*Id.*)  The email stated in part: "Lito, I will accept

today. Original trade date and zero premium on options and original trade date and settlement

(11/02) on futures."  (*Id.*)  The Transfer occurred on November 3, 2010.  (*Id.*)  All of RCA's

open futures positions at Morgan Stanley were closed out by Morgan Stanley and immediately

re-opened at MFGI at that day's settlement price; all funds remaining in the Morgan Stanley

---

[4]       The Court finds that Teel had no basis to believe (as he testified) that RCA could utilize the full "cash
balance" shown on its MSSB account statement in placing new trades either at MSSB or at any other FCM to which
the account was transferred.  Teel's testimony is contradicted by the testimony of his own expert, Marlzberg, and by
the testimony of Burke, O'Rourke and Newcomb.  The "buying power" of the account would be the same whether
the Transfer was booked at original trade prices or at recent settlement prices.

account, after taking account of any gains or losses, were then wired from Morgan Stanley to

MFGI. (*See* Obj. ¶ 14; Opp. ¶¶ 20, 23.) Morgan Stanley charged RCA approximately $328,000

in commissions and fees for executing the Transfer. (Joint Pretrial Order at 4.) Subsequently, as

the result of an arbitration award, RCA has recovered the commissions and fees from MSSB.

(*Id.*)

　　　RCA's account was transferred on November 3, 2010 using the most recent settlement

prices from November 2, 2010—as opposed to the original trade prices. (RCA Mem. of Law at

8). As a result of using the most recent settlement prices, RCA's MFGI account statement

showed a $23,030,696.62 increase in RCA's open trade equity and a corresponding decrease in

RCA's cash balance from the amounts shown in the November 2, 2010 MSSB account

statement. (Joint Pretrial Order at 4.) But the transfer did not affect the net liquidation value or

the required margin on RCA's account. (*Id.*) After Teel raised questions about why the Transfer

was not booked at original trade prices, O'Rourke explained in a November 5, 2010 email to

Newcomb, that ". . . [t]he future positions has to be transferred at settlement price because the

client had APS prices on his books at Citi." (RCA Ex. 28.) APS prices are average prices for

multiple trades of the same contracts. Contrary to O'Rourke's November 5, 2010 email, while

the Citi statements include APS prices, it was nevertheless possible to determine and record the

trades at original trade prices. O'Rourke must have been persuaded that the Transfer could be

booked at original trade prices because on November 5, 2010, O'Rouke sent another email to

Newcomb, stating "[i]f you want we can bust out the settlement prices on the futures and book at

original trade prices and then I will put through a P&L reversal adjustment on the OTE."

(Trustee Ex. O.) Newcomb then sent Teel an email, also on November 5, 2010, that in part

restates O'Rouke's email to Teel. (RCA Ex. 38). Newcomb explained to Teel that whether the

7

Transfer was booked at original trade prices or most recent settlement prices, the "buying power" of the account was the same.  (Newcomb Dep. Tr. 151:17–152:12.)  Teel then decided to not pursue his request that the Transfer be rebooked at original trade prices.  (Newcomb Dep. Tr. 151:1416.)  The Trust argues that Teel thereby ratified the Transfer at most the recent settlement prices.

## III.   DISCUSSION

In the June Opinion, the Court concluded that RCA sufficiently alleged that MFGI deliberately engaged in unauthorized trades.  (June Op. at 17.)  RCA asserts that MFGI executed the Transfer using settlement prices despite the Parties' agreement that the original prices would be utilized.  (*Id.*)  Accordingly, the Court overruled the Objection to RCA's Claim to the extent it was premised on MFGI's violations of sections 4d(a)(2) and 4b of the CEA by failing to follow RCA's instructions regarding the Transfer.  The Court concluded that an evidentiary hearing was required to resolve disputed issues of fact.

The June Opinion also concluded that RCA failed to adequately allege a violation of section 4b of the CEA based on fraud for failing to disclose that it intended to record the positions at settlement prices, unless RCA could establish that: (i) it specifically instructed that the positions be recorded at the original trade prices; (ii) such a methodology was permissible in the circumstances; (iii) and MFGI disregarded the instructions.  However, RCA failed to sufficiently plead a claim based on fraudulent omission in the absence of an instruction to MFGI to record the positions at the original trade prices.

### A.   An FCM Must Follow a Customer's Instructions

RCA alleges that by transferring the account at most the recent settlement prices, instead of original trade prices, MFGI executed an unauthorized transfer in violation of sections 4b and

4d(a) of the CEA.  Section 4b provides that it is unlawful for any person to "cheat or defraud" another person in connection with a futures contract.  7 U.S.C. § 6b(a)(2)(A).  Section 4d(a) requires FCMs to "treat and deal" with customer property "as belonging to such customer."  *Id.* § 6d(a).  "In practice, this duty requires an FCM to follow customers' instructions regarding their money and property."  *Lee v. Lind-Waldock & Co.,* CFTC No. 99-R018, 2000 CFTC LEXIS 153, at *11 (CFTC June 29, 2000) (citing *Slone,* [19941996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,283 at ¶ 42,433 (CFTC Dec. 16, 1984)); *see Yrag Traders LLC,* [2013-2014 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,363, 2013 CFTC LEXIS 67, at *44 (CFTC Dec. 12, 2013) (holding that respondents violated section 4d of the CEA by failing to follow customer's "do-not-liquidate instructions").

"Unauthorized trading constitutes a violation of section 4b when an associated person executes trades without the customer's permission or contrary to the customer's trading instructions."  *Crothers v. CFTC,* 33 F.3d 405, 409 (4th Cir. 1994) (citing *Cange v. Stotler & Co.,* 826 F.2d 581, 589 (7th Cir. 1987); *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir. 1977)).  A person violates section 4b's prohibition against unauthorized trading when he acts "deliberately, knowing that his acts were unauthorized and contrary to instructions."  *Haltmier,* 554 F.2d at 562 (holding that a violation of section 4b does not require acting with "an evil motive or an affirmative intent to injure"); *accord Cange,* 826 F.2d at 589 ("[T]he knowing and deliberate execution of unauthorized trades, even if not done out of an evil motive or intent to injure the customer, violates [section 4b of the CEA]." (citing *Silverman v. CFTC,* 549 F.2d 28, 32–33 (7th Cir. 1977); *Haltmier,* 554 F.2d at 560, 562)).  Additionally, "[t]here is no requirement that the unauthorized trades be in themselves fundamentally unfair or injurious to the client's interests."  *Herman v. T & S Commodities, Inc.,* 578 F. Supp. 601, 603 (S.D.N.Y. 1983).

9

Furthermore, the term "ex-pit" transfer does not necessarily refer to a transfer made at a particular price. Rather, "ex-pit" transfers are generally "office and transfer trades [that] involve a transfer of futures contracts between two accounts of the same customer." 23A JERRY W. MARKHAM & THOMAS LEE HAZEN, BROKER-DEALER OPERATIONS UNDER SECURITIES AND COMMODITIES LAW § 9:17 (West 2015); *see also* JERRY W. MARKHAM, COMMODITIES REGULATION: FRAUD, MANIPULATION & OTHER CLAIMS § 13:4 (West 2015) ("In brief, office and transfer trades involve a transfer of futures contracts between two accounts of the same customer. These transactions are also sometimes referred to as 'ex-pit' trades."). While "purchases and sales of any commodity for future delivery" are generally required to "be executed openly and competitively by open outcry . . . or by other equally open and competitive methods," 17 C.F.R. § 1.38(a), non-competitive office trades are permitted to be conducted "ex-pit," provided they are conducted in accordance with applicable exchange rules. MARKHAM, COMMODITIES REGULATION: FRAUD, MANIPULATION & OTHER CLAIMS § 13:4 ("Regulation 1.38 and Section 4c of the [CEA] . . . allow noncompetitive transfers and office trades, provided they are conducted in accordance with exchange rules.").

**B.    Futures Trading and Transfer Price**

A futures contract is an agreement traded on a commodities exchange to buy or sell financial instruments or physical commodities at a later date. (Burke's written direct testimony, the "Burke Report," at 4.) The value of a futures contract is the product of the size of the contract and the current market prices for the commodity. (*Id.*) At the end of each day, the commodities exchange—here, the Chicago Mercantile Exchange (the "CME")—calculates the gains or losses on futures contracts based on that day's price changes for each FCM that has a

clearing account with the exchange.  (*Id.*)  The exchange will then pay the FCM, if its contracts

have gained value, or deduct cash from the FCM's account, if its contracts have lost value.  (*Id.*)

FCMs in turn calculate the gains and losses for each of their customers with futures contracts on

a daily basis.  (*Id.*; *see also* Trustee Ex. WW at 23.)  FCMs credit their customers' accounts for

gains and deduct losses from futures contracts on a daily basis.  (Trustee Ex. WW at 23.)  The

open trade equity (the "OTE") of a futures contract represents the unrealized gain or loss on open

positions.  (*Id.* at 87.)  The losses are reflected on a customer's account as part of the accounts

"daily cash settlement."  (Burke Report at 5.)  All commodities accounts have a net liquidation

value ("NLV").  (*Id.*)  The NLV is composed of two parts: (i) the total equity in the account—

which is the sum of the cash balance on hand and the OTE, above the margin requirements—and

(ii) the net market value of options in the account.  (*Id.*)

> [Negative OTE] represents the loss on futures positions that has
> already been paid to the other side.  In the futures business for
> every buyer there's a seller.  For every winner in a futures position
> there's a loser on the position. It's a zero sum game.  The cash
> changes hands every single day.

(Hr'g Tr. (Burke) at 165:2–8.)  Burke's testimony on negative OTE is corroborated by RCA's

expert, Malzberg: "Those are losses that have been incurred.  Those are the values of the open

trade equities . . . That is money that has been taken away."  (Hr'g Tr. at 133:12–134:1.)

### C.    Claim for Unauthorized Trading

In the June Opinion, the Court concluded that "whether the positions in RCA's account

were, in fact, 'traded,' and whether RCA's instructions on how to book the transferred positions

were disregarded, are disputed issues of fact."  (June Op. at 3.)  In order to prevail on the Claim,

RCA must show that (i) MFGI placed a trade in its account; (ii) the trade was unauthorized; and

(iii) MFGI knew or was reckless to the fact that the trade was unauthorized.  (*Id.* at 11); *see also*

11

*Peltz v. SHB Commodities,* 115 F.3d 1082, 1086–87 (2d Cir. 1997), *Haltmier v. CFTC*, 554 F.2d 556, 560 (2d Cir. 1977). Finally, even if RCA proves all the elements of its claim, the CEA limits recovery for violations to the actual damage suffered. 7 U.S.C. § 25(a).

"Once an FCM opens an account for a customer, the CEA imposes duties that relate to the control the FCM exercises over its customers' money and property as well as its superior access to material information." *Lee v. Lind-Waldock & Co.,* CFTC No. 99-R018, 2000 CFTC Lexis 153, *11 (CFTC June 29, 2000). Section 166.2 of the Code of Federal Regulations ("CFTC Regulation 166.2") and section 4d(a)(2) of the CEA make it a violation for an FCM to transact business with its customers money without specific authorization. 17 C.F.R. § 166.2, 7 U.S.C. § 6d(a)(2). CFTC Regulation 166.2 specifies the information that the customer must provide—the "precise commodity to be purchased or sold" and the "exact amount" of that commodity to be purchased or sold. Here, RCA argues that "MFGI approved the transfer of RCA's futures account *exactly* as it existed" at MSSB. (RCA Mem. of Law at 13 (emphasis added).) Specifically, RCA states that when Teel signed the Transfer Authorization, Teel expected MFGI to maintain the same cash balance and negative OTE that RCA's account had while at MSSB. (Teel's written direct testimony, the "Teel Decl." ¶ 16.) According to RCA, by using most recent settlement prices, MFGI caused RCA to realize losses in its account, and that in doing so, MFGI engaged in unauthorized trading. (*See generally* Opp.) The Court finds and concludes that the ex-pit transfer was not a trade and, in any event, RCA suffered no losses.

### 1.    No Trade Was Made

Neither CFTC Regulation 166.2 nor section 4d(a)(2) of the CEA contemplate an ex-pit transfer as a "transaction" within the meaning of the law. The transfer from MSSB to MFGI did not affect the NLV of RCA's account. The CME defines a trade as "any purchase or sale of any

commodity futures or options contract made *on the Exchange*." (*Definitions,* CME Rulebook, ch. iii at 10) (emphasis added).) However, in a standard ex-pit transfer, such as the one that took place with RCA's account, no positions are created, no positions are liquidated, and no purchase or sale is made on an exchange. (*See* Burke Report at 10 ("It is my opinion that the Transfer of RCA's account was an ex-pit transfer done in accordance with the instructions provided by RCA. None of RCA's open futures positions were traded or liquidated during the transfer."); *see also* Malzberg's written direct testimony, the "Malzberg Report," at 6 ("[T]ransfer trades are not trades in any real or accurate sense because they neither create new positions nor liquidate existing positions but merely shift the situs of a trader's positions from one location to another.").) Further, the CME Register shows the transaction that occurred for MFGI's account was a transfer rather than a trade. (*See* Burke Report at 13 ("The CME clearing register for November 3, 2010 clearly records that RCA's open futures positions were transferred, as opposed to traded, at the CME from Citi's books to MFGI's books."); *see also* Trustee Ex. UU (Nov. 3, 2010 CME register).)

RCA's agent, Newcomb, testified that no positions were closed or liquidated. (*See* Newcomb Dep. Tr. 142:24–143:14.) Newcomb testified that Teel never told Newcomb that any of Teel's positions were closed or liquidated. (*Id.* at 142:24.) Newcomb also testified that within his own understanding he did not believe any of RCA's positions were liquidated or closed. (*Id.* at 143:1.) Similarly, O'Rourke testified that to the best of his knowledge no trades happened as a result of the transfer. (O'Rourke Dep. Tr. 132:25–133:6; 133:21–134:4.)

Accordingly, the Transfer was a standard ex-pit transfer and therefore was not a trade within the meaning of CFTC Regulation 166.2 or section 4d(a)(2) of the CEA.

2.     *If There Was a Trade, It Was Not Unauthorized*

Second, even if RCA had proved that the Transfer was a trade within the meaning of the

law, it still had to prove that MFGI did not have the requisite specific authorization to carry out

the Transfer in the manner it did. Teel, on behalf of RCA, signed the Transfer Authorization,

providing authority for MFGI to accept the transfer subject to "its approval and compliance with

applicable law and regulation." (Joint Pretrial Order at 9; Trustee Ex. C (Transfer

Authorization).)

It is also important to recognize that the applicable exchange rule permits transfers to be

recorded applying either of two methodologies—using original trade prices or most recent

settlement prices. MFGI recorded the Transfer using most recent settlement prices. Absent

customer instructions to apply one of these two methodologies, an FCM is free to record a

transfer applying either methodology. Here, MFGI chose to record the Transfer at the most

recent settlement prices, as permitted by the applicable exchange rule. CME Rule 853, which

governs the transfers of trades and customer accounts, permits either of two prices to be used in

completing a transfer of the kind at issue. CME Rule 853.A.5 provides in relevant part:

> [T]ransactions in all physically delivered futures contracts except
> for FX futures contracts must be recorded and carried on the books
> of the receiving firm at the original trade dates; all other
> transactions may be recorded and carried at either the original trade
> date or the transfer date. *Futures transactions may be transferred
> using either the original trade price or the most recent settlement
> price* . . . .

CME Rule 853.A.5 (2010 Revision) (emphasis added); *see also* Hr'g Tr. (Malzberg) at 122:16–

20 ("Q: Now the CME Rule 853 as it existed in 2010 and indeed as it exists today permits the

transfer of open futures positions as either original trade price or most recent settlement price,

right? A: Yes. It allows either.").)

The Transfer Authorization is a standard industry form that does not specify which method must be used to transfer the positions.  (Hr'g Tr. (Burke) at 167:25–168:3 ("Q: And this is a standard form that MF Global would use to transfer any account from one FCM to another, so long as there was no change in ownership, right?  A: This is the standard transfer authorization that MF Global or any of the other number of FCMs I've worked with in my career have used.  Correct."); *Id.* at 184:2–184:5 ("Q: And did [the Transfer Authorization] authorize MFGI to instruct Citi to transfer RCA's open futures positions at their most recent settlement price?  A: Absolutely."); *see also* Hr'g Tr. (Malzberg) at 123:10–14 (Q: Sir, there are no express written construct [*sic*]–instructions contained in the transfer authorization letter that calls for the transfer of future positions at original trade prices, right?  A: Written no.").)

The Court held in the June Opinion that "[a]n FCM cannot be faulted for applying a permissible method for recording office transfers on its books and records absent instructions from the customer to the contrary."  (June Op. at 20.)  No evidence has been presented that Teel, or anyone else at RCA, provided specific alternate instructions indicating which pricing method to use.  In reference to the Transfer Authorization, O'Rourke testified that it was the only instruction he had received with respect to the Transfer.  (O'Rourke Dep. Tr. 130:10–15.) Similarly, Newcomb testified that the only instruction he provided on behalf of Teel and RCA, to MFGI, regarding the Transfer, was the Transfer Authorization.  (Newcomb Dep. Tr. 143:21–25.) Teel himself admits that he provided no other specific instructions to MFGI:

> Q: And the transfer authorization is the only instruction you provided in writing to MF Global about your transfer, right?
> A: I believe that's correct
> Q: . . . You provided no instruction in writing or otherwise to anyone at MF Global regarding this transfer apart from that form, right?
> A: If you include the account status report as part of the form that's correct. . . .

> Q: And you never told anyone at MF Global that the futures positions had to be transferred using original trade prices, right?
> A: No, I don't believe I used that language that they had to be.
> Q: In any of the conversations you had from anyone at MF Global, the one thing you never said was the transfer had to occur using original trade prices?
> A: I never said the transfer had to occur using original trade prices.

(Hr'g Tr. (Teel) 69:9–70:5; 71:4–8.)

The Court finds that RCA did not direct or instruct MFGI to book the Transfer at original trade prices.  Contrary to Teel's contention, the Court specifically finds that by attaching the MSSB November 2, 2010 account statement to the Transfer Authorization—showing the cash amount of approximately $26 million and a corresponding OTE liability of approximately $23 million—RCA did not direct or instruct MFGI to book the Transfer at original trade prices.  Nor did Teel's alleged statements to Brown that "cash is king," direct or instruct that the Transfer be booked at original trade prices, as they appeared on the MSSB account statement.  (*See* Hr'g Tr. (Teel) 72:14–73:11; *see also* Teel Decl. ¶ 16.)  Since the negative OTE of $23 million represented money that had already been lost and would be deducted from the "Cash," MFGI cannot be faulted for failing to deduce RCA's unspoken intention.

Similarly, RCA relies on an email sent on November 2, 2010, one day before the Transfer, from MFGI employee Marty Malone to Alaris employees Newcomb and Brown.  In the email, Malone states among other things "[h]is [RCA's/Teel's] positions as they stand at Citi are totally acceptable however that's a mute [*sic*] point now."  (RCA Ex. 19.)  RCA contends that because Malone stated that the positions as they existed were "acceptable," Teel expected that after the Transfer, RCA's account would be identical to what it was at Citi, *i.e.,* with the additional $23 million being reflected in both the cash balance and the corresponding increase in negative OTE.  (*See generally* Teel Decl.)

16

Neither Teel's implicit and unspoken expectation that RCA's existing positions were "acceptable," nor his statement that "cash is king," rise to the level of specificity required to direct or instruct MFGI on how to record the Transfer.  Nor did Teel's expectation and statement create an obligation for MFGI, such that any deviation would be tantamount to the mismanagement of client funds as contemplated in section 4d(a)(2) of the CEA.  As such, no specific instruction to transfer the account using original trade prices existed.  Further, absent such specific instruction, MFGI was authorized to transfer the account at either the original trade prices or the most recent settlement prices.

### 3.    *MFGI Did Not Act Knowingly*

An entity violates the CEA's prohibition on unauthorized trading when it acts "deliberately, knowing that [its] acts were unauthorized and contrary to instructions." *Haltimier v. CFTC,* 554 F.2d 556, 562 (2d Cir. 1977); *see also Drexel Burnham Lambert v. CFTC,* 850 F.2d 742, 748 (D.C. Cir. 1988) (Mere negligence or mistake is not sufficient to satisfy the scienter requirement for unauthorized trading; at a minimum, recklessness must be proven.). Here, the weight of the evidence is clear that the MFGI employees who were involved in the Transfer believed their actions to be authorized.  O'Rourke testified that he believed everything he did with respect to the Transfer to be authorized by the Transfer Authorization.  The Court credits the veracity of O'Rourke's testimony.

The case that RCA cites in support of its position that MFGI acted knowingly is distinguishable. *CFTC v. Brown*, No. 00 C 7344, 2002 U.S. Dist. LEXIS 16971 (N.D. Ill. Mar. 27, 2002).  The facts of *Brown* distinguish it from the instant case.  In *Brown*, one of the defendants was a futures trader with an FCM.  As part of a fraud, he would place a trade in one of a few select favored accounts—either friends or family of his or one of his co-defendants.  If

by the end of the day, the trade appeared profitable, he would leave it in the favored account; however, if the trade was unprofitable, he would execute a transfer and move the unprofitable trade into another customer's account.  *Brown,* 2002 U.S. Dist. Lexis 16971, at *8–10.  The Court held that the defendant lacked specific authorization to make the trades that the defendant recorded in the customers' accounts.  *Id.*  In order to find a violation of CFTC Regulation 166.2 and section 4d(a)(2) of the CEA, the *Brown* court required that the defendant have the requisite scienter.  In that case scienter was found by the defendant committing actual fraud by knowingly moving unprofitable transactions into the accounts of customers he did not favor.  In the instant case, there is no such element of bad faith or wrongdoing.

If MFGI did engage in a trade, as contemplated by CFTC Regulation 166.2 or section 4d(a)(2) of the CEA, there is no evidence that using the settlement price rather than original trade price during the Transfer was done in bad faith, or in an attempt to defraud RCA.  *Cf. Drexel Burnham Lambert Inc v. CFTC*, 850 F.2d 742, 752–53 (D.C. Cir. 1988) (noting that section 4d(a)(2) does not reach every failure by a broker to act in accordance with a client's orders absent an element of scienter.  The court further notes that negligent mishandling of client funds, which is immune from liability under section 4b due to the absence of scienter, would automatically generate liability under section 4d(2), and as such, "Congress cannot have intended this irrational result."); *see also Hill v. Bache Halsey Stuart Shields Inc.,* 790 F.2d 817, 822 (10th Cir. 1986).

MFGI did not act with the necessary scienter required for a violation of the CEA.  MFGI neither acted maliciously, nor in bad faith. Rather, MFGI believed it was authorized to make the Transfer at settlement prices.

18

4.     *RCA Ratified the Transfer*

Ratification of a trade is a complete defense for unauthorized trading.  *Herman v. T.S. Commodities, Inc.,* 592 F. Supp. 1406, 1417–18 (S.D.N.Y. 1984).  Additionally, when a trade is ratified courts have found that the customer "owned" the trades.  *Richardson Greenshields Sec., Inc. v. Lau,* 819 F. Supp. 1246, 1259 (S.D.N.Y. 1993) (stating that "the trades in question were ratified by defendants so that defendants owned the trades").

O'Rourke's proposal to Newcomb on November 5, 2010, after Teel complained about the method used to book the Transfer, offering to "bust out the settlement prices" and rebook the Transfer at original trade prices, constituted an offer to undo in effect the original transfer and redo it at original trade price (*i.e.,* including the $23 million in cash and corresponding $23 million in OTE).  (Newcomb Dep. Tr. 146:11–19 (indicating that Newcomb believed the proposal would put the price back to the way Teel wanted).)  Even though the Transfer would have been rebooked at original trade prices instead of settlement prices, this change would have had no impact on the account's risk, margin, or overall liquidation value; nor would it have changed RCA's risk call of $1.93 million.  (Trustee Ex. S.)

Additionally, even with the "addition" of the $23 million in cash to RCA's account, the buying power and value of the account would remain the same.  (*See* O'Rourke Dep. Tr. 141:11–15 ("Q: So, in other words, his negative 23 million in open equity would show up in the account and he would have a corresponding entry in his credit balance of 23, so his value would be the same? A: Correct"); Newcomb Dep. Tr. 149:10–19 ("Q: . . . do you have any understanding of what Mr. Early meant when he said that "the below entries have no bearing on the account's risk margin or overall liq[uidation] value"?  A: That would be as far as transferred everything over at selling prices and then changing them to the original trade price, that there would be no

difference in his risk in his account, margins in his account."); *see also* Burke Report at 17 ("The additional $23 million in the cash balance would not have been available for RCA to use in its trading because RCA's ability to trade was based on the total equity in the account that represented margin excess—not just cash balance."); Hr'g Tr. (Malzberg) at 143:24–144:16)). In addition to the email Newcomb sent Teel, Newcomb testified that he discussed "several times" that doing the transfer at settlement versus original trade price would have no effect on the account's overall value, margin requirements, and purchasing power.  (Newcomb Dep. Tr. 151:17–152:12.)

Teel declined MFGI's proposal both verbally and by email.  (Newcomb Dep. Tr. 151:9–16; Trustee Ex. T.)  After Teel declined the offer to rebook the Transfer, MFGI believed Teel was satisfied with the Transfer as it stood.  (O'Rouke Dep. Tr. 144: 3–16.)  By refusing MFGI's proposal and mitigating the alleged damage RCA suffered, Teel ratified the Transfer, on the terms MFGI set out—*i.e.*, using the most recent settlement price instead of the original trade price.

### 5.    *RCA Did Not Suffer Damage*

Lastly, even if RCA proved that MFGI knowingly engaged in unauthorized trading, RCA is only able to recover actual damages.  7 U.S.C. § 25(a); s*ee also Wigod v. Chi. Mercantile Exch.,* 981 F.2d 1510, 1521 (7th Cir. 1992) ("To resolve [plaintiff's] commodity rule violations claims, we do not need to determine if the rules were violated or if [plaintiff] can recover under their authority because [plaintiff] has suffered no injury related to these claims.").  RCA alleges that MFGI was the proximate cause of its damages. *See Modlin v. Cane,* CFTC No. 97–R083, slip op. at 17 (CFTC Mar. 15, 2000) (stating that proof of proximate cause includes evidence that the wrongful conduct was a substantial factor in bringing about the complaint's loss).

Originally, RCA alleged that MFGI was responsible for $23,030,696.62 of losses incurred before the Transfer (the amount of the OTE on November 2, 2010), and the $327,645.50 for commission fees charged by MSSB.  (Trustee Mem. of Law at 25.)  Subsequently, RCA reduced its claimed loss, alleging that it lost $11.6 million due to MFGI creating a "storm from which RCA would never recover."  (RCA Mem. of Law at 17.)  Teel alleges that due to the decrease in cash, he was unable to execute a Delta hedge strategy.  (Teel Decl. ¶ 30.)  However, RCA never informed anyone at MFGI of the hedge trades he was planning:

> One such Hedge Trade I planned on executing was the purchase of 5,000 December 1.44 put options for a cash amount of approximately $29,600,000 and without buying back any calls. Another Hedge Trade was the purchase of 3,000 March 141 put options for a cash amount of approximately $20,000,000 and buying to close 250 of the Mar 1.420 call options for a cash amount of $1,200,000 totally $21,200,000.

(Teel Decl. ¶ 46.)

> Q: . . . So you never told anyone about these two particular ones that in paragraph 46 you say you planned on executing?
> A: No. We talked about buying puts in general at the money, in the money, slightly out of the money, but I don't recall discussing these two in particular.

(Hr'g Tr. (Teel) at 89: 10–15.)  Since RCA and Teel never informed MFGI about its plans to place hedge trades, MFGI cannot be found to have "knowingly, or recklessly" prevented or interfered with RCA's ability to place these trades.

Further, Teel asserts the RCA's cash balance was "working capital" that would have allowed him funds to buy options to hedge against changes in the market's direction and volatility.  (Teel Decl. ¶ 38–40.)  However, the Court expressly finds that the buying power of a customer's account is the amount of the customer's total equity that is in excess of the FCM's

margin requirements.  (Burke Report at 6.)  Regardless of RCA's desire to place these trades,

RCA still would have been unable to place the trades it contemplated:

> Q: And looking at that [RCA's account statement] can you tell us
> whether Mr. Teel would have had enough cash in his account to
> purchase $29.6 million in options?
> A: No question unequivocally no.
> Q: Okay. And the second hedge trade that Mr. Teel identified, I
> believe he testified that it would have required $21.2 million in
> cash. Can you tell us looking at the slide whether Mr. Teel would
> have had enough cash to make that purchase if his accounts had
> been transferred at most – at original trade price?
> A: Counselor, ignoring margin requirements the total equity in the
> account was $9,491,000. That is what he had available to purchase.
> Had the account been completely liquidated and he realized his
> $19 million, he still didn't have enough money to make that trade.

(Hr'g Tr. (Burke) at 181:13–182:2.)  In order to make trades in excess of the total equity of its

account RCA, would need someone to loan it the difference between the cost of the trade and the

amount of equity:

> Q: He's got total equity of 9 million, but he's got a bunch of
> options. If he wants to buy 30 million of options someone's got to
> loan him 21 million, right?
> A: Correct.
> Q: So if the FCM decides to loan him 21 million then he would
> have enough money, right?
> A: If they wanted to loan him money, yes.
> Q: If they didn't want to loan him the money, then he wouldn't
> have enough, right?
> A: Correct.
> Q: Right. And here you know Morgan Stanley wasn't loaning any
> money, right?"
> A: To the best of my knowledge, correct.
> Q: And the same thing with MF Global. They weren't loaning any
> money, were they, sir?
> A: I don't believe so.

(Hr'g Tr. (Malzberg) 139:5–20.)

It is clear from the weight of the evidence that RCA's losses were neither directly caused

nor proximately caused by any actions of MFGI.  In fact, after the Transfer of the account

occurred, RCA maintained the same trading strategy that it had before the Transfer.  (Newcomb

Dep. Tr. 158:23–159:12 ("Q: And did you have an understanding of Mr. Teel's trading strategy

after the transfer? A: Yep. Q: Was it the same trading strategy?  A: Yep. . . Q: Are you aware of

any way that the transfer affected Mr. Teel's ability to execute his trading strategy?  A: No, It

didn't affect his strategy.").)  As such, it was not MFGI's actions that contributed to RCA's

losses, but RCA's risky trading strategy.  (Hr'g Tr. (Burke) 182:14–18 ("He was extremely long

the market as a speculative trader in a very, very risky position that was massive, in fact, one of

the largest speculative positions I've seen in my career in this particular market."); *see also*

Newcomb Dep. Tr. 160: 15–17 ("Q: And what was your understanding of the cause for the

decrease in the value of the account?  A: Trading, bad trades.").)

Any losses incurred in RCA's account were not attributable to any action of MFGI.  RCA

suffered no actual damages on account of MFGI transferring the account at most recent

settlement prices rather than original trade prices.

### D.    Claim for Fraudulent Misrepresentation of a Material Fact

RCA also alleges that MFGI violated section 4b(a)(1)(A) of the CEA, 7 U.S.C. §

6b(a)(1)(A).  In the June Opinion, the Court held that RCA "failed to adequately allege a

violation of section 4b of the CEA based on fraud for failing to disclose that it intended to record

positions at settlement prices *unless* RCA established that it specifically instructed that the

positions be recorded at the original trade prices, that such a methodology was permissible in the

circumstances, and that MFGI disregarded the instructions."  (June Op. at 19 (emphasis in

original).)

As explained above, the Court finds that RCA did not specifically instruct MFGI about the method that should be applied in booking the Transfer. Therefore, MFGI acted properly in booking the Transfer at the most recent settlement prices as it was permitted to by law.

## IV.    CONCLUSION

For all of the foregoing reasons and based on the findings of law and fact made herein, the Objection is **SUSTAINED** and the Claim is **DISALLOWED** and **EXPUNGED** pursuant to section 502(b) of the Bankruptcy Code, as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, and Bankruptcy Rule 3007(d).

**IT IS SO ORDERED.**

Dated:  January 15, 2016
      New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge